# EXHIBIT C-7

Fulton County Superior Court
***EFILED***TV
Date: 10/1/2018 5:06 PM
Cathelene Robinson, Clerk



## IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303

### SUMMONS

| | |
|---|---|
| Trade Winds Transport LLC, and _____ ) | |
| ) | |
| Eric Grace, individually, and ) | |
|   doing business as West Coast Logistics LL ) | 2018CV311198 |
| **Plaintiffs,** ) | |
| ) Case No. No.:_____ | |
| vs. ) | |
| ) | |
| Rush Enterprises, Inc., ___) | |
| ) **ADDENDUM ADDED TO INCLUDE ADDITIONAL** | |
| ) **DEFENDANTS** | |
| Rush Truck Centers of Georgia, Inc., ) | |
| **Defendants** ) | |

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at https://efilega.tylerhost.net/ofsweb and serve upon plaintiff's attorney, whose name and address is:

> Robert Arkin
> Arkin.Law Firm
> 50 Hurt Plaza SE, Suite 1428
> Atlanta, GA 30303-2946
> Phone: (404) 220-8500
> Fax:    (855) 804-9334
> Email:  robert@arkin.law

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This_____ 10/1/2018 _____day of_____,20_____

> Honorable Cathelene "Tina" Robinson
> Clerk of Superior Court
>
> By_____*Tracey Vaughn*_____
> ~~Deputy Clerk~~

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you   _____,20_____
> Deputy Sheriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

## ADDENDUM TO SUMMONS

### CASE NO. _____

## ADDITIONAL DEFENDANTS

**RUSH TRUCK CENTERS OF FLORIDA, INC.,**

**INTERSTATE CREATIONS LLC,**

**NAVISTAR, INC.,**

**TROY CLARKE, individually,**

**DENNIS KING, individually,**

**WILL NEWMAN, individually,**

**WILLIAM MAURICE "RUSTY" RUSH, individually,**

**DOUGLAS SHIELDS, individually,**

**CHRISTOPHER VENTI, individually,**

**JOSHUA VENTI, individually,**

**JOHN DOE, individually, and**

**ABC ENTITY.**

Fulton County Superior Court
***EFILED***TV
Date: 10/1/2018 5:06 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **TRADE WINDS TRANSPORT LLC**, and | ) | |
| **ERIC GRACE, individually,** | ) | |
| **and doing business as** | ) | |
| **WEST COAST LOGISTICS LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | Civil Action No.: _____ 2018CV311198 |
| | ) | |
| **RUSH ENTERPRISES, INC.,** | ) | |
| **RUSH TRUCK CENTERS OF GEORGIA, INC.,** | ) | |
| **RUSH TRUCK CENTERS OF FLORIDA, INC.,** | ) | |
| **INTERSTATE CREATIONS LLC,** | ) | |
| **NAVISTAR, INC.,** | ) | **JURY TRIAL DEMANDED** |
| **TROY CLARKE, individually,** | ) | |
| **DENNIS KING, individually,** | ) | |
| **WILL NEWMAN, individually,** | ) | |
| **WILLIAM MAURICE "RUSTY" RUSH,** | ) | |
| **individually,** | ) | |
| **DOUGLAS SHIELDS, individually,** | ) | |
| **CHRISTOPHER VENTI, individually,** | ) | |
| **JOSHUA VENTI, individually,** | ) | |
| **JOHN DOE, individually, and** | ) | |
| **ABC ENTITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## VERIFIED COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES

COME NOW, Trade Winds Transport LLC and Eric Grace, Plaintiffs in the above-styled matter, and file this Verified Complaint against Rush Enterprises, Inc., Rush Truck Centers of Georgia, Inc., Rush Truck Centers of Florida, Inc., Navistar, Inc., Interstate Creations LLC, Troy Clark, individually, Dennis King, individually, William Maurice "Rusty" Rush, individually, Douglas Shields, individually, Christopher Venti, individually, Joshua Venti, individually, John Doe, individually, and ABC Entity, and respectfully show the Court as follows:

## PARTIES

1.

Plaintiff Trade Winds Transport LLC (hereinafter "Trade Winds" and/or "Plaintiff") is a limited liability company, duly organized and validly existing pursuant to the laws of the State of California, with its principal place of business at 505 El Redondo Avenue #A, Redondo Beach, CA 90277. Trade Winds is a startup that entered the long-haul trucking business, which is directly or indirectly owned by Plaintiff Eric Grace.

2.

Plaintiff Eric Grace (hereinafter "Grace" and/or "Plaintiff") is a resident of the State of California and the member-manager of Trade Winds, with his principal place of business at 505 El Redondo Avenue #A, Redondo Beach, CA 90277. For purposes of the Consulting Agreement with Defendant Interstate Consulting, LLC, described *infra*, Grace also operated as a sole proprietorship doing business as West Coast Logistics LLC.

3.

Defendant Rush Enterprises, Inc. (hereinafter "Rush Enterprises" and/or "Defendant") is a corporation duly organized and validly existing pursuant to the laws of the State of Texas, has its principal office address at 555 IH 35 South, Suite 500, New Braunfels, TX 78130 and may be served with process by and through its registered agent, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service, 211 E. 7th St., Suite 620, Austin, TX 78701. Rush Enterprises is a Fortune 1000 company, the common stock of which is traded on NASDAQ under the symbol, RUSHA. Rush Enterprises is a holding company that owns and operates the largest network of commercial vehicle dealerships in the United States, representing truck and bus manufacturers including Peterbilt, International, Hino, Isuzu, Kalmar, Ford, Mitsubishi Fuso, Blue Bird, Elkhart,

Collins and IC Bus.

4.

Defendant Rush Truck Centers of Georgia, Inc. (hereinafter "Rush-Atlanta" and/or "Defendant") is a corporation duly organized and validly existing pursuant to the laws of the State of Delaware, is qualified to transact business as a foreign profit corporation in Georgia, has its principal office address at 555 IH 35 South, Suite 500, New Braunfels, TX 78130 and may be served with process by and through its registered agent, Corporation Service Company, 40 Technology Parkway South #300, Norcross, GA 30092. Rush-Atlanta is a commercial vehicle dealership that, directly or indirectly is a subsidiary of Rush Enterprises.

5.

Defendant Rush Truck Centers of Florida, Inc. (hereinafter "Rush-Jacksonville" and/or "Defendant") is a corporation duly organized and validly existing pursuant to the laws of the State of Delaware, is qualified to transact business as a foreign profit corporation in Georgia, has its principal office address at 555 IH 35 South, Suite 500, New Braunfels, TX 78130 and may be served with process by and through its registered agent, Corporation Service Company, 40 Technology Parkway South #300, Norcross, GA 30092. Rush-Jacksonville is a commercial vehicle dealership that, directly or indirectly is a subsidiary of Rush Enterprises.

6.

Defendant Interstate Creations LLC (hereinafter "Interstate," and/or "Defendant") is a limited liability company duly organized and validly existing pursuant to the laws of the State of Florida and has its principal office address at 4444 SW 115th St, Ocala, Marion County, Florida 34476. Interstate may be served with process by and through its registered agent, Joshua Venti, 4444 SW 115th Street, Ocala, Marion County, Florida 34476-4410. Interstate Creations is a

3

commercial truck consultancy that is directly or indirectly owned and managed by Defendants Christopher Venti and Joshua Venti.

7.

Defendant Navistar, Inc. (hereinafter "Navistar and/or "Defendant") is a corporation duly organized and validly existing pursuant to the laws of the State of Delaware, has its principal office address at 2701 Navistar Drive, Lisle, Illinois 60532 and may be served with process by and through its registered agent, C T Corporation Systems, 208 South Lasalle St, Suite 814, Chicago, IL 60604. Navistar is a Fortune 500 company, the common stock of which is tradeD on the New York Stock Exchange under the symbol, NAV. Navistar is a holding company that owns the manufacturer of International brand commercial trucks, IC Bus school and commercial buses, Workhorse brand chassis for motor homes and step vans, and is a private label designer and manufacturer of diesel engines for the pickup truck, van, and SUV markets. The company is also a provider of truck and diesel engine parts and service.

8.

Defendant Troy Clarke (hereinafter "Clarke" and/or "Defendant") is an individual and a resident of the State of Illinois. He may be personally served with process at his principal office located at 2701 Navistar Drive, Lisle, Illinois 60532. Clarke is the Chairman of the Board, President and Chief Executive Officer of Navistar International Corporation and, on information and belief, the Chairman of the Board, President and Chief Executive Officer of Navistar, Inc.

9.

Defendant Dennis King (hereinafter "King" and/or "Defendant") is an individual and a resident of the State of Florida. King may be personally served with process at his principal office located at 5175 W. Beaver Street, Jacksonville, Duval County, Florida 32254. King is the New

4

and Used Truck Sales Manager at Rush-Jacksonville.

10.

Defendant Will Newman (hereinafter "Newman" and/or Defendant") is an individual and a resident of the State of Georgia. Newman may be personally served with process at his principal office located at Rush-Atlanta, 2560 Moreland Avenue, Atlanta, GA 30315. Newman is the District Used Truck Sales Manager of Rush-Atlanta.

11.

Defendant William Maurice "Rusty" Rush (hereinafter "Rusty Rush" and/or "Defendant") is an individual and a resident of the State of Texas. He may be personally served with process at his principal office located at 555 IH 35 South, Suite 500, New Braunfels, TX 78130. Rusty Rush is the Chairman of the Board, Chief Executive Officer and President of Rush Enterprises.

12.

Defendant Douglas Shields (hereinafter "Shields" and/or Defendant") is an individual and a resident of the State of Texas. Shields may be personally served with process at his principal office located at Rush Enterprises, Inc., 555 IH-35 South, Suite 500, New Braunfels, Texas 78130. Shields is the National Director of Used Truck Operations for Rush Enterprises.

13.

Defendant Christopher Venti ("Chris Venti") is an individual who resides in Marion County, Florida. Chris Venti may be personally served with process at his residence located at 11960 SW 45th Street, Ocala, Marion County, Florida 34481-4204. Chris Venti and Josh Venti are hereinafter referred to collectively as the "Ventis." Chris Venti is the father of Joshua Venti and directly or indirectly an owner and manager of Interstate Creations.

14.

Defendant Joshua Venti ("Josh Venti") is an individual and a resident of the State of Florida. Josh Venti may be personally served with process at his residence located at 4444 SW 115th Street, Ocala, Marion County, Florida 34476-4410. Josh Venti is the son of Christopher Venti and directly or indirectly an owner and manager of Interstate Creations.

15.

Upon information and belief, Defendant John Doe is an individual whose name and residence address are unknown but who may have been a co-conspirator with the other Defendants.

16.

Upon information and belief, Defendant ABC Entity is a corporation, limited liability company or other entity, the name and principal place of business of which are unknown, but which may have been a co-conspirator with the other defendants.

**JURISDICTION AND VENUE**

17.

This Court has subject matter jurisdiction over this action pursuant to Georgia Constitution Article 6, Section 1, Paragraph 1 and O.C.G.A. § 15-7-4.

18.

Trade Winds willfully avails itself to the jurisdiction and venue of this Court because (i) Trade Winds signed contracts, at issue in this case, that were performed in Fulton County, Georgia by Plaintiffs and Rush-Atlanta and Rush-Jacksonville, (ii) a retail sales order, at issue in this case, contains clauses providing that (a) the rights and obligations of the parties shall be governed by, and construed and interpreted in accordance with the laws of the State of Georgia without regard to conflict of law principles, and (b) any claim or dispute will be adjudicated in Fulton County,

6

Georgia; and (iii) tortious acts, omissions, and injuries arising from the above-referenced transactions (the "Transactions") occurred in Fulton County, Georgia.

19.

Grace willfully avails himself to the jurisdiction and venue of this Court because the actions giving rise to Plaintiffs' action took place and are connected to Fulton County, Georgia.

20.

Rush Enterprises transacts business in the State of Georgia through its agents (i.e., Rush-Atlanta and Rush-Jacksonville), which are subsidiaries of Defendant, and the Transactions with Plaintiffs were completed in the State of Georgia pursuant to O.C.G.A. § 9-10-91(1). Rush Enterprises regularly does and solicits business, engages in other persistent conduct, and derives substantial revenue from goods in the State pursuant to O.C.G.A. § 9-10-91(3).

21.

Rush-Atlanta and Rush-Jacksonville, which are subsidiaries of Rush Enterprises (hereinafter referred to collectively as the "Rush Entities"), are qualified as foreign corporations to do business in the State of Georgia. Certain of the contracts, at issue in this case, were signed and performed in Fulton County, Georgia by Plaintiffs and one or more of the Rush Entities, including a retail sales order containing clauses providing that (a) the rights and obligations of the parties shall be governed by, and construed and interpreted in accordance with the laws of the State of Georgia without regard to conflict of law principles, and (b) any claim or dispute will be adjudicated in Fulton County, Georgia. Tortious acts, omissions, and injuries arising from the Transactions occurred in Fulton County, Georgia, and the Rush Entities regularly do and solicit business, engage in other persistent courses of conduct, and derive substantial revenue from goods sold in the state.

22.

King is employed by Rush-Jacksonville and is a primary participant in the Transactions because he facilitated the Transactions and derived substantial revenue as a result of the Transactions.

23.

Newman is a resident of the State of Georgia whose principal place of business is located at 2560 Moreland Avenue SE, Atlanta, Fulton County, Georgia 30315

24.

Navistar transacts business in the State of Georgia through its agent dealers (i.e., Rush Enterprises, Rush-Atlanta and Rush-Jacksonville) and the Transactions with Plaintiffs for the purchase of trucks manufactured by Navistar were completed in the State of Georgia pursuant to O.C.G.A. § 9-10-91(1).

25.

Interstate and the Ventis were primary participants in the Transactions because they facilitated the Transactions and derived substantial revenue as a result of the Transactions.

26.

This Court also has personal jurisdiction over this action and all the named Defendants pursuant to the Official Code of Georgia Annotated long arm statute, which provides that "[a] court of this State may exercise personal jurisdiction over any nonresident . . . in the same manner as if he were a resident of the state, if in person or through an agent, he: (1) Transacts any business within this state . . . or (3) Commits a tortious injury in this state caused by an act or omission outside this state if the tortfeasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or

services rendered in this state." O.C.G.A. § 9-10-91(1), (3).

27.

Venue is proper in any county wherein a substantial part of the business was transacted or the tortious act, omission, or injury occurred. O.C.G.A. § 9-10-93. "Where an action is brought against a resident of this state, any nonresident of this state who is involved in the same transaction or occurrence and who is suable under the provisions of this article may be joined as a defendant in the county where a resident defendant is suable." *Id.*

28.

Venue is proper in this Court pursuant to Georgia Constitution Article 6, Section 2, Paragraph 6 because Rush-Atlanta has a principal place of business at 2560 Moreland Avenue SE, Atlanta, Fulton County, Georgia 30315 and certain contracts at issue in this case were performed at the premises of the aforementioned business.

29.

Further, since venue is proper against one of the Defendants in Fulton County, the other Defendants may be joined in the suit in Fulton County.

## PRELIMINARY STATEMENT

30.

Plaintiffs are victims of Defendants' illicit scheme to pass off, as "Certified Pre-Owned," "Diamond," "remanufactured," or "pre-certified to manufacturer's specs," four used, un-reconditioned, defective 2012 International Prostar® Plus LF 627 Premium 13.0-liter engine diesel rear wheel drive Class 8 commercial tractor trucks manufactured and ostensibly reconditioned by Defendant Navistar and sold through Defendant Rush Enterprises' dealerships in Atlanta, Georgia and Jacksonville Florida. Based upon Defendants' representations that the

9

vehicles were reconditioned and "certified Pre-Owned" and warranted under the Rush Certified Pre-Owned Program ("Rush Certified Pre-Owned Program") and exclusive RushCare™ Protection Plan described on the Rush Entities' websites, Plaintiffs purchased the vehicles for approximately $130,000.  On information and belief, the Rush Certified Pre-Owned Program and exclusive RushCare™ Protection Plan, which Defendants represented as "the best in the industry," is a hoax, existing in name only, which Defendants fabricated to increase profit margins at the expense of trusting customers; however, even if the Rush Certified Pre-Owned Program is not a hoax, the vehicles at issue in this lawsuit (i) did not pass, or even undergo, the "exhaustive 143-point inspection and pre-certification road test" that Defendants represented as central to the Rush Certified Pre-Owned Program, and (ii) were not covered under the exclusive RushCare™ Protection Plan. In fact, all four vehicles broke down within weeks or months of purchase and are no longer in operation. In addition, the vehicles' Navistar MaxxForce engines have serious defects and are the subject of several lawsuits.[1] As a result of Defendants' conspiracy to pawn off these vehicles as reconditioned, precertified and warrantied under the exclusive RushCare™ Protection Plan, Plaintiffs have suffered damages and seek redress.

31.

To prevent Defendants from attempting to conceal this scheme by falsifying documentation after they receive notice of this lawsuit, Plaintiffs seek immediate equitable relief, and have filed, concurrently with this Complaint the following: (i) Motion for *Ex Parte* Temporary Restraining Order and Brief in Support thereof that requests the Court to enjoin Defendants from the spoliation of evidence pertinent to this case pending a hearing on Plaintiffs'

---

[1] In a 2018 Tennessee state court case, Milan Supply Chain Solutions Inc. v. Navistar Inc., the jury awarded the plaintiff trucking company more than $30.8 million in civil damages for fraud and violation of the state's consumer protection act for failing to disclose serious known defects in the engine and its components.

Motion for Ex Parte Temporary Restraining Order and Order Requiring Compliance with Plaintiffs' Notice to Produce; (ii) Motion for Ex Parte Temporary Restraining Order and Order Requiring Compliance with Plaintiffs' Notice to Produce and Brief in Support thereof that requests the Court to enjoin Defendants from the spoliation of evidence pertinent to this case and compel Defendants to comply with the Notice to Produce; and (iii) Motion for Expedited Discovery and Brief in Support thereof that requests the Court to order each Defendant to respond to ten Interrogatories from Plaintiffs and submit to one deposition to enable Plaintiffs to obtain enough information to determine whether to file a Motion for an Interlocutory Injunction before the 30-day term of the Temporary Restraining Order expires of its own accord.

## STATEMENT OF FACTS

**A.   The Ventis, Interstate and Grace**

32.

Grace intended to purchase an established operating company engaged in the trucking business, rather than forming a startup and devoting substantially all of his efforts to establishing a new business.

33.

On or about September 6, 2016, Grace reviewed a listing on BizQuest.com, an online marketplace, regarding a business opportunity in Hawaii. This listing, identified as BizQuest #1277728, advertised for sale, "Trucking company – grossing over 1.5 million."

34.

After reviewing the BizQuest #1277728 listing, Grace sent an email on September 6, 2016, requesting "more information about this business."

35.

On November 6, 2016, Chris Venti emailed a response to Grace's inquiry.

36.

In his email, Chris Venti wrote:

Dear Eric, We currently do not have this business for sale any more [sic] but we have had such a great response we have came [sic] up with another opportunity for you to become a part off [sic]. We can start your own company for you with sales grossing about $900,000.00 and Net Profit about $250,000. All for under $55,000.00 [sic].

You can earn about $5,000 per week to start and you can keep the business for as long as you want or sell the business in a year for about $650,000.00 - $750,000.00 and make a huge profit, Almost [sic] like flipping real estate but much cheaper and greater profits. I have attached a business summary for your review. Please feel free to contact me at 716-783-1081."

37.

On information and belief, Chris Venti's representation in the above-referenced email that he did "not have this business for sale any more [sic]" was a falsehood; that is, a ploy intended to solicit potential customers like Grace on false pretenses for the purpose of exposing them to the business opportunity the Ventis described in their November 6, 2016 email and in the attached business summary.

38.

The business summary is a seven-page document entitled "Dream of Owning Your Own Business and Making a Minimum of $5,000 a week or $260,000 for Under $55,000" that, on information and belief was authored by the Ventis (hereinafter the "Offering Circular"). The Offering Circular is attached hereto and incorporated herein by reference as if fully set forth herein as Plaintiffs' Exhibit 1.

39.

The Offering Circular provided Chris Venti's telephone number for pursuing the business opportunity further.

40.

The Offering Circular is false and misleading, replete with material misrepresentations and omissions to state material facts. Among the material misrepresentations and omissions to state material facts were (i) that the offerors had purchased and sold several trucking companies; (ii) that they had established relationships with insurance companies, shippers, brokers, and other trucking businesses that would benefit the offeree; and (iii) the promise that the offerors would support the offeree by "doing all the work and using [their] relationships to be successful . . . to start this business and start collecting profit from the first day you open."

41.

The Ventis and Interstate knowingly or recklessly made the aforementioned material misrepresentations and omissions to state material facts in the Offering Circular.

42.

On or about November 18, 2016, Chris Venti sent Grace an email with an attached Consulting Agreement. *See* discussion *infra*.

43.

On November 29, 2016, Grace flew from California to Florida to meet the Ventis personally at Interstate's office in Ocala, Florida to discuss the business opportunity described in the Offering Circular.

44.

At this meeting, the Ventis assured Grace that they would make good on the promises they

13

made in the Offering Circular.

45.

Relying on the representations the Ventis made at the November 29, 2016 meeting and in the Offering Circular, Grace abandoned his intention to acquire an established operating company engaged in the trucking business and instead, decided to rely on the Ventis to assist him in launching a new trucking company.

46.

The Ventis described to Grace a "new sales platform" offered by the Rush Entities called the Rush Certified Pre-Owned Program, which they said had just been introduced to the market.

47.

The Ventis directed Grace to the Rush Entities' websites, which describe the "new sales platform" as follows:

> Our Certified Pre-Owned vehicles are among the highest quality, best value, pre-owned trucks available today. Only Peterbilt and International Class 8 trucks that are five model years or newer with fewer than 600,000 miles can earn the Certified-Pre-Owned designation. Each vehicle must pass an exhaustive 143-point inspection and pre-certification road test. And to assure your satisfaction, each vehicle includes a minimum of 100,000 miles of remaining factory warranty or the exclusive RushCare™ Protection Plan.

*See* http://www.rushtruckcenters.com/truck-sales/used-truck-sales   attached   hereto   and incorporated herein by reference as if fully set forth herein as <u>Plaintiffs' Exhibit 2</u>.

48.

The Ventis touted to Grace the virtues of the 143-point inspection and pre-certification road test offered under the Rush Certified Pre-Owned Program (the "Rush Certified Pre-Owned Program"). Among other things, they said the Rush Certified Pre-Owned Program was "the best [they've] seen in the industry" and "the best thing Rush has ever put out."

14

**B.      The Interstate Consulting Agreement**

49.

The proposed Consulting Agreement, which Chris Venti sent to Grace on November 18,

2018, provided that Interstate would provide certain consulting services to Grace. The Consulting

Agreement is attached hereto and incorporated herein by reference as if fully set forth herein as

Plaintiffs' Exhibit 3.

50.

Among the consulting services Interstate promised to provide in the Consulting Agreement

were, without limitation, the following: (i) Secure all trucks and trailers; (ii), register Grace's new

trucking company ("Newco") under the International Registration Plan and International Fuel Tax

Agreement, which are cooperative programs to collect and distribute registration and fuel tax

revenue between member states and Canadian provinces relating to commercial motor vehicles

and truckers; (iii) obtain all federal licenses required to operate Newco; (iv) supply and set up

contracts with shippers; (v) set up U.S. Department of Transportation ("DOT") vehicle

maintenance program; (vi) secure all trucks and trailers; (vii) supply professional drivers; (viii)

complete all driver background checks to assure that drivers have clean Motor Vehicle Reports

and pass all pre-employment drug screening; and (ix) set up contract with a Consortium/Third-

Party Administrator to manage Newco's DOT drug and alcohol testing program and help keep

Newco compliant with the DOT/Federal Motor Carrier Safety Administration Drug and Alcohol

Testing rules and regulations.

51.

Grace, Chris Venti and Josh Venti signed the Consulting Agreement on November 29,

2016 at their face-to-face meeting at Interstate's office in Ocala, Florida.

52.

Interstate breached the Consulting Agreement by failing to use reasonable efforts to fulfill its obligations under the Consulting Agreement.

53.

For example, a U.S. Department of Transportation audit of Newco exposed Interstate's gross negligence with the discovery that Interstate hired drivers for Newco without performing pre-employment drug tests and driving tests.

**C.   The Ventis and King**

54.

On information and belief, King and the Ventis were known to each other and had prior dealings pertaining to the purchase and sale of trucks and other matters before the Ventis introduced Grace to King.

55.

Between the execution of the Consulting Agreement on November 29, 2016 and December 20, 2016, the Ventis spoke by telephone with Defendant King on one or more occasions regarding Grace's interest in purchasing tractor trucks.

56.

On December 20, 2016, King sent an email to the Ventis, which, in relevant part, reads as follows:

> The trucks we spoke about are readily available. They are 2012 International
> Prostar sleepers with ALL of the issues associated with them from the past
> corrected by Navistar / International technicians. They are $29,977 ea. +T,T&T and
> that includes a three year 500,000 mile warranty that covers the engine,
> transmission, turbo, injectors, the water pump as well as a comprehensive warranty
> for the aftertreatment system which protects your investment for 2 years 240,000
> miles. It's our signature RushCare warranty and it's the best used truck warranty
> we have ever offered.

16

57.

On December 22, 2016, the Ventis forwarded the above-referenced email to Grace (hereinafter, the "12/22/16 Email"). The 12/22/16 Email is attached hereto and incorporated herein by reference as if fully set forth herein as Plaintiffs' Exhibit 4.

58.

On information and belief, the Ventis benefited financially from their referral of Grace to King and Interstate's subsequent purchase of tractor trucks from the Rush Entities.

**D.     King and Grace**

59.

After the Ventis introduced Grace to King, several telephone conversations, emails and text messages ensued between Grace and King.

60.

The first communications between Grace and King occurred on December 23, 2016, consisting of a telephone conversation and two emails between Grace and King.

61.

In the December 23, 2016 telephone conversation, King explained to Grace that (i) Rush Enterprises ran the Rush Certified Pre-Owned Program exclusively out of the Rush-Atlanta dealership, (ii) the Rush Certified Pre-Owned Program was very exclusive in that it only included warrantied trucks identified on a Special Inventory List prepared for Rush Enterprises by Shields, the National Director, Used Truck Operations - Rush Enterprises, Inc.; (iii) the Rush Certified Pre-Owned Program included only trucks that passed the 143-point inspection and pre-certification road test and were reconditioned to manufacturers specifications; and (iv) these trucks were covered by the exclusive RushCare™ Protection Plan, which is included without charge under the

Rush Certified Pre-Owned Program.

62.

The Special Inventory List is an Excel spreadsheet. The spreadsheet is entitled "nventory [sic] -2012 Maxxforce Powered International Prostars in Inventory-2.xlsx." The "Summary" subtab under the "Properties" tab on the spreadsheet identifies the author as "Shields, Douglas [PHOENX-Used Sales]" and the Company as "Rush Enterprises." The "Statistics" subtab under the "Properties" tab on the spreadsheet indicates that the spreadsheet was "Created: Thursday, December 22, 2016 at 5:02 PM." The Special Inventory List is attached hereto and incorporated herein by reference as if fully set forth herein as <u>Plaintiffs' Exhibit 5</u>.

63.

The Special Inventory List identified the location, stock number, order name, vehicle identification number and other information for 57 International MaxxForce Powered International Prostar trucks manufactured by Navistar in 2012.

64.

Shields emailed the Special Inventory List to King on or about December 24, 2016.

65.

King emailed the Special Inventory List to Grace on or about December 25, 2016.

66.

Based upon the representations of the Ventis, Interstate, Shields and King, in early January 2017, Grace selected for purchase the following four 2012 MaxxForce Powered International Prostar+ trucks from the Special Inventory List (collectively, the "Trucks"):

18

| Vehicle | Stock Number | Vehicle Identification # | Location | Stated Mileage |
|---------|--------------|--------------------------|----------|----------------|
| Truck #001 | 499864 | 3HSDJSJR8CN624235 | Atlanta, GA | 287,832 |
| Truck #002 | 320851 | 3HSDJSJR6CN624251 | Atlanta, GA | 245,748 |
| Truck #003 | 499891 | 3HSDJSJR7CN624243 | Atlanta, GA | 287,832 |
| Truck #004 | 333227 | 3HSDJSJR5CN624256 | El Paso, TX | 339,560 |

67.

On January 10, 2017, King signed and dispatched to Grace Rush-Jacksonville Customer Proposal Letters for each of the four Trucks, followed by drafts of proposed contracts. The Rush-Jacksonville Customer Proposal Letters for the four Trucks are attached hereto and incorporated herein by reference as Plaintiffs' Exhibit 6, Plaintiffs' Exhibit 7, Plaintiffs' Exhibit 8 and Plaintiffs' Exhibit 9.

68.

Based upon the sales proposals and the draft contracts, on or about January 16, 2017, Grace wire transferred to King the sum of $129,879.76, or $32,469.94 per Truck, to be held in escrow pending completion of all paperwork relating to the sale and purchase of the Trucks.

**E.   The Rush Entities Sales Contracts**

69.

On January 26, 2017, Trade Winds faxed a set of signed sales documents to King for the Trucks. Among the documents for each Truck were the following:

(i)   A three-page contract, each of which was entitled Retail Sales Order, for the sale and purchase of Trucks #001, #002, #003 and #004, respectively, signed by Rush-Atlanta and Trade Winds, dated January 25, 2017. The Retail Sales Orders for the four Trucks are attached hereto and incorporated herein by reference as Plaintiffs'

19

Exhibit 10, Plaintiffs' Exhibit 11, Plaintiffs' Exhibit 12 and Plaintiffs' Exhibit 13.

(ii)   A six-page contract, each of which was entitled Vehicle Service Agreement, also known as AGWS Service Agreement, pertaining to Trucks #001, #002, #003 and #004 respectively, signed by Rush-Jacksonville, in its capacity as a dealer for American Guardian Warranty Services, Inc., and Trade Winds, dated January 25, 2017.  The Vehicle Service Agreements for the four Trucks are attached hereto and incorporated herein by reference as Plaintiffs' Exhibit 14, Plaintiffs' Exhibit 15, Plaintiffs' Exhibit 16 and Plaintiffs' Exhibit 17.

(iii)  A one-page contract, each of which was entitled Truck/Bus Owner Responsibilities Used Truck Service Contract, pertaining to Trucks #001, #002, #003 and #004 respectively, signed by Grace, dated January 25, 2017. The Truck/Bus Owner Responsibilities Used Truck Service Contracts for the four Trucks are attached hereto and incorporated herein by reference as Plaintiffs' Exhibit 18, Plaintiffs' Exhibit 19, Plaintiffs' Exhibit 20 and Plaintiffs' Exhibit 21.

(iv)  A one-page contract, entitled Acknowledgment of "As Is" Purchase and 3rd Party Service Contract with Rush-Atlanta, pertaining to Trucks #001, #002, #003 and #004 respectively, signed by Grace, dated January 25, 2017. The Acknowledgement of "As Is" Purchase and 3rd Party Service Contract for each of the four Trucks are attached hereto and incorporated herein by reference as Plaintiffs' Exhibit 22, Plaintiffs' Exhibit 23, Plaintiffs' Exhibit 24 and Plaintiffs' Exhibit 25.

The Retail Sales Orders, Vehicle Service Agreements, Truck/Bus Owner Responsibilities Used Truck Service Contracts and Acknowledgment of "As Is" Purchase and 3rd Party Service Contracts

are hereinafter referred to collectively as the "Sales Contracts."

70.

The Acknowledgement of "As Is" Purchase and 3rd Party Service Contract includes the following

paragraph:

> By signing below, Customer acknowledges that the Vehicle(s) are sold by Rush
> on an "AS IS, WHERE IS" basis without any warranties by rush, *provided that
> Vehicle(s) sold by Dealer as "Certified Pre-Owned" are subject to the express
> written terms and conditions of the Dealer's certified pre-owned program.*
> [Italics added for emphasis.]

71.

Although King repeatedly described each of the Trucks as "Certified Pre-Owned," the

Sales Contracts themselves do not directly identify the four Trucks as "Certified Pre-Owned;"

however, when Plaintiffs wrote to King requesting copies of the completed 143-point inspection

and road test for each Truck, King did not disabuse Plaintiffs' understanding that the Trucks were,

in fact, "Certified Pre-Owned."

72.

Despite Plaintiffs' repeated requests, neither King nor any other agent or affiliate of the

Rush Entities, furnished Plaintiffs with copies of the completed 143-point inspection and road test

for each Truck.

73.

On information and belief, the Rush Certified Pre-Owned Program is a marketing ploy

conceived by Navistar, the Rush Entities, Clarke, Rusty Rush, Shields, King and Newman in

collusion with the Ventis and Interstate to foist defective, unreconditioned used vehicles on an

unsuspecting public.

74.

Alternatively, if the *Rush Certified Pre-Owned Program* is legitimate, none of the four Trucks, on information and belief, underwent "an exhaustive 143-point inspection and pre-certification road test," despite King's representations to the contrary.

**F.     RushCare™ Protection Plan**

75.

As part of the truck purchase, Trade Winds also purchased what the Rush Entities' websites, the Ventis and King described as the "exclusive RushCare™ Protection Plan."

76.

King and the Ventis represented to Grace that the "exclusive RushCare™ Protection Plan" was the best in the business. Among other things, King represented in the 12/22/16 Email that the RushCare™ Protection Plan included a three-year or 500,000-mile powertrain warranty on the engine, transmission, and axle systems, including the EGR system and ECM. *See* Plaintiffs' Exhibit 4.

77.

King told Grace that the exclusive RushCare™ Protection Plan was only available through Rush-Atlanta.

78.

On information and belief, the "exclusive RushCare™ Protection Plan" is a fiction.

79.

On information and belief, King intentionally confused the so-called RushCare™ Protection Plan with the Vehicle Service Agreements, misleading Trade Winds and Grace into believing the Vehicle Service Agreements and the "exclusive RushCare™ Protection Plan" were

one and the same, when they were not.

80.

Alternatively, if the "exclusive RushCare™ Protection Plan" is not a fraud and does, in fact, include a three-year or 500,000 extended powertrain warranty on the engine, transmission, and axle systems, then, on information and belief, the Rush Entities, King and Nelson, intentionally excluded the RushCare™ Protection Plan from Trade Winds' purchase of the four Trucks.

81.

The Vehicle Service Agreements are, in fact, optional warranties that American Guardian Warranty Services, Inc. ("AGWS") offers through an AGWS's extensive dealer network located throughout the United States, which dealer network includes, but is not limited to Rush-Atlanta or Rush-Jacksonville.

82.

King represented to Grace that, if the Trucks experienced any problems with the Trucks' engines, transmissions, and axle systems, any Rush Truck Center was available to quickly make repairs under the exclusive RushCare™ Protection Plan at a nominal cost.

83.

In actuality, the Vehicle Service Agreements proved worthless to Trade Winds and Grace for several reasons, including, without limitation, the following:

    (i)      The warranties only included "covered Breakdowns."

    (ii)     To determine the existence of a covered Breakdown, Trade Winds was required to "pay for any teardown or diagnostic time needed to determine whether [the vehicle had] a covered Breakdown," the cost of which was extremely expensive.

    (iii)    It took weeks, once the repairer diagnosed a covered Breakdown, for the

Administrator in the Claims Department to issue a Repair Authorization.

(iv)    The total downtime between delivery of the disabled Trucks to the repair facility, the teardown and diagnosis and the repair itself was so lengthy as to be untenable.[2]

(v)    Although the warranties covered repairs for the engine, transmission and aftertreatment assemblies, the warranties did not cover (a) cracked or corroded fuel tanks; (b) the electronic control module, which monitors engine performance (i.e., the engine computer); (c) brakes; (d) air conditioning; (e) the electrical system; (f) the alternator/generator/regulator; (g) electronic stability control; (h) trailer hitches; (i) fifth wheel assembly; (j) visibility; (k) defroster/defogger system, windshield and blower; or (j) the drive axle (i.e., output shaft, bearings, bushings, gear sets, axle and bearings, carrier ring and pinion gears, bushings and axle shaft).

(vi)    Certain warranty exclusions, such as fuel tank cracks, would, if not repaired, cause the Trucks, to fail DOT inspections.

## G.    Truck #001

84.

A driver employed by Plaintiffs took physical possession of Truck #001 from Newman at Rush-Atlanta on February 4, 2017, and drove to Florida to pick up a flatbed, GPS system and additional accessories; however, contrary to King's representation, Truck #001 was not equipped with a headache rack.

85.

On March 15, 2017, the driver returned Truck #001 to Rush-Atlanta from Florida for

---

[2] When operational each Truck generated revenues for Trade Winds of approximately $900 per day. When out of service, the incremental fixed cost for each Truck to Trade Winds was $50 per hour.

installation of the missing headache rack.

86.

In the interval between February 4th and March 15th, the driver discovered that none of the electrical outlets in Truck #001's sleeping compartment worked. In addition, the u-joint, trailer air service lines and trailer air service gaskets failed.

87.

In addition, the Anti-lock Braking System ("ABS"), which is designed to help the driver maintain some steering ability and avoid skidding while braking, also malfunctioned.

88.

On March 27, 2017, Truck #001 broke down near a Rush Truck Centers' location in Pico Rivera, California.

89.

An inspection by technicians at Rush Truck Centers' Pico Rivera location advised Trade Winds and Grace that the presence of cracks on the tops of both the driver and passenger-side fuel tanks required replacement of both fuel tanks; the four straps holding the fuel tanks in place were completely rusted; the bolts attached to the straps were broken; and four new isolators were required.

90.

In addition, Truck #001 had the following defects: (i) holes in the sleeper floor, allowing engine exhaust fumes inside the sleeper and cab; (ii) low oil pressure, causing severe oil dilution; (iii) old fuel air and oil filters; (iv) outdated firmware on the electronic control module; (v) a malfunctional passenger window that could not roll-up; and (vi) malfunctioning backup lights that would not turn off when the vehicle was not in use.

25

91.

The 143-point inspection of Truck #001 should have detected all or most of the aforementioned defects.

92.

After the Pico Rivera inspection, Trade Winds and Grace complained to the Rush Entities and King about the fuel tank cracks. On April 11, 2017, King sent Grace an email stating that the Rush Entities would pay for the fuel tank repairs on Truck #001 if Trade Winds signed a Settlement Agreement and Full Release of All Claims (the "Proposed Release").

93.

The Proposed Release would have acquitted and forever discharged the Rush Entities, and all of their corporate affiliates and subsidiaries and any of their employees, directors, officers, attorneys and representatives, and any other parties who might be liable from any liability arising from the "Contract" (i.e., the January 25, 2017 Retail Sales Orders) or certain "Claims" relating to the Trucks.

94.

The Proposed Release broadly defined the "Claims" as follows:

. . . disagreements, disputes and controversies between the Parties regarding the Contract, the Truck [sic], and the rights and obligations arising therefrom, including the RELEASING PARTY'S claims that the Trucks have needed repairs since they were purchased, has incurred unexpected repairs and expenses arising from those repairs, claims the Trucks at the time of sale were overvalued and did not the meet the quality or conditions as advertised and represented, that they did not receive the benefit of their bargain, have sustained unexpected and unnecessary out of pocket expense, experienced down time and lost revenue . . . .

The Proposed Release is attached hereto and incorporated herein by reference as if fully set forth herein as Plaintiffs' Exhibit 26.

95.

Trade Winds refused to sign the Release.

96.

Truck #001 has been permanently out of service since March 27, 2017 and is currently located on the tarmac at the Rush Truck Centers' Pico Rivera location.

97.

Because of extensive downtime due to mechanical failure, between February 4, 2017 and March 27, 2017, Truck #001 was only able to haul 11 loads.

**H.     Truck #002**

98.

A driver employed by Plaintiffs took physical possession of Truck #002 from Newman at Rush-Atlanta on February 7, 2017.

99.

On the same day, Truck #002 broke down 70 miles after departing from the Rush-Atlanta location due to a bad fuel gauge.

100.

After filling the fuel tanks with gasoline, a one-inch open hole on the top of the fuel tank and bent fuel tank mounting bracket were discovered on the driver's side,  as well as the concomitant fuel leak.

101.

150 miles after the repair of the fuel tank hole, the fuel filters failed.

102.

The fuel filters failed once more, leaving the Truck #002 stranded. Further inspection

revealed black algae and other debris in the filters and the bottom of the fuel tanks. To address this problem, Trade Winds had the fuel tanks drained and the full lines and full pump steamed, necessitating the dumping of 200+ gallons of gasoline.

103.

Other problems included (i) paint overspray on the windshield, which required replacement and resealing; (ii) a carrier bearing failure, requiring roadside repair; (iii) dried paint drips on the Truck body; and (iv) outdated firmware on the electronic control module.

104.

The 143-point inspection of Truck #002 should have detected all or most of the aforementioned defects.

105.

On May 24, 2017, Truck #002 broke down again and was towed to a Rush Truck Center in Swannanoa, North Carolina outside of Asheville, North Carolina.

106.

Trade Winds filed a warranty claim on Truck #002, only to find that (i) no RushCare™ Protection Plan existed independently of the AGWS warranty, (ii) the AGWS warranty was not offered by Rush exclusively, and (iii) the AGWS warranty required that Trade Winds pay upfront for teardowns and diagnostic time, included only covered Breakdowns and excluded most of the required repairs.

107.

Trade Winds experienced a 60-day delay between the time Trade Winds delivered Truck #002 to the warranty center for evaluation and the actual physical inspection, because the service personnel at the warranty center did not want to inspect the vehicle to determine

whether the breakage was covered by the warranty.

108.

Once the service personnel inspected the vehicle, they determined that the repair cost under the AGWS warranty was $13,000, representing more than 23% of the vehicle's original purchase price.

109.

Truck #002 returned to service on August 1, 2017, after being out of service in Swannanoa, North Carolina for 67 days.

110.

Truck #002's engine warning light alarm illuminated two hours outside Sawanona, North Carolina on September 12, 2017.

111.

Truck #002 broke down again 25 miles outside of Montgomery, Alabama on September 25, 2017.

112.

Truck #002 has been permanently out of service since September 25, 2017 and, on information and belief, was last located in Houston, Texas.

113.

The 143-point inspection of Truck #002 should have detected all or most of the aforementioned defects.

114.

Because of extensive downtime due to mechanical failure, between February 7, 2017 and August 1, 2017, Truck #002 was only able to haul 17 loads.

I.      **Truck #003**

115.

A driver employed by Plaintiffs took physical possession of Truck #003 at Rush-Atlanta on February 13, 2017.

116.

Although the Special Inventory List indicated the vehicle's total mileage as 287,832, on pickup at Rush-Atlanta, the odometer reading was 347,201 miles.

117.

Truck #003 experienced its first off-the-road repair on March 20, 2017.

118.

In the interim between February 13, 2017 and May 8, 2017, Truck #003 had the following problems: (i) Windshield leaks; (ii) low oil pressure; (iii) unsafe wear on rear tires; (iv) outdated firmware on the electronic control module; and (v) broken lock on the driver's door.

119.

In addition, a Rush Truck Center dealer determined that the HVAC system was corroded and required replacement, which had the effect of rendering Truck #003 inoperable.

120.

The 143-point inspection of Truck #003 should have detected all or most of the aforementioned defects.

121.

Truck #003 has been permanently out of service since May 8, 2017 and, on information and belief, was last located in Houston, Texas.

**J.      Truck #004**

122.

A driver employed by Plaintiffs took physical possession of Truck #004 at Rush-Atlanta on February 23, 2017.

123.

Truck #004 experienced the following problems: (i) Windshield leaks; (ii) outdated firmware on the electronic control module; (iii) broken left turn signal; and (iv) faulty head lights.

124.

The 143-point inspection of Truck #004 should have detected all or most of the aforementioned defects.

125.

Subsequently, Truck #004 broke down and, since October 2017, is no longer in service. On information and belief, Truck #004 was last located in Houston, Texas.

**K.      EGR Engine Design and Manufacturing Defects**

126.

The four Trucks purchased by Trade Winds are 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks manufactured by Defendant Navistar.

127.

2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks are equipped with the Navistar 13.0-liter EGR MaxxForce diesel engine (the "EGR Engine"). The EGR Engine includes an emissions-control technology designed by Navistar dubbed "advanced exhaust gas recirculation system," which uses exhaust gas recirculation to reduce emissions rather than conventional catalytic converters.

31

128.

However, when Navistar introduced the EGR Engine, the EGR Engine failed to meet

applicable 2010 U.S. Environmental Protection Agency standards. Therefore, after the expiration

of certain emissions credits that Navistar had accrued, Navistar took the EGR Engine out of service

for the 2015 model year.

129.

On information and belief, Navistar knew when it launched the EGR Engine that critical

engine components had significant quality problems[3] and a shortened life span.[4] On information

and belief, Navistar, while touting the quality of its testing program, knew that its prelaunch testing

had serious flaws, was incomplete at launch, and put the trucks into customers' hands knowing

that the customers would end up becoming the de facto test fleet for the EGR Engine.[5]

130.

Among the problems with the EGR engine is that constant vibration and wind underneath

the engine hood causes the connection between EGR valve[6] and the engine's electronic control

module ("ECM")[7] to become loose and connect intermittently. The intermittent connection

"overfuels" the engine, allowing a free-flow of soot-saturated exhaust into the EGR valve, EGR

coolers[8] and exhaust manifold inside the EGR housing. Exacerbating the situation, the shaft on the

---

[3] According to court testimony in the Milan case by former Navistar executive, Jim Hebe, Navistar "did not test s**t."
[4] According to court testimony in the Milan case, the EGR cooler had a life span of less than 20% of the design requirement based upon testing done before the sale of the engines to the public.
[5] Lockridge, D, "Navistar Hit With $30.8 Million Judgment in ProStar/MaxxForce Lawsuit," Aug 14, 2017, HDT Truckinginfo, https://www.truckinginfo.com/141709/navistar-hit-with-30-8-million-judgment-in-prostar-maxxforce-lawsuit.
[6] The EGR valves allow the flow of exhaust gases into the engine's intake manifold in controlled amounts.
[7] The ECM is the computer inside the engine that monitors many functions electronically. Among the ECM's functions is controlling, via a connection to the EGR valve, how much fresh air should be supplied to the engine and for how long, as well as how much hot exhaust should be supplied and for how long, to effectively reduce emissions.
[8] The EGR cooler lowers the temperature of the exhaust gases that are recirculated by the EGR system back into the engine to decrease cylinder temperatures and the emissions causing pollution.

EGR valve is predisposed to failure.[9]

131.

As a result of these problems, the 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks was susceptible to (i) engine overheating, (ii) air conditioner malfunctions, (iii) coolant leaks, (iv) exhaust fumes entering passenger compartments, (v) fuel economy deterioration, (vi) dashboard light warnings and (vi) sudden breakdowns.

132.

The four Trucks purchased by Trade Winds suffered from (i) engine overheating, (ii) air conditioner malfunctions, (iii) coolant leaks, (iv) exhaust fumes entering passenger compartments, (v) fuel economy deterioration, (vi) dashboard light warnings and (vi) sudden breakdowns.

133.

On information and belief, the design and manufacturing defects in the EGR Engine that Navistar foisted on unsuspecting purchasers of 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks with the International Navistar 13.0-liter EGR MaxxForce diesel engines were a proximate cause of Trade Winds' many problems with the four Trucks.

134.

On information and belief, Navistar and the Rush Entities failed to remedy these design and manufacturing defects before Trade Winds purchased the Trucks.

135.

On information and belief, the 143-point inspections should have detected some or most of the aforementioned design and manufacturing defects afflicting the Trucks.

---

[9]   Menzies, J, "How Navistar Solved its EGR Problems," Feb 5, 2015, Trucknews.com, https://www.trucknews.com/equipment/navistar-solved-egr-problems/1003063689/.

**L.** **Recalls**

136.

2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks have been the subject of 17 recalls, wherein Navistar, through its dealers, has agreed to correct the following defects free of charge:

| Recall # | Date | Recall Description | Corrective Action |
|---|---|---|---|
| 11V252000 | 04/26/11 | Brakes, Air, Antilock, Control Unit/Module | Reprogram or replace the brake system electronic control unit. |
| 11V426000 | 08/08/11 | Electrical System, Alternator/Generator/Regulator | Install a bracket to route the wires away from the power steering hose |
| 11V590000 | 12/20/11 | Electronic Stability Control | Install a new ESC module |
| 12V052000 | 02/13/12 | Brakes, Air, Supply, Check Valve | Provide temporary remedy until permanent remedy is developed |
| 12V115000 | 03/22/12 | Equipment | Replace step mounting brackets |
| 12V196000 | 05/04/12 | Electrical System, Alternator/Generator/Regulator | Install standoff bracket and improve harness routing to route alternator wires away from power steering hose |
| 12V403000 | 08/15/12 | Brakes, Air, Disc | Replace missing caliper mounting bolts and tighten caliper mounting bolts |
| 12V465000 | 09/20/12 | Parking Brake, Driveline, Air, Chamber | Replace spring brake chamber |
| 12V546000 | 11/27/12 | Brakes | Replace S-cam tube bracket assemblies |
| 13V146000 | 04/17/13 | Visibility | Strengthen sun shade mounting |
| 13V231000 | 06/04/13 | Brakes | Replace S-cam tube bracket assemblies |

| 13V439000 | 10/17/13 | Trailer Hitches, Fifth Wheel Assembly | Correct air line routing |
| --- | --- | --- | --- |
| 13V439000 | 10/17/13 | Equipment | Correct air line routing |
| 14V064000 | 02/25/14 | Brakes | Replace S-can brake assemblies with a brake assembly with cast spider and S-cam tube bracket assemblies with reinforced gussets |
| 14V688000 | 10/31/14 | Electrical System | Replace the 60 amp relay and battery harness with a 150 amp relay and battery harness |
| 15V241000 | 04/22/15 | Visibility, Defroster/Defogger System, Windshield, Blower | Replace the HVAC system linear power module (LPM) with an upgraded LPM |
| 15V607000 | 09/29/15 | Trailer Hitches, Fifth Wheel Assembly | Replace the fifth wheel with an Ultra NT model fifth wheel |

137.

The four Trucks purchased by Trade Winds suffered from some or all of the defects referenced in the above-referenced recall descriptions.

138.

On information and belief, Navistar and the Rush Entities failed to address the above-referenced recalls by taking the corrective actions specified before Trade Winds purchased the Trucks.

139.

On information and belief, the 143-point inspections should have detected that some or most of the aforementioned corrective actions were not implemented on the four Trucks.

### M.     Rusty Rush and/or Clarke

140.

Defendant Rusty Rush is the Chairman of the Board, Chief Executive Officer and President of Rush Enterprises. Out of 32,756 unit vehicles sales for the 2017 calendar year, used vehicles represented 7,060 unit sales, or approximately 21.6 percent of all unit sales.

141.

Defendant Rush Enterprises, with 100 Rush Truck Center locations in 21 states, operates the largest network of commercial vehicle dealerships in North America. For the year ended December 31, 2017, Rush Enterprises achieved revenues of $4.7 billion and net income of $172.1 million.

142.

Defendant Clarke is the Chairman of the Board, President and Chief Executive Officer of Navistar International Corp.

143.

Defendant Navistar manufactures International-brand commercial trucks, diesel engines and other types of commercial vehicles, truck and vehicle parts. For the year ended December 31, 2017, Navistar achieved revenues of $8.57 billion and net income of $30 million.

144.

On information and belief, Rush Enterprises is the largest distributor of Navistar International trucks.

145.

Because of Navistar's relatively poor financial performance, Navistar is financially dependent upon revenue generated from Rush Truck Centers sales.

146.

On information and belief, Rush Enterprises had a surplus of used 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks in its inventory. Rush Enterprises had difficulty selling these vehicles because of their poor industry reputation.

147.

King told Grace that, because of Rush Enterprises' difficulty selling the used 2012 International Prostar® Plus LF 627 Premium tractor trucks, Rusty Rush conversed with Clarke by telephone regarding the implementation of the Rush Certified Pre-Owned Program.

148.

According to King, Rusty Rush, leveraging his strong bargaining position with Navistar, went to the Chairman of Navistar and built the [Rush Certified Pre-Owned] Program from scratch."

149.

According to King, Rusty Rush told King that Navistar had agreed with Rush Enterprises to "remanufacture" the 2012 International Prostar® Plus LF 627 Premium tractor trucks to manufacturer's specifications; hence, the genesis of the Rush Certified Pre-Owned Program.

150.

On information and belief, the Rush Certified Pre-Owned Program was a ruse concocted by Rusty Rush and/or Clarke to rebrand Rush Enterprises' inventory of otherwise unsaleable 2012 International Prostar® Plus LF 627 Premium tractor trucks as "Certified Pre-Owned," "Diamond," "remanufactured" or "pre-certified to manufacturer's specs."

151.

On information and belief, the Ventis, Navistar, Clarke, ABC Entity, the Rush Entities, Rusty Rush, Shields, King, Newman and John Doe knew that Rush Enterprises' inventory of used

2012 International Prostar® Plus LF 627 Premium tractor trucks on the Special Inventory List were not "remanufactured," subjected to a rigorous 143-point inspection and pre-certification road test and/or reconditioned to manufacturers specifications.

152.

As a result of this ruse, Defendants knowingly and intentionally misled Grace into believing that the four Trucks purchased by Trade Winds were "remanufactured," passed a rigorous 143-point inspection and pre-certification road test and/or reconditioned to manufacturers specifications.

**N.       Wire Fraud (18 U.S.C. § 1843)**

153.

The Ventis, King, Newman, Rusty Rush, Shields, Clarke and John Doe (hereinafter, collectively the "Individual Defendants"), by and through each other and Rush Enterprises, Rush-Atlanta, Rush-Jacksonville, Navistar, Interstate and ABC Entity (hereinafter, collectively the "Business Entity Defendants"), engaged in a systematic and ongoing scheme with the intent to defraud, deceive, mislead, and/or fraudulently induce prospective buyers to purchase used 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks from the Rush Entities rather than the used vehicles of other competitors in the used tractor truck market. Defendants knowingly devised or knowingly participated in a scheme or artifice to defraud Grace and Trade Winds and/or to obtain the money or property of Grace or Trade Winds by means of fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1843.

154.

Defendants' business practices described above are contrary to public policy or fail to measure up to the reflection of moral uprightness, fundamental honesty, fair play and right dealing

in the general and business life of members of society in violation of 18 U.S.C. § 1843.

155.

Defendants could foresee that the interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. § 1843.

156.

In particular, Defendants knew or could foresee that the interstate wires would be used to transmit false and deceptive descriptions of the Rush Certified Pre-Owned Program on the Rush Entities' websites (i.e., http://www.rushtruckcenters.com/truck-sales/used-truck-sales).

157.

The Individual Defendants acting singly and in concert, personally or through the Corporate Defendants, as hereinafter defined, or the Corporate Defendants' agents, used the interstate wires or caused the interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud Grace and/or Trade Winds, within the meaning of 18 U.S.C. § 1843.

158.

It is not possible for Grace and/or Trade Winds to plead with particularity all instances of wire fraud that advanced, furthered, executed and concealed the scheme because the particulars of many such communications (such as when the Rush Entities' announcement of the Rush Certified Pre-Owned Program was first published on the Rush Entities' websites) are within the exclusive control and within the exclusive knowledge of Defendants or other presently unknown individuals.

159.

By way of example, however, the Individual Defendants specifically used the interstate

wires or caused the interstate wires to deliver each and every false, deceptive and misleading statement described in ¶¶ 31 through 152 *supra*, including, but not limited to the following false, deceptive and misleading communications:

| Type of Communication | Date of Initial Publication | Website or Other Medium | Description |
|---|---|---|---|
| Website | Before 09/06/16 | https://www.biz quest.com/shipp ing-and-transportation-businesses-for-sale/?q=aT0yNg | The Ventis posted a false and misleading "bait and switch" notice on the BizQuest.com website advertising a Hawaiian trucking company for sale: "For Sale #1277728-"Trucking company – grossing over 1.5 million" |
| Email | 11/17/16 at 3:48 AM | From: 24transport16@gmail.com<br><br>To: egrace5577@gmail.com<br><br>Subject: Re: New BizQuest Buyer Interest: 1277728 00 Trucking company – grossing over 1.5 Million | Chris Venti posted an email to Grace proposing the engagement by Grace of the Ventis. The email contained false and misleading statements and omissions to state material facts, including, but not limited to the following:<br><br>(i) The trucking company described in BizQuest #1277728 is no longer available.<br><br>(ii) With the Ventis' assistance, (a) Grace can start his own trucking company "with sales grossing about $900,000.00 and Net Profit about $250,000. All for under $55,000.00 [sic]."; (b) Grace "can earn about $5,000 per week to start;".<br><br>(iii) Grace can "sell the business in a year for about $650,000.00 - $750,000.00 and make a huge profit … "<br><br>The email also attached an offering circular prepared by the Ventis containing false and misleading statements and omissions to state material facts, entitled, "Dream of Owning your Own Business and Making 5,000 Per Week." |

| | 11/18/17 at 2:03 PM | From: 24transport16@ gmail.com<br><br>To: egrace5577@ gmail.com<br><br>Subject: CONTRACT | Chris Venti posted an email to Grace attaching a proposed Consulting Agreement with Interstate prepared by the Ventis. |
|---|---|---|---|
| Website | Before 12/20/16 | http://www.rush truckcenters.co m/truck-sales/used-truck-sales | Rush Enterprises posted the following description on its website that contained false and misleading statements and omissions to state material facts regarding the Rush Certified Pre-Owned Program, including, but not limited to the following:<br><br>(i) "Our Certified Pre-Owned vehicles are among the highest quality, best value, pre-owned trucks available today."<br><br>(ii) "Each vehicle must pass an exhaustive 143-point inspection and pre-certification road test."<br><br>(iii) "And to assure your satisfaction, each vehicle includes a minimum of 100,000 miles of remaining factory warranty or the exclusive RushCare™ Protection Plan." |
| Website | Before 12/20/16 | http://www.rush truckcenters.co m/locations/loca tion-search/1902-atlanta | Rush-Atlanta posted the following description on its website that contained false and misleading statements and omissions to state material facts regarding the Rush Certified Pre-Owned Program, including, but not limited to the following:<br><br>(i) "Our Certified Pre-Owned vehicles are among the highest quality, best value, pre-owned trucks available today."<br><br>(ii) "Each vehicle must pass an exhaustive 143-point inspection and pre-certification road test."<br><br>(iii) "And to assure your satisfaction, each vehicle includes a minimum of 100,000 miles |

41

| | | | of remaining factory warranty or the exclusive RushCare™ Protection Plan." |
|---|---|---|---|
| Website | Before 12/20/16 | http://www.rush truckcenters.co m/locations/loca tion-search/1705-jacksonville | Rush Jacksonville posted the following description on its website that contained false and misleading statements and omissions to state material facts regarding the Rush Certified Pre-Owned Program, including, but not limited to the following:<br><br>(i) "Our Certified Pre-Owned vehicles are among the highest quality, best value, pre-owned trucks available today."<br><br>(ii) "Each vehicle must pass an exhaustive 143-point inspection and pre-certification road test."<br><br>(iii) "And to assure your satisfaction, each vehicle includes a minimum of 100,000 miles of remaining factory warranty or the exclusive RushCare™ Protection Plan." |
| Email | 12/20/16 at 5:37 PM | From: KingD1@rush enterprises.com<br><br>To: truckingbiz16@ gmail.com<br><br>Subject: Fwd: Credit App Attached for 2012 International ProStar Sleepers | Dennis King posted an email to Chris Venti regarding the Rush Certified Pre-Owned Program. The email contained false and misleading statements and omissions to state material facts, including, but not limited to the following:<br><br>(i) "ALL of the issues associated with them from the past corrected by Navistar / International technicians."<br><br>(ii) The price included "a three year 500,000 mile warranty that covers the engine, transmission, turbo, injectors, the water pump as well as a comprehensive warranty for the aftertreatment system which protects your investment for 2 years 240,000 miles." (iii) It's our signature RushCare warranty and it's the best used truck warranty we have ever offered." |
| Email | 12/22/16 at 8:09 AM | From: truckingbiz16@ gmail.com | Chris Venti posted an email to Eric Grace that forwarded the above email from Dennis King to Chris Venti dated 12/20/16 at 5:37 PM. This |

| | | | |
|---|---|---|---|
| | | To:<br>egrace5577@<br>gmail.com<br><br>Subject: Fwd:<br>Credit App<br>Attached for<br>2012<br>International<br>ProStar Sleepers | email republished the following false and misleading statements and omissions to state material facts made by King:<br><br>(i) "ALL of the issues associated with them from the past corrected by Navistar / International technicians."<br><br>(ii) The price included "a three year 500,000 mile warranty that covers the engine, transmission, turbo, injectors, the water pump as well as a comprehensive warranty for the aftertreatment system which protects your investment for 2 years 240,000 miles." (iii) It's our signature RushCare warranty and it's the best used truck warranty we have ever offered |
| Telephone Call | 12/23/16 | Between Dennis King and Eric Grace | Dennis King made the following false and misleading statements during the telephone conversation:<br><br>(i) Rush Enterprises ran the Rush Certified Pre-Owned Program exclusively out of the Rush-Atlanta dealership.<br><br>(ii) the Rush Certified Pre-Owned Program was very exclusive in that it only included warrantied trucks identified on a Special Inventory List prepared for Rush Enterprises by Shields, the National Director of Used Truck Operations for Rush Enterprises;<br><br>(iii) the Rush Certified Pre-Owned Program included only trucks that passed the 143-point inspection and pre-certification road test and were reconditioned to manufacturers specifications.<br><br>(iv) The trucks on the Special Inventory List were covered by the exclusive RushCare™ Protection Plan, which is included, without charge, under the Rush Certified Pre-Owned Program. |

| Email | On or about 12/27/16 | From: KingD1@rush enterprises.com<br><br>To: egrace5577@ gmail.com<br><br>Subject: RE: International Prostar Vin # | Shields posted an email to King that includes, as an attachment, the Special Inventory List, which Shields falsely represented to Grace as including only warrantied trucks covered under the Rush Certified Pre-Owned Program and the exclusive RushCare™ Protection Plan. |
|---|---|---|---|
| Email | 01/12/17 at 7:21 AM | From: KingD1@rush enterprises.com<br><br>To: egrace5577@ gmail.com<br><br>Cc: truckingbiz16@ gmail.com<br><br>Subject: REvised [sic] Money Wire Instructions | King posted an email to Grace, with a copy to Chris Venti, providing wire transfer instructions for Grace's transfer of immediately available funds to the Rush Entities for the purchase of the Trucks. |
| Email | 01/17/17 at 2:19 PM | From: KingD1@rush enterprises.com<br><br>To: egrace5577@g mail.com<br><br>Cc: truckingbiz16@ gmail.com<br><br>Subject: Updated Truck List | King posted an email to Grace, with a copy to Chris Venti, acknowledging the Rush Entities' receipt of immediately available funds from Grace for the purchase of the trucks. |

| Email | 01/19/17 at 9:40 AM | From: KingD1@rush enterprises.com | King posted an email to Grace, with a copy to Chris Venti, which includes the following false and misleading statements of material facts or omissions to state material facts: |
|---|---|---|---|
| | | To: egrace5577@ gmail.com | (i) Rush-Atlanta will perform the certified warranty inspection and any necessary corrections needed. I will keep you posted. |
| | | Cc: truckingbiz16@ gmail.com  Subject: Updated Truck List | (ii) King will update the maintenance records after the trucks have been serviced and any corrections have been made to get the Trucks ready for delivery. |

160.

All of the wire communications described above crossed interstate and international borders by reason of the technology used to transmit the communications.

161.

Some or all of the communications described above have appeared and continue to appear on Defendants' websites or email servers since the date of their original posting.

162.

Each and every use of the interstate wires described above was committed by Defendants with the specific intent to defraud Trade Winds and/or Grace by means of false or fraudulent pretenses, representations or promises. Defendants' acts of wire fraud in violation of 18 U.S.C. § 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

163.

Trade Winds and/or Grace justifiably relied on Defendants' fraudulent representations and omissions made pursuant to the above-described scheme, resulting in the following:

(i)     Loss of revenue and earnings to Trade Winds;

(ii)    Complete loss of Grace's investment in Trade Winds;

(iii)   Trade Winds' insolvency and business failure;

(iv)   Loss of income to Grace;

(v)    Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)   Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

## COUNT I

## BREACH OF CONTRACT – VIOLATION OF EXPRESS WARRANTIES

### (Against Defendants Rush-Atlanta And Rush-Jacksonville)

### (Alternative to Count VI)

164.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

165.

Article 2 of the Uniform Commercial Code, dealing with the sale and purchase of goods between merchants and buyers, has been adopted in Georgia at Title 11 of the Georgia Code.

166.

Under the Uniform Commercial Code, a "merchant" is defined as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his

occupation holds himself out as having such knowledge or skill." O.C.G.A. § 11-2-104(1).

167.

The Rush Entities are merchants within the meaning of O.C.G.A. § 11-2-104(1).

168.

Trade Winds and the Rush Entities entered into a transaction relating to the purchase and sale of the four Trucks that is governed by Title 11 of the Georgia Code.

169.

Plaintiffs and the Rush Entities signed valid and binding Sales Contracts, whereby the Rush Entities sold, and Plaintiffs purchased the Trucks.

170.

O.C.G.A. § 11-2-313(1)(a), which addresses express warranties made in connection with the sale of goods, provides, in relevant part, that "[a]ny affirmation of fact or promise made by the seller to buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

171.

In addition, O.C.G.A. § 11-2-313(1)(b) provides that "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."

172.

Among the Sales Contracts relating to the purchase and sale of the Trucks was the contract entitled "Acknowledgment of "AS IS" Purchase." This document provides that "Vehicle(s) sold By Dealer as "Certified Pre-Owned" are subject to the express written terms and conditions of the Dealer's certified pre-owned program."

173.

The Rush Certified Pre-Owned Program specifies on the Rush Entities websites that "each vehicle must pass an exhaustive 143-point inspection and pre-certification road test."

174.

Defendants King, the Ventis and the Rush Entities represented to Grace that the four Trucks purchased by Trade Winds were "Certified Pre-Owned," subject to an exhaustive 143-point inspection and road test, and "remanufactured" or "pre-certified to manufacturer's specs" in accordance with the Rush Certified Pre-Owned Program described on the Rush Entities' websites.

175.

On information and belief, the Rush Entities, Shields King and Newman intentionally failed to deliver copies of the "exhaustive 143-point inspection and pre-certification road test" because the inspections and road tests were not conducted on the four Trucks.

176.

The failure of the Trucks to undergo the "exhaustive 143-point inspection and pre-certification road test represents" a material breach of the Rush Entities' express warranties.

177.

Plaintiffs relied on the Rush Entities' express warranty that the Trucks had undergone an "exhaustive 143-point inspection and precertification road test."

178.

The Rush Entities websites specified that under the Rush Certified Pre-Owned Program "each vehicle includes a minimum of 100,000 miles of remaining factory warranty or the exclusive RushCare™ Protection Plan."

179.

The purchase and sale of the Trucks did not include the "exclusive RushCare™ Protection Plan," if it in fact exists, but rather an optional extended warranty for which Trade Winds and Grace paid $28,548.

180.

The optional extended warranty is not exclusive to Rush Truck Centers but is provided by AGWS through its extensive dealer network located throughout the United States, that includes, but is not limited to, Rush-Atlanta or Rush-Jacksonville.

181.

The failure of the Rush Entities to include the "exclusive RushCare™ Protection Plan" in the sale of the Trucks or, in the alternative, the misrepresentation that the optional extended warranty was an "exclusive" warranty when, in fact, it is provided through AGWS's extensive dealer network located throughout the United States, represents" a material breach of the Rush Entities' express warranties.

182.

Because of the Rush Entities' breach of the express warranties and Plaintiffs' reliance thereon, Plaintiffs have suffered damages, including, with limitation, the following:

    (i)   Loss of revenue and earnings to Trade Winds;

    (ii)   Complete loss of Grace's investment in Trade Winds;

    (iii)   Trade Winds' insolvency and business failure;

    (iv)   Loss of income to Grace;

    (v)   Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)   Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

183.

Plaintiffs are entitled to relief in the form of actual damages in an amount to be determined at trial.

184.

Plaintiffs are entitled to attorneys' fees and expenses of litigation because the Sales Contracts were entered into in bad faith and procured by fraud.

## COUNT II

## BREACH OF CONTRACT – VIOLATION OF IMPLIED WARRANTIES OF MERCHANTABILITY

### *(Against Defendants Rush-Atlanta And Rush-Jacksonville)*

### (Alternative to Count VI)

185.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

186.

O.C.G.A. § 11-2-314 addresses implied warranties of merchantability. O.C.G.A. § 11-2-314(1) provides that, "[a] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." O.C.G.A. § 11-2-314(2)(a) provides that, for goods to be merchantable, the goods "must be at least such as . . . [a]re fit for the ordinary purposes for which such goods are used."

187.

O.C.G.A. § 11-2-315 provides that, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose."

188.

Rusty Rush, Shields, King, Newman and the Rush Entities knew of the particular purpose for which Trade Winds and Grace intended to use the four Trucks, which was to engage in the business of long-haul trucking.

189.

Rusty Rush, Shields, King, Newman and the Rush Entities knew that Grace and Trade Winds were relying on their skill or judgment to select or furnish suitable tractor trucks for Trade Winds' business.

190.

The merchantability of the four Trucks was a material basis for the Sales Contracts between the Rush Entities and Trade Winds.

191.

To be "merchantable", the Trucks must have reasonably conformed to an ordinary buyer's expectations, i.e., they are what they say they are.

192.

Based upon the performance of the Trucks after Trade Winds purchased them, the Trucks would not have reasonably conformed to an ordinary buyer's expectations of merchantability.

193.

Because the four Trucks were not merchantable, the Rush Entities' breached the implied warranties of merchantability.

194.

Because of the Rush Entities' breach of the implied warranties of merchantability, Trade Winds and Grace have suffered damages, including, without limitation, the following:

(i)   Loss of revenue and earnings to Trade Winds;

(ii)   Complete loss of Grace's investment in Trade Winds;

(iii)   Trade Winds' insolvency and business failure;

(iv)   Loss of income to Grace;

(v)   Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)   Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

195.

Plaintiffs are entitled to relief in the form of actual damages in an amount to be determined at trial. suffered damages.

196.

Plaintiffs are entitled to attorneys' fees and expenses of litigation because the Sales Contracts were entered into in bad faith and procured by fraud.

## COUNT III

### BREACH OF CONTRACT – VIOLATION OF IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE

*(Against Defendants Rush-Atlanta And Rush-Jacksonville)*

**(Alternative to Count VI)**

197.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

198.

O.C.G.A. § 11-2-315 addresses implied warranties of fitness for a particular purpose. O.C.G.A. § 11-2-315 provides in relevant part that, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose."

199.

Rusty Rush, Shields, King, Newman and the Rush Entities knew of the particular purpose for which Trade Winds and Grace intended to use the four Trucks; that is, to engage in the business of long-haul trucking.

200.

Rusty Rush, Shields, King, Newman and the Rush Entities knew that Grace and Trade Winds were relying on their skill or judgment to select or furnish suitable tractor trucks for the particular purpose of long-haul trucking.

201.

The fitness of the four Trucks for the particular purpose of long-haul trucking was a material basis for the Sales Contracts between the Rush Entities and Trade Winds.

202.

Based upon the performance of the Trucks after Trade Winds purchased them, the four Trucks were not fit for the particular purpose for which Trade Winds purchased the Trucks.

203.

The Rush Entities are in breach of their implied warranty of fitness for a particular purpose relating to the sale of the four Trucks.

204.

Because of the Rush Entities' breach of the implied warranty of fitness for a particular purpose, Plaintiffs have suffered damages, including, without limitation, the following:

(i)   Loss of revenue and earnings to Trade Winds;

(ii)   Complete loss of Grace's investment in Trade Winds;

(iii)   Trade Winds' insolvency and business failure;

(iv)   Loss of income to Grace;

(v)   Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)   Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

205.

Plaintiffs are entitled to relief in the form of actual damages as a result of Defendants' breach in an amount to be determined at trial.

206.

Plaintiffs are entitled to attorneys' fees and expenses of litigation because the Sales Contracts were entered into in bad faith and procured by fraud.

## COUNT IV

### BREACH OF CONTRACT – IMPLIED COVENANT

### OF GOOD FAITH AND FAIR DEALING

*(Against Defendants Rush-Atlanta And Rush-Jacksonville)*

**(Alternative to Count VI)**

207.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

208.

Implied in every contract are duties of good faith and fair dealing. These common law implied duties require that parties to a contract exercise good faith and honest judgment in carrying out their rights and obligations under the contract and refrain from acting arbitrarily or capriciously or with an improper motive. "The requirement that a party exercise good faith and honest judgment, even where the contractual language grants the party discretion, arises from the implied duty of good faith and fair dealing imposed upon virtually every contract under Georgia law." Capital Health Management Group, Inc. v. Hartley, 301 Ga. App. 812, 817 (2009). "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts Sec. 205.

209.

A similar concept is imposed by the Uniform Commercial Code on all transactions

55

involving the sale of goods. O.C.G.A. § 11-1-203 provides that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." O.C.G.A. § 11-1-201(b)(20) defines "good faith" to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing."

210.

The Rush Entities had a duty of good faith, to be honest in observance of reasonable commercial standards of fair dealing regarding the offer and sale of the Trucks. Instead, the Rush Entities were opportunistic in failing to observe reasonable commercial standards. "The office of the doctrine of good faith is to forbid the kinds of opportunistic behavior that a mutually dependent, cooperative relationship might enable in the absence of rule." Market Street Associates Limited Partnership v. Frey, 941 F.2d 588 (7th Cir. 1991)

211.

The Rush Entities exploited Grace's inexperience in the trucking industry to their advantage to convince Trade Winds to sign and close the Sales Contracts relating to the Trucks, even though the Rush Entities knew that the Trucks were lemons and would not withstand the rigors of long-haul trucking.

212.

The Rush Entities were dishonest and failed to observe reasonable commercial standards by representing to Trade Winds and Grace that:

(i)     Navistar had corrected the problems associated with 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks with the Navistar 13.0-liter EGR MaxxForce diesel engines, by "remanufacturing" or "precertifying" the Trucks to manufacturer's specs, when, in fact, these problems

56

remained uncorrected.

(ii)     Rusty Rush and/or Clarke had developed a Rush Certified Pre-Owned Program that included a 143-point inspection and pre-certification road test to assure that selected 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks with the Navistar 13.0-liter EGR MaxxForce diesel engines met specified quality standards before they could be sold under that nomenclature of the Rush Certified Pre-Owned Program, when, in fact, the Rush Certified Pre-Owned Program was a sham.

(iii)    The vehicles on the Special Inventory created by Shields included only trucks that passed the 143-point inspection and pre-certification road test and were reconditioned to manufacturers specifications, when in fact they were not.

(iv)    The Trucks were among the highest quality, best value, pre-owned trucks available in the industry, when, in fact, they were not.

(v)     The Trucks had undergone the "exhaustive 143-point inspection and pre-certification road test" promised by the Rush Certified Pre-Owned Program when, in fact, the Trucks had not.

(vi)    The Trucks were "remanufactured" or "pre-certified to manufacturer's specs," when, in fact, they were not.

(vii)   The Trucks were suitable for long-haul trucking when, in fact, they were not.

(viii)  The RushCare™ Protection Plan was included in the sale of the Trucks, when, in fact, it was not.

(ix)    In the alternative to subparagraph (viii) of ¶ 212, the RushCare™ Protection Plan was exclusive to the Rush Entities when, in fact, this plan was actually a used truck

extended warranty offered, not by the Rush Entities, but by AGWS to all of AGWS's dealers.

(x)   In the alternative to subparagraph (ix) of ¶ 212, repair costs under the RushCare™ Protection Plan were de minimis when, in fact, they were not, because the RushCare™ Protection Plan did not cover "teardown costs" and "diagnostic time."

213.

The Rush Entities were also dishonest when they attempted to circumvent their responsibilities under the Sales Contracts by proffering a Settlement Agreement and Release of All Claims that would have obviated from any further liabilities arising from the sale of the four Trucks the Rush Entities and all of their corporate affiliates and subsidiaries and any of their employees, directors, officers, attorneys and representatives and any other parties who might be liable.

214.

Through their dishonest conduct, the Rush Entities violated their implied covenants of good faith and fair dealing. In the Sales Contracts.

215.

Because of the Rush Entities' breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages, including, without limitation, the following:

(i)    Loss of revenue and earnings to Trade Winds;

(ii)   Complete loss of Grace's investment in Trade Winds;

(iii)  Trade Winds' insolvency and business failure;

(iv)   Loss of income to Grace;

(v)    Damage to Grace's reputation and credibility as a business person, entrepreneur

and manager; and

    (vi)   Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

216.

Plaintiffs are entitled to relief in the form of actual damages as a result of Defendants' breach in an amount to be determined at trial.

217.

Plaintiffs are entitled to attorneys' fees and expenses of litigation because the Sales Contracts were entered into in bad faith and procured by fraud.

## COUNT V

## BREACH OF CONTRACT- SEVERABILITY

### *(Against Defendants Rush-Atlanta And Rush-Jacksonville)*

### **(Alternative to Count VI)**

218.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

219.

When a party breaches a contract agreement, if it is severable or if the breaches occur at successive periods in an entire contract, an action will lie for each breach . . .." O.C.G.A. § 13-6-14.

220.

Trade Winds entered into the Sales Contracts with the Rush Entities.

59

221.

The Sales Contracts are legally binding contracts.

222.

The Rush Entities breached their Sales Contracts with Trade Winds and Grace.

223.

As a result of the breach of each of the Sales Contracts by the Rush Entities, Trade Winds and Grace have suffered actual damages, including, without limitation, the following:

(i)   Loss of revenue and earnings to Trade Winds;

(ii)   Complete loss of Grace's investment in Trade Winds;

(iii)   Trade Winds' insolvency and business failure;

(iv)   Loss of income to Grace;

(v)   Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)   Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

224.

Plaintiffs are entitled to relief in the form of actual damages as a result of each of Defendants' breaches of the Sales Contracts in an amount to be determined at trial.

225.

Plaintiffs are entitled to attorneys' fees and expenses of litigation because each of the Sales Contracts was entered into in bad faith and procured by fraud.

226.

Since the four Sales Contracts are severable, Trade Winds and Grace have a separate cause of action for each of the breaches of each of the respective Sales Contracts.

227.

Plaintiffs are entitled to relief in the form of actual damages as a result of each of Defendants' breaches of each of the Sales Contracts, as well as all reasonable expenses incurred in complying with the contract and costs, in an amount to be determined at trial.

228.

Plaintiff are entitled to attorneys' fees and expenses of litigation as a result of Defendants' for each of the breaches of each of the respective Sales Contracts because each of the Sales Contracts was entered into in bad faith and procured by fraud.

## COUNT VI

### CONTRACT RESCISSION

*(Against Defendants Rush-Atlanta And Rush-Jacksonville)*

**(Alternative to Counts I, II, III, IV and V)**

229.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

230.

Trade Winds and Grace have been injured as a result of the contract breaches by the Rush Entities of the (i) express warranty that the Trucks underwent the "exhaustive 143-point inspection and pre-certification road test promised by the Rush Certified Pre-Owned Program, (ii) the implied warranty of merchantability, (iii) the implied warranty of fitness for a particular purpose and (iv)

61

the implied warranty of good faith and fair dealing.

231.

Under O.C.G.A. § 23-2-31, one party "may rescind and cancel [a written contract] upon the ground of mistake of fact material to the contract . . .."

232.

Based upon the craven lies and duplicity of Defendants King, the Ventis and the Rush Entities, Trade Winds and Grace made the following mistakes of fact:

(i)    Navistar had corrected the problems associated with 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks with the Navistar 13.0-liter EGR MaxxForce diesel engines, by "remanufacturing" or "precertifying" the Trucks to manufacturer's specs, when, in fact, these problems remained uncorrected.

(ii)   Rusty Rush and/or Clarke had developed a Rush Certified Pre-Owned Program that included a 143-point inspection and pre-certification road test to assure that selected 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks with the Navistar 13.0-liter EGR MaxxForce diesel engines met specified quality standards before they could be sold under the nomenclature of the Rush Certified Pre-Owned Program, when, on information and belief, the Rush Certified Pre-Owned Program was a sham.

(iii)  The vehicles on the Special Inventory created by Shields included only trucks that passed the 143-point inspection and pre-certification road test and were reconditioned to manufacturers specifications, when in fact they were not.

(iv)   The Trucks were among the highest quality, best value, pre-owned trucks available

in the industry, when, in fact, they were not.

(v)     The Trucks had undergone the "exhaustive 143-point inspection and pre-certification road test" promised by the Rush Certified Pre-Owned Program when, in fact, the Trucks had not.

(vi)    The Trucks were "remanufactured" or "pre-certified to manufacturer's specs, when, in fact, they were not.

(vii)   The Trucks were suitable for long-haul trucking when, in fact, they were not.

(viii)  The RushCare™ Protection Plan was included in the sale of the Trucks, when, in fact, it was not.

(ix)    In the alternative to subparagraph (viii) of ¶ 232, the RushCare™ Protection Plan was exclusive to the Rush Entities when, in fact, this plan was actually a used truck extended warranty offered, not by the Rush Entities, but by AGWS. to all of its dealers.

(x)     In the alternative to subparagraph (ix) to ¶ 232, repair costs under the RushCare™ Protection Plan were de minimis when, in fact, they were not, because the RushCare™ Protection Plan did not cover "teardown costs" and "diagnostic time."

233.

Trade Winds and Grace have suffered damages as a result of their reliance on the above-referenced factual misstatements, including, without limitation, the following:

(i)     Loss of revenue and earnings to Trade Winds;

(ii)    Complete loss of Grace's investment in Trade Winds;

(iii)   Trade Winds' insolvency and business failure;

(iv)    Loss of income to Grace;

(v)     Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)    Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

234.

Because of the aforementioned mistakes of fact, Trade Winds is entitled to have the Sales Contracts for the sale and purchase of the four Trucks rescinded and canceled upon the ground of mistake of fact material to the contract.

235.

Plaintiffs are entitled to relief in the form of general damages as a result of Plaintiffs' reliance on the above-referenced factual misstatements in an amount to be determined at trial.

236.

For the reasons stated above, Trade Winds and Grace signed the Sales Contracts for the Trucks based upon mistakes of facts that were material to Grace's decision to have Trade Winds purchase the Trucks from the Rush Entities.

237.

Plaintiffs are entitled to relief in the form of attorneys' fees and expenses of litigation because the Sales Contracts were entered into in bad faith and procured by fraud.

238.

Plaintiffs are entitled to relief in the form of punitive damages, in an amount to be determined at trial, because the Sales Contracts were entered into in bad faith and procured by fraud.

## COUNT VII

## BREACH OF CONTRACT – VIOLATION OF EXPRESS WARRANTIES

### *(Against Defendant Interstate)*

239.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

240.

The Consulting Agreement was a valid binding contract between Grace and Interstate, whereby Defendant would provide consulting and other services, and Plaintiffs paid for those services.

241.

Interstate breached the Consulting Agreement by failing to use reasonable efforts to fulfill its obligations under the Consulting Agreement.

242.

In addition, Interstate breached several express warranties that it made in the Consulting Agreement, including, without limitation, hiring drivers for Trade Winds without performing pre-employment drug tests and driving tests.

243.

Because of Interstate's breach of the express warranties, Grace has suffered damages, including, without limitation, the following:

    (i)  Loss of revenue and earnings to Trade Winds;

    (ii)   Complete loss of Grace's investment in Trade Winds;

    (iii)  Trade Winds' insolvency and business failure;

(iv)   Loss of income to Grace;

(v)   Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)   Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

244.

Grace is entitled to relief in the form of actual damages in an amount to be determined at trial.

245.

Grace is entitled to attorneys' fees and expenses of litigation because the Consulting Agreement was entered into in bad faith and procured by fraud.

## COUNT VIII

## BREACH OF CONTRACT – IMPLIED COVENANT

## OF GOOD FAITH AND FAIR DEALING

### *(Against Defendant Interstate)*

246.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

247.

Interstate has a duty of good faith and to be honest in observance of reasonable commercial standards of fair dealing regarding their consulting and other services.

248.

Interstate exploited Grace's inexperience in the trucking industry to its advantage to

66

convince Grace to sign an exclusive Consulting Agreement, even though Interstate knew that it could not produce the results Grace sought.

249.

By taking advantage of Grace, Interstate breached the covenant of good faith and fair dealing that was implied in its Consulting Agreement with Grace.

250.

Because of Interstate's breach of the implied covenant of good faith and fair dealing, Trade Winds and Grace have suffered damages as a result of their reliance on the above-referenced factual misstatements, including, without limitation, the following:

(i)   Loss of revenue and earnings to Trade Winds;

(ii)  Complete loss of Grace's investment in Trade Winds;

(iii) Trade Winds' insolvency and business failure;

(iv)  Loss of income to Grace;

(v)   Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)  Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

251.

Grace is entitled to relief in the form of actual damages, as well as all reasonable expenses incurred in complying with the contract and costs, in an amount to be determined at trial.

252.

Grace is entitled to attorneys' fees and expenses of litigation because the Consulting Agreement was entered into in bad faith and procured by fraud.

## COUNT IX

## CONTRACT RESCISSION

### *(Against Defendant Interstate)*

### (Alternative to Counts VII AND VIII)

253.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

254.

Grace has been injured as a result of the contract breaches by Defendant Interstate.

255.

Under O.C.G.A. § 23-2-31, one party "may rescind and cancel [a written contract] upon the ground of mistake of fact material to the contract . . .."

256.

Based upon the representations of Interstate, Grace made the following mistakes of fact:

(i)     Interstate had purchased and sold several trucking companies and were very experienced in the long-haul trucking business, when, on information and belief, they had not sold "several trucking companies' and were not "very" experienced in the long-haul trucking business.

(ii)    Interstate would start a trucking company for Grace that would generate sales in its first year of operation grossing about $900,000 and net profit about $250,000 for an investment of less than $55,000.00.

(iii)   Grace would earn about $5,000 per week "to start" from the trucking company started by him by Interstate and sell the business in a year for about $650,000.00 to

$750,000.00.

(iv)   Grace's trucking company would start collecting profit from the first day Interstate launched the business on his behalf.

(v)    Interstate would perform pre-employment drug tests and driving tests for the drivers it hired for Grace's trucking company.

257.

Grace has suffered damages as a result of his reliance on the above-referenced misstatements of fact, including, without limitation the following:

(i)     Loss of revenue and earnings to Trade Winds;

(ii)    Complete loss of Grace's investment in Trade Winds;

(iii)   Trade Winds' insolvency and business failure;

(iv)   Loss of income to Grace;

(v)    Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)   Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

258.

Because of the aforementioned mistakes of fact, Grace is entitled to have the Interstate Consulting Agreement rescinded and canceled upon the ground of mistake of fact material to the Consulting Agreement.

259.

Plaintiffs are entitled to relief in the form of general damages as a result of Defendants' reliance on the above-referenced factual misstatements in an amount to be determined at trial.

260.

Plaintiffs are entitled to relief in the form of attorneys' fees and expenses of litigation because the Consulting Agreement was entered into in bad faith and procured by fraud.

261.

Plaintiffs are entitled to relief in the form of punitive damages, in an amount to be determined at trial, because the Sales Contracts were entered into in bad faith and procured by fraud.

## COUNT X

## FRAUD IN THE INDUCEMENT

### *(Against All Defendants)*

262.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

263.

Under O.C.G.A. § 51-6-2(a), willful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give rise to a right of action for fraudulent inducement.

264.

To prove a cause of action for fraudulent inducement, Plaintiffs must show (i) a misrepresentation of fact; (ii) that this misrepresentation was material; (iii) that Defendants were responsible for this misrepresentation; (iv) that Defendants knew that the representation was false; (v) that Defendants intended the representation to induce Plaintiffs to purchase the Trucks; and (vi) consequent injury to Plaintiffs acting in reliance on the misrepresentation.

265.

Defendants misrepresented material facts to induce Plaintiffs to purchase the Trucks, including without limitation, the following:

(i)     Navistar had corrected the problems associated with 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks with the Navistar 13.0-liter EGR MaxxForce diesel engines, by "remanufacturing" or "precertifying" these tractor trucks, including the Trucks, to manufacturer's specs, when, in fact, these problems remained uncorrected.

(ii)    Rusty Rush and/or Clarke had developed a Rush Certified Pre-Owned Program that included a 143-point inspection and pre-certification road test to assure that selected 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks with the Navistar 13.0-liter EGR MaxxForce diesel engines met specified quality standards before they could be sold under that nomenclature of the Rush Certified Pre-Owned Program, when, in fact, the Rush Certified Pre-Owned Program was a sham.

(iii)   The vehicles on the Special Inventory created by Shields included only trucks that passed the 143-point inspection and pre-certification road test and were reconditioned to manufacturers specifications, when in fact they were not.

(iv)    The Trucks were among the highest quality, best value, pre-owned trucks available in the industry, when, in fact, they were not.

(v)     The Trucks had undergone the "exhaustive 143-point inspection and pre-certification road test" promised by the Rush Certified Pre-Owned Program when, in fact, the Trucks had not.

(vi)    The Trucks were "remanufactured" or "pre-certified to manufacturer's specs," when, in fact, they were not.

(vii)   The Trucks were suitable for long-haul trucking when, in fact, they were not.

(viii)  The RushCare™ Protection Plan was included in the sale of the Trucks, when, in fact, it was not.

(ix)    In the alternative to subparagraph (viii) of paragraph ¶ 265, the RushCare™ Protection Plan was exclusive to the Rush Entities when, in fact, this plan was actually a used truck extended warranty offered, not by the Rush Entities, but by AGWS. to all of its dealers.

(x)     In the alternative to subparagraph (ix) of ¶ 265, repair costs would be minimal under the RushCare™ Protection Plan.

(xi)    The Ventis procured Grace as a client on false pretenses by, on information and belief, dangling the promise of a nonexistent business opportunity in a classic "bait and switch," to take advantage of his lack of trucking industry experience and sell him on their scheme.

(xii)   The Ventis provided Grace with a false and misleading Offering Circular, replete with material misrepresentations and omissions to state material facts, including, without limitation, that (a) they had purchased and sold several trucking companies; (b) they would start Grace's own trucking company for him with sales grossing about $900,000 and net profit about $250,000 for an investment of less than $55,000.00; (c) Grace would earn about $5,000 per week to start and sell the business in a year for about $650,000.00 - $750,000.00; and (d) they would do all the work and use their relationships to start collecting profit for Grace from the first

72

day he launched the business.

266.

Defendants knew that the representations were false when they were made and the omissions to state material facts were misleading and intended the misrepresentations and omissions to state material facts to fraudulently induce Plaintiffs to purchase the Trucks.

267.

Plaintiffs reasonably relied upon such fraudulent inducements and sustained loss and damage as the proximate result of the representations having been made, including, without limitation, the following:

(i)   Loss of revenue and earnings to Trade Winds;

(ii)   Complete loss of Grace's investment in Trade Winds;

(iii)   Trade Winds' insolvency and business failure;

(iv)   Loss of income to Grace;

(v)   Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)   Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

268.

Plaintiffs are entitled to relief in the form of general damages in an amount to be determined at trial.

269.

Plaintiffs are entitled to relief in the form of attorneys' fees and expenses of litigation because Defendants acted in bad faith and fraudulently induced Plaintiffs to purchase the Trucks.

270.

Plaintiffs are entitled to relief in the form of punitive damages, in an amount to be determined at trial, because Defendants acted in bad faith and fraudulently induced Plaintiffs to purchase the Trucks.

## COUNT XI

### DECEIT

*(Against All Defendants)*

271.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

272.

Under O.C.G.A. § 51-6-2(a), willful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action for deceit.

273.

Under O.C.G.A. § 51-6-2(b), in all cases of deceit, knowledge of the falsehood constitutes an essential element of the tort. A fraudulent or reckless representation of facts as true when they are not if intended to deceive, is equivalent to a knowledge of their falsehood even if the party making the representation does not know that such facts are false.

274.

To prove the tort of deceit, Plaintiffs must show that (i) one or more of the Defendants made deceitful representations to Plaintiffs; (ii) at the time such representations were made, one or more of the Defendants knew the representations were false or were made with reckless disregard as to their truth or falsity; (iii) that one or more of the Defendants made the

representations with the intention and purpose of deceiving Plaintiffs; (iv) Plaintiffs reasonably relied upon such representations; and (v) Plaintiffs sustained the alleged loss and damage as the proximate result of the representations having been made.

275.

Defendants made deceitful representations to Grace to induce Trade Winds to purchase the Trucks, including without limitation, the following:

(i)     Navistar had corrected the problems associated with 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks with the Navistar 13.0-liter EGR MaxxForce diesel engines, by "remanufacturing" or "precertifying" the Trucks to manufacturer's specs, when, in fact, these problems remained uncorrected.

(ii)    Rusty Rush and/or Clarke had developed a Rush Certified Pre-Owned Program that included a 143-point inspection and pre-certification road test to assure that selected 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks with the Navistar 13.0-liter EGR MaxxForce diesel engines met specified quality standards before they could be sold under that nomenclature of the Rush Certified Pre-Owned Program, when, in fact, the Rush Certified Pre-Owned Program was a sham.

(iii)   The vehicles on the Special Inventory created by Shields included only trucks that passed the 143-point inspection and pre-certification road test and were reconditioned to manufacturers specifications, when in fact they were not.

(iv)    The Trucks were among the highest quality, best value, pre-owned trucks available in the industry, when, in fact, they were not.

(v)    The Trucks had undergone the "exhaustive 143-point inspection and pre-certification road test" promised by the Rush Certified Pre-Owned Program when, in fact, the Trucks had not.

(vi)    The Trucks were "remanufactured" or "pre-certified to manufacturer's specs," when, in fact, they were not.

(vii)    The Trucks were suitable for long-haul trucking when, in fact, they were not.

(viii)    The RushCare™ Protection Plan was included in the sale of the Trucks, when, in fact, it was not.

(ix)    In the alternative to subparagraph (viii) of ¶ 275, the RushCare™ Protection Plan was exclusive to the Rush Entities when, in fact, this plan was actually a used truck extended warranty offered, not by the Rush Entities, but by AGWS. to all of its dealers.

(x)    In the alternative to subparagraph (ix) of ¶ 275, repair costs under the RushCare™ Protection Plan were de minimis when, in fact, they were not, because the RushCare™ Protection Plan did not cover "teardown costs" and "diagnostic time."

(xi)    The Ventis procured Grace as a client on false pretenses by, on information and belief, dangling the promise of a nonexistent business opportunity in a classic "bait and switch," to take advantage of his lack of trucking industry experience and sell him on their scheme.

(xii)    The Ventis provided Grace with a false and misleading Offering Circular, replete with material misrepresentations and omissions to state material facts, including, without limitation, that (a) they had purchased and sold several trucking companies; (b) they would start Grace's own trucking company for him with sales grossing

about $900,000 and net profit about $250,000 for an investment of less than $55,000.00; (c) Grace would earn about $5,000 per week to start and sell the business in a year for about $650,000.00 - $750,000.00; and (d) they would do all the work and use their relationships to start collecting profit for Grace from the first day he launched the business.

### 276.

Defendants knew that the representations were false when they were made and the omissions to state material facts were misleading and intended the misrepresentations and omissions to state material facts to deceive Plaintiffs into purchasing the Trucks.

### 277.

Plaintiffs were deceived by Defendants' false representations and omissions to state material facts and sustained loss and damage as the proximate result of the false representations and omissions of material facts, including, without limitation, the following:

(i)     Loss of revenue and earnings to Trade Winds;

(ii)    Complete loss of Grace's investment in Trade Winds;

(iii)   Trade Winds' insolvency and business failure;

(iv)    Loss of income to Grace;

(v)     Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)    Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

### 278.

Plaintiffs are entitled to relief in the form of general damages in an amount to be determined

at trial.

279.

Plaintiffs are entitled to relief in the form of attorneys' fees and expenses of litigation because Defendants acted in bad faith by deceiving Plaintiffs into purchasing the Trucks.

280.

Plaintiffs are entitled to relief in the form of punitive damages, in an amount to be determined at trial, because Defendants acted in bad faith and fraudulently induced Plaintiffs to purchase the Trucks.

**COUNT XII**

**<u>CONSTRUCTIVE FRAUD</u>**

***(Against All Defendants)***

281.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

282.

In relevant part, O.C.G.A. § 23-2-51(b) provides that "[c]onstructive fraud consists of any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another."

283.

The Rush Entities and King have committed certain acts of omission or commission, including, without limitation, making the following representations, which were contrary to legal or equitable duty, trust or confidence justly reposed, contrary to good conscience and injured Plaintiffs:

78

(i)     Navistar had corrected the problems associated with 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks with the Navistar 13.0-liter EGR MaxxForce diesel engines, by "remanufacturing" or "precertifying" the Trucks to "manufacturer's specs," when, in fact, these problems remained uncorrected.

(ii)    Rusty Rush and/or Clarke had developed a Rush Certified Pre-Owned Program that included a 143-point inspection and pre-certification road test to assure that selected 2012 International Prostar® Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks with the Navistar 13.0-liter EGR MaxxForce diesel engines met specified quality standards before they could be sold under that nomenclature of the Rush Certified Pre-Owned Program, when, in fact, the Rush Certified Pre-Owned Program was a sham.

(iii)   The vehicles on the Special Inventory created by Shields included only trucks that passed the 143-point inspection and pre-certification road test and were reconditioned to manufacturers specifications, when in fact they were not.

(iv)    The Trucks were among the highest quality, best value, pre-owned trucks available in the industry, when, in fact, they were not.

(v)     The Trucks had undergone the "exhaustive 143-point inspection and pre-certification road test" promised by the Rush Certified Pre-Owned Program when, in fact, the Trucks had not.

(vi)    The Trucks were "remanufactured" or "pre-certified to manufacturer's specs," when, in fact, they were not.

(vii)   The Trucks were suitable for long-haul trucking when, in fact, they were not.

(viii)   The RushCare™ Protection Plan was exclusive to the Rush Entities when, in fact, this plan was actually a used truck service contract offered, not by the Rush Entities, but by American Guardian Warranty Services, Inc. to all of its dealers.

(ix)   The RushCare™ Protection Plan was included in the sale of the Trucks, when, in fact, it was not.

(x)   In the alternative to subparagraph (ix) of ¶ 283, the RushCare™ Protection Plan was exclusive to the Rush Entities when, in fact, this plan was actually a used truck extended warranty offered, not by the Rush Entities, but by AGWS. to all of its dealers.

(xi)   In the alternative to subparagraph (x) of ¶ 283, repair costs under the RushCare™ Protection Plan would be de minimis, when they were not, because the RushCare™ Protection Plan did not cover "teardown costs" and "diagnostic time."

(xii)   The Ventis procured Grace as a client on false pretenses by, on information and belief, dangling the promise of a nonexistent business opportunity in a classic "bait and switch," to take advantage of his lack of trucking industry experience and sell him on their scheme.

(xiii)   The Ventis provided Grace with a false and misleading Offering Circular, replete with material misrepresentations and omissions to state material facts, including, without limitation, that (a) they had purchased and sold several trucking companies; (b) they would start Grace's own trucking company for him with sales grossing about $900,000 and net profit about $250,000 for an investment of less than $55,000.00; (c) Grace would earn about $5,000 per week to start and sell the business in a year for about $650,000.00 - $750,000.00; and (d) they would do all

the work and use their relationships to start collecting profit for Grace from the first day he launched the business.

284.

Plaintiffs sustained loss and damage as the proximate result of Defendants' constructive fraud, including, without limitation, the following:

(i)     Loss of revenue and earnings to Trade Winds;

(ii)    Complete loss of Grace's investment in Trade Winds;

(iii)   Trade Winds' insolvency and business failure;

(iv)    Loss of income to Grace;

(v)     Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)    Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

285.

Plaintiffs are entitled to relief in the form of general damages in an amount to be determined at trial.

286.

Plaintiffs are entitled to relief in the form of attorneys' fees and expenses of litigation because Defendants engaged in constructive fraud.

287.

Plaintiffs are entitled to relief in the form of punitive damages, in an amount to be determined at trial, because Defendants engaged in constructive fraud.

## COUNT XIII

### CIVIL CONSPIRACY

#### *(Against All Defendants)*

288.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

289.

"A conspiracy upon which a civil action for damages may be founded is a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort. The gist of the action, if a cause of action exists, is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage." Cook v. Robinson, 216 Ga. 328, 329, 116 SE2d 742 (1960).

290.

Reasonable people, including a jury, could conclude that Defendants engaged in a conspiracy, and that the sole purpose of the conspiracy was to defraud Trade Winds and Grace by passing off as "Certified Pre-Owned," "Diamond," "remanufactured," or "pre-certified to manufacturer's specs," and selling to Trade Winds, through Defendant Rush Enterprises' dealerships in Atlanta, Georgia and Jacksonville Florida, four used, un-reconditioned, defective 2012 International Prostar® Plus LF 627 Premium 13.0-liter engine diesel rear wheel drive Class 8 commercial tractor trucks manufactured and ostensibly reconditioned by Defendant Navistar.

291.

The facts indicate that all Defendants acted in a conspiracy among themselves, and with persons unknown. They engaged in multiple predicate acts as part of the conspiracy, as follows:

(i)     Rusty Rush and/or Clarke concocted an elaborate ruse to rebrand and sell Rush Enterprises' inventory of otherwise unsaleable 2012 International Prostar® Plus LF 627 Premium tractor trucks by identifying them as "Certified Pre-Owned," "Diamond," "remanufactured" or "pre-certified to manufacturer's specs under the so-called Rush Certified Pre-Owned Program.

(ii)    Shields prepared an Excel spreadsheet listing otherwise unsaleable 2012 International Prostar® Plus LF 627 Premium tractor trucks that King could pawn off as precertified.

(iii)   The Ventis solicited potential victims lacking experience in the long-haul trucking industry, such as Grace, who were likely to be susceptible to the Ventis' "bait and switch" who King could deceive into purchasing the otherwise unsaleable tractor trucks under the so-called Rush Certified Pre-Owned Program.

(iv)    The Ventis referred Grace to King.

(v)     King fraudulently represented to Grace that (A) the Trucks were among the highest quality, best value, pre-owned trucks available in the industry; had passed the "exhaustive 143-point inspection and pre-certification road test" required by the Rush Certified Pre-Owned Program; and were suitable for long-haul trucking; and (B) Navistar had corrected the problems associated with 2012 International Prostar Plus LF 627 Premium rear wheel drive Class 8 commercial tractor trucks with the Navistar 13.0-liter EGR MaxxForce diesel engines, by "remanufacturing" or "precertifying" the Trucks to manufacturer's specifications.

(vi)    King also fraudulently represented to Grace that (A) the RushCare™ Protection Plan was included in the sale of the Trucks, when, in fact, it was not; or (B) in the

alternative to subparagraph (vi)(A) of ¶ 291, the RushCare™ Protection Plan was exclusive to the Rush Entities when, in fact, this plan was not exclusive and was actually a used truck extended warranty offered, not by the Rush Entities, but by AGWS. to all of its dealers; and repair costs would be minimal; and (C) repair costs under the RushCare™ Protection Plan were de minimis, when in fact they were not, because the RushCare™ Protection Plan did not cover "teardown costs" and "diagnostic time."

(vii)   King did not provide Grace with copies of the "exhaustive 143-point inspection and pre-certification road test" on each Truck because the inspections and road tests were not conducted.

(viii)   Following the sale and purchase of the Trucks, the Ventis breached their obligations to Grace under the Consulting Agreement.

(ix)   Rush Enterprises, the Rush Entities and King attempted to induce Grace, on behalf of Trade Winds, to sign the Proposed Release would have acquitted and forever discharged them, their corporate affiliates and subsidiaries and any of their employees, directors, officers, attorneys and representatives, and any other parties who might be liable from any liability arising from their fraud and conspiracy.

292.

The acts associated with the aforementioned elements of the conspiracy were tortious in nature.

293.

Defendants inflicted great harm upon Plaintiffs through their predicate acts.

294.

Plaintiffs sustained loss and damage as the proximate result thereof, including, without limitation, the following:

(i)     Loss of revenue and earnings to Trade Winds;

(ii)    Complete loss of Grace's investment in Trade Winds;

(iii)   Trade Winds' insolvency and business failure;

(iv)    Loss of income to Grace;

(v)     Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)    Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

295.

Plaintiffs are entitled to relief in the form of general damages in an amount to be determined at trial.

296.

Plaintiffs are entitled to relief in the form of attorneys' fees and expenses of litigation as a result thereof.

297.

Plaintiffs are entitled to relief in the form of punitive damages, in an amount to be determined at trial as a result thereof.

## U.S. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

## ("FEDERAL RICO")

## COUNT XIV

### FEDERAL RICO - 18 U.S.C. § 1962(c)

*(Against Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John*

*Doe)*

298.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth

herein.

299.

Federal RICO explicitly provides a cause of action for any person injured in his business

or property by reason of a violation of the federal RICO statute. 18 U.S.C.S. § 1964(c).

300.

The U.S. Supreme Court "has made it clear that federal RICO applies 'not just [to]

mobsters' but to 'any person' who violates its provisions. The statute, moreover, is intended 'to

be read broadly,' in accordance with 'Congress' self-consciously expansive language and overall

approach,' as 'an aggressive initiative to supplement old remedies and develop new methods for

fighting crime,' regardless of whether the defendant is associated with organized crime or a

'respected business.'" Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 526-27 (S.D.N.Y. 2014)

*citing* Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497-99 (1985.

301.

To prove a violation of 18 U.S.C. § 1962(c), a plaintiff must establish: (i) the existence of

an enterprise which affects interstate or foreign commerce; (ii) that the defendant associated with

86

the enterprise; (iii) that the defendant participated in or conducted the enterprise's affairs; and (iv) that the participation in or conduct of the enterprise's affairs was through a pattern of racketeering activities. United States v. Goldin Indus., Inc., 219 F.3d 1271, 1274 (11th Cir. 2000) (*citing* United States v. Weinstein, 762 F.2d 1522, 1536 (11th Cir. 1985)).

302.

18 U.S.C. § 1961(4) defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

## A. Defendant Persons / Enterprises

303.

At all relevant times, the enterprises alleged in paragraphs 304 through 347 infra were engaged in, and their activities affected, interstate commerce.

### (1) The Individual Enterprise

304.

An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." Boyle v. United States, 556 U.S. 938, 946, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009) (*quoting* United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)).

305.

Although it need not have an "'ascertainable structure' distinct from the associations necessary to conduct the pattern of racketeering activity," Goldin Indus., 219 F.3d at 1275, an association-in-fact nevertheless "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these

associates to pursue the enterprise's purpose." <u>Boyle</u>, 556 U.S. at 946.

306.

"[T]he definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." <u>Goldin Indus.</u>, 219 F.3d at 1275 (citing <u>United States v. Elliott</u>, 571 F.2d 880, 898 (5th Cir. 1978)).

307.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "Individual Enterprise").

308.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe share the common purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain used, un-reconditioned, defective 2012 International Prostar® Plus LF 627 Premium 13.0-liter engine diesel rear wheel drive Class 8 commercial tractor trucks manufactured and ostensibly reconditioned by Navistar (hereinafter, the" Defective Tractor Trucks") as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities, which are owned or controlled by King, Shields, Newman, Rusty Rush and/or

88

Clarke, and through Interstate, which is owned or controlled by Chris Venti and Josh Venti;

(iii)    all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

309.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and Navistar, which are owned or controlled by King, Shields, Newman, Rusty Rush and/or Clarke, and through Interstate, which is owned or controlled by Chris Venti and Josh Venti.

310.

The Individual Enterprise possesses sufficient longevity for its members to carry out their purposes in that the Individual Enterprise has operated, at a minimum, since November 2016, continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

311.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the Individual Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

312.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire

fraud described in paragraphs 153 through 163.

### (2) Corporate Enterprise I (Alternatively)

313.

In the alternative to ¶¶ 304 through 312 *supra*, Navistar, the Rush Entities, Interstate and/or ABC Entity, as legal entities, constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter referred to as "Corporate Enterprise I").

314.

Navistar, the Rush Entities, Interstate and/or ABC Entity share the common purpose of, among other things, fraudulently and deceptively:

(i)   Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)   marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

315.

Navistar, the Rush Entities, Interstate and/or ABC Entity are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and share common ownership.

316.

Corporate Enterprise I possesses sufficient longevity for its members to carry out their purposes in that the Individual Enterprise has operated, at a minimum, since November 2016, continues to operate, and continues to fraudulently induce the Rush Entities' customers to

purchase the Defective Tractor Trucks sold through the Rush Entities.

317.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise I through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

318.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (3) Corporate Enterprise II (Alternatively)

319.

In the alternative to ¶¶ 304 through 318 *supra*, Navistar and the Rush Entities, as legal entities, constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter referred to as "Corporate Enterprise II").

320.

Navistar and the Rush Entities share the common purpose of, among other things, fraudulently and deceptively:

(i)      Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)     marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)    all for the common purpose of fraudulently inducing the Rush Entities' customers

91

to purchase these used, un-reconditioned, defective tractor trucks.

321.

Navistar and the Rush Entities are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and share common ownership.

322.

Corporate Enterprise II possesses sufficient longevity for its members to carry out their purposes in that the Individual Enterprise has operated, at a minimum, since November 2016, continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

323.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise II through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

324.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (4) Corporate Enterprise III (Alternatively)

325.

In the alternative to ¶¶ 304 through 324 *supra*, the Rush Entities, as legal entities, constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter referred to as "Corporate Enterprise III").

326.

The Rush Entities share the common purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

327.

The Rush Entities are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and share common ownership.

328.

Corporate Enterprise III possesses sufficient longevity for its members to carry out their purposes in that the Individual Enterprise has operated, at a minimum, since November 2016, continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

329.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the Corporate Enterprise III through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

330.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (5) Corporate Enterprise IV (Alternatively)

331.

In the alternative to ¶¶ 304 through 330 *supra*, Rush Enterprises, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter referred to as "Corporate Enterprise IV").

332.

Rush Enterprises has the purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

333.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise IIV through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

334.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (6) Corporate Enterprise V (Alternatively)

335.

In the alternative to ¶¶ 304 through 334 *supra*, Rush-Atlanta and Rush-Jacksonville, as legal entities, constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter referred to as "Corporate Enterprise V").

336.

Rush-Atlanta and Rush-Jacksonville share the common purpose of, among other things, fraudulently and deceptively:

(i)    Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)   marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)  all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

337.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise V through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

338.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (7) Corporate Enterprise VI (Alternatively)

339.

In the alternative to ¶¶ 304 through 338 *supra*, Rush-Jacksonville, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter referred to as "Corporate Enterprise VI").

340.

Rush-Jacksonville has the common purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

341.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise VI through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

342.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (8) Corporate Enterprise VII (Alternatively)

343.

In the alternative to ¶¶ 304 through 342 *supra*, Rush-Atlanta, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter referred to as "Corporate Enterprise VII").

344.

Rush-Atlanta has the common purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

345.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise VII through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

346.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

**(9) The King Enterprise (Alternatively)**

347.

In the alternative to ¶¶ 304 through 346 *supra*, King, as an individual, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter referred to as the "King Enterprise").

348.

The King Enterprise has the common purpose of, among other things, fraudulently and deceptively:

(i)    Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)   marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)  all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

349.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the King Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

350.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

**B. Pattern of Racketeering Activity**

351.

All of the acts of racketeering described in ¶¶ 1 through 163 supra were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that (i) their common purpose was to defraud Trade Winds and Grace of money; (ii) their common result was to defraud Trade Winds and Grace of money; (iii) Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe, personally or through Navistar, the Rush Entities, Interstate and/or ABC Entity (hereinafter collectively the "Corporate Defendants"), their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; (iv) Trade Winds and Grace were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

352.

All of the acts of racketeering described in ¶¶ 1 through 163 supra were continuous so as to form a pattern of racketeering activity in that Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe have engaged in the predicate acts since November 2016, at a minimum and/or the acts of racketeering threaten to continue indefinitely because the acts of racketeering are the regular way in which Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe used tractor truck market and in other markets, such as the new tractor truck market. See ¶¶ 126-135 and footnotes 3, 4 and 5 *supra*.

### C. Treble Damages

353.

As a direct and proximate result of, and by reason of, the activities of Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe, and their conduct in violation of 18 U.S.C. § 1962(c), purchasers of the Defector Tractor Trucks, including Trade Winds and Grace, were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).

354.

Among other things, purchasers of the Defector Tractor Trucks, including Trade Winds and Grace, suffered damages to the extent they were fraudulently induced to purchase the Trucks; and which, in the case of Trade Winds and Grace, included, without limitation, the following damages and injury:

(i)     Loss of revenue and earnings to Trade Winds;

(ii)    Complete loss of Grace's investment in Trade Winds;

(iii)   Trade Winds' insolvency and business failure;

(iv)    Loss of income to Grace;

(v)     Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)    Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

355.

Trade Winds and Grace, there, are entitled to recover threefold the damages sustained, together with the cost of this lawsuit, including costs, reasonable attorneys' fees and reasonable

experts' fees.

### D. Permanent Injunction

356.

Pursuant to 18 U.S.C. § 1964(a), Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe should be restrained from further violating 18 U.S.C. § 1962(c) and should disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c).

## COUNT XV

## FEDERAL RICO - 18 U.S.C. § 1962(d)

*(Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe)*

357.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

### A. Operator / Manager(s)

358.

As alleged in Count XIV, one or more of the following individuals violated 18 U.S.C. § 1962(c): Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe. Any person(s) who is found to have violated 18 U.S.C. § 1962(c) is hereinafter referred to as the "Operator / Manager(s)" for the remainder of this Count XV. At all relevant times, the Operator / Manager(s) were engaged in, and their activities affected, interstate commerce.

### B. Pattern of Racketeering Activity

359.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe

101

conspired with the Operator / Manager(s) to conduct or participate, directly or indirectly, the affairs of the enterprises (*see* ¶¶ 304 to 355 *supra*) through a pattern of racketeering activity (*see* ¶¶ 1 to 163 *supra*) in violation of 18 U.S.C. § 1962(d). In particular, Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe intended to or agreed to further an endeavor of the Operator / Manager(s) which, if completed, would satisfy all of the elements of a substantive federal RICO criminal offense under 18 U.S.C. § 1962(c) and adopted the goal of further or facilitating the criminal endeavor.

360.

Trade Winds and Grace were injured by the overt acts of Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe, which are acts of racketeering or otherwise unlawful under the federal RICO statute, including, among other acts, acts of wire fraud, as described in *see* ¶¶ 1 to 163 *supra*, committed through the enterprises alleged in Count IV.

## C. Treble Damages

361.

As a direct and proximate result of, and by reason of, the activities of Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe, and their conduct in violation of 18 U.S.C. § 1962(d), Trade Winds and Grace were injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

362.

Among other things, purchasers of the Defector Tractor Trucks, including Trade Winds and Grace, suffered damages to the extent they were fraudulently induced to purchase the Trucks; and which, in the case of Trade Winds and Grace, included, without limitation, the following

damages and injury:

(i)     Loss of revenue and earnings to Trade Winds;

(ii)    Complete loss of Grace's investment in Trade Winds;

(iii)   Trade Winds' insolvency and business failure;

(iv)    Loss of income to Grace;

(v)     Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)    Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

363.

Trade Winds and Grace, there, are entitled to recover threefold the damages sustained, together with the cost of this lawsuit, including costs, reasonable attorneys' fees and reasonable experts' fees.

**D.  Permanent Injunction**

364.

Pursuant to 18 U.S.C. § 1964(a), the Operator / Manager(s) should be restrained from further violating 18 U.S.C. § 1962(d) and should disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(d).

## COUNT XVI

### FEDERAL RICO - 18 U.S.C. § 1962(c)

*(Against Navistar, the Rush Entities, Interstate and/or ABC Entity)*

365.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth

103

herein.

## A. Defendant Persons / Enterprises

### (1) Corporate Enterprise I: Navistar, the Rush Entities, Interstate and/or ABC Entity

366.

Navistar, the Rush Entities, Interstate and/or ABC Entity, as legal entities, constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

367.

Navistar, the Rush Entities, Interstate and/or ABC Entity share the common purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

368.

Navistar, the Rush Entities, Interstate and/or ABC Entity are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and share common ownership.

369.

Corporate Enterprise I possesses sufficient longevity for its members to carry out their purposes in that Corporate Enterprise I has operated, at a minimum, since November 2016,

continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

370.

Navistar, the Rush Entities, Interstate and/or ABC Entity are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), that individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise I through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

371.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (2) Corporate Enterprise II: Navistar and the Rush Entities (Alternatively)

372.

In the alternative to ¶¶ 366 through 371 *supra*, Navistar and the Rush Entities, as legal entities, constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

373.

Navistar and the Rush Entities share the common purpose of, among other things, fraudulently and deceptively:

(i)  Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)  marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)  all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

374.

Navistar and the Rush Entities are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and share common ownership.

375.

Corporate Enterprise II possesses sufficient longevity for its members to carry out their purposes in that Corporate Enterprise II has operated, at a minimum, since November 2016, continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

376.

Navistar and the Rush Entities are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), that individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise II through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

377.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

**(3) Corporate Enterprise III: The Rush Entities (Alternatively)**

378.

In the alternative to ¶¶ 366 through 377 *supra*, the Rush Entities, as legal entities, constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

379.

The Rush Entities share the common purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

380.

The Rush Entities are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and share common ownership.

381.

The Rush Entities possess sufficient longevity for its members to carry out their purposes in that Corporate Enterprise III has operated, at a minimum, since November 2016, continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

382.

The Rush Entities are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), that individually conducted, participated in, engaged in, and operated and managed the affairs of the Corporate Enterprise III through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

383.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

**(4) The Corporate Enterprise V: Rush-Atlanta and Rush-Jacksonville (Alternatively)**

384.

In the alternative to ¶¶ 366 through 383 *supra*, Rush-Atlanta and Rush-Jacksonville, as legal entities, constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

385.

Rush-Atlanta and Rush-Jacksonville share the common purpose of, among other things, fraudulently and deceptively:

(i) Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii) marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii) all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

386.

Rush-Atlanta and Rush-Jacksonville are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), that individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise V through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

387.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

388.

In the alternative to ¶¶ 366 through 387 *supra*, Rush-Atlanta, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter referred to as "Corporate Enterprise VII").

**B. Pattern of Racketeering Activity**

389.

All of the acts of racketeering described in ¶¶ 1 through 163 supra were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that (i) their common purpose was to defraud Trade Winds and Grace of money; (ii) their common result was to defraud Trade Winds and Grace of money; (iii) Corporate Enterprises I, II, III, IV, V, VI, VII and VIII (hereinafter collectively the "Corporate Defendants"), through their officers, agents and employees, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; (iv) Trade Winds and Grace were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

390.

All of the acts of racketeering described in ¶¶ 1 through 163 supra were continuous so as to form a pattern of racketeering activity in that Navistar, the Rush Entities and/or Interstate have engaged in the predicate acts since November 2016, at a minimum and/or the acts of racketeering threaten to continue indefinitely because the acts of racketeering are the regular way in which the Rush Entities and/or Interstate do business in the used tractor truck market and in other markets, such as the new tractor truck market. See ¶¶ 126-135 and footnotes 3, 4 and 5 *supra*.

## C. Treble Damages

391.

As a direct and proximate result of, and by reason of, the activities of Navistar, the Rush Entities and/or Interstate, and their conduct in violation of 18 U.S.C. § 1962(c), purchasers of the Defector Tractor Trucks, including Trade Winds and Grace, were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).

392.

Among other things, purchasers of the Defector Tractor Trucks, including Trade Winds and Grace, suffered damages to the extent they were fraudulently induced to purchase the Trucks; and which, in the case of Trade Winds and Grace, included, without limitation, the following damages and injury:

(i)      Loss of revenue and earnings to Trade Winds;

(ii)     Complete loss of Grace's investment in Trade Winds;

(iii)    Trade Winds' insolvency and business failure;

(iv)     Loss of income to Grace;

(v)      Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)     Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

393.

Trade Winds and Grace, there, are entitled to recover threefold the damages sustained, together with the cost of this lawsuit, including costs, reasonable attorneys' fees and reasonable experts' fees.

### E.  Permanent Injunction

394.

Pursuant to 18 U.S.C. § 1964(a), Navistar, the Rush Entities and/or Interstate should be restrained from further violating 18 U.S.C. § 1962(c) and should disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c).

## COUNT XVII

### FEDERAL RICO - 18 U.S.C. § 1962(d)

#### *(Against Navistar, the Rush Entities, Interstate and/or ABC Entity)*

395.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

### A.  Operator / Manager(s)

396.

As alleged in Count XVI, one or more of the following individuals violated 18 U.S.C. § 1962(c): Navistar, the Rush Entities, Interstate and/or ABC Entity. Any person(s) who is found to have violated 18 U.S.C. § 1962(c) is hereinafter referred to as the "Operator / Manager(s)" for the remainder of this Count XVII. At all relevant times, the Operator / Manager(s) were engaged in, and their activities affected, interstate commerce.

### B.  Pattern of Racketeering Activity

397.

Navistar, the Rush Entities, Interstate and/or ABC Entity conspired with the Operator / Manager(s) to conduct or participate, directly or indirectly, the conduct of the affairs of the

enterprises (*see* ¶¶ 304 to 394 *supra*) through a pattern of racketeering activity (*see* ¶¶ 1 to 163 *supra*) in violation of 18 U.S.C. § 1962(d). In particular, Navistar, the Rush Entities, Interstate and/or ABC Entity intended to or agreed to further an endeavor of the Operator / Manager(s) which, if completed, would satisfy all of the elements of a substantive federal RICO criminal offense under 18 U.S.C. § 1962(c) and adopted the goal of further or facilitating the criminal endeavor.

398.

Trade Winds and Grace were injured by the overt acts of Navistar, the Rush Entities, Interstate and/or ABC Entity, which are acts of racketeering or otherwise unlawful under the federal RICO statute, including, among other acts, acts of wire fraud, as described in *see* ¶¶ 1 to 163 *supra*, committed through the enterprises alleged in Count IV.

## C. Treble Damages

399.

As a direct and proximate result of, and by reason of, the activities of Navistar, the Rush Entities, Interstate and/or ABC Entity, and their conduct in violation of 18 U.S.C. § 1962(d), Trade Winds and Grace were injured in their business or property within the meaning of 18 U.S.C. § 1964(c). Among other things, Trade Winds and Grace, suffered damages to the extent they were fraudulently induced to purchase the Trucks; and which, in the case of Trade Winds and Grace, directly resulted in the following:

     (i)  Loss of revenue and earnings to Trade Winds;

     (ii)  Complete loss of Grace's investment in Trade Winds;

     (iii)  Trade Winds' insolvency and business failure;

     (iv)  Loss of income to Grace;

(v)   Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)   Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

400.

Trade Winds and Grace, therefore, are entitled to recover threefold the damages sustained, together with the cost of this lawsuit, including costs, reasonable attorneys' fees and reasonable experts' fees.

**D.  Permanent Injunction**

401.

Pursuant to 18 U.S.C. § 1964(a), the Operator / Manager(s) should be restrained from further violating 18 U.S.C. § 1962(d) and should disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(d).

**GEORGIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

**("GEORGIA RICO")**

**COUNT XVIII**

**O.C.G.A. § 16-14-4**

*(Against Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe)*

402.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth herein.

**A. Defendant Persons / Enterprises**

**(1) The Individual Enterprise**

403.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe constitute an "enterprise," under O.C.G.A. § 16-14-3(6).

404.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe share the common purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain used, un-reconditioned, defective 2012 International Prostar® Plus LF 627 Premium 13.0-liter engine diesel rear wheel drive Class 8 commercial tractor trucks manufactured and ostensibly reconditioned by Navistar (hereinafter, the" Defective Tractor Trucks") as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities, which are owned or controlled by King, Shields, Newman, Rusty Rush and/or Clarke, and through Interstate, which is owned or controlled by Chris Venti and Josh Venti;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

405.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are related in that they cooperatively market and sell the Defective Tractor Trucks through the

Rush Entities, which are owned or controlled by King, Shields, Newman, Rusty Rush and/or Clarke, and through Interstate, which is owned or controlled by Chris Venti and Josh Venti.

406.

The Individual Enterprise possesses sufficient longevity for its members to carry out their purposes in that the Individual Enterprise has operated, at a minimum, since November 2016, continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

407.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of O.C.G.A. § 16-14-4, who individually conducted, participated in, engaged in, and operated and managed the affairs of the Individual Enterprise through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

408.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

**(2) Corporate Enterprise I (Alternatively)**

409.

In the alternative to ¶¶ 403 through 408 *supra*, Navistar, the Rush Entities, Interstate and/or ABC Entity, as legal entities, constitute an "enterprise," within the meaning of O.C.G.A. § 16-14-4.

410.

Navistar, the Rush Entities, Interstate and/or ABC Entity share the common purpose of, among other things, fraudulently and deceptively:

115

(i)    Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)   marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)  all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

411.

Navistar, the Rush Entities, Interstate and/or ABC Entity are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and share common ownership.

412.

Corporate Enterprise I possesses sufficient longevity for its members to carry out their purposes in that the Individual Enterprise has operated, at a minimum, since November 2016, continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

413.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of O.C.G.A. § 16-14-4, who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise I through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

414.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (3) Corporate Enterprise II (Alternatively)

415.

In the alternative to ¶¶ 403 through 414 *supra*, Navistar and the Rush Entities, as legal entities, constitute an "enterprise," within the meaning of O.C.G.A. § 16-14-4.

416.

Navistar and the Rush Entities share the common purpose of, among other things, fraudulently and deceptively:

(i)    Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)   marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)  all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

417.

Navistar and the Rush Entities are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and share common ownership.

418.

Corporate Enterprise II possesses sufficient longevity for its members to carry out their purposes in that the Individual Enterprise has operated, at a minimum, since November 2016, continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

419.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe

117

are each a "person," within the meaning of O.C.G.A. § 16-14-4, who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise II through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

420.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (4) Corporate Enterprise III (Alternatively)

421.

In the alternative to ¶¶ 403 through 420 *supra*, the Rush Entities, as legal entities, constitute an "enterprise," within the meaning of O.C.G.A. § 16-14-4.

422.

The Rush Entities share the common purpose of, among other things, fraudulently and deceptively:

(i)   Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)  marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii) all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

423.

The Rush Entities are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and share common ownership.

118

424.

Corporate Enterprise III possesses sufficient longevity for its members to carry out their purposes in that the Individual Enterprise has operated, at a minimum, since November 2016, continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

425.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of O.C.G.A. § 16-14-4, who individually conducted, participated in, engaged in, and operated and managed the affairs of the Corporate Enterprise III through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

426.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

**(5) Corporate Enterprise IV (Alternatively)**

427.

In the alternative to ¶¶ 403 through 426 *supra*, Rush Enterprises, as a legal entity, constitutes an "enterprise," within the meaning of O.C.G.A. § 16-14-4.

428.

Rush Enterprises has the purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

119

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

429.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of O.C.G.A. § 16-14-4, who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise IIV through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

430.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (6) Corporate Enterprise V (Alternatively)

431.

In the alternative to ¶¶ 403 through 430 *supra*, Rush-Atlanta and Rush-Jacksonville, as legal entities, constitute an "enterprise," within the meaning of O.C.G.A. § 16-14-4.

432.

Rush-Atlanta and Rush-Jacksonville share the common purpose of, among other things, fraudulently and deceptively:

(i)   Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)   marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

433.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of O.C.G.A. § 16-14-4, who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise V through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

434.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

**(7) Corporate Enterprise VI (Alternatively)**

435.

In the alternative to ¶¶ 403 through 434 *supra*, Rush-Jacksonville, as a legal entity, constitutes an "enterprise," within the meaning of O.C.G.A. § 16-14-4.

436.

Rush-Jacksonville has the common purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

437.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe

are each a "person," within the meaning of O.C.G.A. § 16-14-4, who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise VI through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

438.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (8) Corporate Enterprise VII (Alternatively)

439.

In the alternative to ¶¶ 403 through 438 *supra*, Rush-Atlanta, as a legal entity, constitutes an "enterprise.".

440.

Rush-Atlanta has the common purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

441.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of O.C.G.A. § 16-14-4, who individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise VII

through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

442.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (9) The King Enterprise (Alternatively)

443.

In the alternative to ¶¶ 403 through 442 *supra*, King, as an individual, constitutes an "enterprise."

444.

The King Enterprise has the common purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

445.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe are each a "person," within the meaning of O.C.G.A. § 16-14-4, who individually conducted, participated in, engaged in, and operated and managed the affairs of the King Enterprise through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

446.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

**B.  Pattern of Racketeering Activity**

447.

All of the acts of racketeering described in ¶¶ 1 through 163 supra were related so as to establish a pattern of racketeering activity, within the meaning of O.C.G.A. § 16-14-4, in that (i) their common purpose was to defraud Trade Winds and Grace of money; (ii) their common result was to defraud Trade Winds and Grace of money; (iii) Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe, personally or through Navistar, the Rush Entities, Interstate and/or ABC Entity (hereinafter collectively the "Corporate Defendants"), their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; (iv) Trade Winds and Grace were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

448.

All of the acts of racketeering described in ¶¶ 1 through 163 supra were continuous so as to form a pattern of racketeering activity in that Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe have engaged in the predicate acts since November 2016, at a minimum and/or the acts of racketeering threaten to continue indefinitely because the acts of racketeering are the regular way in which Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe used tractor truck market and in other markets, such as the new tractor truck market. See ¶¶ 126-135 and footnotes 3, 4 and 5 *supra*.

124

## C. Treble Damages

449.

As a direct and proximate result of, and by reason of, the activities of Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe, and their conduct in violation of O.C.G.A. § 16-14-4, purchasers of the Defector Tractor Trucks, including Trade Winds and Grace, were injured in their business or property, within the meaning of O.C.G.A. § 16-14-6(c).

450.

Among other things, purchasers of the Defector Tractor Trucks, including Trade Winds and Grace, suffered damages to the extent they were fraudulently induced to purchase the Trucks; and which, in the case of Trade Winds and Grace, included, without limitation, the following damages and injury:

    (i)     Loss of revenue and earnings to Trade Winds;

    (ii)    Complete loss of Grace's investment in Trade Winds;

    (iii)   Trade Winds' insolvency and business failure;

    (iv)   Loss of income to Grace;

    (v)    Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

    (vi)   Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

451.

Among other things, purchasers of the Defector Tractor Trucks, including Trade Winds and Grace, suffered damages to the extent they were fraudulently induced to purchase the Trucks;

and which, in the case of Trade Winds and Grace, directly resulted in the following:

    (i)      Loss of revenue and earnings to Trade Winds;

    (ii)     Complete loss of Grace's investment in Trade Winds;

    (iii)    Trade Winds' insolvency and business failure;

    (iv)    Loss of income to Grace;

    (v)     Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

    (vi)    Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

452.

Trade Winds and Grace, there, are entitled to recover threefold the damages sustained, together with the cost of this lawsuit, including costs, reasonable attorneys' fees and reasonable experts' fees, pursuant to O.C.G.A. § 16-14-6(c).

**D. Permanent Injunction**

453.

Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe should be restrained from further violating O.C.G.A. § 16-14-4 and should disgorge all ill-gotten profits earned by their violation of O.C.G.A. § 16-14-4.

## COUNT XIX

### O.C.G.A. § 16-14-4 – Georgia RICO

*(Against Navistar, the Rush Entities, Interstate and/or ABC Entity)*

454.

Plaintiffs repeat and reallege the preceding paragraphs set forth above as if fully set forth

126

herein.

**A. Defendant Persons / Enterprises**

    **(1) Corporate Enterprise I: Navistar, the Rush Entities, Interstate and/or ABC Entity**

455.

Navistar, the Rush Entities, Interstate and/or ABC Entity, as legal entities, constitute an "enterprise," within the meaning of O.C.G.A. § 16-14-4.

456.

Navistar, the Rush Entities, Interstate and/or ABC Entity share the common purpose of, among other things, fraudulently and deceptively:

    (i)    Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

    (ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

    (iii)    all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

457.

Navistar, the Rush Entities, Interstate and/or ABC Entity are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and share common ownership.

458.

Corporate Enterprise I possesses sufficient longevity for its members to carry out their purposes in that Corporate Enterprise I has operated, at a minimum, since November 2016,

127

continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

459.

Navistar, the Rush Entities, Interstate and/or ABC Entity are each a "person," within the meaning of O.C.G.A. § 16-14-4, that individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise I through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

460.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (2) Corporate Enterprise II: Navistar and the Rush Entities (Alternatively)

461.

In the alternative to ¶¶ 456 through 460 *supra*, Navistar and the Rush Entities, as legal entities, constitute an "enterprise," within the meaning of O.C.G.A. § 16-14-4.

462.

Navistar and the Rush Entities share the common purpose of, among other things, fraudulently and deceptively:

(i)   Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)  marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii) all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

128

463.

Navistar and the Rush Entities are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and share common ownership.

464.

Corporate Enterprise II possesses sufficient longevity for its members to carry out their purposes in that Corporate Enterprise II has operated, at a minimum, since November 2016, continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

465.

Navistar and the Rush Entities are each a "person," within the meaning of O.C.G.A. § 16-14-4, that individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise II through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

466.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

### (3) Corporate Enterprise III: The Rush Entities (Alternatively)

467.

In the alternative to ¶¶ 456 through 466 *supra*, the Rush Entities, as legal entities, constitute an "enterprise," within the meaning of O.C.G.A. § 16-14-4.

468.

The Rush Entities share the common purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

469.

The Rush Entities are related in that they cooperatively market and sell the Defective Tractor Trucks through the Rush Entities and share common ownership.

470.

The Rush Entities possess sufficient longevity for its members to carry out their purposes in that Corporate Enterprise III has operated, at a minimum, since November 2016, continues to operate, and continues to fraudulently induce the Rush Entities' customers to purchase the Defective Tractor Trucks sold through the Rush Entities.

471.

The Rush Entities are each a "person," within the meaning of O.C.G.A. § 16-14-4, that individually conducted, participated in, engaged in, and operated and managed the affairs of the Corporate Enterprise III through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

472.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

**(4) The Corporate Enterprise V: Rush-Atlanta and Rush-Jacksonville (Alternatively)**

473.

In the alternative to ¶¶ 456 through 472 *supra*, Rush-Atlanta and Rush-Jacksonville, as legal entities, constitute an "enterprise," within the meaning of O.C.G.A. § 16-14-4.

474.

Rush-Atlanta and Rush-Jacksonville share the common purpose of, among other things, fraudulently and deceptively:

(i)     Passing off certain Defective Tractor Trucks as "Certified Pre-Owned," "Diamond," "remanufactured," "pre-certified to manufacturer's specs," and warrantied under the Rush Certified Pre-Owned Program; and

(ii)    marketing and selling the Defective Tractor Trucks through the Rush Entities;

(iii)   all for the common purpose of fraudulently inducing the Rush Entities' customers to purchase these used, un-reconditioned, defective tractor trucks.

475.

Rush-Atlanta and Rush-Jacksonville are each a "person," within the meaning of O.C.G.A. § 16-14-4, that individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise V through a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8) and 9(A).

476.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 153 through 163.

477.

In the alternative to ¶¶ 456 through 476 *supra*, Rush-Atlanta, as a legal entity, constitutes an "enterprise," within the meaning of O.C.G.A. § 16-14-4 (hereinafter referred to as "Corporate Enterprise VII").

### B.  Pattern of Racketeering Activity

478.

All of the acts of racketeering described in ¶¶ 1 through 163 supra were related so as to establish a pattern of racketeering activity, within the meaning of O.C.G.A. § 16-14-4, in that (i) their common purpose was to defraud Trade Winds and Grace of money; (ii) their common result was to defraud Trade Winds and Grace of money; (iii) Corporate Enterprises I, II, III, IV, V, VI, VII and VIII (hereinafter collectively the "Corporate Defendants"), through their officers, agents and employees, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; (iv) Trade Winds and Grace were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

479.

All of the acts of racketeering described in ¶¶ 1 through 163 supra were continuous so as to form a pattern of racketeering activity in that Navistar, the Rush Entities and/or Interstate have engaged in the predicate acts since November 2016, at a minimum and/or the acts of racketeering threaten to continue indefinitely because the acts of racketeering are the regular way in which the Rush Entities and/or Interstate do business in the used tractor truck market and in other markets, such as the new tractor truck market. See ¶¶ 126-135 and footnotes 3, 4 and 5 *supra*.

## C. Treble Damages

480.

As a direct and proximate result of, and by reason of, the activities of Navistar, the Rush Entities and/or Interstate, and their conduct in violation of O.C.G.A. § 16-14-4, purchasers of the Defector Tractor Trucks, including Trade Winds and Grace, were injured in their business or property, within the meaning of O.C.G.A. § 16-14-6(c).

481.

Among other things, purchasers of the Defector Tractor Trucks, including Trade Winds and Grace, suffered damages to the extent they were fraudulently induced to purchase the Trucks; and which, in the case of Trade Winds and Grace, directly resulted in the following injuries and damages:

    (i)      Loss of revenue and earnings to Trade Winds;

    (ii)     Complete loss of Grace's investment in Trade Winds;

    (iii)    Trade Winds' insolvency and business failure;

    (iv)    Loss of income to Grace;

    (v)     Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

    (vi)    Grace's severe emotional distress, which resulted in an almost fatal heart attack, medical complications and heart and kidney transplants.

482.

Trade Winds and Grace, there, are entitled to recover threefold the damages sustained, together with the cost of this lawsuit, including costs, reasonable attorneys' fees and reasonable experts' fees, pursuant to O.C.G.A. § 16-14-6(c).

### E.  Permanent Injunction

483.

Navistar, the Rush Entities and/or Interstate should be restrained from further violating O.C.G.A. § 16-14-4 and should disgorge all ill-gotten profits earned by their violation of O.C.G.A. § 16-14-4.

### PRAYER FOR RELIEF

1.  Under Count I, enter judgment against Rush-Atlanta and Rush-Jacksonville arising from their breach of the express warranties in the Sales Contracts, and award to Trade Winds and Grace all actual damages, reasonable attorneys' fees and expenses of litigation;

2.  Under Count II, enter judgment against Rush-Atlanta and Rush-Jacksonville arising from their breach of implied warranties of merchantability in the Sales Contracts, and award to Trade Winds and Grace all actual damages, reasonable attorneys' fees and expenses of litigation;

3.  Under Count III, enter judgment against Rush-Atlanta and Rush-Jacksonville arising from their breach of the implied warranties of fitness for a particular purpose in the Sales Contracts, and award to Trade Winds and Grace all actual damages, reasonable attorneys' fees and expenses of litigation;

4.  Under Count IV, enter judgment against Rush-Atlanta and Rush-Jacksonville arising from their breach of implied warranties of good faith and fair dealing in the Sales Contracts, and award to Trade Winds and Grace all actual damages, reasonable attorneys' fees and expenses of litigation;

5.  Under Count V, enter judgment against Rush-Atlanta and Rush-Jacksonville for their breaches the express warranties, implied warranties of merchantability, implied

warranties of fitness for a particular purpose and implied warranties of good faith and fair dealing in each one of the Sales Contracts and award to Trade Winds and Grace all actual damages, reasonable attorneys' fees and expenses of litigation;

6.  Under Count VI, enter judgment against Interstate by rescinding the Consulting Agreement, and award to Trade Winds and Grace all actual damages, reasonable attorneys' fees and expenses of litigation;

7.  Under Count VII, enter judgment against Interstate arising from their breach of the express warranties in the Consulting Agreement, and award to Trade Winds and Grace all actual damages, reasonable attorneys' fees and expenses of litigation;

8.  Under Count VIII enter judgment against Interstate arising from their breach of implied warranties of good faith and fair dealing in the Consulting Agreement, and award to Trade Winds and Grace all actual damages, reasonable attorneys' fees and expenses of litigation;

9.  As an alternative to Counts VI through IX, enter judgment against Interstate by rescinding the Consulting Agreement, and award to Trade Winds and Grace all actual damages, reasonable attorneys' fees and expenses of litigation;

10. Under Count X, enter judgment against all Defendants for fraud in the inducement, and award to Trade Winds and Grace all actual damages, punitive damages, reasonable attorneys' fees and expenses of litigation;

11. Under Count XI, enter judgment against all Defendants for deceit, and award to Trade Winds and Grace all actual damages, punitive damages, reasonable attorneys' fees and expenses of litigation;

12. Under Count XII, enter judgment against all Defendants for constructive fraud, and

award to Trade Winds and Grace all actual damages, punitive damages, reasonable attorneys' fees and expenses of litigation;

13. Under Count XIII, enter judgment against all Defendants for civil conspiracy, and award to Trade Winds and Grace all actual damages, punitive damages, reasonable attorneys' fees and expenses of litigation;

14. Under Count XIV,

    a.  enter judgment against Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe for violation of 18 U.S.C. § 1962(c) of Federal RICO, and award to Trade Winds and Grace treble all actual damages and reasonable attorneys' fees and expenses of litigation pursuant to 18 U.S.C. § 1964(c);

    b.  restrain Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe from further violating 18 U.S.C. § 1962(c) pursuant to 18 U.S.C. § 1964(a); and

    c.  cause Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe to disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c);

15. Under Count XV,

    a.  enter judgment against Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe for violation of 18 U.S.C. § 1962(d) of Federal RICO, and award to Trade Winds and Grace treble all actual damages and reasonable attorneys' fees and expenses of litigation pursuant to 18 U.S.C. § 1964(c);

    b.  restrain Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe from further violating 18 U.S.C. § 1962(d) pursuant to 18 U.S.C. § 1964(a); and

    c.  cause Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe to disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(d);

16. Under Count XVI,

    a.  enter judgment against Navistar, the Rush Entities, Interstate and/or ABC Entity for violation of 18 U.S.C. § 1962(c) of Federal RICO, and award to Trade Winds and Grace treble all actual damages and reasonable attorneys' fees and expenses of litigation pursuant to 18 U.S.C. § 1964(c);

    b.  restrain Navistar, the Rush Entities, Interstate and/or ABC Entity from further violating 18 U.S.C. § 1962(c) pursuant to 18 U.S.C. § 1964(a); and

    c.  cause Navistar, the Rush Entities, Interstate and/or ABC Entity to disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c);

17. Under Count XVII,

    a.  enter judgment against Navistar, the Rush Entities, Interstate and/or ABC Entity for violation of 18 U.S.C. § 1962(d) of Federal RICO, and award to Trade Winds and Grace treble all actual damages and reasonable attorneys' fees and expenses of litigation pursuant to 18 U.S.C. § 1964(c);

    b.  restrain Navistar, the Rush Entities, Interstate and/or ABC Entity from further violating 18 U.S.C. § 1962(d) pursuant to 18 U.S.C. § 1964(a); and

      c.  cause Navistar, the Rush Entities, Interstate and/or ABC Entity to disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(d);

18. Under Count XVIII,

      a.  enter judgment against Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe for violation of O.C.G.A. § 16-14-4 of Georgia RICO;

      b.  restrain Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe from further violating O.C.G.A. § 16-14-4; and

      c.  cause Chris Venti, Josh Venti, King, Shields, Newman, Rusty Rush, Clarke and/or John Doe to disgorge all ill-gotten profits earned by their violation of O.C.G.A. § 16-14-4;

19. Under Count XIX,

      a.  enter judgment against Navistar, the Rush Entities, Interstate and/or ABC Entity for violation of O.C.G.A. § 16-14-4 of Georgia RICO;

      b.  restrain Navistar, the Rush Entities, Interstate and/or ABC Entity from further violating O.C.G.A. § 16-14-4; and

      c.  cause Navistar, the Rush Entities, Interstate and/or ABC Entity to disgorge all ill-gotten profits earned by their violation of O.C.G.A. § 16-14-4;

20. Enter judgment awarding to Trade Winds and Grace for all interest allowed by law; and

21. Award Trade Winds and Grace such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Trade Winds and Grace hereby demand a trial by jury on all issues triable by jury.


Respectfully submitted this 24th day of September 2018.

Robert Arkin
Georgia Bar No.: 021575
Attorney for Plaintiffs


ROBERT ARKIN LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Ste. 1428
Atlanta, GA 30303
Phone: (404) 220-8500
Fax:    (855) 804-9334
Email: robert@arkin.law

## VERIFICATION

Personally appeared before me, Eric Grace, who, after being first duly sworn, deposes and states on oath that the facts supplied in the forgoing pleading is true and correct to the best of his knowledge.

The word usage and/or sentence structure may be that of the attorneys assisting in the preparation of the above-referenced pleading and does not necessarily purport to be the precise language of the executing party.

This $\underline{23}$ day of March, 2018.


_____
Eric Grace, Plaintiff

Sworn to and subscribed before me
This $\underline{23rd}$ day of March, 2018.


_____
NOTARY PUBLIC
STATE OF GEORGIA
My Commission Expires:

Exhibit 1

Offering Circular

# DREAM OF OWNING YOUR OWN BUSINESS AND MAKING A MINIMUM OF $5,000 A WEEK OR $260,000 FOR UNDER $55,000.00

We saw your interest in owning a trucking company on Biz Buy, we are introducing a very profitable business opportunity for a fraction of the cost of buying an existing trucking company and you will make money from day one.

We have been in the trucking industry for many, many years and have owned and operated many successful trucking companies and have made a very good profit from these companies and now we are willing to help you start your own company with us doing all the work and using our relationships to be successful.

There are so many rules and regulations along with knowing how to start and run a successful trucking company that NO one knows what to do when they try to start a trucking company and they fail with in the first 6 months. We have been in the trucking industry for over 20 years and if you let us show you how to start and run a successful trucking company you will not fail like so many others do. We have the knowledge to make you successful.

With you being a part of this opportunity you can just make money while you are sleeping and we will take care of everything. This is such a great business because You can work from home or on a beach or in your underwear if you choose, all you need is a computer. We will do all of the work for you to start this business and start collecting profit from the first day you open. You can make a profit of approximately $270,000.00 per year or around $5,000 per week, all for a start up cost for under $55,000.00.

The most important aspect of this business is we will give you access to the data base of loads that need to be moved on a daily basis and can pick and choose the most profitable loads to book, we have thousands of loads that need to be moved every single day. You do not have to do the leg work and find the loads we will do that for you. We will also show you what are the best lanes to run through out the country, so many people make mistakes of sending trucks to locations with no good loads or very low paying loads coming out or they are paying a fortune in gas and tolls, and it all starts with the very first load you book on Monday that will determine your profits for the rest of the week, this is a very important aspect of the business.

We have thousands of relationships with shippers and brokers that we have created over the years and we do not have a shortage of loads to run, in matter of fact we have so many loads to choose from we pick and choose what loads we want to run and the most profitable loads. Its like opening a new restaurant and having the customers lined up at your door the minute you open.

So as you can see this is the best business in the world, you can do this business while you are on the beach or on vacation. We will do all the work for you and all you have to do is sit back and collect your profits. The return on investment is about 3 month which is unheard of in any business and you start making money from day one and that means make a profit the first week you start hauling loads which is also unheard of when opening a new business, most people do not pull out a profit when opening a new business for months even years, so you can see this really is the best business out there.

We also have a relationship with the third largest Kenworth Dealership to get your trucks from. We have everything you need to start making $5,000.00 a week from day one. Here are a few facts about the trucking industry.

America has always been about being the biggest and the best; being on top of the hill was, and is, almost always revered. Right or wrong, being number one — if only in size — has always been important to us. The tallest building, the fastest car, or the biggest pizza pies are all deemed significant.

The trucking industry has not been one to toot its own horn (pun intended), but it's become one of the largest and most critical industries in the U.S.A. It touches everyone's daily life and, in my humble opinion, we should know just how big it is.



PLAINTIFF'S EXHIBIT



Scanned by CamScanner

The scope of the trucking industry in the U.S. is hard to fathom. In a previous post, Life in America without Trucking, we shared a few statistics. For example, trucking moves nearly 70% of all freight tonnage in this country, but when you look closer at the overall impact of trucking in the U.S. — the numbers are staggeri

## A Few U.S. Trucking Industry Statistics:

"275.5 billion in annual revenue
"260,000 trailers are sold per year
"53.9 billion gallons of fuel are consumed yearly
"671 billion in merchandise is shipped yearly
"21.4 billion dollars in road usage and taxes are paid every year
"432.9 billion miles are driven on U.S. highways, 139.3 by class 8 (tractor-trailers)
"15.5 million tractor-trailers are on the road
"8.9 million trucking employees, including, 3.5 million truck drivers
"500,000 trucking companies operate in the U.S. with more needed.
   "Statistics compiled by truckinfo.net.

## What Do These Numbers Mean?

Trucking is larger in annual revenue than any U.S. manufacturing industry (keep in mind, trucking is 275.5 BILLION dollars).

Food: $284,390,000
Pharmaceuticals: $257,975,000
Motor Vehicles: $150,721,000
Beverages: $133,619,000

As mentioned above, the trucking industry employs 8.9 million people, of which, 3.5 million are drivers. The U.S. Federal Government employs slightly over 3.5 Million
The annual miles driven by the trucking industry in this country are enough to go to the moon — over 100 times

The 53.9 billion gallons of fuel used yearly by the trucking industry represents 13.8% of the total fuel consumed in the U.S. How big is the trucking industry? If the trucking industry was a nation, and the 275.5 billion in annual revenue was their GDP (Gross Domestic Product), it would rank 33rd — that's huge.

When I began research for this post, I had some idea how large the industry and how much it affects us, but I was surprised at the magnitude. Is the size of an industry really important? Yes extremely, an industry this large — especially one so closely tied to all industries — touches everyone. The next time you pass a tractor-trailer on the highway, remember they are delivering the goods for all of America. - Statistics compiled by truckinfo.net.

Trucking continues to be the dominant mode of freight transportation in the United States. In 2015, trucks moved 11.9 billion tons of freight, which is equivalent to 72.5% of all domestic shipments. The trucking industry has an optimistic future ahead; a combination of low inflation, a growing housing market, a recovering stock market, and low fuel prices has helped the industry expand 12.3% from 2012, and it only continues to look even more positive.

In April 2016 alone, the industry growth reached 3.9%. The trucking industry has such a positive outlook, that companies are desperately struggling to fill driver positions. Positions are in such high demand that drivers in training school are getting offered jobs before they are even certified!



Scanned by CamScanner

The trucking industry is the lifeblood of the U.S. economy. Nearly 72% of all the freight tonnage moved in the U.S. goes on trucks. Without the industry and our truck drivers, the economy would come to a standstill. To move 11.9 billion tons of freight annually requires nearly 15 million heavy-duty Class 8 trucks and over 7 million truck drivers. It also takes over 53 billion gallons of diesel fuel to move all of that freight. Simply – without trucks, America stops.

Trucking companies have added over 70,000 new jobs in the last 6 months, according to the U.S. Bureau of Labor Statistics. That's the 17th straight month of growth and the industry is expected to continue adding jobs over the next several years.

According to Noel Perry, consultant with FTR Associates, a company that provides freight transportation forecasting and analysis, the industry expects to have a shortage of 100,000 freight movers by the end of this year.

The shortage could reach 300,000 by 2017. There is so much freight that has to be moved at this time that most companies are willing to pay more than the national average to freight movers to get their product to the customers or their product just sits at a dock and no major companies can afford to have their product sit. On average there are about 700,000.00 loads that need to be moved from point A to point B somewhere in the lower 48 states every day and there just is not enough trucking companies to move this freight. The bottom line is the trucking industry is getting bigger each and every day with more and more products needed to be shipped and a shortage of freight movers says Perry. As you have read the trucking industry is a very profitable industry and this opportunity is a very lucrative opportunity.

## OPPORTUNITY:

- We will open your new corporation in your state or any state
- We will do all the administrative work to start new company including IRP and IFTA
- We will supply you with our data base to book all of your loads (Shippers)
- We will set up all contracts with shippers
- We will secure the trucks and trailers
- We will get you your own authority MC # and DOT # (Federal licenses to run trucking company)
- We will supply all the professional drivers
- We will do all the drivers back ground checks, MVR reports
- We will set up DOT drug consortium for Pre employment drug screening and random
- We will set all the DOT employment compliance and safety requirements – Online
- We will set up all DOT vehicle maintenance program - Online
- We will set up gas cards
- We will set up Pre Pass Plus (Drivers do not need to stop for tolls or weigh stations)
- We will set up the billing and collecting
- We will set up accounting services
- We will design logo if needed
- We will place all vinyl in correct locations on tractors – MC # - DOT # - Unit # - Reg #
- We will get storage locations for when truck is parked – if needed
- We will set up GPS and Satellite tracking on trucks
- We will set up factoring company to get paid on a daily basis
- We will set up payroll service
- We will set you up with a accounting firm that just works with trucking companies
- We will dispatch all loads for you for 2 weeks and teach you the best lanes to run
- We will set this company up so you can work from home or were ever you prefer
- We will set up everything for the business to be very successful
- We will get you Return on investment within 3 months



We will set you up with all of this for a small one time fee of $7,900. Half is paid once we sign contracts and we start working on your business and the balance after we book your first load and you made a profit. You will not find any other service that does this for other parties unless they get a portion of the total profits, which we do not want. Once the business is set up and you start making profit, its all of your profit and no one else. We teach you for 2 weeks for free on how to do all the day to day operations to run a successful trucking company. If you prefer we can stay on as long as you need us for to run your trucking company for $1,000 a week which means you do not have to do any the work and just sit back and collect your profits.

As you can see there is a lot of requirements and things to do to start up a trucking company but the nice thing is that we do it all for you and you do not have to make the mistakes that many new trucking companies make when they try to do it their selves. We have been in this business for many, many years and know what to do and what works with out making costly mistakes.

We do all the work and you can just sit back and make money. Now you are probably asking how much you can make. Well first of all as I said we have unlimited loads of freight to move across the USA, thousands of loads every day, so once your company is set up and trucks are ready to move freight we will supply you with what's called Rate Confirmation agreements (examples will be provided), this is just an agreement with your company and the shipper for the rate of that shipment to be moved from point A to point B, once the load is delivered the receiver signs the BOL (Bill of Lading) then the drivers scan the BOL to you inside their truck and send it to you and you will get paid within hours from the factoring company we provide you. Now there are costs that must come out of these loads but we will get into that in a little bit.

We feel it is best to start with purchasing 4 trucks to start but you can purchase more if you choose. We have relationships with the third largest Kenworth dealership in the nation and we can get you newer good quality trucks with low miles and an extended warranty and head ache rack for around $45,000.00 a piece but the dealership will finance the trucks for you with only 10% down or $4,500.00 Down on each truck (Depending on credit)

This Business is the best business for value out there, nothing compares, It's not like a restaurant or gas station were you have to be there all the time and make sure employees are not steeling from you, plus you do not have to put up $300,000 like you would need for those business's, this is much better and you get back your return on investment within 3 months which is unheard of in any investment.

Now once we set up your Federal Authority MC and DOT # (Federal License to Haul Freight across the USA) Which takes about 3 weeks to complete before we can start booking loads for you and start making money from day one. In the mean time while we are waiting for your authority to be activated we will set up the financing for you to purchase the trucks and rent the trailers (We only run flat bed trailers which pay the most per mile compared to dry van and reefer) and we will secure the drivers that will live in the same area were your corporation is located and we can meet at the Kenworth dealership if you prefer so you can meet all of your drivers.

All drivers go through a rigid background check and drug screen and the must have experience but again we will take care of this for you and we keep online files of all employees who will be placed into random drug testing consortium and we keep online maintenance files on all the trucks so when you get audited (You will get audited, its DOT mandatory with in the first year) you will not have any problems passing the audit, we have never failed a safety audit.

The drivers and us will then take the trucks to your state you live in and we will go to the DMV with you to help you register the trucks which include securing an IRP account (International Registration Plan) and an IFTA account (International Fuel Tax Agreement) if you have never done this before you probably will not have the correct paperwork to start and will have to make many trips back and forth and just waste a lot of time, we know what needs to be done at the DMV so you can start hauling loads that day and we will have the insurance in place for you to start hauling loads.



Since the drivers will be over the road drivers we let them come home on weekends so we just let the drivers bring the trucks home with them. If needed and you want to keep any of the trucks at your location that is also OK but remember the drivers need to be out on the road every morning at 5 am.

Some insurance companies want to see the owners have a place to store or garage the trucks and if this is the case and you do not have the property we will find a truck storage facility that you can sign a contract with but in all terms you will never store the trucks there. Once we have the trucks and trailers registered and insurance place on the vehicles your ready to start moving freight and making money.

We have a data base of thousands of shippers and brokers we work with in which we have built relationships with over the last 20 years and you will have access to this. Everyday there are tens of thousands of loads that need to be moved so finding the freight is not a problem and we can show how to do this online with you getting on our computers from your home or office.

There is a lot to finding the correct loads because some lanes are much better then others and we will go over what lanes to stay out of and what lanes to run. We will teach you for 2 weeks for free, if you need us to stay on longer to book all of your loads we will for a small fee.

You will always be able to monitor by computer the location of the trucks through satellite tracking systems that we we will have installed in your trucks which also provides you when the truck is running and has been turned off and lets you know how much gas has been used and purchased also it gives us notice of how much gas we have used between all states which helps us calculate how much gas tax you pay for each state which the accountant will take care for you.

This system will let us know everything that is going on when trucks are on the road and that the drivers are performing their duties and not slacking off and when drivers know there is a satellite tracking system on the truck they will not screw around.

We supply gas cards so you can track exactly how much gas is being purchased on a daily basis. You will be supplied a copy of gas statements for each week. We will supply an accounting service needed to run your business successfully. You may use your own accountant if you desire but our accountant only works with trucking companies and no one else.

We will also supply the cheapest factoring company. The factoring company will fund your invoices that same day. So when a driver drop the load and sends back the bol. you send the bol and rate conformation to the factoring company and they deposit the amount of that load you took into your bank account that same day. They charge 2% but this is much better then having to wait 30-45 days like the old days. You get your profits deposited into your bank account immediately which means you make money immediately.

As you can see there is a lot to opening a successful trucking company but do not worry about we take care of everything for you from A to Z and you will not make the mistakes we made when we first started many years ago. We are your partners for success and will always be a phone call away if you ever need anything. Now lets talk Profits

**KEYS TO SUCCESS:**

As for any new business there are certain keys to success that must be followed in order to be successful. The number one key in the trucking business is hard work bust most importantly to always keep your trucks moving and hauling freight.

When it comes to getting the freight that is not be problems because you will be a nationwide carrier and we have hundreds if not thousands of loads needed to be picked up on a daily basis and delivering freight to all lower 48 states again we have thousands of loads on a daily basis all over the USA that needs to be moved and to make it clear their just simply not enough trucks and trailers to move the freight and that is why we are letting you become a part of this $270 Billion dollar industry which the demand is much greater than the supply.



## PROFITS

Now once we set up your business for you and supply the drivers, trucks and trailers, insurance, GPS and tracking systems we will then start booking loads for you, we will send you the rate confirmation from the shippers or brokers, then we give the drivers the drivers instructions were to pick up and drop off the loads. Once the loads are delivered the drivers will scan back the signed BOL stating the load has been delivered, then we use our bank to factor the loads and profit is made.

We only run flatbed loads they average about 600 miles a day doing next day drops and each load they drop on a daily basis pays us $900 - 1,200 Per drop per day and they go home for the weekend and we get them a short haul on Friday to drop on Monday near their home which is about $500-$600. The 4 Solo trucks will average about $18,000.00 – $20,000.00 per week, divided by 4 trucks come out to about $4,300 - $5,000 per truck also you might have 2 trucks that grossed $5,100 that particular week and the other 2 trucks might gross $4,800 that week but all in all it averages out over the month.

The drivers will work Monday through Friday,drivers can only work a maximum of 70 hours per week and by federal law the drivers must take off for 34 hours after 70 hours of on duty time so we do not kill our drivers and we only have them drive Monday through Friday and let them be home on weekends, drivers are the most valuable asset to our company. As stated it is very important to book the correct loads going to the best parts of the country and it all starts with what loads you start of on Monday that will determine the profits for the rest of the week which we will show you.

So if we are just making the lower end of the numbers of $4,300 per week per truck  (many weeks we are making more than $5,000 per week) but I would rather go on the lower end and when we make more it is better for all of us.

Weekly average Per Truck = $4,300.00 – Per Week

Weekly average Factoring fee at 2% = $100.00

Weekly average driver pay 2,700 miles (including DH) @ $0.41 cents per mile -$1,100

Weekly average gas $2.25 diesel cost per gallon (After Rebate) @ 6.7 mpg - $900

Weekly average toll expenses - $75.00 (We use Pre Pass Plus)

Weekly IFTA withdrawal - $25.00

Weekly truck  payment (With 10% Down) - $220.00

Weekly trailer payment -$150.00

Weekly truck & trailer insurance - $325.00 (With workers comp – not needed until 30 days after open)

Weekly accountant pay- $ 30.00

Weekly maintenance cost - $125.00

Total  $3,100.00

$1,250.00 profit per truck X 4 Trucks = $5,000.00 Profit Per Week for all 4 trucks

This is on a 28 day cycle (M-F), so there will be 2 additional days of hauling freight with 30 days in a month and 3 additional days with 31 days in a month so that is also additional funds.



**START UP COST:**

$ ____ — Down payment on trucks (Depending on credit, but everyone can get financed)
$ ____ — Equipment for Rehab (Chairs, straps, V boards, etc)
$ ____ — Our Fee, Half down when starting and the other half after we book first load
$ ____ — Registration, Permits and authority
$ ____ — Members Deposit
$ ____ — Fuel Deposit (This deposit is returned back to you)
$ ____ — The Back Title
$ ____ — Smog Correction and DOT software
$ ____ — Cash to pick up trucks and trailers
$ ____ — Vinyl and Graphics
$ ____ — Miscellaneous

**TOTAL COST = $54,500**

We will go over everything more in detail once all contracts have been signed. So as you can see this is the best business in the world, you can do this business while you are on the beach or on vacation. We will do all the work for you and all you have to do is sit back and collect your profits. The return on investment is about 5 month which is unheard of in any business and you start making money from day one and that means make a profit the first week which is also unheard of when opening a new business, most people do not pull out a profit when opening a new business for months even years, so you can see this really is the best business out there.

If you're interested please contact Chris at 715-783-1051. We are extremely busy and only are taking in 3 clients per month. Only interested parties please.


7

Exhibit 2

Rush Truck Centers Certified Pre-Owned Program



## When it comes to pre-owned trucks, no one offers you more.

Rush Truck Centers is your source for quality, used trucks of all makes and models. With a large inventory pre-owned trucks from the brands you know and trust, our dedicated used truck sales specialists can help find the right truck to meet your needs.

### MORE TRUCKS. MORE BRANDS.

No one offers a wider selection of quality, pre-owned trucks than Rush Truck Centers. Through our network of over 100 locations, our sales specialists have access to thousands of heavy-, medium-, and light-duty trucks in a variety of specifications and applications. We will work with you to maximize your trade and offer suggestions on how to purchase your next vehicle for maximum resale value. And through Rush Truck Financing, you have access to the best financing options for your pre-owned truck purchase.

### RUSH TRUCK CENTERS CERTIFIED PRE-OWNED PROGRAM.

Our Certified Pre-Owned vehicles are among the highest quality, best value, pre-owned trucks available today. Only Peterbilt and International Class 8 trucks that are five model years or newer with fewer than 600,000 miles can earn the Certified-Pre-Owned designation. Each vehicle must pass an exhaustive 143-point inspection and pre-certification road test. And to assure your satisfaction, each vehicle includes a minimum of 100,000 miles of remaining factory warranty or the exclusive RushCare™ Protection Plan.



**FIND THE RIGHT TRUCK**

○ New  ● Used

Vehicle Type ⌄

Make ⌄

⌄

⌄

SEARCH INVENTORY ›

### TELEMATICS SOLUTIONS

Keeping your fleet operating at peak efficiency is critical to the success of your business. And if you are like most fleet managers today, you operate a variety of different truck makes that probably each have their own remote diagnostics systems. Keeping up with all of that data on a variety of systems and portals is time consuming and inefficient. RushCare Technology Solutions can help. Our telematics solution is the tool you need to streamline and simplify the management of your fleet. We've partnered with Geotab, the leader in telematics services, to offer a system to optimize your fleet's performance and maximize your profitability.
Learn More



**RUSHCARE TELEMATICS**

Optimize your fleet's productivity, performance, safety and maintenance while streamlining regulatory compliance.
Learn More



**FIND A LOCATION**

With over 100 locations coast to coast, no one can match our network reach and scale. We provide our customers an integrated, one-stop approach to all their truck needs.
Find Location



**FINANCING SOLUTIONS**

Rush Truck Financing is your complete source for truck financing as well as short-term and extended financing options for parts and service purchases.
Learn More

PLAINTIFF'S
EXHIBIT
2

Exhibit 3

Consulting Agreement



# INTERSTATE CREATIONS LLC

## *CONSULTING AGREEMENT*

This Consulting Agreement (this "Agreement") is made as of **11/29/2016** , by and between **West Coast Logistics**, a Limited Liability Company, with Address located at **11960 SW 45ᵗʰ Street, Ocala, FL 34481** (the "Company"), and **Interstate Creations** a Limited Liability Company, with Address located at **11960 SW 45ᵗʰ Street, Ocala, FL 34481**("Consultant").

1.**Consulting Relationship.** During the term of this Agreement, **Consultant will provide** consulting services to the Company as described on Exhibit A to this Agreement (the "Services"). Consultant represents that Consultant is duly licensed (as applicable) and has the qualifications, the experience and the ability to properly perform the Services. Consultant shall use Consultant's best efforts to perform the Services such that the results are satisfactory to the Company. Consultant shall devote [at least] **45 - 60 DAYS** to performance of the Services and the Consultant will run the day to day operations for the Company for as long as the Company desires. The Company will pay the Consultant $1,000.00 Per week after the second week of operations to perform all day to day operations.

2. **Fees.** As consideration for the Services to be provided by Consultant and other obligations, the Company shall pay to Consultant the amounts specified in Exhibit B to this Agreement at the times specified in Exhibit B.

3.**Expenses.** Consultant is not authorized to incur expenses on behalf of the Company and the Company will be responsible for all expenses incurred while performing the Services [as expressly specified in Exhibit C hereto] unless otherwise agreed to in writing by the Company's **Eric Grace** . As a condition to receipt of reimbursement, Consultant shall submit to the Company reasonable evidence that the amount involved was both reasonable and necessary to the Services provided under this Agreement.





PLAINTIFF'S
EXHIBIT

3

Scanned by CamScanner

4.Term and Termination. Consultant shall serve as a consultant to the Company for a period stated in paragraph 1 commencing on upon payment of first draw of consulting fee of $3,950.00 and terminating on the date Consultant completes the provision of the Services to the Company under this Agreement and with the second and final payment of $3,950.00 being received after Consultant has booked loads for all of Companies trucks and Company has verified successful delivery of funds in the Companies bank Account, or (a) the date Consultant has been retained by the Company to run all day to day operations for the company and has paid the maximum amount of consulting fees as provided in Exhibit B.

5.Notwithstanding the above, neither party may terminate this Agreement at any time until all work has been completed by the Consultant within 45-60 business days. In the event of a termination of this Contract, the Company shall pay Consultant for any portion of the Services that have been performed prior to the termination. Should either party default in the performance of this Agreement or materially breach any of its obligations under this Agreement, including but not limited to Consultant's obligations under the Confidential Information and Invention Assignment Agreement between the Company and Consultant referenced below, the non-breaching party may terminate this Agreement immediately if the breaching party fails to cure the breach within 10 business days after having received written notice/and by email by the non-breaching party of the breach or default.

6.Independent Contractor. Consultant's relationship with the Company will be that of an independent contractor and not that of an employee.

7. Method of Provision of Services. Consultant shall be solely responsible for determining the method, details and means of performing the Services. Consultant may, at Consultant's own expense, employ or engage the services of such employees, subcontractors, partners or agents, as Consultant deems necessary to perform the Services (collectively, the "Assistants"). The Assistants are not employees of the Company, and Consultant shall be wholly responsible for the professional performance of the Services by the Assistants such that the results are satisfactory to the Company. Consultant shall expressly advise the Assistants of the terms of this Agreement.

a. No Authority to Bind Company. Consultant acknowledges and agrees that Consultant and its Assistants have no authority to enter into contracts that bind the Company or create obligations on the part of the Company without the prior written authorization of the Company.

b. No Benefits. Consultant acknowledges and agrees that Consultant and its Assistants shall not be eligible for any Company employee benefits and, to the extent Consultant otherwise would be eligible for any Company employee benefits but for the express terms of this



c.Withholding; Indemnification. Consultant shall have full responsibility for applicable withholding taxes for all compensation paid to Consultant or its Assistants under this Agreement, and for compliance with all applicable labor and employment requirements with respect to Consultant's self-employment, sole proprietorship or other form of business organization, and with respect to the Assistants, including state worker's compensation insurance coverage requirements and any U.S. immigration visa requirements. Consultant agrees to indemnify, defend and hold the Company harmless from any liability for, or assessment of, any claims or penalties with respect to such withholding taxes, labor or employment requirements, including any liability for, or assessment of, withholding taxes imposed on the Company by the relevant taxing authorities with respect to any compensation paid to Consultant or its Assistants.

8. Supervision of Consultant's Services. All of the services to be performed by Consultant, including but not limited to the Services, will be as agreed between Consultant and the Company . Consultant will be required to report to the Company concerning the Services performed under this Agreement. The nature and frequency of these reports will be left to the discretion of the Company.

9. Confidential Information and Invention Assignment Agreement. Consultant shall sign the Company's Confidential Information and Invention Assignment Agreement, if requested, on or before the date Consultant begins providing the Services.

10. Training. Consultant will train the Owner/Assignee of the Company to run the day-to-day business operations of the company and also in all aspects as listed in Exhibit A of this agreement.

11. Conflicts with this Agreement. Consultant represents and warrants that neither Consultant nor any of the Assistants is under any per-existing obligation in conflict or in any way inconsistent with the provisions of this Agreement. Consultant represents and warrants that Consultant's performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Consultant in confidence or in trust prior to commencement of this Agreement. Consultant warrants that Consultant has the right to disclose and/or or use all ideas, processes, techniques and other information, if any, which Consultant has gained from third parties, and which Consultant discloses to the Company or uses in the course of performance of this Agreement, without liability to such third parties. Notwithstanding the foregoing, Consultant agrees that Consultant shall not bundle with or incorporate into any deliveries provided to the Company any third party products, ideas, processes, or other techniques, without the express, written prior approval of the Company. Consultant represents and warrants that Consultant has not granted and will not grant any rights or licenses to any intellectual property or technology that would conflict with Consultant's obligations under

Scanned by CamScanner

secret or other property right of any former client, employer or third party in the performance of the Services.

## 12. Miscellaneous.

a. Governing Law. The validity, interpretation, construction and performance of this Agreement, will be governed, construed and interpreted in accordance with the laws of the state of Florida , without giving effect to principles of conflicts of law.

b. Entire Agreement. This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter of this Agreement and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter of this Agreement.

c. Amendments and Waivers. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of any provision of this Agreement will constitute a waiver of that provision as to that or any other instance

d. Successors and Assigns. Except as otherwise provided in this Agreement, the rights and obligations of the parties under this Agreement will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

e. Notices. Any notice, demand or request required or permitted to be given under this Agreement must be in writing and will be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at that party's address as provided on the signature page to this Agreement, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

f. Sever-ability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate that provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for that provision, then (i) that provision will be excluded from this Agreement, (ii) the balance of the Agreement will be interpreted as if the provision were excluded and (iii) the balance of the Agreement will be enforceable in accordance with its terms.

Scanned by CamScanner

g. **Construction.** This Agreement is the result of negotiations between the parties and has been reviewed by each of the parties and their respective counsel, if any. This Agreement is the product of all of the parties to this Agreement, and no ambiguity will be construed in favor of or against any one of the parties to this Agreement.

h. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when executed and delivered will be deemed an original, and all of which together will constitute one and the same agreement. Execution by electronic signature will be deemed an original and valid signature.

i. **Electronic Delivery.** The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Consultant consents to (i) conduct business electronically (ii) receive documents and notices by electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

The parties have executed this Agreement as of the date first written above.

**The Company: West Coast Logistics LLC**

_____ - Signature

Name: Eric Gra___

**Contact: Trucking company Consultant Agreement**

_____

Address:

**The Consultant: Interstate Creations LLC**

_____ - Signature

Name:

John Vmti

Address: 1960 sw 45th st ocala Fl

**EXHIBIT PAGE TO FOLLOW**

**EXHIBIT A**

**Services Provided by the Consultant:**

1. Set up new corporation in your state or any state
2. Complete all the administrative work to start new company including IRP, IFTA
3. Supply our data base to book all of your loads (Shippers)
4. Set up all contracts with shippers
5. Secure all trucks and trailers including registration
6. Set up authority MC # and DOT # BOC( Federal licenses to run trucking company)
7. Supply all the professional drivers
8. Complete all the drivers background checks, MVR reports
9. Set up DOT drug consortium for Pre employment drug screening and random
10. Set all the DOT employment compliance and safety requirements – Online
11. Set up all DOT vehicle maintenance program - Online
12. Set up gas cards
13. Set up Pre Pass Plus (Drivers do not need to stop for tolls or weigh stations)
14. Set up the proper insurance needed to run Interstate
15. Set up accounting services
16. Help design logo if needed
17. Order and place all vinyl in correct locations on tractors MC, DOT, REG, UNIT
18. Set up storage locations for when truck is parked – If needed
19. Set up GPS and Satellite tracking on trucks
20. Set up factoring company to get paid on a daily basis
21. Set up payroll service
22. Complete all day to day operations for 2 weeks for free
23. We will teach you the best lanes to run
24. We will set this company up so you can work from home

# EXHIBIT B

## Consulting Fees

A. Upon the Signing of this Contract, the Company will wire $3,950.00 to Consultant

B. Upon the Consultant completing all the services as stated in EXHIBIT A and the Consultant booking the first loads for the Company, with the Company receiving and confirming successful delivery of funds into the Companies bank account, the Company will release the second & final draw of $3,950.00

C. The Consultant will run all day to day operations for 3 weeks free of charge and these day to day operations include, Booking loads, Completing Contracts with Shippers, Completing all the drivers miles for payroll and will submit Payroll, Will complete all documentation to deliver to Factoring company on a daily basis. Will keep track of all loads and drivers, Will keep weekly expense and profit forms, Will handle all maintenance on all vehicles, will keep tracks of all state miles ran for accounting and IFTA and any other items needed to run a successful company.

CL If the Company wishes to retain the Consultant after 3 weeks to run all day to operations, the Consultant will charge $1,000.00 Per Week.





Scanned by CamScanner

## Procedures

1. Sign Contracts – Pay half of Consulting fee - $3,950

2. Set up corporation

3. Fill out Application to obtain Federal Authority, MC#, DOT# BOC – Takes 3 weeks to activate

4. Fill out application to obtain trucks

5. Fill out application to obtain trailers

6. I will obtain drivers and complete all back round and MVR compliance

7. Complete Pre Employment Drug test on all drivers

8. Set up Drug Consortium

9. Set up Employee compliance through web based soft ware

10. Set up Vehicle Maintenance through web based soft ware

11. Set up gas cards for all trucks and drivers

12. Set up insurance – Will not pay down payment until authority is active

13. Order vinyl for trucks – including MC, DOT, REG, UNIT

14. Order GPS systems

15. Set up Account with Factoring company

16. Set up Payroll service

17. Set up Accountant



Scanned by CamScanner

18. After 3 weeks – we go pick up trucks and trailers – put in GPS and put vinyl on trucks

19. Register Trucks

Start running loads, It will be a 3 week process to complete everything but it takes 3 weeks to obtain an Federal authority. Once we book the first days loads for all 4 trucks and profits have been deposited into companies account the second half of the Consultant fee is due - $3,950

Scanned by CamScanner

Exhibit 4

12/22/16 Email



Robert Arkin <robert@arkin.law>

## Fwd: Credit App Attached for 2012 International ProStar Sleepers
1 message

Eric Grace <egrace5577@gmail.com>                                    Tue, Apr 3, 2018 at 2:34 PM
To: Robert Arkin - Arkin Law <robert@arkin.law>

---------- Forwarded message ----------
From: chris venti <truckingbiz16@gmail.com>
Date: Thu, Dec 22, 2016 at 8:09 AM
Subject: Fwd: Credit App Attached for 2012 International ProStar Sleepers
To: Eric Grace <egrace5577@gmail.com>

---------- Forwarded message ----------
From: <KingD1@rushenterprises.com>
Date: Tue, Dec 20, 2016 at 5:37 PM
Subject: Credit App Attached for 2012 International ProStar Sleepers
To: truckingbiz16@gmail.com

Chris,

The trucks we spoke about are readily available. They are 2012 International ProStar sleepers with ALL of the issues
associated with them from the past corrected by Navistar / International technicians. They are $29,977 ea. +T,T&T and
that includes a three year 500,000 mile warranty that covers the engine, transmission, turbo, injectors, the water pump as
well as a comprehensive warranty for the aftertreatment system which protects your investment for 2 years 240,000
miles. It's our signature RushCare warranty and it's the best used truck warranty we have ever offered.

I attached the credit app. Please have your clients call me direct if necessary.

Sincerely,


**Dennis King**

**New and Used Sales**

**Rush Truck Center – Jacksonville**

**5175 West Beaver St.**

**Jacksonville, FL 32254**

**Cell: 904-386-9488**

**FAX: 904-265-2378**



 

DK Rush Credit Application email.pdf
61K

Exhibit 5

Special Inventory List

Case 1:18-cv-05154-TCB   Document 1-5   Filed 11/08/18   Page 168 of 320

| LDC | Stock No | Order Name | VIN | Year | Truck MFG | Model | B&C | W/B | Color | Interior | SLPR | HR/LR | Engine Model | Brake | HP | Trans Model | Ratio | Rear Axle Susp | ALST | Tires | Price | Mileage | Age | GVWR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Idaho Falls | 143728 | RTL | RUSH TRUCK LEASING | 548081 | 2012 | Inter | ProStar+126344 | 131 | 236 | WHITE | N/A | 73 | HR | MaxxForc | N/A | 475 | RTLO14918A | 3.55 | Air | N/A | 22.5 | 23000 | 472873 | 131 | 52350 |
| San Diego | 144622 | RTL | RUSH TRUCK LEASING | 134203 | 2012 | Inter | ProStar | 131 | 236 | WHITE | N/A | 73 | HR | MaxxForc | N/A | 475 | PRO16220C | 3.36 | Air | N/A | 22.5 | 19977 | 404457 | 47 | 52350 |
| Boise | 144626 | RTL | | 564389 | 2012 | Inter | ProStar+126604 | 131 | 175 | White | N/A | 73 | HR | MaxxForc | N/A | 475 | PRO16220C | 3.36 | Air | N/A | 22.5 | 24500 | 360000 | 139 | 52000 |
| Boise | 144629 | RTL | | 566592 | 2012 | Inter | ProStar+126604 | 131 | 175 | White | N/A | 73 | HR | MaxxForc | N/A | 475 | PRO16220C | 3.55 | Air | N/A | 22.5 | 24500 | 360209 | 139 | 52000 |
| Boise | 144633 | Idealease | | 622381 | 2012 | Inter | ProStar+126604 | 174 | 236 | White | N/A | 73 | HR | MaxxForc | N/A | 475 | PRO16210C | 3.55 | Air | N/A | 22.5 | 23900 | 400030 | 402 | 52350 |
| Salt Lake City | 145194 | RUSH TRUCK LEASING | | 617610 | 2012 | Inter | ProStar | 131 | 222 | WHITE | N/A | 73 | HR | MaxxForc | N/A | 475 | PRO16210C | 3.55 | Air | N/A | 22.5 | 22977 | 281800 | 75 | 52350 |
| Charlotte Int | 159500 | Idealease Charlotte | | 560122 | 2012 | Inter | ProStar+ | 131 | 236 | White | N/A | 73 | HR | MaxxForc | N/A | 475 | PRO16210C | 3.36 | Air | steel | 22.5 | 24977 | 311179 | 371 | 52350 |
| Richmond | 186606 | RUSH TRUCK LEASING INC | | 626884 | 2012 | Inter | ProStar+ | 122 | 230 | WHITE | N/A | 73 | HR | MaxxForc | N/A | 450 | EOM15631DC-LAS | 3.42 | Air Ride | N/A | 22.5 | 18500 | 472873 | 131 | 52350 |
| Aurora | 186611 | Rush Truck Leasing, Inc. | | 115247 | 2012 | Inter | ProStar | 122 | 230 | White | N/A | 73 | HR | MaxxForc | Jake | 450 | PRO16220C | 3.42 | Air Ride | Steel | 22.5 | 29971 | 419064 | 178 | 52350 |
| Hickory | 284051 | Truck Service | | 115250 | 2012 | Inter | ProStar | 122 | 230 | White | N/A | 73 | HR | MaxxForc | Jake | 450 | PRO16220C | 3.36 | Air Ride | N/A | 22.5 | 26977 | 420000 | 17 | 52350 |
| Hickory | 284052 | Truck Service | | 115255 | 2012 | Inter | ProStar | 122 | 230 | White | N/A | 73 | HR | MaxxForc | Jake | 450 | PRO16220C | 3.36 | Air Ride | N/A | 22.5 | 26977 | 420000 | 17 | 52350 |
| Hickory | 284055 | Truck Service | | 115248 | 2012 | Inter | ProStar | 122 | 230 | White | N/A | 73 | HR | MaxxForc | Jake | 450 | PRO16220C | 3.36 | Air Ride | N/A | 22.5 | 26977 | 420000 | 17 | 52350 |
| Hickory | 284056 | Truck Service | | 115362 | 2012 | Inter | ProStar | 122 | 230 | White | N/A | 73 | HR | MaxxForc | Jake | 450 | PRO16220C | 3.36 | Air Ride | N/A | 22.5 | 26977 | 420000 | 17 | 52350 |
| Hickory | 284061 | Truck Service | | 115291 | 2012 | Inter | ProStar | 122 | 230 | White | N/A | 73 | HR | MaxxForc | Jake | 450 | PRO16220C | 3.36 | Air Ride | N/A | 22.5 | 26977 | 420000 | 17 | 52350 |
| Hickory | 284065 | Truck Service | | 115361 | 2012 | Inter | ProStar | 122 | 230 | White | N/A | 73 | HR | MaxxForc | Jake | 450 | PRO16220C | 3.36 | Air Ride | N/A | 22.5 | 26977 | 478034 | 17 | 52350 |
| Hickory | 284069 | Truck Service | | 115340 | 2012 | Inter | ProStar | 122 | 230 | White | N/A | 73 | HR | MaxxForc | Jake | 450 | PRO16220C | 3.36 | Air Ride | N/A | 22.5 | 26977 | 420000 | 17 | 52350 |
| Chicago | 309811 | RTL/Idealease | | 402038 | 2012 | Inter | ProStar+ | 112 | 216 | Black | N/A | 71 | HR | MaxxForc | Jake | 450 | PRO16220C | 3.42 | Air | Alum | 22.5 | 22977 | 343116 | 332 | 52350 |
| Chicago | 309937 | RTL/Idealease | | 460493 | 2012 | Inter | ProStar+ | 122 | 230 | White | N/A | 71 | Sky-Rs | MaxxForc | Jake | 475 | EOM16210DC-LAS | 3.36 | Air | Alum | 22.5 | 22997 | 433483 | 367 | 52250 |
| Huntley | 343286 | Meyers Motors Service | | 594492 | 2012 | Inter | ProStar+ | 122 | 217 | White | N/A | 56 | HR | MaxxForc | N/A | 450 | FRO16210C | 3.36 | Air | N/A | 22.5 | 17997 | 422333 | 208 | 52750 |
| Huntley | 343601 | Carry Transit | | 554022 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 490 | FRO15320C | 3.21 | Air | N/A | 22.5 | 20977 | 406474 | 77 | 52750 |
| Huntley | 343792 | Ed Lewis Trucking | | 554023 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 490 | FRO15320C | 3.21 | Air Ride | N/A | 22.5 | 0 | 202232 | 165 | 52250 |
| | 343974 | Carry Transit | | 554021 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 430 | FRO15320C | 3.21 | Hendricks | N/A | 22.5 | 144642 | 146642 | 77 | 52350 |
| | 344151 | Carry Transit | | 554029 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 430 | FRO15320C | 3.21 | Hendricks | N/A | 22.5 | 0 | 406199 | 18 | 52350 |
| | 344155 | Carry Transit | | 554040 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 430 | FRO15320C | 3.21 | Hendricks | N/A | 22.5 | 24977 | 119024 | 77 | 52350 |
| | 344148 | Carry Transit | | 608663 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 430 | FRO15320C | 3.21 | Hendricks | N/A | 22.5 | 24977 | 521801 | 77 | 52350 |
| | 344515 | Carry Transit | | 554033 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 430 | FRO15320C | 3.21 | Hendricks | N/A | 22.5 | 17997 | 233123 | 73 | 52350 |
| | 345056 | Carry Transit | | 554026 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 430 | FRO15320C | 3.21 | Hendricks | N/A | 22.5 | 0 | | 716 | 52350 |
| | 345067 | Carry Transit | | 352500 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 430 | FRO15320C | 3.21 | Hendricks | N/A | 22.5 | 10000 | 416740 | 73 | 52350 |
| | 397392 | Ed Lewis Trucking | | 580255 | 2012 | Inter | ProStar+ | 122 | 224 | White | N/A | 73 | Sky-Rs | MaxxForc | Jake | 430 | FRO15320C | 3.43 | Air Ride | N/A | 22.5 | 25500 | 349800 | 109 | 52350 |
| | 398046 | Ed Lewis Trucking | | 554040 | 2012 | Inter | ProStar+ | 122 | 224 | White | N/A | 73 | HR | MaxxForc | Jake | 430 | FRO15320C | 3.42 | Air Ride | N/A | 22.5 | 29500 | 370000 | 109 | 52350 |
| | 402921 | Carry Transit | | 560971 | 2012 | Inter | ProStar+ | 127 | 228 | White | N/A | 56 | HR | MaxxForc | Jake | 430 | FRO15320C | 3.21 | Air Ride | N/A | 22.5 | 17977 | 552548 | 77 | 52350 |
| | 451415 | Interstar | | 072351 | 2012 | Inter | ProStar+ | 122 | 224 | White | N/A | 71 | HR | MaxxForc | N/A | 430 | FRO16210C | 3.36 | Air Ride | N/A | 22.5 | | 403077 | 17 | 52350 |
| | 456377 | Carry Transit | | 554037 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 410 | FRO15320C | 3.21 | Hendricks | N/A | 22.5 | 0 | 293410 | 77 | 52350 |
| | 474851 | Carry Transit | | 554175 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 490 | FRO15320C | 3.21 | Hendricks | N/A | 22.5 | 0 | 206864 | 17 | 52350 |
| Chicago | 520413 | Meyers Motor Service | | 599491 | 2012 | Inter | ProStar+ | 121 | 217 | White | N/A | 56 | HR | MaxxForc | Jake | 450 | PRO16210C | 3.36 | Air Rise | Steel | 22.5 | 17977 | 418000 | 529 | 52350 |
| Indianapolis | 550636 | Nuvistar Indy UTC | | 387261 | 2012 | Inter | ProStar+ | 125 | 242 | Green | N/A | 71 | HR | MaxxForc | Interstar | 450 | PRO16220C | 3.25 | Air Rise | N/A | 22.5 | 39977 | 248134 | 208 | 52750 |
| HT Willowbrook | 564717 | Carry Transit | | 554026 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 430 | FRO15320B | 3.21 | Hendricks | N/A | 22.5 | 17937 | 500867 | 77 | 52350 |
| Joliet | 565531 | Carry Transit | | 554627 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 430 | FRO15320C | 3.21 | Hendricks | N/A | 22.6 | 23977 | 658758 | 77 | 52350 |
| Charlotte Int | 603142 | Nuvistar Indy UTC | | 608617 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 73 | Sky-Rs | MaxxForc | Interstar | 450 | N/A | 3.42 | Air Ride | N/A | 22.5 | 33937 | 279329 | 188 | 52350 |
| Springfield | 602087 | Nuvistar Indy UTC | | 608613 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 71 | Sky-Rs | MaxxForc | Interstar | 450 | F60162108 | 3.42 | Air Ride | N/A | 22.5 | 45977 | 248541 | 215 | 52350 |
| Chicago | 605695 | Carry Transit | | 554021 | 2012 | Inter | ProStar+ | 129 | 228 | BLUE | N/A | 56 | HR | MaxxForc | Jake | 430 | FRO15210C | 3.21 | Hendricks | N/A | 22.5 | 33977 | 292192 | 77 | 52350 |
| Atlanta | 670394 | Nuvistar Indy UTC | | 433952 | 2012 | Inter | Prostar+ | 129 | 224 | White | N/A | 73 | HR | MaxxForc | Interstar | 450 | N/A | 3.42 | Air Ride | Alum | 22.5 | 29977 | 100012 | 209 | 52750 |
| Indianapolis | 670411 | Nuvistar Indy UTC | | 435630 | 2012 | Inter | Prostar+ | 120 | 242 | Mauve | N/A | 71 | HR | MaxxForc | Jake | 490 | FRO15320C | 3.47 | Air Ride | Alum | 22.5 | 35977 | 106250 | 209 | 52950 |
| Lima | 688469 | Dunbar Transportation | | 564170 | 2012 | Inter | ProStar | Long | 234 | Blue | N/A | 73 | HR | MaxxForc | Jake | 490 | FRO15320C | 3.21 | Hendricks | N/A | 22.5 | 23977 | 502915 | 77 | 52950 |
| Huntley | 712153 | Carry Transit | | 554049 | 2012 | Inter | ProStar+ | 122 | 128 | BLUE | N/A | 56 | HR | MaxxForc | Jake | 490 | FRO15210C | 3.21 | Hendricks | N/A | 22.5 | 24977 | 314710 | 77 | 52350 |
| Chicago | 712359 | Carry Transit | | 554044 | 2012 | Inter | ProStar | 122 | 228 | White | N/A | 73 | HR | MaxxForc | Jake | 490 | FRO16210C | 3.42 | Air Ride | Alum | 22.5 | 21000 | 538475 | 95 | 0 |
| Tulsa | 713175 | Left Lane Transportation | | 546732 | 2012 | Inter | ProStar | 125 | 130 | White | N/A | 71 | Sky-Rs | MaxxForc | Jake | 490 | FRO15210C | 3.42 | Air Ride | N/A | 22.5 | 21000 | 518475 | 95 | 0 |
| Huntley | 723402 | Carry Transit | | 554051 | 2012 | Inter | ProStar+ | 122 | 228 | Blue | N/A | 56 | HR | MaxxForc | Jake | 430 | FRO15210C | 3.21 | Hendricks | N/A | 22.5 | 21377 | 290858 | 56 | 52350 |

PLAINTIFF'S
EXHIBIT
5

Exhibit 6

Sales Proposal – Truck #001



**Rush Truck Center, Jacksonville**
5175 W. Beaver St.
Jacksonville, FL 32254
904-783-8170

## Customer Proposal Letter

Trade Winds Transport, LLC
505 El Redundo Ave. #A
Redondo Beach, CA 90277
(310) 809-4661
egrace5577@gmail.com
Eric Grace

Eric Grace, thank you for the opportunity to earn your business. We look forward to working with you on your business needs. Please accept the following proposal.

**VEHICLE**

Make Intermational (I_ Model ProStar +   Year 2012        Stock Number 499864
Additional Vehicle and Accessories Description        To be delivered on or about 1/31/2017

2012 International ProStar+ 73" Mid Roof Sleeper White; 450 HP MaxxForce 13 Diesel Engine; Fuller 10 Speed OD Manual Transmission; 287,832 Miles; 226" Wheelbase; Air Ride Suspension; 3.42 Final Ratio; 22.5" Aluminum Wheels; VIN: 3HSDJSJR8CN624235

| | | |
|---|---|---|
| Quantity | 1 | Total |
| Truck Price per Unit | $22,813.00 | $22,813.00 |
| F.E.T. (Factory & Dealer Paid) | $0.00 | $0.00 |
| Net Sales Price | $22,813.00 | $22,813.00 |
| Optional Extended Warranty(ies) | $7,137.00 | $7,137.00 |
| State Sales Tax | $2,194.94 | $2,194.94 |
| Dealer Fee | $325.00 | $325.00 |
| Administration Fee | | |
| Vehicle Inventory Tax | | |
| Additional Taxes | | |
| Tire Recycling Program | | |
| Battery Disposal Fee | | |
| Out of State Vehicle Fee | | |
| Rebate(s) | | |
| Total Sales Price (including Rebate(s)) | $32,469.94 | $32,469.94 |
| Trade Allowance (see DISCLAIMER Below) | | 22,469.94 |

Sales Representative _____ Dennis King _____ $ 10,000 00
printed name

Purchaser _____ Eric Grace _____
printed name

_____ 1,18,17
date

Accepted by Sales Manager or
General Manager _____
signature        printed name

Quote good until 1/31/2017      Note: The above Customer Proposal is a quotation only. Sale terms subject to approval of Sales Manager of Dealer.

DISCLAIMER: Any order based on this Proposal subject to Customer executing Dealer's standard form Retail Purchase Order incorporating above terms. Any documentary fees, state tax, title, registration and license fees subject to adjustment and change. Actual F.E.T. to be paid by Dealer, subject to adjustment. Any F.E.T. variance will be responsibility of Dealer. Manufacturer has reserved the right to change the price to Dealer of any vehicle not currently in Dealer's stock, without notice to Dealer. If Quoted Vehicle(s) not currently in Dealer's stock, Dealer reserves right to change Quotation Total to reflect any price increases from Manufacturer. This Proposal is based upon Dealer's current and expected inventory, which is subject to change. Dealer not obligated to retain any specific vehicles in stock, nor maintain any specific inventory level. Dealer shall not be obligated to fulfill Proposal in event quoted vehicle(s) not in stock, or available within requested delivery schedule at time Proposal accepted. Dealer shall not be liable for any delay in providing or inability to provide Quoted Vehicle(s), where such inability or delay is due, in whole or in part, to any cause beyond the reasonable control of Dealer or is without the gross negligence or intended misconduct of Dealer. Above listed Trade Value based upon current appraisal of Trade Vehicle(s). Dealer may adjust Trade Value of Trade Vehicle(s) to reflect changes in condition and/or mileage of Trade Vehicle(s) between date of current appraisal and acceptance of this Proposal by Customer.

RTC O-300-7/12

PLAINTIFF'S
EXHIBIT
6

Printed on 1/10/2017 at 4:01 PM.

Exhibit 7

Sales Proposal – Truck #002



**Rush Truck Center, Jacksonville**
5175 W. Beaver St.
Jacksonville, FL 32254
904-783-6170

# Customer Proposal Letter

Trade Winds Transport, LLC
505 El Redundo Ave. #A
Redondo Beach, CA 90277
(310) 809-4661
egrace5577@gmail.com
Eric Grace

Eric Grace, thank you for the opportunity to earn your business. We look forward to working with you on your business needs. Please accept the following proposal.

## VEHICLE

Make _International (I_   Model _ProStar +_   Year _2012_   Stock Number _320851_

Additional Vehicle and Accessories Description   To be delivered on or about _1/31/2017_

2012 International ProStar+ 73" Mid Roof Sleeper White; 450 HP MaxxForce 13 Diesel Engine; Fuller 10 Speed OD Manual Transmission; 245,748 Miles; 226" Wheelbase; Air Ride Suspension; 3.42 Final Ratio; 22.5" Aluminum Wheels;  VIN: 3HSDJSJR6CN624251

| | Quantity | | Total |
|---|---|---|---|
| Quantity | 1 | | Total |
| Truck Price per Unit | | $22,813.00 | $22,813.00 |
| F.E.T. (Factory & Dealer Paid) | | $0.00 | $0.00 |
| Net Sales Price | | $22,813.00 | $22,813.00 |
| Optional Extended Warranty(ies) | | $7,137.00 | $7,137.00 |
| State Sales Tax | | $2,194.94 | $2,194.94 |
| Dealer Fee | | $325.00 | $325.00 |
| Administration Fee | | | |
| Vehicle Inventory Tax | | | |
| Additional Taxes | | | |
| Tire Recycling Program | | | |
| Battery Disposal Fee | | | |
| Out of State Vehicle Fee | | | |
| Rebate(s) | | | |
| Total Sales Price (Including Rebate(s)) | | $32,469.94 | $32,469.94 |
| Trade Allowance (see DISCLAIMER Below) | | _Down Pymt_ | 22,969.99 |

Sales Representative _____   Dennis King _Bal._   _$ 10,000.00_
                                    printed name

Purchaser _____   _Eric Grace_
                        printed name

_____   _1.10.18_
title        date

Accepted by Sales Manager or
General Manager _____   _____
                signature     printed name

Quote good until _1/31/2017_     Note: The above Customer Proposal is a quotation only. Sale terms subject to approval of Sales Manager of Dealer.

DISCLAIMER: Any order based on this Proposal subject to Customer executing Dealer's standard form Retail Purchase Order incorporating above terms. Any documentary fees, state tax, title, registration and license fees subject to adjustment and change. Actual F E T to be paid by Dealer subject to adjustment. Any F.E.T. variance will be responsibility of Dealer. Manufacturer has reserved the right to change the price to Dealer of any vehicle not currently in Dealer's stock, without notice to Dealer. If Quoted Vehicle(s) not currently in Dealer's stock, Dealer reserves right to change Quotation Total to reflect any price increases from Manufacturer. This Proposal is based upon Dealer's current and expected inventory, which is subject to change. Dealer not obligated to retain any specific vehicles in stock, nor maintain any specific inventory level. Dealer shall not be obligated to fulfil Proposal in event quoted vehicle(s) not in stock or available within requested delivery schedule at time Proposal accepted. Dealer shall not be liable for any delay in providing or inability to provide Quoted Vehicle(s), where such inability or delay is due, in whole or in part, to any cause beyond the reasonable control of Dealer or is without the gross negligence or intended misconduct of Dealer. Above listed Trade Value based upon current appraisal of Trade Vehicle(s). Dealer may adjust Trade Value of Trade Vehicle(s) to reflect changes in condition and/or mileage of Trade Vehicle(s) between date of current appraisal and acceptance of this Proposal by Customer

RTC G-300-7/12

**PLAINTIFF'S EXHIBIT**
7

Printed on 1/10/2017 at 3:51 PM

Exhibit 8

Sales Proposal – Truck #003



**Rush Truck Center, Jacksonville**
5175 W. Beaver St.
Jacksonville, FL 32254
904-783-6170

# Customer Proposal Letter

Trade Winds Transport, LLC
505 El Redundo Ave. #A
Redondo Beach, CA 90277
(310) 809-4661
egrace5577@gmail.com
Eric Grace

Eric Grace, thank you for the opportunity to earn your business. We look forward to working with you on your business needs. Please accept the following proposal.

## VEHICLE

Make Internatonal (I   Model ProStar +   Year 2012       Stock Number 499891
Additional Vehicle and Accessories Description        To be delivered on or about 1/31/2017

2012 International ProStar+ 73" Mid Roof Sleeper White; 450 HP MaxxForce 13 Diesel Engine; Fuller 10 Speed OD Manual Transmission; 287,832 Miles; 226" Wheelbase; Air Ride Suspension; 3.42 Final Ratio; 22.5" Aluminum Wheels;  VIN: 3HSDJSJR7CN624243

| | Quantity | Total |
|---|---|---|
| Quantity | 1 | Total |
| Truck Price per Unit | $22,813.00 | $22,813.00 |
| F.E.T. (Factory & Dealer Paid) | $0.00 | $0.00 |
| Net Sales Price | $22,813.00 | $22,813.00 |
| Optional Extended Warranty(ies) | $7,137.00 | $7,137.00 |
| State Sales Tax | $2,194.94 | $2,194.94 |
| Dealer Fee | $325.00 | $325.00 |
| Administration Fee | | |
| Vehicle Inventory Tax | | |
| Additional Taxes | | |
| Tire Recycling Program | | |
| Battery Disposal Fee | | |
| Out of State Vehicle Fee | | |
| Rebate(s) | | |
| Total Sales Price (Including Rebate(s)) | $32,469.94 | $32,469.94 |
| Trade Allowance (see DISCLAIMER Below) | *Down Pymt*  $22,969.94 | |

Sales Representative _[signature]_   Dennis King _Bal_  *$10,000 —*
                                      printed name

Purchaser _[signature]_   ERic Grace
                          printed name
          _[signature]_   1.10.17
          title              date

Accepted by Sales Manager or
General Manager _____   _____
                signature          printed name

Quote good until 1/31/2017        Note: The above Customer Proposal is a quotation only. Sale terms subject to approval of Sales Manager of Dealer.

DISCLAIMER: Any order based on this Proposal subject to Customer executing Dealer's standard form Retail Purchase Order incorporating above terms. Any documentary fees, state tax, title, registration and license fees subject to adjustment and change. Actual F.E.T. to be paid by Dealer, subject to adjustment. Any F.E.T. variance will be responsibility of Dealer. Manufacturer has reserved the right to change the price to Dealer of any vehicle not currently in Dealer's stock, without notice to Dealer. If Quoted Vehicle(s) not currently in Dealer's stock, Dealer reserves right to change Quotation Total to reflect any price increases from Manufacturer. This Proposal is based upon Dealer's current and expected inventory, which is subject to change. Dealer not obligated to retain any specific vehicles in stock, nor maintain any specific inventory level. Dealer shall not be obligated to fulfill Proposal in event quoted vehicle(s) not in stock or available within requested delivery schedule at time Proposal accepted. Dealer shall not be liable for any delay in providing or inability to provide Quoted Vehicle(s), where such inability or delay is due, in whole or in part, to any cause beyond the reasonable control of Dealer or is without the gross negligence or intended misconduct of Dealer. Above listed Trade Value based upon current appraisal of Trade Vehicle(s). Dealer may adjust Trade Value of Trade Vehicle(s) to reflect changes in condition and/or mileage of Trade Vehicle(s) between date of current appraisal and acceptance of this Proposal by Customer.

RTC Q-300-7/12

PLAINTIFF'S EXHIBIT
8

Printed on 1/10/2017 at 4:02 PM.

Exhibit 9

Sales Proposal – Truck #004



**Rush Truck Center, Jacksonville**
5175 W. Beaver St.
Jacksonville, FL 32254
904-783-6170

# Customer Proposal Letter

Trade Winds Transport, LLC
505 El Redundo Ave. #A
Redondo Beach, CA 90277
(310) 809-4661
egrace5577@gmail.com
Eric Grace

Eric Grace, thank you for the opportunity to earn your business. We look forward to working with you on your business needs. Please accept the following proposal.

## VEHICLE

Make International    Model ProStar+    Year 2012    Stock Number 333227

Additional Vehicle and Accessories Description    To be delivered on or about 1/31/2017

2012 International ProStar+ 73" High Rise Sleeper White; 430 HP MaxxForce 13 Diesel Engine; Fuller 10 Speed OD Manual Transmission; 339,580 Miles; 229" Wheelbase; Air Ride Suspension; 3.36 Final Ratio; 22.5" Aluminum Wheels;  VIN: 3HSDJSJR5CN624256

| Quantity | 1 | Total |
|---|---|---|
| Truck Price per Unit | $22,813.00 | $22,813.00 |
| F.E.T. (Factory & Dealer Paid) | $0.00 | $0.00 |
| Net Sales Price | $22,813.00 | $22,813.00 |
| Optional Extended Warranty(ies) | $7,137.00 | $7,137.00 |
| State Sales Tax | $2,194.94 | $2,194.94 |
| Dealer Fee | $325.00 | $325.00 |
| Administration Fee | | |
| Vehicle Inventory Tax | | |
| Additional Taxes | | |
| Tire Recycling Program | | |
| Battery Disposal Fee | | |
| Out of State Vehicle Fee | | |
| Rebate(s) | | |
| Total Sales Price (Including Rebate(s)) | $32,469.94 | $32,469.94 |
| Trade Allowance (see DISCLAIMER Below) | | 22,469.94 |

Sales Representative _____    Dennis King _____    $10,000 __
                                                                                                     printed name

Purchaser _____    Eric Grace _____
                                                                            printed name

_____    1.10.17
                                                    date

Accepted by Sales Manager or
General Manager _____
                                     signature                                     printed name

Quote good until 1/31/2017    Note: The above Customer Proposal is a quotation only. Sale terms subject to approval of Sales Manager of Dealer.

DISCLAIMER: Any order based on this Proposal subject to Customer executing Dealer's standard form Retail Purchase Order incorporating above terms. Any documentary fees, state tax, title, registration and license fees subject to adjustment and change. Actual F.E.T. to be paid by Dealer, subject to adjustment. Any F.E.T variance will be responsibility of Dealer. Manufacturer has reserved the right to change the price to Dealer of any vehicle not currently in Dealer's stock, without notice to Dealer. If Quoted Vehicle(s) not currently in Dealer's stock, Dealer reserves right to change Quotation Total to reflect any price increases from Manufacturer. This Proposal is based upon Dealer's current and expected inventory, which is subject to change. Dealer not obligated to retain any specific vehicles in stock, nor maintain any specific inventory level. Dealer shall not be obligated to fulfill Proposal in event quoted vehicle(s) not in stock or available within requested delivery schedule at time Proposal accepted. Dealer shall not be liable for any delay in providing or inability to provide Quoted Vehicle(s), where such inability or delay is due, in whole or in part, to any cause beyond the reasonable control of Dealer or is without the gross negligence or intended misconduct of Dealer. Above listed Trade Value based upon current appraisal of Trade Vehicle(s). Dealer may adjust Trade Value of Trade Vehicle(s) to reflect changes in condition and/or mileage of Trade Vehicle(s) between date of current appraisal and acceptance of this Proposal by Customer.

RTC G-300-7/12

PLAINTIFF'S EXHIBIT
9

Printed on 1/10/2017 at 3:57 PM

Exhibit 10

Retail Sales Order – Truck #001



Rush Truck Center, Atlanta
2560 Moreland Avenue SE
Atlanta, GA 30315
(404) 622-1921

www.rushtruckcenters.com

# Retail Sales Order

| SALES ORDER | | | | Date 01/25/2017 | | | |
|---|---|---|---|---|---|---|---|
| Please enter my order for the following: | | | | Trade Winds Transport LLC | | | |
| ☐ New   ☐ F.E.T. Applicable | | | | Customer's Name | | | |
| ☑ Used   ☑ F.E.T. Exempt | | | | 505 El redondo Ave | Redondo Beach  CA | | 90277 |
| Make  International (Used) | Series | ProStar + | | Street | City (310) 809-4661 | State | Zip |
| Year  2012 | Body Type | | | Federal Tax ID # | Business Phone | Fax | |
| Color  N/I | Trim | | | | | | |
| Serial #  3HSDJSJR8CN524235 | | | | Purchaser's Name | | | |
| Stock #  499864 | | | | | | | |
| To be delivered on or about | | | | Street | City | State | Zip |
| | | | | Federal Tax ID # | Business Phone | Fax | |
| | | | | Dennis King | | | |
| | | | | By Salesman | | | |
| | | | | Truck Will be Titled in _____ County. | | | |
| | | | | LIENHOLDER INFORMATION | | | |
| | | | | Date of Lien | | | |
| | | | | Lien Holder | | | |
| Sales Price | | 22,813.00 | | | | | |
| Factory Paid F.E.T. | | 0.00 | | | | | |
| F.E.T. Tire Credit | | 0.00 | | | | | |
| Total Factory Paid F.E.T. | | 0.00 | | | | | |
| Optional Extended Warranties | | 7,137.00 | | Draft Through | | | |
| Sub-Total | | 29,950.00 | | | | | |
| | | | | | | | |
| Dealer Paid F.E.T. * | | 0.00 | | | | | |
| Local Taxes | | 0.00 | | | | | |
| Additional Taxes | | 2,194.94 | | Total Used Vehicle Allowance * | | | 0.00 |
| License, Transfer, Title, Registration Fee | | 0.00 | | Less Total Balance Owed | | | 0.00 |
| Documentary Fee | | 0.00 | | Total Net Allowance on Used Vehicle(s) | | | 0.00 |
| Administration Fee | | 325.00 | | Deposit or Credit Balance | | | 0.00 |
| Total Cash Delivered Price | | 32,469.94 | | Cash with Order | | | 0.00 |
| Total Down Payment | | 0.00 | | ← - - - - - - - - - - - - - - - - - - - - - - | | | 0.00 |
| Unpaid Cash Balance Due on Delivery | | 32,469.94 | | *See Trade-in details on page 4 | | | |

A DOCUMENTARY FEE IS NOT AN OFFICIAL FEE. A DOCUMENTARY FEE IS NOT REQUIRED BY LAW, BUT MAY BE CHARGED TO CUSTOMERS FOR HANDLING DOCUMENTS RELATING TO THE SALE.

Customer, by the execution of this Order, offers to purchase the Product(s) described above upon the Terms and Conditions contained herein. Customer acknowledges that Customer has read the Terms and Conditions of this Order on Page 2 and has received a true copy of this Order and the Terms and Conditions.

*SUBJECT TO ADJUSTMENT – FINAL F.E.T. MAY VARY. ANY F.E.T. VARIANCE RESPONSIBILITY OF DEALER

Customer's Signature                    1/25/17
                                              Date

NOTICE: THE FOLLOWING ARE IMPORTANT PROVISIONS OF THIS ORDER

OFFER RECEIVED BY: _____

THIS ORDER CANCELS AND SUPERCEDES ANY PRIOR AGREEMENTS AND, AS OF THIS DATE HEREOF, COMPRISES THE COMPLETE AND EXCLUSIVE STATEMENT OF THE TERMS OF THE AGREEMENT BETWEEN THE PARTIES.

SALES REPRESENTATIVE          Date

IF ANY REPRESENTATIONS, SPECIFICATIONS OR OTHER AGREEMENTS ARE RELIED UPON BY CUSTOMER, THEY MUST BE IN WRITING AND SPECIFICALLY IDENTIFIED AND REFERENCED IN THIS ORDER; OTHERWISE, THEY WILL NOT BE BINDING ON OR ENFORCEABLE AGAINST DEALER.

OFFER ACCEPTED BY: _____

AUTHORIZED REPRESENTATIVE     Date

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

RTC S-120 GA-1/14

PLAINTIFF'S EXHIBIT
10

1



**Rush Truck Center, Atlanta**

2580 Moreland Avenue SE
Atlanta, GA 30315
(404) 622-1921

www.rushtruckcenters.com

# Retail Sales Order

## TERMS AND CONDITIONS

1. **Parties to Order; Definitions.** As used in this Retail Sales Order ("Order"), the terms: (a) "Dealer" shall mean the Rush Dealer identified at the top of the first page of this Order; (b) "Customer" shall mean the Customer identified on the first page of this Order; (c) "Manufacturer(s)" shall mean the entity or entities that manufactured the Product(s), it being understood by Customer that Dealer is in no respect the agent of Manufacturer(s); and (d) "Product(s)" shall mean the new and/or used vehicle or other components, accessories or products, which are being purchased by Customer, as set forth in this Order.

2. **WARRANTY DISCLAIMERS AND LIMITATIONS**

NEW PRODUCTS – MANUFACTURER WARRANTIES ONLY. Any warranties on any new Product(s) sold under this Order are limited only to any printed Manufacturers' warranties delivered to Customer with the Product(s). EXCEPT FOR ANY SUCH WARRANTIES MADE BY MANUFACTURERS, THE PRODUCT(S) ARE SOLD WITHOUT ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EACH OF WHICH IS EXPRESSLY DISCLAIMED.

USED PRODUCTS – NO WARRANTIES. All used Product(s) sold under this Order are sold on an "AS IS, WHERE IS" basis, without any warranties by Dealer, provided that Products that are sold by Dealer as "Certified Pre-Owned" are subject to the express written terms and conditions of the Dealer's certified pre-owned program. EXCEPT FOR ANY MANUFACTURERS' WARRANTIES THAT MAY STILL BE IN EFFECT, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY DISCLAIMED.

LIMITED WARRANTY ON SERVICES. Dealer warrants that all services performed by Dealer for Customer in conjunction with the sale of the Product(s), including if applicable installation, upfitting and conversion services ("Services"), will be performed in a good and workmanlike manner ("Services Warranty"). The Services Warranty is valid for a period of ninety (90) days from the date the Product(s) is delivered to Customer. Customer's sole and exclusive remedy, and Dealer's entire liability, under the Services Warranty is the repair of any nonconforming portion of the Services. DEALER PROVIDES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ITS SERVICES. The Services Warranty is strictly limited to Services performed by Dealer for Customer. Dealer does not warrant any services provided by any third-party, including but not limited to installation, upfitting or conversion services. Any warranties are solely those that are provided by third-party service provider.
NO OTHER WARRANTIES. EXCEPT AS SET FORTH ABOVE, DEALER EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED.

3. **Reappraisal of Trade-in Vehicle.** If the motor vehicle which has been traded in ("Trade-in Vehicle") as a part of the consideration for the Product(s) ordered hereunder is not to be delivered to Dealer until delivery to Customer of the Product(s), the Trade-in Vehicle shall be reappraised at that time and such reappraised value shall determine the allowance made for the Trade-in Vehicle. If the reappraised value is lower than the original allowance shown on the front of this Order, Customer may, if dissatisfied, cancel this Order.

4. **Delivery of Trade-in Vehicle by Customer; Customer Warranty of Title.** Customer agrees to deliver to Dealer satisfactory evidence of title to the Trade-in Vehicle at the time of delivery of the Trade-in Vehicle to Dealer. Customer warrants the Trade-in Vehicle to be Customer's property free and clear of all liens and encumbrances.

5. **Delay or Failure in Delivery; Limitation of Dealer Liability.** Dealer shall not be liable for failure to deliver or delay in delivering any Product(s) covered by this Order where such failure or delay is due, in whole or in part, to any cause beyond the reasonable control, or is without the group negligence or intentional misconduct, of Dealer. Examples of causes beyond Dealer's reasonable control include, but are not limited to, Manufacturers' delay or failure to deliver Product(s) for any reason, earthquake, hurricane or other natural disaster, fire, war, terrorist act, labor dispute, strike, etc.

6. **Liability for Taxes.** The price for the Product(s) specified on the face of this Order includes reimbursement to Dealer for federal excise taxes paid, but does not include sales or use taxes or occupational taxes based on sales volume (federal, state or local) unless expressly so stated. Customer assumes and agrees to pay, unless prohibited by law, any such sales or use or occupational taxes imposed on or applicable to the transaction covered by this Order, regardless of which party may have primary tax liability thereof.

7. **Customer's Deposit.** Any Customer's deposit, whether cash or Trade-in Vehicle, shall not be refunded except due to Dealer's failure to deliver the Product(s).

8. **Risk of Loss; Insurance.** Customer shall assume all risk of loss relating to the Product(s) at the time Customer receives possession of the Product(s), or at the time Customer receives title to the Product(s) if title is conveyed before Customer receives possession. Customer shall obtain insurance for the Product(s) that will be in effect at the time Customer takes possession of the Product(s), or at the time Customer receives title to the Product(s) if title is conveyed before the Customer receives possession. Dealer shall have no responsibility or liability related to the Product(s) after Customer receives either possession or title to the Product(s).

9. **Governing Law; Venue; Time to Commence Action.** Except to the extent that the laws of the United States may apply or otherwise control this Order, the rights and obligations of the parties hereunder shall be governed by, and construed and interpreted in accordance with, the laws of the state in which Dealer is located, without regard to conflict of law principles. The mandatory venue for any claim, litigation, civil action or any other legal or administrative proceeding ("Action") involving any controversy or claim between or among the parties to this Order, is the state in which Dealer is located. Customer has one (1) year from the accrual of any cause of action arising from the purchase of the Product(s) to commence an Action against Dealer.

10. **Limitation of Damages.** Customer agrees that in the event of any Action brought by Customer against Dealer, Customer shall not be entitled to recover any incidental or consequential damages as defined in the Uniform Commercial Code, including but not limited to indirect or special damages, loss of income or anticipated profits, or down-time, or any punitive damages.

11. **Fees and Expenses of Actions.** In any Action, whether initiated by Dealer or Customer, where the Customer has a right, pursuant to statute, common law or otherwise, to recover reasonable attorneys' fees and costs in the event it prevails, Customer agrees that Dealer shall have the same right to recover reasonable attorneys' fees and costs incurred in connection with the Action in the event that Dealer prevails.

12. **Execution and Delivery by Electronic Transmission.** If this Order or any document executed in connection with this Order is delivered by facsimile, email or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, such execution and delivery shall be considered valid, binding and effective for all purposes as an original document. Additionally, the signature of any party on this Order transmitted by way of a facsimile machine or email shall be considered for all purposes as an original signature. Any such faxed or emailed document shall be considered to have the same binding legal effect as an original document. At the request of Dealer, any faxed or emailed document shall be re-executed by Customer in an original form.

13. **Waiver; Severability.** No waiver of any term of this Order shall be valid unless it is in writing and signed by Dealer's authorized representative. If any provision or part of any provision of this Order shall be deemed to violate any applicable law or regulation, such invalid provision or part of a provision shall be inapplicable, BUT the remaining part of that provision and the remainder of the Order shall continue to be binding and enforceable.

14. **No Broker; Manufacturer Incentives.** If at any time Dealer determines that the Customer intends to engage in the resale of vehicles for profit, where such resale is not in conjunction with further manufacturing, Dealer reserves the right to cancel this Order. Certain manufacturer incentives are intended to be used for retail customers at the location as identified by the Customer in this Order. Customer represents that they will register the vehicle with their state motor vehicle department and are not purchasing this vehicle with the intent to resell/export the vehicle, except where such resale is in conjunction with further manufacturing. If at any time Dealer determines that the foregoing representations are not true, Dealer has the right to seek repayment of any manufacturer incentives that are paid.

15. **Communication Consent.** Dealer and any other owner or servicer of this account may use any information Customer gives Dealer, including but not limited to email addresses, cell phone numbers, and landline numbers, to contact Customer for purposes related to this account, including debt collection and marketing purposes. In addition, Customer expressly consents to any such contact being made by the most efficient technology available, including but not limited to, automated dialing equipment, automated messages, and prerecorded messages, even if Customer is charged for the contact.

Customer Initial _____

RTC S-120 GA-1/14

2

# Rush Privacy Policy

Rev. 10/13

For Nonpublic Personal Information Disclosed in Connection with the Provision of Financial Products or Services

| FACTS | WHAT DOES RUSH TRUCK CENTERS DO WITH YOUR PERSONAL INFORMATION? |
|---|---|

| WHY? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
|---|---|

| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include: <br>• Social Security number and income <br>• Account balances and payment history <br>• Credit history and employment information <br>When you are no longer our customer, we continue to share your information as described in this notice. |
|---|---|

| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Rush Truck Centers chooses to share; and whether you can limit this sharing. |
|---|---|

| Reasons we can share your personal information | Does Rush Truck Centers share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes- Such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes- To offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | Yes | No |
| For our affiliates' everyday business purposes- Information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes- Information about your creditworthiness | No | We don't share |
| For our affiliates to market to you | No | We don't share |
| For nonaffiliates to market to you | No | We don't share |

| Questions? | Call (830) 626-5249 |
|---|---|

Who we are

**Who is providing this notice?**    Rush Enterprises, Inc. and its wholly owned subsidiaries.  See "Other important information" below for a listing of companies.

What we do

**How does Rush Truck Centers protect my personal information?**    To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings.

**How does Rush Truck Centers collect my personal information?**    We collect your personal information, for example, when you
* apply for financing
* give us your income information or provide employment information
* provide account information or give us your contact information
We also collect your personal information from others, such as credit bureaus, affiliates, or other companies.

**Why can't I limit all sharing?**    Federal law gives you the right to limit only
* sharing for affiliates' everyday business purposes-information about your creditworthiness
* affiliates from using your information to market to you
* sharing for nonaffiliates to market to you
State laws and individual companies may give you additional rights to limit sharing.

Definitions

**Affiliates**    Companies related by common ownership or control. They can be financial and nonfinancial companies.

**Nonaffiliates**    Companies not related by common ownership or control. They can be financial and nonfinancial companies.

Rush does not share with nonaffiliates so they can market to you.

**Joint marketing**    A formal agreement between nonaffiliated financial companies that together market financial products or services to you.

* Includes lenders, finance companies and financial service providers

Other important information

* This notice is made by Rush Enterprises, Inc. and its wholly owned subsidiaries in the Rush Truck Centers' family of companies: Rush Administrative Services, Inc., Rush Truck Centers of Alabama, Inc.,  Rush Truck Centers of Arizona, Inc.,  Rush Truck Centers of California, Inc.,  Rush Truck Centers of Colorado, Inc., Rush Truck Centers of Florida, Inc., Rush Truck Centers of Georgia, Inc., Rush Truck Centers of Idaho, Inc.,  Rush Truck Centers of New Mexico,Inc., Rush Truck Centers of North Carolina, Inc.,  Rush Truck Centers of Ohio, Inc.,  Rush Truck Centers of Oklahoma, Inc.,  Rush Truck Centers of Oregon, Inc., Rush Truck Centers of Tennessee, Inc.,  Rush Truck Centers of Texas, LP and Rush Truck Centers of Utah, Inc.,  Rush Truck Centers of Virginia, Inc.
* This Privacy Policy does not apply to information obtained in a non-financial transaction.

3

Exhibit 11

Retail Sales Order – Truck #002



**Rush Truck Center, Atlanta**
2580 Moreland Avenue SE
Atlanta, GA 30315
(404) 622-1921

www.rushtruckcenters.com

# Retail Sales Order

**SALES ORDER**

Date **01/25/2017**

Please enter my order for the following:

☐ New   ☐ F.E.T. Applicable
☑ Used   ☑ F.E.T. Exempt

Trade Winds Transport LLC

Customer's Name
505 El redondo Ave    Redondo Beach  CA    90277

| Make | International (Used) | Series | ProStar + |
|------|---------------------|--------|-----------|

Street                    City (310) 809-4661   State   Zip

| Year | 2012 | Body Type | |
|------|------|-----------|--|

Federal Tax ID #    Business Phone   Fax

| Color | N/I | Trim | |
|-------|-----|------|--|

Serial # 3HSDJSJR6CN624251

Purchaser's Name

Stock # 320851

To be delivered on or about

Street                    City    State   Zip

Federal Tax ID #    Business Phone   Fax

Dennis King

By Salesman

Truck Will be Titled In _____ County.

**LIENHOLDER INFORMATION**

Date of Lien

Lien Holder

| | |
|---|---|
| Sales Price | 22,813.00 |
| Factory Paid F.E.T. | 0.00 |
| F.E.T. Tire Credit | 0.00 |
| Total Factory Paid F.E.T. | 0.00 |
| Optional Extended Warranties | 7,137.00 |
| Sub-Total | 29,950.00 |

Draft Through

| | | |
|---|---|---|
| Dealer Paid F.E.T. * | 0.00 | |
| Local Taxes | 0.00 | |
| Additional Taxes | 2,194.94 | Total Used Vehicle Allowance * | 0.00 |
| License, Transfer, Title, Registration Fee | 0.00 | Less Total Balance Owed | 0.00 |
| Documentary Fee | 0.00 | Total Net Allowance on Used Vehicle(s) | 0.00 |
| Administration Fee | 325.00 | Deposit or Credit Balance | 0.00 |
| Total Cash Delivered Price | 32,469.94 | Cash with Order | 0.00 |
| Total Down Payment | 0.00 | ◄ - - - - - - - - - - - - - - - - - - - - - - | 0.00 |
| Unpaid Cash Balance Due on Delivery | 32,469.94 | *See Trade-in details on page 4 | |

A DOCUMENTARY FEE IS NOT AN OFFICIAL FEE. A DOCUMENTARY FEE IS NOT REQUIRED BY LAW, BUT MAY BE CHARGED TO CUSTOMERS FOR HANDLING DOCUMENTS RELATING TO THIS SALE.

Customer, by the execution of this Order, offers to purchase the Product(s) described above upon the Terms and Conditions contained herein. Customer acknowledges that Customer has read the Terms and Conditions of this Order on Page 2 and has received a true copy of this Order and the Terms and Conditions.

*SUBJECT TO ADJUSTMENT – FINAL F.E.T. MAY VARY.
ANY F.E.T. VARIANCE RESPONSIBILITY OF DEALER

Customer's Signature                    1/25/17
                                        Date

NOTICE: THE FOLLOWING ARE IMPORTANT PROVISIONS OF THIS ORDER

THIS ORDER CANCELS AND SUPERCEDES ANY PRIOR AGREEMENTS AND, AS OF THE DATE HEREOF, COMPRISES THE COMPLETE AND EXCLUSIVE STATEMENT OF THE TERMS OF THE AGREEMENT BETWEEN THE PARTIES.

IF ANY REPRESENTATIONS, SPECIFICATIONS OR OTHER AGREEMENTS ARE RELIED UPON BY CUSTOMER, THEY MUST BE IN WRITING AND SPECIFICALLY IDENTIFIED AND REFERENCED IN THIS ORDER; OTHERWISE, THEY WILL NOT BE BINDING ON OR ENFORCEABLE AGAINST SALER.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

OFFER RECEIVED BY: _____
                    SALES REPRESENTATIVE    Date

OFFER ACCEPTED BY: _____
                    AUTHORIZED REPRESENTATIVE    Date

PLAINTIFF'S
EXHIBIT
11

RTC S-120 GA-1/14

1



2560 Moreland Avenue SE
Atlanta, GA 30315
(404) 622-1921

www.rushtruckcenters.com

**Retail Sales Order**

TERMS AND CONDITIONS

**1. Parties to Order; Definitions.** As used in this Retail Sales Order ("Order"), the terms: (a) "Dealer" shall mean the Rush Dealer identified at the top of the first page of this Order; (b) "Customer" shall mean the Customer identified on the first page of this Order; (c) "Manufacturer(s)" shall mean the entity or entities that manufactured the Product(s), it being understood by Customer that Dealer is in no respect the agent of Manufacturer(s); and (d) "Product(s)" shall mean the new and/or used vehicle or other components, accessories or products, which are being purchased by Customer, as set forth in this Order.

**2. WARRANTY DISCLAIMERS AND LIMITATIONS**

**NEW PRODUCTS – MANUFACTURER WARRANTIES ONLY.** Any warranties on any new Product(s) sold under this Order are limited only to any printed Manufacturers' warranties delivered to Customer with the Product(s). EXCEPT FOR ANY SUCH WARRANTIES MADE BY MANUFACTURERS, THE PRODUCT(S) ARE SOLD WITHOUT ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EACH OF WHICH IS EXPRESSLY DISCLAIMED.

**USED PRODUCTS – NO WARRANTIES.** All used Product(s) sold under this Order are sold on an "AS IS, WHERE IS" basis, without any warranties by Dealer, provided that Products that are sold by Dealer as "Certified Pre-Owned" are subject to the express written terms and conditions of the Dealer's certified pre-owned program. EXCEPT FOR ANY MANUFACTURERS' WARRANTIES THAT MAY STILL BE IN EFFECT, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY DISCLAIMED.

**LIMITED WARRANTY ON SERVICES.** Dealer warrants that all services performed by Dealer for Customer in conjunction with the sale of the Product(s), including if applicable installation, upfitting and conversion services ("Services"), will be performed in a good and workmanlike manner ("Services Warranty"). The Services Warranty is valid for a period of ninety (90) days from the date the Product(s) is delivered to Customer. Customer's sole and exclusive remedy, and Dealer's entire liability, under the Services Warranty is the repair of any nonconforming portion of the Services. DEALER PROVIDES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ITS SERVICES. This Services Warranty is strictly limited to Services performed by Dealer for Customer. Dealer does not warrant any services provided by any third-party, including but not limited to installation, upfitting or conversion services. Any warranties are solely those that are provided by the third-party service provider.
NO OTHER WARRANTIES. EXCEPT AS SET FORTH ABOVE, DEALER EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED.

**3. Reappraisal of Trade-In Vehicle.** If the motor vehicle which has been traded in ("Trade-In Vehicle") as a part of the consideration for the Product(s) ordered hereunder is not to be delivered to Dealer until delivery to Customer of the Product(s), the Trade-In Vehicle shall be reappraised at that time and such reappraised value shall determine the allowance made for the Trade-In Vehicle. If the reappraised value is lower than the original allowance shown on the front of this Order, Customer may, if dissatisfied, cancel this Order.

**4. Delivery of Trade-In Vehicle by Customer; Customer Warranty of Title.** Customer agrees to deliver to Dealer satisfactory evidence of title to the Trade-In Vehicle at the time of delivery of the Trade-In Vehicle to Dealer. Customer warrants the Trade-In Vehicle to be Customer's property free and clear of all liens and encumbrances.

**5. Delay or Failure in Delivery; Limitation of Dealer Liability.** Dealer shall not be liable for failure to deliver or delay in delivering any Product(s) covered by this Order where such failure or delay is due, in whole or in part, to any cause beyond the reasonable control, or is without the gross negligence or intentional misconduct, of Dealer. Examples of causes beyond Dealer's reasonable control include, but are not limited to, Manufacturers' delay or failure to deliver Product(s) for any reason, earthquake, hurricane or other natural disaster, fire, war, terrorist act, labor dispute, strike, etc.

**6. Liability for Taxes.** The price for the Product(s) specified on the face of this Order includes reimbursement to Dealer for federal excise taxes paid, but does not include sales or use taxes or occupational taxes based on sales volume (federal, state or local) unless expressly so stated. Customer assumes and agrees to pay, unless prohibited by law, any such sales or use or occupational taxes imposed on or applicable to the transaction covered by this Order, regardless of which party may have primary tax liability thereof.

**7. Customer's Deposit.** Any Customer's deposit, whether cash or Trade-In Vehicle, shall not be refunded except due to Dealer's failure to deliver the Product(s).

**8. Risk of Loss; Insurance.** Customer shall assume all risk of loss relating to the Product(s) at the time Customer receives possession of the Product(s), or at the time Customer receives title to the Product(s) if title is conveyed before Customer receives possession. Customer shall obtain insurance for the Product(s) that will be in effect at the time Customer takes possession of the Product(s), or at the time Customer receives title to the Product(s) if title is conveyed before Customer receives possession. Dealer shall have no responsibility or liability related to the Product(s) after Customer receives either possession or title to the Product(s).

**9. Governing Law; Venue; Time to Commence Action.** Except to the extent that the laws of the United States may apply or otherwise control this Order, the rights and obligations of the parties hereunder shall be governed by, and construed and interpreted in accordance with, the laws of the state in which Dealer is located, without regard to conflict of law principles. The mandatory venue for any claim, litigation, civil action or any other legal or administrative proceeding ("Action") involving any controversy or claim between or among the parties to this Order, is the state in which Dealer is located. Customer has one (1) year from the accrual of any cause of action arising from the purchase of the Product(s) to commence an Action against Dealer.

**10. Limitation of Damages.** Customer agrees that in the event of any Action brought by Customer against Dealer, Customer shall not be entitled to recover any incidental or consequential damages as defined in the Uniform Commercial Code, including but not limited to indirect or special damages, loss of income or anticipated profits, or down-time, or any punitive damages.

**11. Fees and Expenses of Actions.** In any Action, whether initiated by Dealer or Customer, where the Customer has a right, pursuant to statute, common law or otherwise, to recover reasonable attorneys' fees and costs in the event it prevails, Customer agrees that Dealer shall have the same right to recover reasonable attorneys' fees and costs incurred in connection with the Action in the event that Dealer prevails.

**12. Execution and Delivery by Electronic Transmission.** If this Order or any document executed in connection with this Order is delivered by facsimile, email or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, such execution and delivery shall be considered valid, binding and effective for all purposes as an original document. Additionally, the signature of any party on this Order transmitted by way of a facsimile machine or email shall be considered for all purposes as an original signature. Any such faxed or emailed document shall be considered to have the same binding legal effect as an original document. At the request of Dealer, any faxed or emailed document shall be re-executed by Customer in an original form.

**13. Waiver; Severability.** No waiver of any term of this Order shall be valid unless it is in writing and signed by Dealer's authorized representative. If any provision or part of any provision of this Order shall be deemed to violate any applicable law or regulation, such invalid provision or part of a provision shall be inapplicable, BUT the remaining part of that provision and the remainder of the Order shall continue to be binding and enforceable.

**14. No Broker; Manufacturer Incentives.** If at any time Dealer determines that the Customer intends to engage in the resale of vehicles for profit, where such resale is not in conjunction with further manufacturing, Dealer reserves the right to cancel this Order. Certain manufacturer incentives are intended to be used for retail customers at the location as identified by the Customer in this Order. Customer represents that they will register the vehicle with their state motor vehicle department and are not purchasing this vehicle with the intent to resell/export the vehicle, except where such resale is in conjunction with further manufacturing. If at any time Dealer determines that the foregoing representations are not true, Dealer has the right to seek repayment of any manufacturer incentives that are paid.

**15. Communication Consent.** Dealer and any other owner or servicer of this account may use any information Customer gives Dealer, including but not limited to email dresses, cell phone numbers, and landline numbers, to contact Customer for purposes related to this account, including debt collection and marketing purposes. In addition, customer expressly consents to any such contact being made by the most efficient technology available, including but not limited to, automated dialing equipment, automated messages, and prerecorded messages, even if Customer is charged for the contact.



# Rush Privacy Policy

Rev. 10/13

For Nonpublic Personal Information Disclosed in Connection with the Provision of Financial Products or Services

| FACTS | WHAT DOES RUSH TRUCK CENTERS DO WITH YOUR PERSONAL INFORMATION? |
|---|---|

| WHY? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
|---|---|

| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and income<br>• Account balances and payment history<br>• Credit history and employment information<br>When you are no longer our customer, we continue to share your information as described in this notice. |
|---|---|

| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Rush Truck Centers chooses to share; and whether you can limit this sharing. |
|---|---|

| Reasons we can share your personal information | Does Rush Truck Centers share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes–<br>Such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes–<br>To offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | Yes | No |
| For our affiliates' everyday business purposes–<br>Information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes–<br>Information about your creditworthiness | No | We don't share |
| For our affiliates to market to you | No | We don't share |
| For nonaffiliates to market to you | No | We don't share |

| Questions? | Call (830) 626-5249 |
|---|---|

**Who we are**

| Who is providing this notice? | Rush Enterprises, Inc. and its wholly owned subsidiaries. See "Other important information" below for a listing of companies. |
|---|---|

**What we do**

| How does Rush Truck Centers protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
|---|---|
| How does Rush Truck Centers collect my personal information? | We collect your personal information, for example, when you<br>• apply for financing<br>• give us your income information or provide employment information<br>• provide account information or give us your contact information<br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>• sharing for affiliates' everyday business purposes–information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. |

**Definitions**

| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies. |
|---|---|
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>Rush does not share with nonaffiliates so they can market to you. |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>• Includes lenders, finance companies and financial service providers |

**Other important information**

• This notice is made by Rush Enterprises, Inc. and its wholly owned subsidiaries in the Rush Truck Centers' family of companies: Rush Administrative Services, Inc., Rush Truck Centers of Alabama, Inc., Rush Truck Centers of Arizona, Inc., Rush Truck Centers of California, Inc., Rush Truck Centers of Colorado, Inc., Rush Truck Centers of Florida, Inc., Rush Truck Centers of Georgia, Inc., Rush Truck Centers of Idaho, Inc., Rush Truck Centers of New Mexico, Inc., Rush Truck Centers of North Carolina, Inc., Rush Truck Centers of Ohio, Inc., Rush Truck Centers of Oklahoma, Inc., Rush Truck Centers of Oregon, Inc., Rush Truck Centers of Tennessee, Inc., Rush Truck Centers of Texas, LP and Rush Truck Centers of Utah, Inc., Rush Truck Centers of Virginia, Inc.

• This Privacy Policy does not apply to information obtained in a non-financial transaction.

3

Exhibit 12

Retail Sales Order – Truck #003



Rush Truck Center, Atlanta
2580 Moreland Avenue SE
Atlanta, GA 30315
(404) 622-1921

**Retail Sales Order**

rw.rushtruckcenters.com

| SALES ORDER | | | | Date 01/25/2017 | | | |
|---|---|---|---|---|---|---|---|
| Please enter my order for the following: | | | | Trade Winds Transport LLC | | | |
| ☐ New     ☐ F.E.T. Applicable | | | | Customer's Name | | | |
| ☑ Used    ☑ F.E.T. Exempt | | | | 505 El redondo Ave | Redondo Beach  CA | | 90277 |
| Make | International (Used) | Series | ProStar + | Street | City           State | | Zip |
| | | Body Type | | (310) 809-4661 | | | |
| Year | 2012 | | | Federal Tax ID # | Business Phone   Fax | | |
| Color | N/I | Trim | | | | | |
| Serial # | 3HSDJSJR7CN624243 | | | Purchaser's Name | | | |
| Stock # | 499891 | | | | | | |
| To be delivered on or about | | | | Street | City | State | Zip |
| | | | | Federal Tax ID # | Business Phone   Fax | | |
| | | | | Dennis King | | | |
| | | | | By Salesman | | | |
| | | | | Truck Will be Titled in _____ County. | | | |
| | | | | LIENHOLDER INFORMATION | | | |
| | | | | Date of Lien | | | |
| | | | | Lien Holder | | | |
| Sales Price | | 22,813.00 | | | | | |
| Factory Paid F.E.T. | | 0.00 | | | | | |
| F.E.T. Tire Credit | | 0.00 | | | | | |
| Total Factory Paid F.E.T. | | 0.00 | | | | | |
| Optional Extended Warranties | | 7,137.00 | | Draft Through | | | |
| Sub-Total | | 29,950.00 | | | | | |
| Dealer Paid F.E.T. * | | 0.00 | | | | | |
| Local Taxes | | 0.00 | | | | | |
| Additional Taxes | | 2,194.94 | | Total Used Vehicle Allowance * | | | 0.00 |
| License, Transfer, Title, Registration Fee | | 0.00 | | Less Total Balance Owed | | | 0.00 |
| Documentary Fee | | 0.00 | | Total Net Allowance on Used Vehicle(s) | | | 0.00 |
| Administration Fee | | 325.00 | | Deposit or Credit Balance | | | 0.00 |
| Total Cash Delivered Price | | 32,469.94 | | Cash with Order | | | 0.00 |
| Total Down Payment | | 0.00 | | ◄ - - - - - - - - - - - - - - - - - - - - - - - | | | 0.00 |
| Unpaid Cash Balance Due on Delivery | | 32,469.94 | | *See Trade-In details on page 4 | | | |

A DOCUMENTARY FEE IS NOT AN OFFICIAL FEE. A DOCUMENTARY FEE IS NOT REQUIRED BY LAW, BUT MAY BE CHARGED TO CUSTOMERS FOR HANDLING DOCUMENTS RELATING TO THE SALE.

Customer, by the execution of this Order, offers to purchase the Product(s) described above upon the Terms and Conditions contained herein. Customer acknowledges that Customer has read the Terms and Conditions of this Order on Page 2 and has received a true copy of this Order and the Terms and Conditions.

*SUBJECT TO ADJUSTMENT – FINAL F.E.T. MAY VARY.
ANY F.E.T. VARIANCE RESPONSIBILITY OF DEALER

Customer's Signature                    1/25/17
                                         Date

NOTICE: THE FOLLOWING ARE IMPORTANT PROVISIONS OF THIS ORDER

THIS ORDER CANCELS AND SUPERCEDES ANY PRIOR AGREEMENTS AND, AS OF THE DATE HEREOF, COMPRISES THE COMPLETE AND EXCLUSIVE STATEMENT OF THE TERMS OF THE AGREEMENT BETWEEN THE PARTIES.

IF ANY REPRESENTATIONS, SPECIFICATIONS OR OTHER AGREEMENTS ARE RELIED UPON BY CUSTOMER, THEY MUST BE IN WRITING AND SPECIFICALLY IDENTIFIED AND REFERENCED IN THIS ORDER; OTHERWISE, THEY WILL NOT BE BINDING ON OR ENFORCEABLE AGAINST DEALER.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

OFFER RECEIVED BY: _____
                    SALES REPRESENTATIVE          Date

OFFER ACCEPTED BY: _____
                    AUTHORIZED REPRESENTATIVE     Date

RTC S-120 GA-1/14

**PLAINTIFF'S EXHIBIT**
12

1



2560 Moreland Avenue SE
Atlanta, GA 30315
(404) 622-1921
www.rushtruckcenters.com

**Retail Sales Order**

**TERMS AND CONDITIONS**

**1. Parties to Order; Definitions.** As used in this Retail Sales Order ("Order"), the terms: (a) "Dealer" shall mean the Rush Dealer identified at the top of the first page of this Order; (b) "Customer" shall mean the Customer identified on the first page of this Order; (c) "Manufacturer(s)" shall mean the entity or entities that manufactured the Product(s), it being understood by Customer that Dealer is in no respect the agent of Manufacturer(s); and (d) "Product(s)" shall mean the new and/or used vehicle or other components, accessories or products, which are being purchased by Customer, as set forth in this Order.

**2. WARRANTY DISCLAIMERS AND LIMITATIONS**

**NEW PRODUCTS – MANUFACTURER WARRANTIES ONLY.** Any warranties on any new Product(s) sold under this Order are limited only to any printed Manufacturers' warranties delivered to Customer with the Product(s). EXCEPT FOR ANY SUCH WARRANTIES MADE BY MANUFACTURERS, THE PRODUCT(S) ARE SOLD WITHOUT ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EACH OF WHICH IS EXPRESSLY DISCLAIMED.

**USED PRODUCTS – NO WARRANTIES.** All used Product(s) sold under this Order are sold on an "AS IS, WHERE IS" basis, without any warranties by Dealer, provided that Products that are sold by Dealer as "Certified Pre-Owned" are subject to the express written terms and conditions of the Dealer's certified pre-owned program. EXCEPT FOR ANY MANUFACTURERS' WARRANTIES THAT MAY STILL BE IN EFFECT, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY DISCLAIMED.

**LIMITED WARRANTY ON SERVICES.** Dealer warrants that all services performed by Dealer for Customer in conjunction with the sale of the Product(s), including if applicable installation, upfitting and conversion services ("Services"), will be performed in a good and workmanlike manner ("Services Warranty"). The Services Warranty is valid for a period of ninety (90) days from the date the Product(s) is delivered to Customer. Customer's sole and exclusive remedy, and Dealer's entire liability, under the Services Warranty is the repair of any nonconforming portion of the Services. DEALER PROVIDES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ITS SERVICES. The Services Warranty is strictly limited to Services performed by Dealer for Customer. Dealer does not warrant any services provided by any third-party, including but not limited to installation, upfitting or conversion services. Any warranties are solely those that are provided by the third-party service provider.
NO OTHER WARRANTIES. EXCEPT AS SET FORTH ABOVE, DEALER EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED.

**3. Reappraisal of Trade-In Vehicle.** If the motor vehicle which has been traded in ("Trade-In Vehicle") as a part of the consideration for the Product(s) ordered hereunder is not to be delivered to Dealer until delivery to Customer of the Product(s), the Trade-In Vehicle shall be reappraised at that time and such reappraised value shall determine the allowance made for the Trade-In Vehicle. If the reappraised value is lower than the original allowance shown on the front of this Order, Customer may, if dissatisfied, cancel this Order.

**4. Delivery of Trade-In Vehicle by Customer; Customer Warranty of Title.** Customer agrees to deliver to Dealer satisfactory evidence of title to the Trade-In Vehicle at the time of delivery of the Trade-In Vehicle to Dealer. Customer warrants the Trade-In Vehicle to be Customer's property free and clear of all liens and encumbrances.

**5. Delay or Failure in Delivery; Limitation of Dealer Liability.** Dealer shall not be liable for failure to deliver or delay in delivering any Product(s) covered by this Order where such failure or delay is due, in whole or in part, to any cause beyond the reasonable control, or is without the gross negligence or intentional misconduct, of Dealer. Examples of causes beyond Dealer's reasonable control include, but are not limited to, Manufacturers' delay or failure to deliver Product(s) for any reason, earthquake, hurricane or other natural disaster, fire, war, terrorist act, labor dispute, strike, etc.

**6. Liability for Taxes.** The price for the Product(s) specified on the face of this Order includes reimbursement to Dealer for federal excise taxes paid, but does not include sales or use taxes or occupational taxes based on sales volume (federal, state or local) unless expressly so stated. Customer assumes and agrees to pay, unless prohibited by law, any such sales or use or occupational taxes imposed on or applicable to the transaction covered by this Order, regardless of which party may have primary tax liability thereof.

**7. Customer's Deposit.** Any Customer's deposit, whether cash or Trade-in Vehicle, shall not be refunded except due to Dealer's failure to deliver the Product(s).

**8. Risk of Loss; Insurance.** Customer shall assume all risk of loss relating to the Product(s) at the time Customer receives possession of the Product(s), or at the time Customer receives title to the Product(s) if title is conveyed before Customer receives possession. Customer shall obtain insurance for the Product(s) that will be in effect at the time Customer takes possession of the Product(s), or at the time Customer receives title to the Product(s) if title is conveyed before the Customer receives possession. Dealer shall have no responsibility or liability related to the Product(s) after Customer receives either possession or title to the Product(s).

**9. Governing Law; Venue; Time to Commence Action.** Except to the extent that the laws of the United States may apply or otherwise control this Order, the rights and obligations of the parties hereunder shall be governed by, and construed and interpreted in accordance with, the laws of the state in which Dealer is located, without regard to conflict of law principles. The mandatory venue for any claim, litigation, civil action or any other legal or administrative proceeding ("Action") involving any controversy or claim between or among the parties to this Order, is the state in which Dealer is located. Customer has one (1) year from the accrual of any cause of action arising from the purchase of the Product(s) to commence an Action against Dealer.

**10. Limitation of Damages.** Customer agrees that in the event of any Action brought by Customer against Dealer, Customer shall not be entitled to recover any incidental or consequential damages as defined in the Uniform Commercial Code, including but not limited to indirect or special damages, loss of income or anticipated profits, or down-time, or any punitive damages.

**11. Fees and Expenses of Actions.** In any Action, whether initiated by Dealer or Customer, where the Customer has a right, pursuant to statute, common law or otherwise, to recover reasonable attorneys' fees and costs in the event it prevails, Customer agrees that Dealer shall have the same right to recover reasonable attorneys' fees and costs incurred in connection with the Action in the event that Dealer prevails.

**12. Execution and Delivery by Electronic Transmission.** If this Order or any document executed in connection with this Order is delivered by facsimile, email or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, such execution and delivery shall be considered valid, binding and effective for all purposes as an original document. Additionally, the signature of any party on this Order transmitted by way of a facsimile machine or email shall be considered for all purposes as an original signature. Any such faxed or emailed document shall be considered to have the same binding legal effect as an original document. At the request of Dealer, any faxed or emailed document shall be re-executed by Customer in an original form.

**13. Waiver; Severability.** No waiver of any term of this Order shall be valid unless it is in writing and signed by Dealer's authorized representative. If any provision or part of any provision of this Order shall be deemed to violate any applicable law or regulation, such invalid provision or part of a provision shall be inapplicable, BUT the remaining part of that provision and the remainder of the Order shall continue to be binding and enforceable.

**14. No Broker; Manufacturer Incentives.** If at any time Dealer determines that the Customer intends to engage in the resale of vehicles for profit, where such resale is not in conjunction with further manufacturing, Dealer reserves the right to cancel this Order. Certain manufacturer incentives are intended to be used for retail customers at the location as identified by the Customer in this Order. Customer represents that they will register the vehicle with their state motor vehicle department and are not purchasing this vehicle with the intent to resell/export the vehicle, except where such resale is in conjunction with further manufacturing. If at any time Dealer determines that the foregoing representations are not true, Dealer has the right to seek repayment of any manufacturer incentives that are paid.

**15. Communication Consent.** Dealer and any other owner or servicer of this account may use any information Customer gives Dealer, including but not limited to email addresses, cell phone numbers, and landline numbers, to contact Customer for purposes related to this account, including debt collection and marketing purposes. In addition, Customer expressly consents to any such contact being made by the most efficient technology available, including but not limited to, automated dialing equipment, automated messages, and prerecorded messages, even if Customer is charged for the contact.

Customer Initial

RTC S-120 GA-1/14

2

# Rush Privacy Policy

Rev. 10/13

For Nonpublic Personal Information Disclosed in Connection with the Provision of Financial Products or Services

| FACTS | WHAT DOES RUSH TRUCK CENTERS DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| WHY? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and income<br>• Account balances and payment history<br>• Credit history and employment information<br>When you are no longer our customer, we continue to share your information as described in this notice. |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Rush Truck Centers chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Rush Truck Centers share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes- Such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes- To offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | Yes | No |
| For our affiliates' everyday business purposes- Information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes- Information about your creditworthiness | No | We don't share |
| For our affiliates to market to you | No | We don't share |
| For nonaffiliates to market to you | No | We don't share |

| Questions? | Call (830) 626-5249 |
|---|---|

## Who we are

| Who is providing this notice? | Rush Enterprises, Inc. and its wholly owned subsidiaries. See "Other important information" below for a listing of companies. |
|---|---|

## What we do

| How does Rush Truck Centers protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
|---|---|
| How does Rush Truck Centers collect my personal information? | We collect your personal information, for example, when you<br>▪ apply for financing<br>▪ give us your income information or provide employment information<br>▪ provide account information or give us your contact information<br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>▪ sharing for affiliates' everyday business purposes–information about your creditworthiness<br>▪ affiliates from using your information to market to you<br>▪ sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. |

## Definitions

| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies. |
|---|---|
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>Rush does not share with nonaffiliates so they can market to you. |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>▪ Includes lenders, finance companies and financial service providers |

## Other important information

- This notice is made by Rush Enterprises, Inc. and its wholly owned subsidiaries in the Rush Truck Centers' family of companies: Rush Administrative Services, Inc., Rush Truck Centers of Alabama, Inc., Rush Truck Centers of Arizona, Inc., Rush Truck Centers of California, Inc., Rush Truck Centers of Colorado, Inc., Rush Truck Centers of Florida, Inc., Rush Truck Centers of Georgia, Inc., Rush Truck Centers of Idaho, Inc., Rush Truck Centers of New Mexico, Inc., Rush Truck Centers of North Carolina, Inc., Rush Truck Centers of Ohio, Inc., Rush Truck Centers of Oklahoma, Inc., Rush Truck Centers of Oregon, Inc., Rush Truck Centers of Tennessee, Inc., Rush Truck Centers of Texas, LP and Rush Truck Centers of Utah, Inc., Rush Truck Centers of Virginia, Inc.
- This Privacy Policy does not apply to information obtained in a non-financial transaction.

Exhibit 13

Retail Sales Order – Truck #004



Rush Truck Center, Atlanta
2560 Moreland Avenue SE
Atlanta, GA 30315
(404) 622-1921

**Retail Sales Order**

www.rushtruckcenters.com

| | | | | Date 01/25/2017 | | |
|---|---|---|---|---|---|---|
| **SALESMAN** | | | | Trade Winds Transport LLC | | |
| Please enter my order for the following: | | | | Customer's Name | | |
| ☐ New ☐ F.E.T. Applicable | | | | 505 El redondo Ave | Redondo Beach CA | 90277 |
| ☒ Used ☒ F.E.T. Exempt | | | | Street | City State | Zip |
| Make International | Series ProStar+ | | | | (310) 809-4661 | |
| Year 2012 | Body Type | | | Federal Tax ID # | Business Phone Fax | |
| Color White | Trim | | | | | |
| Serial # 3HSDJSJR5CN624256 | | | | Purchaser's Name | | |
| Stock # 333227 | | | | | | |
| To be delivered on or about | | | | Street | City State | Zip |
| | | | | Federal Tax ID # | Business Phone Fax | |
| | | | | Dennis King | | |
| | | | | By Salesman | | |
| | | | | Truck Will be Titled in _____ County. | | |
| | | | | **LIENHOLDER INFORMATION** | | |
| | | | | Date of Lien | | |
| | | | | Lien Holder | | |
| Sales Price | 22,813.00 | | | | | |
| Factory Paid F.E.T. | 0.00 | | | | | |
| F.E.T. Tire Credit | 0.00 | | | | | |
| Total Factory Paid F.E.T. | 0.00 | | | | | |
| Optional Extended Warranties | 7,137.00 | | | Draft Through | | |
| Sub-Total | 29,950.00 | | | | | |
| Dealer Paid F.E.T. * | 0.00 | | | | | |
| Local Taxes | 0.00 | | | | | |
| Additional Taxes | 2,194.94 | | | Total Used Vehicle Allowance * | | 0.00 |
| License, Transfer, Title, Registration Fee | 0.00 | | | Less Total Balance Owed | | 0.00 |
| Documentary Fee | 0.00 | | | Total Net Allowance on Used Vehicle(s) | | 0.00 |
| Administration Fee | 325.00 | | | Deposit or Credit Balance | | 0.00 |
| Total Cash Delivered Price | 32,469.94 | | | Cash with Order | | 0.00 |
| Total Down Payment | 0.00 | | | ◄ - - - - - - - - - - - - - - - - - - - - - - - - - | | 0.00 |
| Unpaid Cash Balance Due on Delivery | 32,469.94 | | | *See Trade-in details on page 4 | | |

A DOCUMENTARY FEE IS NOT AN OFFICIAL FEE. A DOCUMENTARY FEE IS NOT REQUIRED BY LAW, BUT MAY BE CHARGED TO CUSTOMERS FOR HANDLING DOCUMENTS RELATING TO THE SALE.

Customer, by the execution of this Order, offers to purchase the Product(s) described above upon the Terms and Conditions contained herein. Customer acknowledges that Customer has read the Terms and Conditions of this Order on Page 2 and has received a true copy of this Order and the Terms and Conditions.

*SUBJECT TO ADJUSTMENT – FINAL F.E.T. MAY VARY.
ANY F.E.T. VARIANCE RESPONSIBILITY OF DEALER

Customer's or _____ Signature        1/25/17
                                            Date

NOTICE: THE FOLLOWING ARE IMPORTANT PROVISIONS OF THIS ORDER

THIS ORDER CANCELS AND SUPERCEDES ANY PRIOR AGREEMENTS AND, AS OF THE DATE HEREOF, COMPRISES THE COMPLETE AND EXCLUSIVE STATEMENT OF THE TERMS OF THE AGREEMENT BETWEEN THE PARTIES.

IF ANY REPRESENTATIONS, SPECIFICATIONS OR OTHER AGREEMENTS ARE RELIED UPON BY CUSTOMER, THEY MUST BE IN WRITING AND SPECIFICALLY IDENTIFIED AND REFERENCED IN THIS ORDER; OTHERWISE, THEY WILL NOT BE BINDING ON OR ENFORCEABLE AGAINST DEALER.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

OFFER RECEIVED BY: _____
                    SALES REPRESENTATIVE        Date

OFFER ACCEPTED BY: _____
                    AUTHORIZED REPRESENTATIVE   Date

**PLAINTIFF'S EXHIBIT**
13
blobber

RTC B-120 GA-1/14

1



**Rush Truck Center, Atlanta**

2560 Moreland Avenue SE
Atlanta, GA 30315
(404) 622-1921

w.rushtruckcenters.com

# Retail Sales Order

## TERMS AND CONDITIONS

**1. Parties to Order; Definitions.** As used in this Retail Sales Order ("Order"), the terms: (a) "Dealer" shall mean the Rush Dealer identified at the top of the first page of this Order; (b) "Customer" shall mean the Customer identified on the first page of this Order; (c) "Manufacturer(s)" shall mean the entity or entities that manufactured the Product(s), it being understood by Customer that Dealer is in no respect the agent of Manufacturer(s); and (d) "Product(s)" shall mean the new and/or used vehicle or other components, accessories or products, which are being purchased by Customer, as set forth in this Order.

### 2. WARRANTY DISCLAIMERS AND LIMITATIONS

**NEW PRODUCTS – MANUFACTURER WARRANTIES ONLY.** Any warranties on any new Product(s) sold under this Order are limited only to any printed Manufacturers' warranties delivered to Customer with the Product(s). EXCEPT FOR ANY SUCH WARRANTIES MADE BY MANUFACTURERS, THE PRODUCT(S) ARE SOLD WITHOUT ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EACH OF WHICH IS EXPRESSLY DISCLAIMED.

**USED PRODUCTS – NO WARRANTIES.** All used Product(s) sold under this Order are sold on an "AS IS, WHERE IS" basis, without any warranties by Dealer, provided that Products that are sold by Dealer as "Certified Pre-Owned" are subject to the express written terms and conditions of the Dealer's certified pre-owned program. EXCEPT FOR ANY MANUFACTURERS' WARRANTIES THAT MAY STILL BE IN EFFECT, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY DISCLAIMED.

**LIMITED WARRANTY ON SERVICES.** Dealer warrants that all services performed by Dealer for Customer in conjunction with the sale of the Product(s), including if applicable installation, upfitting and conversion services ("Services"), will be performed in a good and workmanlike manner ("Services Warranty"). The Services Warranty is valid for a period of ninety (90) days from the date the Product(s) is delivered to Customer. Customer's sole and exclusive remedy, and Dealer's entire liability, under the Services Warranty is the repair of any nonconforming portion of the Services. DEALER PROVIDES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ITS SERVICES. The Services Warranty is strictly limited to Services performed by Dealer for Customer. Dealer does not warrant any services provided by any third-party, including but not limited to installation, upfitting or conversion services. Any warranties are solely those that are provided by the third-party service provider.
**NO OTHER WARRANTIES. EXCEPT AS SET FORTH ABOVE, DEALER EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED.**

**3. Reappraisal of Trade-In Vehicle.** If the motor vehicle which has been traded in ("Trade-In Vehicle") as a part of the consideration for the Product(s) ordered hereunder is not to be delivered to Dealer until delivery to Customer of the Product(s), the Trade-In Vehicle shall be reappraised at that time and such reappraised value shall determine the allowance made for the Trade-In Vehicle. If the reappraised value is lower than the original allowance shown on the front of this Order, Customer may, if dissatisfied, cancel this Order.

**4. Delivery of Trade-In Vehicle by Customer; Customer Warranty of Title.** Customer agrees to deliver to Dealer satisfactory evidence of title to the Trade-In Vehicle at the time of delivery of the Trade-In Vehicle to Dealer. Customer warrants the Trade-In Vehicle to be Customer's property free and clear of all liens and encumbrances.

**5. Delay or Failure in Delivery; Limitation of Dealer Liability.** Dealer shall not be liable for failure to deliver or delay in delivering any Product(s) covered by this Order where such failure or delay is due, in whole or in part, to any cause beyond the reasonable control, or is without the gross negligence or intentional misconduct, of Dealer. Examples of causes beyond Dealer's reasonable control include, but are not limited to, Manufacturers' delay or failure to deliver Product(s) for any reason, earthquake, hurricane or other natural disaster, fire, war, terrorist act, labor dispute, strike, etc.

**6. Liability for Taxes.** The price for the Product(s) specified on the face of this Order includes reimbursement to Dealer for federal excise taxes paid, but does not include sales or use taxes or occupational taxes based on sales volume (federal, state or local) unless expressly so stated. Customer assumes and agrees to pay, unless prohibited by law, any such sales or use or occupational taxes imposed on or applicable to the transaction covered by this Order, regardless of which party may have primary tax liability thereof.

**7. Customer's Deposit.** Any Customer's deposit, whether cash or Trade-In Vehicle, shall not be refunded except due to Dealer's failure to deliver the Product(s).

**8. Risk of Loss; Insurance.** Customer shall assume all risk of loss relating to the Product(s) at the time Customer receives possession of the Product(s), or at the time Customer receives title to the Product(s) if title is conveyed before Customer receives possession. Customer shall obtain insurance for the Product(s) that will be in effect at the time Customer takes possession of the Product(s), or at the time Customer receives title to the Product(s) if title is conveyed before the Customer receives possession. Dealer shall have no responsibility or liability related to the Product(s) after Customer receives either possession or title to the Product(s).

**9. Governing Law; Venue; Time to Commence Action.** Except to the extent that the laws of the United States may apply or otherwise control this Order, the rights and obligations of the parties hereunder shall be governed by, and construed and interpreted in accordance with, the laws of the state in which Dealer is located, without regard to conflict of law principles. The mandatory venue for any claim, litigation, civil action or any other legal or administrative proceeding ("Action") involving any controversy or claim between or among the parties to this Order, is the state in which Dealer is located. Customer has one (1) year from the accrual of any cause of action arising from the purchase of the Product(s) to commence an Action against Dealer.

**10. Limitation of Damages.** Customer agrees that in the event of any Action brought by Customer against Dealer, Customer shall not be entitled to recover any incidental or consequential damages as defined in the Uniform Commercial Code, including but not limited to indirect or special damages, loss of income or anticipated profits, or down-time, or any punitive damages.

**11. Fees and Expenses of Actions.** In any Action, whether initiated by Dealer or Customer, where the Customer has a right, pursuant to statute, common law or otherwise, to recover reasonable attorneys' fees and costs in the event it prevails, Customer agrees that Dealer shall have the same right to recover reasonable attorneys' fees and costs incurred in connection with the Action in the event that Dealer prevails.

**12. Execution and Delivery by Electronic Transmission.** If this Order or any document executed in connection with this Order is delivered by facsimile, email or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, such execution and delivery shall be considered valid, binding and effective for all purposes as an original document. Additionally, the signature of any party on this Order transmitted by way of a facsimile machine or email shall be considered for all purposes as an original signature. Any such faxed or emailed document shall be considered to have the same binding legal effect as an original document. At the request of Dealer, any faxed or emailed document shall be re-executed by Customer in an original form.

**13. Waiver; Severability.** No waiver of any term of this Order shall be valid unless it is in writing and signed by Dealer's authorized representative. If any provision or part of any provision of this Order shall be deemed to violate any applicable law or regulation, such invalid provision or part of a provision shall be inapplicable, BUT the remaining part of that provision and the remainder of the Order shall continue to be binding and enforceable.

**14. No Broker; Manufacturer Incentives.** If at any time Dealer determines that the Customer intends to engage in the resale of vehicles for profit, where such resale is not in conjunction with further manufacturing, Dealer reserves the right to cancel this Order. Certain manufacturer incentives are intended to be used for retail customers at the location as identified by the Customer in this Order. Customer represents that they will register the vehicle with their state motor vehicle department and are not purchasing this vehicle with the intent to resell/export the vehicle, except where such resale is in conjunction with further manufacturing. If at any time Dealer determines that the foregoing representations are not true, Dealer has the right to seek repayment of any manufacturer incentives that are paid.

**15. Communication Consent.** Dealer and any other owner or servicer of this account may use any information Customer gives Dealer, including but not limited to email dresses, cell phone numbers, and landline numbers, to contact Customer for purposes related to this account, including debt collection and marketing purposes. In addition, customer expressly consents to any such contact being made by the most efficient technology available, including but not limited to, automated dialing equipment, automated messages, and prerecorded messages, even if Customer is charged for the contact.

Customer Initial _____

RTC S-120 GA-1/14

2

Rev. 10/13

# Rush Privacy Policy

For Nonpublic Personal Information Disclosed in Connection with the Provision of Financial Products or Services

| FACTS | WHAT DOES RUSH TRUCK CENTERS DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| WHY? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and income<br>• Account balances and payment history<br>• Credit history and employment information<br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Rush Truck Centers chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Rush Truck Centers share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes-<br>Such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes-<br>To offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | Yes | No |
| For our affiliates' everyday business purposes-<br>Information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes-<br>Information about your creditworthiness | No | We don't share |
| For our affiliates to market to you | No | We don't share |
| For nonaffiliates to market to you | No | We don't share |

| Questions? | Call (830) 626-5249 |
|---|---|

## Who we are

**Who is providing this notice?** Rush Enterprises, Inc. and its wholly owned subsidiaries. See "Other important information" below for a listing of companies.

## What we do

**How does Rush Truck Centers protect my personal information?** To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings.

**How does Rush Truck Centers collect my personal information?** We collect your personal information, for example, when you
▪ apply for financing
▪ give us your income information or provide employment information
▪ provide account information or give us your contact information
We also collect your personal information from others, such as credit bureaus, affiliates, or other companies.

**Why can't I limit all sharing?** Federal law gives you the right to limit only
▪ sharing for affiliates' everyday business purposes-information about your creditworthiness
▪ affiliates from using your information to market to you
▪ sharing for nonaffiliates to market to you
State laws and individual companies may give you additional rights to limit sharing.

## Definitions

**Affiliates** Companies related by common ownership or control. They can be financial and nonfinancial companies.

**Nonaffiliates** Companies not related by common ownership or control. They can be financial and nonfinancial companies.

Rush does not share with nonaffiliates so they can market to you.

**Joint marketing** A formal agreement between nonaffiliated financial companies that together market financial products or services to you.

▪ Includes lenders, finance companies and financial service providers

## Other important information

• This notice is made by Rush Enterprises, Inc. and its wholly owned subsidiaries in the Rush Truck Centers' family of companies: Rush Administrative Services, Inc., Rush Truck Centers of Alabama, Inc., Rush Truck Centers of Arizona, Inc., Rush Truck Centers of California, Inc., Rush Truck Centers of Colorado, Inc., Rush Truck Centers of Florida, Inc., Rush Truck Centers of Georgia, Inc., Rush Truck Centers of Idaho, Inc., Rush Truck Centers of New Mexico,Inc., Rush Truck Centers of North Carolina, Inc., Rush Truck Centers of Ohio, Inc., Rush Truck Centers of Oklahoma, Inc., Rush Truck Centers of Oregon, Inc., Rush Truck Centers of Tennessee, Inc., Rush Truck Centers of Texas, LP and Rush Truck Centers of Utah, Inc., Rush Truck Centers of Virginia, Inc.
• This Privacy Policy does not apply to information obtained in a non-financial transaction.

3

Exhibit 14

AGWS Service Agreement – Truck #001



**Vehicle Service Agreement
Information Page**

**compass**
HEAVY DUTY TRUCK & BUS
**PROTECTION**

Agreement No.

HDTRA80460471

## I. Customer Information

| | |
|---|---|
| Trade Winds Transport LLC | Eric Grace |
| Last Name/Company Name | First Name · M |
| 505 El Redundo Ave #A | |
| Address | |
| Redondo Beach | CA | 90277 |
| City | State | Zip |
| (310) 809-4661 | egrace5577@gmail.com |
| Phone | Email |

## II. Dealer Information

Rush Truck Center - Jacksonville
Name

5175 West Beaver Street
Address

Jacksonville,                 FL        32254
City                          State     Zip

(888) 783-6170     mulhollandr@rushenterprises.com
Phone              Email

## III. Lienholder Information

| | |
|---|---|
| Name | |
| Address | |
| City | State | Zip |

## IV. Vehicle and Coverage Information

| 2012 | INTERNATIONAL | PROSTAR LF627 PREMIUM | 3HSDJSJR8CN624235 | | 287,850 |
|---|---|---|---|---|---|
| Year | Make | Model | Vehicle Identification Number (VIN) | Current ECM Reading | Current Odometer Reading |
| | $22,813.00 | | 01/25/2017 | $7,137.00 | |
| Vehicle Purchase Date | Vehicle Purchase Price | | Agreement Purchase Date | Agreement Purchase Price | |
| 8 | | | | ☑ Diesel    ☐ Gas |
| Vehicle Class (3-8) | Engine Size in Liters | | Engine Type | |

### Refrigeration Unit:

| | | |
|---|---|---|
| Model No. | Model Year | Serial No. |

### Navigator Coverage:

☐ Engine Coverage
☑ Engine/Transmission Coverage
☐ Engine/Transmission/Drive Axle Coverage

### Optional Coverage: (must be selected at the time of purchase to apply)

☐ Option A - EGR/DPF

☑ Option B - (Aftertreatment Assemblies)
☐ Paccar MX Equipped   ☑ Maxxforce Equipped

☐ **Refrigeration Unit Coverage**
(Current Unit Hours: _____ )

☐ **XLT Package**

### Agreement Term:

Months **36**        Miles **500,000**

☐ Service Drive Sale/Non-Point of Sale Delivery
(Inspection and waiting period of 30 days and 1,500 miles required)

Coverage Start Date:
**01/25/2017**

Coverage Starting Mileage:
**287,850**

Agreement Administrator/
Provider/Obligor: American
Guardian Warranty Services, Inc.
PO Box 768
Warrenville, Illinois 60555
800.579.2233

Lockhion Obligor/Administrator:
American Guardian Warranty Services of Florida, Inc.
PO Box 768, Warrenville, IL 60555
800.579.2233

Wisconsin Administrator & Obligor:
American Guardian Warranty
Services of Wisconsin, Inc.
PO Box 768
Warrenville, Illinois 60555
800.579.2233

## V. Customer Acknowledgment

The Agreement that You are purchasing is between You and the Agreement Obligor. You will be notified by the Selling Dealer and/or the Administrator if the Agreement is ineligible for coverage. You (the undersigned) have reviewed the terms of this Agreement and understand the coverage, exclusions and maintenance requirements. This Agreement is based on information You provided on this Information Page. AUTHORIZATION IS REQUIRED FROM THE ADMINISTRATOR PRIOR TO THE REPAIR OF COVERED COMPONENTS.

_____                01/25/2017
Customer Signature (Date)               Purchase Date               Selling Dealer Representative Signature

If no coverage level is selected, then only engine coverage will apply. If no term months and mileage have been indicated in Agreement term, then coverage will be in effect for 12 months/25,000 miles, whichever occurs first. A Deductible of $100 per repair visit will apply. Any modification, alteration or change to the printed terms, conditions or coverages of this Agreement renders the Agreement invalid.

**AUTHORIZATION IS REQUIRED FROM THE ADMINISTRATOR PRIOR TO THE REPAIR OF COVERED COMPONENTS**

**CLAIMS: 800.579.2233 | ROADSIDE ASSISTANCE: 888.491.3370
TO START A CLAIM ONLINE GO TO WWW.AGWSINC.COM**

AG HDT (08.16) VSC XLT RT EMAT                Page 1 of 6                CUSTOMER MUST RECEIVE



PLAINTIFF'S
EXHIBIT
14

## TERMS AND CONDITIONS

In the event of a **Breakdown** of a covered part listed below, **We** agree to pay for the **Cost** of necessary parts and labor to repair or replace a covered part listed below for each component (including replacement of all lost fluids), less applicable **Deductible**, subject to the terms, conditions and limitations herein. A covered part has failed when it can no longer perform the function for which it was designed and not because of the action, inaction or failure of any non-covered parts.

**ENGINE ONLY COVERAGE** (includes those items listed in Components 1-2)

**1. ENGINE:** The following stated components are covered. The internal lubricated parts within the engine including pistons, piston rings, wrist pins, crankshaft, rod and main bearings, camshaft and cam bearings, cam followers. Timing chain and timing gears, timing chain tensioners. Intake and exhaust valves, valve guides, valve springs and valve retainers. Rocker arms, pushrods, lifters. Turbocharger rotor/turbine and housing. Water pump. Fuel injectors. Progressive Damage: the Engine Block, Cylinder Head(s) and Cylinder Liners are covered if damaged in conjunction with a covered mechanical failure.

**2. TAXES AND FLUIDS:** Associated state and local taxes where applicable and required fluids to complete covered repairs.

**ENGINE AND TRANSMISSION COVERAGE** (includes those items listed in Components 1-3)

**3. TRANSMISSION:** The following stated components are covered. All internal lubricated parts of the manual or automatic transmissions, including: torque converter, oil pump, valve body, governor, bands, drums, planetaries, sun gear, sprag(s), shaft(s), bearings and related bushings, shift rail, forks and synchronizers. Progressive Damage: the transmission case is covered if damaged in conjunction with a covered mechanical failure.

**ENGINE, TRANSMISSION AND DRIVE AXLE COVERAGE** (includes those items listed in Components 1-4)

**4. DRIVE AXLE:** The following stated components are covered. All internal lubricated parts including: output shaft, bearings, bushings, gear sets, axle and bearings, carrier, ring and pinion gears, bearings, bushings, axle shaft. Progressive Damage: the drive axle housing is covered if damaged in conjunction with a covered mechanical failure.

**OPTIONAL COVERAGE** The following surcharged coverage is available when identified on the **Information Page** and a surcharge has been paid.

**OPTION A – DPF/EGR:** Failure of the diesel particulate filter (DPF) or the EGR Valve Coverage is limited to the first 24 months or 240,000 miles, or term months/mileage selected, whichever is less. No progressive damage outside of DPF/EGR coverage. **Coverage under this option is limited to one failure for DPF and two failures of the EGR Valve.**

**OPTION B—Aftertreatment Assemblies (includes the following named components):** DPF (filter only), EGR Valve(s) (valve component only), EGR Cooler, DOC Doser Injector, SCR, DPF Doser Injector, DPF Dosing Module, DEF Dosing Injection Nozzle, DEF Tank, Diesel Oxidation Catalyst (DOC), Lambda Sensor (O2 Sensor), NOx Sensor, Aftertreatment Control Module (Aftertreatment ECM), DEF Dosing Module. No progressive damage to Aftertreatment to any other component except within Aftertreatment Assemblies. **Coverage is limited to one failure per listed component.** Coverage is limited to the first 24 months or 240,000 miles, or term months/mileage selected, whichever is less. Proof of maintenance service being done as per OEM schedule must be documented.

**XLT PACKAGE—**The following stated components are covered: Radiator, fan clutch, charged air cooler, air compressor, alternator, starter and solenoid, fuel tank(s), engine oil pan, engine vibration damper, radio (AM/FM/CD) main cabin primary HVAC (excluding sleeper); a/c compressor and clutch, blower motor, temperature control head, heater core.

**REFRIGERATION UNIT COVERAGE— Thermo King** and **Carrier** units only: Engine Components: Internally lubricated hard parts limited to pistons, piston rings, piston oil cooling jets, wrist pins, connecting rods, connecting rod bearings, crankshaft, thrust washers, camshaft and cam bearings, cam followers, rocker arm shafts, rocker arms, push rods, hydraulic lifters, intake and exhaust valves and guides, valve springs, constant velocity valve, oil pump housing, oil pump gears, oil pump pick up screen, oil pump pick up tube, oil pump pressure relief springs and valves, valve retainers, valve keepers (locks), timing chain and gears, timing chain tensioners, timing gear cover, valve cover, oil pan, injectors and water pump. Compressor: Limited to reciprocal compressor internal components and scroll compressor internal components. Any image resulting from a seal leak or a blown head gasket is not covered.

### Additional Benefits

**ROADSIDE ASSISTANCE:** You are entitled to one (1) Roadside Assistance service per 72-hour period. To receive these benefits You must call 888-491-3370 and provide Your Agreement number. The following benefits are available: (1) **Battery Service:** if a battery failure occurs, a jump start will be applied to start the covered Vehicle; (2) **Vehicle Fluid Delivery:** an emergency supply of coolant, oil or fuel will be delivered for Your covered Vehicle if you have an immediate need. You must pay the **Cost** of the actual fluid or fuel when delivered. (3) **Lock-Out Assistance:** If Your keys are locked inside the Vehicle, assistance will be provided to gain entry to the Vehicle. Roadside Assistance is available ONLY during the Agreement term and services obtained through any source other than the toll-free number will not be covered. **The limit of liability for any single benefit is one hundred dollars ($100.00).**

**TRIP INTERRUPTION OR RENTAL ASSISTANCE:** When a covered **Breakdown** disables Your **Vehicle** and the repairs are completed more than one hundred (100) miles from Your residence, **We** will reimburse You for lodging and meal expenses or substitute rental vehicle expenses incurred by You between the date of the Breakdown and the date on which covered repairs are completed. You will be reimbursed for actual lodging expenses or substitute rental vehicle expenses up to one hundred twenty five dollars ($125.00) per day for up to two (2) days, not to exceed two hundred fifty dollars ($250.00) per occurrence. Legible and verifiable receipts are required for reimbursement.

**TOWING ASSISTANCE:** If towing assistance becomes necessary due to the **Breakdown** of a covered component, towing costs not payable by insurance will be covered for up to three hundred seventy five dollars ($375.00) per occurrence. A paid in full, signed towing bill is required for reimbursement.

### WHAT TO DO IF REPAIRS ARE NEEDED

If **Your Vehicle is unsafe and needs to be towed**, contact a tow company to arrange towing service. Otherwise, deliver **Your Vehicle** to a repair facility and authorize them to diagnose the failure. Provide the repairer with Your Agreement number and direct them to call the Administrator for Repair Authorization at 1-800-579-2233. **Emergency Repair—if** a covered component has a **Breakdown** at any time outside of the Claims Department regular business hours, You may take one of the following steps: (1) Wait until regular business hours and then follow the normal claims procedure outlined above; or (2) Authorize and pay for any teardown or diagnostic time needed to determine whether **Your Vehicle** has a covered **Breakdown**. If You reasonably determine that You have a covered **Breakdown** and You choose to have Your Vehicle repaired, **You** are responsible for paying the repair. You must then call the Administrator during the next available regular business day so that the Administrator may determine whether there was a covered **Breakdown**. If the Administrator determines that there was a covered **Breakdown** and You meet the requirements outlined herein, then **We** will pay You in accordance with the terms and conditions of this Agreement.

*You must obtain a Repair Authorization Number from Our Claims Department to assure coverage under this Agreement.*

**Call Toll Free at 1-800-579-2233 for Instructions and Repair Authorization.**

### No Payment for a Claim will be made without Authorization.

This Agreement is subject to the following terms and conditions. No alterations, changes or waivers of provisions may be made to this Agreement. The benefits liable under this Agreement are strictly provided to You for repairs to the Covered Vehicle.

**Definitions:** When used, key terms will appear in bold print and have special meaning as follows:

**Actual Cash Value (ACV)** – means the actual cash value of Your Vehicle at the time of repair according to the most recently published NADA Guide for Trade-in-Value.

**Administrator, Obligor, Our, Us and We** – means American Guardian Warranty Services, Inc. ("AGWS"), except in the state of Louisiana where it means American Guardian Warranty Services of Florida, Inc. and in the state of Wisconsin where it means American Guardian Warranty Services of Wisconsin, Inc. Our mailing address is P.O. Box 768, Warrenville, IL 60555; and Our toll-free telephone number is 1-800-579-2233.

**Agreement** – means the service Agreement that is a contract between You and Us.

**Breakdown or Mechanical Failure** – means the failure of an original or replacement part, covered by this Agreement, to perform its function as it was originally designed to work in normal service with required maintenance due to material failure, wear and tear or defects in workmanship and outside the manufacturer's tolerance.

**Cost(s)** – means the usual and fair charges for parts and labor necessary to repair covered parts. Replacement of any covered part may be made with new, remanufactured, rebuilt or like kind and quality at the time of Breakdown at the discretion of the Administrator. Parts will be reimbursed up to the manufacturer's suggested list price. Labor time will be reimbursed using nationally recognized labor time standards. Labor rate will be determined based on repairing facility's geographic region.

**Deductible** – means the amount that You must pay for covered repairs per occurrence as identified on the Information Page.

**Information Page** – means Page 1 of this Agreement.

**Lienholder/Lender** – means a financial institution identified on the Information Page and providing financing for the purchase of this Agreement.

**Selling Dealer** – means the retail seller of this Agreement to You for the Vehicle described on the Information Page.

**Vehicle or Covered Vehicle** – means the Vehicle described on the Information Page.

**You and Your** – means the purchaser identified on the Information Page.

#### Insurance Statement:

Our obligations are guaranteed by an insurance policy issued by Virginia Surety Company, Inc. In the event that We cease to operate, are bankrupt, or fail to pay an authorized claim within sixty (60) days after proof of loss is filed, You may file a claim directly with Virginia Surety Company, Inc., 175 West Jackson Blvd., Chicago, IL 60604 (800) 209-6206.

#### Your Responsibilities:

1. You must follow the manufacturer's recommended maintenance schedule for any and all required services, including keeping receipts for services performed. The required receipts include date, mileage, service performed and service provider. These records may be requested by the Administrator for the investigation of a claim or transfer. IT IS RECOMMENDED THAT YOU KEEP MAINTENANCE RECORDS WITH THE VEHICLE. In the event that You perform Your own maintenance, You must provide copies of receipts for materials purchased and a service log showing date, mileage and services.
2. Use all reasonable means to protect Your Vehicle from further damage when a Breakdown occurs.
3. You must authorize necessary labor time for the repairer to diagnose a Breakdown.
4. Direct the repair facility to call Administrator at 1-800-579-2233 to report a claim. You must obtain Repair Authorization from the Administrator prior to repairing any covered component.
5. In the event You need to receive reimbursement for Your authorized claim, You must submit the following within ninety (90) days of approval: A) the original Repair Order signed by You; B) proof of payment with a cash register receipt/credit card receipt/personal check copy; C) where applicable, copies of original towing or rental bill with proof of payment.

#### Our Responsibilities:

Subject to the Coverage Level and Deductible selected on the Information Page of this Agreement, the Limits of Liability and items found under EXCLUSIONS-WHAT IS NOT COVERED, the Administrator will pay for the Cost of necessary repairs. The Administrator reserves the right to inspect Your Vehicle to evaluate covered repairs.

#### Exclusions-What Is Not Covered:

Where permitted by state requirements the following are not covered (See State Requirements):

PRE-EXISTING CONDITIONS.

2. Failures that occur during the waiting period identified on the Information Page.
3. Cooler lines and related componentry.
4. Damage to a covered component caused by the failure of a component not listed as covered under this Agreement.
5. Repairs that are covered under the original manufacturer's warranty regardless of whether or not that warranty was transferred to You or the manufacturer refuses to honor its obligations. Any cost, repair, replacement or benefit for which the manufacturer has announced its responsibility through any means including recalls, service bulletins or campaign(s) by manufacturer.
6. Repairs beyond those required to correct a Breakdown.
7. ANY COVERED REPAIR NOT AUTHORIZED IN ADVANCE BY THE ADMINISTRATOR.
8. Damage caused by continued operation of an impaired Vehicle.
9. Seals, gaskets, and fasteners unless required in conjunction with a covered mechanical Breakdown. Any component part of the engine block assembly not specifically listed as covered under Item 1. ENGINE. Stock or failed variable vanes (VGT) turbocharger mechanism. Any component parts of the transmission assembly not listed as covered under Item 3. TRANSMISSION, including electronic controls, levers, linkage, rubber mounts, transmission cooler, external hoses, pipes, tubes and hard lines. Any component parts of the drive axle assembly not listed as covered under Item 4. DRIVE AXLE: including wheel bearings.
10. Damage caused by towing the Vehicle in a manner not consistent with the manufacturer's recommendations.
11. Damage caused by overloading the Vehicle beyond the manufacturer's recommended capacity.
12. A Breakdown caused by or involving modifications, alterations or additions to the Vehicle unless those modifications, alterations or additions were performed by or recommended by the original Vehicle Manufacturer.
13. Towing another vehicle unless Your Vehicle was equipped by the manufacturer for that purpose.
14. Repairs required because of technician negligence, overheating, detonation, sludge or carbon deposits, contamination, rust, corrosion, cavitation, electrolysis, operation without the proper lubrication levels or fluid type, and the failure to perform the manufacturer's recommended maintenance. All gasket or seal failures, cracked heads or block, overheating or other engine failure due to lack of fluids or improper maintenance.
15. Repairs made outside of the United States and Canada.
16. Repairs required because of fraud, collision, abuse, negligence, neglect, misuse, abuse, road hazard, racing, off-road use, vandalism, riot, theft, flood, fire, war, acts of God, or loss that is normally covered by Casualty Insurance.
17. The cost of teardown, disassembly or assembly when a Breakdown is not covered by this Agreement.
18. Repairs that are covered under a repairer's guarantee, service agreement or other warranty.
19. Incidental or consequential damage, loss of profits, property damage, personal injury, inconvenience, loss of Vehicle use, commercial loss, punitive or exemplary damages, attorney fees, loss of earnings, personal damage or per diem expenses.

This Agreement provides no benefit or coverage and We have no obligation if:

1. The Vehicle odometer fails to register, record actual mileage or true mileage cannot be determined for any reason, including ECM failure, while owned by You.
2. You rent Your Vehicle to someone else.
3. Your Vehicle is used for postal service, taxi, livery, police or other emergency services, snow plowing, competition or speed events.

4.  Your Vehicle is modified from the Vehicle manufacturer's original specifications regardless of who made the modifications or when the modifications were made.

5.  Your Vehicle is identified as a Gray Market Vehicle, Total Loss, Flood Damaged, Salvaged, Rebuilt or a Glider Reconstruction.

_nit of Liability:_ In no event shall the Aggregate Limit of liability exceed the amount identified by Vehicle Class below or the Actual Cash Value (ACV) of the vehicle at the time of repair, whichever is less.

| | Vehicle Class 3-4 | Vehicle Class 5-6-7 | Vehicle Class 8 |
|---|---|---|---|
| Engine/Water Pump: | $9,500 | $15,000 | $20,000 |
| Transmission: | $4,000 | $6,000 | $7,500 |
| Drive Axle: | $4,000 | $6,000 | $7,500 |
| Option B (if selected): | $7,500 | $7,500 | $7,500 |
| XLT Package: | $1,000 per component | $1,000 per component | $1,000 per component |
| AGGREGATE LIMIT: | $13,000/ACV | $20,000/ACV | $30,000/ACV |

**Subrogation:**

If You receive benefits under this Agreement, We will be entitled to Your rights to recover against any manufacturer, insurance company or service Agreement provider who may be responsible to You for Costs covered under this Agreement or any payments made by Us. In all states except California, if We ask, You agree to cooperate with Us in any matter concerning this Agreement or, to enforce Our rights.

**Agreement Period:**

The time and mileage limit of the Term Selected starts on the Agreement Purchase Date and Current Odometer Reading shown on the Information Page. If the Service Drive Sale/Non- Point of Sale Delivery box is checked, coverage begins 30 days and 1,500 miles from the Agreement Purchase Date and Current Odometer Reading shown on the Information Page. The additional 30 days and 1,500 miles will be added on to the end of the contract term and odometer mileage.

**Arbitration:** You agree that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE, BUT THEY CHOOSE TO HAVE ANY DISPUTES DECIDED THROUGH ARBITRATION. Rules and forms of the American Arbitration Association may be obtained and all claims shall be filed at any office of the American Arbitration Association or at Corporate Headquarters, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043. Telephone: (877) 495-4185; Website: www.adr.org. This Arbitration provision is deleted in its entirety in California, Georgia, Mississippi, Nebraska, and Oregon.

**Cancellation:**

In the event the covered Vehicle is repossessed, declared a total loss, or You give notice of cancellation, the Agreement shall terminate. You may cancel this Agreement. To request a cancellation, submit written notification immediately to the Selling Dealer or Administrator including the following: 1) the Agreement Number; 2) Vehicle _nitfication Number; 3) a signed notarized statement certifying the current Vehicle odometer reading. If this Agreement is canceled within thirty (30) days of the _greement purchase date and no claim has been made, We will refund the full Agreement purchase price. If the Agreement is cancelled after the first thirty (30) days or a claim has been filed, the refund will be made on an amount of the Agreement purchase price calculated according to the pro-rata method reflecting the greater days in force or the miles driven based on the term of the plan selected and the date coverage begins, less a fifty dollar ($50.00) administrative fee; $25.00 or 10% of the refund, whichever is less, in California; $50.00 or 10% of the refund, whichever is less, in Georgia; $50.00 or 10% of the refund, whichever is less, in Illinois; $50.00 or 10% of the pro rata refund, whichever is less, in North Carolina; $25.00 in Washington; and $60 or 10% of the provider fee, whichever is less, in Wisconsin). In the event of a cancellation, the Lienholder, if any, will be named on the refund check. In the event of a cancellation upon repossession, the Lienholder will be the sole payee. Where permitted, any claim incurred or paid will be deducted from the amount of the cancellation refund. State guidelines and regulations where the Agreement was sold take precedent over these terms. (Georgia does not allow for a claim incurred or paid to be deducted from the amount to be returned.)

**Cancellation By Us:** We may cancel this Agreement: 1) if there has been a material misrepresentation or fraud at the time of sale of this Agreement or when filing a claim under this Agreement; 2) if the odometer or ECM has been tampered with or disabled and You have failed to repair the odometer or ECM; 3) If You do not pay the Agreement price. If We cancel this Agreement for any reason other than non-payment, We will mail You written notice at least thirty (30) days prior to cancellation. A pro-rata refund reflecting the greater days in force or miles driven based on the term of the plan selected and the date coverage begins will be made to You. All refunds will be paid to the Lienholder, if any, otherwise to You. If this Agreement is financed and Your Vehicle is a total loss or is repossessed, You authorize Your Lienholder to cancel this Agreement and receive the refund.

**Transfer of Agreement:**

In the event that You sell the covered Vehicle, this Agreement shall terminate. You may apply for a transfer to the new owner. Where applicable, the manufacturer's warranty including extended powertrain warranty must transfer to the new owner to obtain coverage under the Transfer provisions of this Agreement. Within thirty (30) days from the date of sale to a private party and not a dealer or entity in the business of selling, trading or leasing vehicles, submit the following: 1) A check for a $100.00 transfer fee payable to Administrator - AGWS, 2) A copy of the Information Page of this Agreement, 3) A signed affidavit stating the date of sale, the mileage at sale and the new owners name, address and telephone number, and 4) Copies of Your maintenance documents for the covered Vehicle. Proof of continuation of regular maintenance will be necessary in the event of a claim. The Administrator reserves the right to reject a transfer request in the event that the above requirements are not met. This Agreement may not be assigned separately from the covered Vehicle, nor can it be assigned to a new or used car dealership or anyone other than an individual person that purchased Your Vehicle. This Agreement may only be transferred once.

**Payment Plan Agreements:**

If this Agreement is purchased on a payment plan, failure to make timely payments will result in cancellation with no refund due unless state law mandates otherwise. Should a claim arise before this Agreement is paid in full, the balance owed will be deducted from the claim payment unless state law mandates otherwise.

**NOTICE TO CONSUMERS:**

- The benefits provided may duplicate express manufacturer or seller's warranties that come automatically with every sale. You may be required by the Seller of this coverage to pursue those warranties, which are available to You without this Agreement.
  The purchase of this Agreement is not required to purchase or obtain financing for the Vehicle.
- The terms of this written Agreement control the Agreement between us. No change or modification to the written terms is valid.
- This Agreement is based on information You provided on the Information Page. Misrepresentation on the Information Page will result in rejection of this Agreement.
- This is a service contract not an insurance policy.

## STATE REQUIREMENTS

If this Agreement was purchased in any of the following states, the Agreement is amended as indicated after each state. The Administrator of this Agreement makes diligent effort to include all state notices as they become effective, but in cases where a state's notice is not present on this printing of the Agreement, state law will take precedence over the terms and conditions of this Agreement.

**California:** American Guardian Warranty Services, Inc.'s California License number is 0C73808. Performance to You under this contract is guaranteed by a California approved insurance company. You may file a claim with this insurance company if any promise made in the contract has been denied or has not been honored within sixty (60) days after Your request. The name and address of the insurance company is Virginia Surety Company, Inc., 175 West Jackson Blvd., Chicago, IL 60804 (800) 209-6206. If You are not satisfied with the insurance company's response, You may contact the California Department of Insurance at 1-800-927-4357. Cancellation of this Agreement shall comply with California law. If You provide notice of cancellation to Us during the first sixty (60) days from the effective date for a new or thirty (30) days for a used Vehicle, You will be refunded 100% of the premium paid, if no claims have been filed. If a claim has been filed within the first sixty (60) days for a new or thirty (30) days for a used Vehicle, the refund will be pro-rated based on either elapsed time or mileage remaining. After the first sixty (60) days for a new or thirty (30) days for a used Vehicle, You will be refunded 100% of the unearned premium paid, less a fee of ten percent (10%) of the refund amount or $25.00, whichever is less. The unearned premium will be prorated according to the pro-rata method reflecting the greater days in force or the miles remaining. In the event of a claim arising in California, the proper venue for litigation shall be in California. Administrator reserves the right to void the Agreement or deny claims at any time due to fraud, misrepresentation or nonpayment. The name of the Obligor is amended to American Guardian Warranty Services Inc. dba A.G.W.S. Insurance Services.

**Connecticut:** All disputes must be resolved in accordance with the Regulations of Connecticut State Agencies §42-260. In the event of a dispute with the Administrator, You may contact the State of Connecticut Insurance Department, PO Box 816, Hartford, CT 06142-0816. Attn: Consumer Affairs. The written complaint must contain a description of the dispute, the purchase price or lease price of the product, the cost of the repair or replacement and a copy of the extended warranty contract. If the term of this Agreement is less than one (1) year, the Agreement term shall be automatically extended while any repairs covered under the Agreement are being done and the Vehicle is in the custody of the Authorized Repair Facility. If You return the Vehicle or the Vehicle is sold, lost, stolen, or destroyed, You may cancel this Agreement, subject to the cancellation provisions of this Agreement.

**Georgia:** Any claim or dispute will be adjudicated in Your county of residence. Pre-existing conditions known to You at the time of Your purchase of the Agreement is excluded from coverage. Also, repairs when the covered Vehicle's odometer has been altered or tampered with while owned by You are excluded from coverage. Modifications to the Vehicle made by You results in rejection of coverage under this Agreement. Damage due to sludge may not be excluded from coverage. A cancellation will comply with Georgia Code Chapter 33-24-44. If You cancel this Agreement after thirty days, the cancellation/administrative fee will be $50 or 10% of the pro-rata refund amount, whichever is less. The Obligor/Administrator may only cancel the Agreement for fraud, material misrepresentation or nonpayment. There is a thirty (30) day written notice of cancellation for reasons other than non-payment regardless of when the Agreement was cancelled. We will return the unearned premium to You within ten (10) working days after cancellation. A ten (10) day written notice of cancellation will be given if canceled for non-payment. The finance company/Lienholder must hold a power of attorney in order to cancel the service for nonpayment.

**Hawaii:** Cancellation: A ten percent (10%) penalty per month shall be added to a refund that is not paid or credited within forty-five (45) days after the receipt of the service contract to the provider.

**Idaho:** Coverage afforded under this Contract is not guaranteed by the Idaho Insurance Guarantee Association.

**Illinois:** If You provide a written notice of cancellation to the Selling Dealer after the first thirty (30) days after the Agreement purchase date, or if We or the Lienholder cancel this Agreement at any time, You will be entitled to a pro-rated refund of the Agreement price based on the greater of the number of days the Agreement was in force or the miles driven compared to the total time or mileage specified in the Agreement, less a cancellation fee equal to the lesser of $50.00 or ten percent (10%) of the amount of the pro-rated refund, and the amount of claims paid under this Agreement. Wear and Tear: a gradual reduction in operating performance due to normal wear and use IS included in this Agreement.

**Indiana:** THIS SERVICE CONTRACT IS NOT INSURANCE AND IS NOT SUBJECT TO INDIANA INSURANCE LAW.

**Iowa:** If You have problems or questions about this Agreement, You may contact the Commissioner of Insurance of the State of Iowa or the Iowa Securities Bureau at (515) 281-4441, Two Ruan Center, 601 Locust Street, 4th Floor, Des Moines, Iowa 50309-3738. Cancellation: A ten (10%) penalty will be added each month to the cancellation refund not paid to You within thirty (30) days of the return of the Agreement to Us.

**Louisiana:** The Obligor/Provider is American Guardian Warranty Services of Florida, Inc., PO Box 768, Warrenville, IL 60555, (800) 579-2233. Cancellation: If this Agreement is cancelled within thirty (30) days of the sale date, We will refund the full amount of the cost of the Agreement. If the Agreement is cancelled after the first thirty (30) days the refund will be made on an amount of the Agreement charge according to the pro-rata method reflecting the days in force based on the term of the plan selected and the date coverage begins, less a $50.00 dollar administrative fee.

**Maine:** A monthly penalty equal to ten percent (10%) of the returned amount will be added to any refund that is not paid or credited to You within forty-five (45) days after Our receipt of a cancellation request from You. In the event of a cancellation by Us, We will provide You with notice mailed fifteen (15) days prior to cancellation that identifies both the basis for cancellation and the cancellation effective date.

**Maryland:** The repair of a malfunction or defect covered under this Agreement shall include the Cost of the tear down and diagnosing the malfunction or defect. A ten percent penalty (10%) per month shall be added to a refund that is not paid within forty five (45) days after the receipt of the service contract to Us.

**Mississippi:** Cancellation of a contract by Us shall become effective sixty (60) days after a cancellation notice is mailed to You unless a cancellation is for non-payment of a contract whereby the contract will be cancelled fifteen (15) days after the notice of cancellation is mailed to You.

**Nebraska:** The aggregate actual cash value is the purchase price of the Vehicle.

**New York:** A ten percent (10%) penalty per month shall be added to a refund not made within thirty (30) days of the receipt of the cancellation request.

**North Carolina:** The seller of this Coverage is required to inform You of any warranties available to You without this Agreement. No Agreements may be cancelled by the Seller or Administrator prior to the expiration of the term as stated in the Agreement without Your consent, except in the case of nonpayment of the Agreement price, a material misrepresentation related to this Agreement made by You or any other act by You constituting a breach of duty under this Agreement. You may cancel at any time and receive a pro rata refund less any claims paid on the Agreement and a reasonable administrative fee not to exceed ten percent (10%) of the pro-rata refund. The term of this Agreement for cancellation purposes will be based on the date You purchased Your Vehicle and the Vehicle mileage on the date purchased.

**Utah:** This service contract or warranty is subject to limited regulation by the Utah Insurance Department. To file a complaint, contact the Utah Insurance Department. Coverage afforded under this Agreement is not guaranteed by the Property and Casualty Guarantee Association. Arbitration in Utah is binding and shall be in compliance with the "Utah Uniform Arbitration Act" (78B-11-101). In Utah, arbitration does not have to take place within sixty (60) days of the filed loss. ANY MATTER IN DISPUTE BETWEEN YOU AND THE COMPANY MAY BE SUBJECT TO ARBITRATION AS AN ALTERNATIVE TO COURT ACTION PURSUANT TO THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION, A COPY OF WHICH IS AVAILABLE ON REQUEST FROM THE COMPANY. ANY DECISION REACHED BY ARBITRATION SHALL BE BINDING UPON BOTH YOU AND THE COMPANY. THE ARBITRATION AWARD MAY INCLUDE ATTORNEY'S FEES IF ALLOWED BY STATE LAW AND MAY BE ENTERED AS JUDGMENT IN ANY COURT OF PROPER JURISDICTION. Agreement Coverage: Failure to give any notice or file any proof of loss required by the policy within the time specified in the policy does not invalidate a claim made by the insured, if the insured shows that it was not reasonably possible to give the notice or file proof of loss within the prescribed time. The Cancellation provision is amended to abide by the Utah Code 31A-21-303. Cancellation of this Agreement at any time is

effective no sooner than thirty (30) days from the delivery or first-class mailing of a written notice to You. This Agreement cannot be voided for any reason and may only be cancelled with proper notice. You may purchase this Agreement through payment up front or through installment payments.

**Washington:** You may contact Virginia Surety Company at any time. The following provisions of Your Agreement are hereby amended with the following pursuant to the Revised Code of Washington 48.110.075: Cancellation: You may cancel and return this Agreement and receive a refund of the full purchase price by returning it to the Iministrator within nine (9) days or less, if no claim has been made. If after nine (9) days and no claim has been made, You may cancel and return this Agreement for ull purchase price, less a cancellation charge of $25.00. If after thirty (30) days, and a claim has not been made, the refund will be determined on a pro-rata basis, which is the greater of usage reflecting the days in force or the miles driven from the start of the Agreement term to the expiration terms, less a cancellation charge of up to twenty five dollars ($25.00). If You cancel and return this Agreement, the Agreement is void from the beginning and the parties are in the same position as if no Agreement had been issued. Any claim paid or incurred may be deducted from the amount of the cancellation refund. A ten percent (10%) penalty shall be added to any refund that is not paid within thirty (30) days of return of the Agreement to the provider. Cancellation by Us: We will not deny a claim based upon Your failure to properly maintain the Vehicle, UNLESS the failure to maintain the Vehicle involved the failed part or parts. Arbitration: Any decision reached by Arbitration shall be binding upon both You and AGWS. If this Agreement is found to be subject to Arbitration the proceeding will take place in the state of Washington near Your residence. If this Agreement is found to be not subject to arbitration, any legal proceeding with respect to any dispute will be tried in the State of Washington. Both Parties hereby waive the right to a jury trial in any such proceeding. The implied warranty of merchantability on the motor Vehicle is not waived if the Agreement has been purchased within ninety (90) days of the purchase date of the motor Vehicle from a provider who also sold the motor Vehicle covered by this Agreement. ____ (You must initial here). By initialing, You acknowledge the review and understanding of the above disclosures and the contract including, coverage, maintenance requirements, duty to protect against further damage, claim procedures, covered parts and labor, time/mileage limitations, exclusions, and cancellation provisions. Service of Suit: The commissioner is the attorney to receive service of legal process in action, suit or proceeding in court.

**Wisconsin:** THIS CONTRACT IS SUBJECT TO LIMITED REGULATION BY THE OFFICE OF THE COMMISSIONER OF INSURANCE. The Agreement Administrator and Obligor is American Guardian Warranty Services of Wisconsin, Inc., P.O. Box 768, Warrenville, Illinois 60555; (800) 579-2233. Cancellation: If We do not pay or credit a refund within 45 days after the return of a service contract to the provider, We shall pay a ten percent (10%) per month penalty of the refund amount outstanding which will be added to the amount of the refund. If We cancel this Agreement, notice, inclusive of an effective date outlining the specific nature or reason for cancellation will be mailed to You at the last known address for You at least five (5) days prior to the cancellation date. We may charge an administrative fee for cancellation equal to ten (10%) percent of the provider fee. Our rights of ownership to salvaged parts shall become effective only after You have been fully compensated for damages or repairs under this Agreement. Our rights to subrogation under this Agreement are not valid until You have been made whole and fully compensated for damages. Note: In Wisconsin, the arbitration provision is amended to provide for non-binding arbitration upon the agreement of both parties.

Exhibit 15

AGWS Service Agreement – Truck #002

Agreement No.

**Vehicle Service Agreement**
**Information Page**


**compass**
**HEAVY DUTY TRUCK & BUS**
**PROTECTION**

HDTRA80460469

## I.  Customer Information

| | |
|---|---|
| Trade Winds Transport LLC | Eric Grace |
| Last Name/Company Name | First Name |  # |
| 505 El Redundo Ave #A | |
| Address | |
| Redondo Beach | CA | 90277 |
| City | State | Zip |
| (310) 809-4661 | egrace5577@gmail.com |
| Phone | Email |

## II.  Dealer Information

## III.  Lienholder Information

| | |
|---|---|
| Rush Truck Center - Jacksonville | |
| Name | Name |
| 5175 West Beaver Street | |
| Address | Address |
| Jacksonville,          FL        32254 | City                    State            Zip |
| City                   State        Zip | |
| (888) 783-6170      mulhollandr@rushenterprises.com | |
| Phone         Email | |

## IV.  Vehicle and Coverage Information

| 2012 | INTERNATIONAL | PROSTAR LP627 PREMIUM | 3HSDJSJR6CN624251 | | 245,772 |
|---|---|---|---|---|---|
| Year | Make | Model | Vehicle Identification Number (VIN) | Current ECM Reading | Current Odometer Reading |
| | $22,813.00 | | 01/25/2017 | | $7,137.00 |
| Vehicle Purchase Date | Vehicle Purchase Price | | Agreement Purchase Date | | Agreement Purchase Price |
| 8 | | | | ☑ Diesel    ☐ Gas |
| Vehicle Class (34) | Engine Size in Liters | | Engine Type | | |

**Refrigeration Unit:**

| | | |
|---|---|---|
| Model No. | Model Year | Serial No. |

| **Navigator Coverage:** | **Optional Coverage:** (must be selected at the time of purchase to apply) | |
|---|---|---|
| ☐ Engine Coverage | ☐ Option A - EGR/DPF | ☐ **Refrigeration Unit Coverage** (Current Unit Hours: _____) |
| ☑ Engine/Transmission Coverage | ☑ Option B - (Aftertreatment Assemblies) | |
| ☐ Engine/Transmission/Drive Axle Coverage | ☐ Proxor MX Equipped ☑ Maxxforce Equipped | ☐ **XLT Package** |

| **Agreement Term:** | Coverage Start Date: | Agreement Administrator/ Provider/Obligor: American Guardian Warranty Services, Inc. PO Box 760 Warrenville, Illinois 60555 800.579.2233 | Warranty Administrator & Obligor: American Guardian Warranty Services of Wisconsin, Inc. PO Box 760 Warrenville, Illinois 60555 800.579.2233 |
|---|---|---|---|
| Months  36          Miles  500,000 | 01/25/2017 | | |
| ☐ Service Drive Sale/Non-Point of Sale Delivery (Inspection and waiting period of 30 days and 1,500 miles required) | Coverage Starting Mileage: 245,772 | Lienholder Obligor/Administrator: American Guardian Warranty Services of Florida, Inc. PO Box 760, Warrenville, IL 60555 800.579.2233 | |

## V.  Customer Acknowledgment

The **Agreement** that **You** are purchasing is between **You** and the **Agreement Obligor**. **You** will be notified by the **Selling Dealer** and/or the **Administrator** if the **Agreement** is ineligible for coverage. **You** (the undersigned) have reviewed the terms of this **Agreement** and understand the coverage, exclusions and maintenance requirements. This **Agreement** is based on information **You** provided on this **Information Page**. AUTHORIZATION IS REQUIRED FROM THE **ADMINISTRATOR** PRIOR TO THE REPAIR OF COVERED COMPONENTS.

| | 01/25/2017 | |
|---|---|---|
| Customer Signature (Year) | Purchase Date | Selling Dealer Representative Signature |

If no coverage level is selected, then only engine coverage will apply. If no term months and mileage have been indicated in Agreement term, then coverage will be in effect for 12 months/25,000 miles, whichever occurs first. A Deductible of $100 per repair visit will apply. Any modification, alteration or change to the printed terms, conditions or coverages of this Agreement renders the Agreement invalid.

**AUTHORIZATION IS REQUIRED FROM THE ADMINISTRATOR PRIOR TO THE REPAIR OF COVERED COMPONENTS**

**CLAIMS: 800.579.2233 | ROADSIDE ASSISTANCE: 888.491.3370**
**TO START A CLAIM ONLINE GO TO WWW.AGWSINC.COM**

AG HDT (06.16) VSC XLT RT EMAT             Page 1 of 6             CUSTOMER MUST RECEIVE


**PLAINTIFF'S EXHIBIT**
15

## TERMS AND CONDITIONS

In the event of a **Breakdown** of a covered part listed below, **We** agree to pay for the **Cost** of necessary parts and labor to repair or replace a covered part listed below for each component (including replacement of all lost fluids), less applicable **Deductible**, subject to the terms, conditions and limitations herein. A covered part has failed when it can no longer perform the function for which it was designed and not because of the action, inaction or failure of any non-covered parts.

**ENGINE ONLY COVERAGE** (includes those items listed in Components 1-2)

**1. ENGINE:** The following stated components are covered. The internal lubricated parts within the engine including pistons, piston rings, wrist pins, crankshaft, rod and main bearings, camshaft and cam bearings, cam followers. Timing chain and timing gears, timing chain tensioners. Intake and exhaust valves, valve guides, valve springs and valve retainers. Rocker arms, pushrods, lifters. Turbocharger rotor/turbine and housing. Water pump. Fuel Injectors. Progressive Damage: the Engine Block, Cylinder Head(s) and Cylinder Liners are covered if damaged in conjunction with a covered mechanical failure.

**2. TAXES AND FLUIDS:** Associated state and local taxes where applicable and required fluids to complete covered repairs.

**ENGINE AND TRANSMISSION COVERAGE** (includes those items listed in Components 1-3)

**3. TRANSMISSION:** The following stated components are covered. All internal lubricated parts of the manual or automatic transmissions, including: torque converter, oil pump, valve body, governor, bands, drums, planetaries, sun gear, sprag(s), shaft(s), bearings and related bushings, shift rail, forks and synchronizers. Progressive Damage: the transmission case is covered if damaged in conjunction with a covered mechanical failure.

**ENGINE, TRANSMISSION AND DRIVE AXLE COVERAGE** (includes those items listed in Components 1-4)

**4. DRIVE AXLE:** The following stated components are covered. All internal lubricated parts including: output shaft, bearings, bushings, gear sets, axle and bearings, carrier, ring and pinion gears, bearings, bushings, axle shaft. Progressive Damage: the drive axle housing is covered if damaged in conjunction with a covered mechanical failure.

**OPTIONAL COVERAGE** The following surcharged coverage is available when identified on the Information Page and a surcharge has been paid.

**OPTION A – DPF/EGR:** Failure of the diesel particulate filter (DPF) or the EGR Valve Coverage is limited to the first 24 months or 240,000 miles, or term months/mileage selected, whichever is less. No progressive damage outside of DPF/EGR coverage. Coverage under this option is limited to one failure per DPF and two failures of the EGR Valve.

**OPTION B—Aftertreatment Assemblies (includes the following named components):** DPF (filter only), EGR Valve(s) (valve component only), EGR Cooler, DOC Doser Injector, SCR, DPF Doser Injector, DPF Dosing Module, DEF Dosing Injection Nozzle, DEF Tank, Diesel Oxidation Catalyst (DOC), Lambda Sensor (O2 Sensor), NOx Sensor, Aftertreatment Control Module (Aftertreatment ECM), DEF Dosing Module. No progressive damage from Aftertreatment to any other component except within Aftertreatment Assemblies. Coverage is limited to one failure per listed component. Coverage is limited to the first 24 months or 240,000 miles, or term months/mileage selected, whichever is less. Proof of maintenance service being done as per OEM schedule must be documented.

**XLT PACKAGE**—The following stated components are covered. Radiator, fan clutch, charged air cooler, air compressor, alternator, starter and solenoid, fuel tank(s), engine oil pan, engine vibration damper, radio (AM/FM/CD) main cabin primary HVAC (excluding sleeper): a/c compressor and clutch, blower motor, temperature control head, heater core.

**REFRIGERATION UNIT COVERAGE**— Thermo King and Carrier units only: Engine Components: Internally lubricated hard parts limited to pistons, piston rings, piston oil cooling jets, wrist pins, connecting rods, connecting rod bearings, crankshaft, main bearings, thrust washers, camshaft and cam bearings, cam followers, rocker arm shafts, rocker arms, push rods, hydraulic lifters, intake and exhaust valves and guides, valve springs, constant velocity valve, oil pump housing, oil pump gears, oil pump pick up screen, oil pump pick up tube, oil pump pressure relief springs and valves, valve retainers, valve keepers (locks), timing chain and gears, timing chain tensioners, timing gear cover, valve cover, oil pan, injectors and water pump. Compressor: Limited to reciprocal compressor internal components and scroll compressor internal components. Any damage resulting from a seal leak or a blown head gasket is not covered.

## Additional Benefits

**ROADSIDE ASSISTANCE:** You are entitled to one (1) Roadside Assistance service per 72-hour period. To receive these benefits You must call 888-491-3370 and provide Your Agreement number. The following benefits are available: (1) Battery Service: if a battery failure occurs, a jump start will be applied to start the covered Vehicle; (2) Vehicle Fluid Delivery: an emergency supply of coolant, oil or fuel will be delivered for Your covered Vehicle if you have an immediate need. You must pay the Cost of the actual fluid or fuel when delivered. (3) Lock-Out Assistance: If Your keys are locked inside the Vehicle, assistance will be provided to gain entry to the Vehicle. Roadside Assistance is available ONLY during the Agreement term and services obtained through any source other than the toll-free number will not be covered. The limit of liability for any single benefit is one hundred dollars ($100.00).

**TRIP INTERRUPTION OR RENTAL ASSISTANCE:** When a covered Breakdown disables Your Vehicle and the repairs are completed more than one hundred (100) miles from Your residence, We will reimburse You for lodging and meal expenses or substitute rental vehicle expenses incurred by You between the date of the Breakdown and the date on which covered repairs are completed. You will be reimbursed for actual lodging expenses or substitute rental vehicle expenses up to one hundred twenty five dollars ($125.00) per day for up to two (2) days, not to exceed two hundred fifty dollars ($250.00) per occurrence. Legible and verifiable receipts are required for reimbursement.

**TOWING ASSISTANCE:** If towing assistance becomes necessary due to the Breakdown of a covered component, towing costs not payable by insurance will be covered for up to three hundred seventy five dollars ($375.00) per occurrence. A paid in full, signed towing bill is required for reimbursement.

## WHAT TO DO IF REPAIRS ARE NEEDED

If Your Vehicle is unsafe and needs to be towed, contact a tow company to arrange towing service. Otherwise, deliver Your Vehicle to a repair facility and authorize them to diagnose the failure. Provide the repairer with Your Agreement number and direct them to call the Administrator for Repair Authorization at 1-800-579-2233.
Emergency Repair—if a covered component has a Breakdown at any time outside of the Claims Department regular business hours, You may take one of the following steps: (1) Wait until regular business hours and then follow the normal claims procedure outlined above; or (2) Authorize and pay for any teardown or diagnostic time needed to determine whether Your Vehicle has a covered Breakdown. If You reasonably determine that You have a covered Breakdown and You choose to have Your Vehicle repaired, You are responsible for paying the repair. You must then call the Administrator during the next available regular business day so that the Administrator may determine whether there was a covered Breakdown. If the Administrator determines that there was a covered Breakdown and You meet the requirements outlined herein, then We will pay You in accordance with the terms and conditions of this Agreement.

*You must obtain a Repair Authorization Number from Our Claims Department to assure coverage under this Agreement.*

Call Toll Free at 1-800-579-2233 for instructions and Repair Authorization.

No Payment for a Claim will be made without Authorization.

**Definitions:** When used, key terms will appear in bold print and have special meaning as follows:
**Actual Cash Value (ACV)** – means the actual cash value of Your Vehicle at the time of repair according to the most recently published NADA Guide for Trade-In-Value.
**Administrator, Obligor, Our, Us and We** – means American Guardian Warranty Services, Inc. ("AGWS"), except in the state of Louisiana where it means American Guardian Warranty Services of Florida, Inc. and in the state of Wisconsin where it means American Guardian Warranty Services of Wisconsin, Inc. Our mailing address is P.O. Box 768, Warrenville, IL 60555; and Our toll-free telephone number is 1-800-579-2233.
**Agreement** – means the service Agreement that is a contract between You and Us.

AG HDT (08.16) VSC XLT RT EMAT                                    Page 2 of 6                                    CUSTOMER MUST RECEIVE PAGES 1 - 6

Breakdown or Mechanical Failure – means the failure of an original or replacement part, covered by this Agreement, to perform its function as it was originally designed to work in normal service with required maintenance due to material failure, wear and tear or defects in workmanship and outside the manufacturer's tolerance.

Cost(s) – means the usual and fair charges for parts and labor necessary to repair covered parts. Replacement of any covered part may be made with new, remanufactured, rebuilt or like kind and quality at the time of Breakdown at the discretion of the Administrator. Parts will be reimbursed up to the manufacturer's suggested list price. Labor time will be reimbursed using nationally recognized labor time standards. Labor rate will be determined based on repairing facility's geographic region.

Deductible – means the amount that You must pay for covered repairs per occurrence as identified on the Information Page.

Information Page – means Page 1 of this Agreement.

Lienholder/Lender – means a financial institution identified on the Information Page and providing financing for the purchase of this Agreement.

Selling Dealer – means the retail seller of this Agreement to You for the Vehicle described on the Information Page.

Vehicle or Covered Vehicle – means the Vehicle described on the Information Page.

You and Your – means the purchaser identified on the Information Page.

Insurance Statement:

Our obligations are guaranteed by an insurance policy issued by Virginia Surety Company, Inc.  In the event that We cease to operate, are bankrupt, or fail to pay an authorized claim within sixty (60) days after proof of loss is filed, You may file a claim directly with Virginia Surety Company, Inc., 175 West Jackson Blvd., Chicago, IL 60604 (800) 209-6206.

Your Responsibilities:

1. You must follow the manufacturer's recommended maintenance schedule for any and all required services, including keeping receipts for services performed. The required receipts include date, mileage, service performed and service provider. These records may be requested by the Administrator for the investigation of a claim or transfer. IT IS RECOMMENDED THAT YOU KEEP MAINTENANCE RECORDS WITH THE VEHICLE. In the event that You perform Your own maintenance, You must provide copies of receipts for materials purchased and a service log showing date, mileage and services.
2. Use all reasonable means to protect Your Vehicle from further damage when a Breakdown occurs.
3. You must authorize necessary labor time for the repairer to diagnose a Breakdown.
4. Direct the repair facility to call Administrator at 1-800-579-2233 to report a claim.  You must obtain Repair Authorization from the Administrator prior to repairing any covered component.
5. In the event You need to receive reimbursement for Your authorized claim, You must submit the following within ninety (90) days of approval: A) the original Repair Order signed by You; B) proof of payment with a cash register receipt/credit card receipt/personal check copy; C) where applicable, copies of original towing or rental bill with proof of payment.

Our Responsibilities:

Subject to the Coverage Level and Deductible selected on the Information Page of this Agreement, the Limits of Liability and items found under EXCLUSIONS-WHAT IS NOT COVERED, the Administrator will pay for the Cost of necessary repairs.  The Administrator reserves the right to inspect Your Vehicle to evaluate covered repairs.

Exclusions-What Is Not Covered:

Where permitted by state requirements the following are not covered (See State Requirements):

1. PRE-EXISTING CONDITIONS.
2. Failures that occur during the waiting period identified on the Information Page.
3. Cooler lines and related componentry.
4. Damage to a covered component caused by the failure of a component not listed as covered under this Agreement.
5. Repairs that are covered under the original manufacturer's warranty regardless of whether or not that warranty was transferred to You or the manufacturer refuses to honor its obligations. Any cost, repair, replacement or benefit for which the manufacturer has announced its responsibility through any means including recalls, service bulletins or campaign(s) by manufacturer.
6. Repairs beyond those required to correct a Breakdown.
7. ANY COVERED REPAIR NOT AUTHORIZED IN ADVANCE BY THE ADMINISTRATOR.
8. Damage caused by continued operation of an impaired Vehicle.
9. Seals, gaskets, and fasteners unless required in conjunction with a covered mechanical Breakdown. Any component part of the engine block assembly not specifically listed as covered under Item 1. ENGINE. Stuck or failed variable vanes (VGT) turbocharger mechanism. Any component parts of the transmission assembly not listed as covered under Item 3. TRANSMISSION, including electronic controls, levers, linkage, rubber mounts, transmission cooler, external hoses, pipes, tubes and hard lines. Any component parts of the drive axle assembly not listed as covered under Item 4. DRIVE AXLE: including wheel bearings.
10. Damage caused by towing the Vehicle in a manner not consistent with the manufacturer's recommendations.
11. Damage caused by overloading the Vehicle beyond the manufacturer's recommended capacity.
12. A Breakdown caused by or involving modifications, alterations or additions to the Vehicle unless those modifications, alterations or additions were performed by or recommended by the original Vehicle Manufacturer.
13. Towing another vehicle unless Your Vehicle was equipped by the manufacturer for that purpose.
14. Repairs required because of technician negligence, overheating, detonation, sludge or carbon deposits, contamination, rust, corrosion, cavitation, electrolysis, operation without the proper lubrication levels or fluid type, and the failure to perform the manufacturer's recommended maintenance. All gasket or seal failures, cracked heads or block, overheating or other engine failure due to lack of fluids or improper maintenance.
15. Repairs made outside of the United States and Canada.
16. Repairs required because of fraud, collision, abuse, negligence, neglect, misuse, abuse, road hazard, racing, off-road use, vandalism, riot, theft, flood, fire, war, acts of God, or loss that is normally covered by Casualty Insurance.
17. The cost of teardown, disassembly or assembly when a Breakdown is not covered by this Agreement.
18. Repairs that are covered under a repairer's guarantee, service agreement or other warranty.
19. Incidental or consequential damage, loss of profits, property damage, personal injury, inconvenience, loss of Vehicle use, commercial loss, punitive or exemplary damages, attorney fees, loss of earnings, personal damage or per diem expenses.

This Agreement provides no benefit or coverage and We have no obligation if:

1. The Vehicle odometer fails to register, record actual mileage or true mileage cannot be determined for any reason, including ECM failure, while owned by You.
2. You rent Your Vehicle to someone else.
3. Your Vehicle is used for postal service, taxi, livery, police or other emergency services, snow plowing, competition or speed events.

AG HDT (06.15) VSC XLT RT EMAT                    Page 3 of 6                    CUSTOMER MUST RECEIVE PAGES 1 - 6

4. Your Vehicle is modified from the Vehicle manufacturer's original specifications regardless of who made the modifications or when the modifications were made.

5. Your Vehicle is identified as a Gray Market Vehicle, Total Loss, Flood Damaged, Salvaged, Rebuilt or a Glider Reconstruction.

...mit of Liability: In no event shall the Aggregate Limit of liability exceed the amount identified by Vehicle Class below or the Actual Cash Value (ACV) of the vehicle at the time of repair, whichever is less.

| | Vehicle Class 3-4 | Vehicle Class 5-6-7 | Vehicle Class 8 |
|---|---|---|---|
| Engine/Water Pump: | $9,500 | $15,000 | $25,000 |
| Transmission: | $4,000 | $6,000 | $7,500 |
| Drive Axle: | $4,000 | $6,000 | $7,500 |
| Option B (if selected): | $7,500 | $7,500 | $7,500 |
| XLT Package: | $1,000 per component | $1,000 per component | $1,000 per component |
| AGGREGATE LIMIT: | $13,000/ACV | $20,000/ACV | $30,000/ACV |

**Subrogation:**
If You receive benefits under this Agreement, We will be entitled to Your rights to recover against any manufacturer, insurance company or service Agreement provider who may be responsible to You for Costs covered under this Agreement or any payments made by Us. In all states except California, if We ask, You agree to cooperate with Us in any matter concerning this Agreement or, to enforce Our rights.

**Agreement Period:**
The time and mileage limit of the Term Selected starts on the Agreement Purchase Date and Current Odometer Reading shown on the Information Page. If the Service Drive Sale/Non- Point of Sale Delivery box is checked, coverage begins 30 days and 1,500 miles from the Agreement Purchase Date and Current Odometer Reading shown on the Information Page. The additional 30 days and 1,500 miles will be added on to the end of the contract term and odometer mileage.

**Arbitration:** You agree that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE, BUT THEY CHOOSE TO HAVE ANY DISPUTES DECIDED THROUGH ARBITRATION. Rules and forms of the American Arbitration Association may be obtained and all claims shall be filed at any office of the American Arbitration Association or at Corporate Headquarters, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043. Telephone: (877) 495-4185; Website: www.adr.org. This Arbitration provision is deleted in its entirety in California, Georgia, Mississippi, Nebraska, and Oregon.

**Cancellation:**
In the event the covered Vehicle is repossessed, declared a total loss, or, You give notice of cancellation, the Agreement shall terminate. You may cancel this Agreement. request a cancellation, submit written notification immediately to the Selling Dealer or Administrator including the following: 1) the Agreement Number; 2) Vehicle notification Number; 3) a signed notarized statement certifying the current Vehicle odometer reading. If this Agreement is canceled within thirty (30) days of the Agreement purchase date and no claim has been made, We will refund the full Agreement purchase price. If the Agreement is canceled after the first thirty (30) days or a claim has been filed, the refund will be made on an amount of the Agreement purchase price calculated according to the pro-rata method reflecting the greater days in force or the miles driven based on the term of the plan selected and the date coverage begins, less a fifty dollar ($50.00) administrative fee; $25.00 or 10% of the refund, whichever is less, in California; $50.00 or 10% of the refund, whichever is less, in Georgia; $50.00 or 10% of the refund, whichever is less, in Illinois; $50.00 or 10% of the pro rata refund, whichever is less, in North Carolina; $25.00 in Washington; and $50 or 10% of the provider fee, whichever is less, in Wisconsin). In the event of a cancellation, the Lienholder, if any, will be named on the refund check. In the event of a cancellation upon repossession, the Lienholder will be the sole payee. Where permitted, any claim incurred or paid will be deducted from the amount of the cancellation refund. State guidelines and regulations where the Agreement was sold take precedent over these terms. (Georgia does not allow for a claim incurred or paid to be deducted from the amount to be returned.)

**Cancellation By Us:** We may cancel this Agreement: 1) If there has been a material misrepresentation or fraud at the time of sale of this Agreement or when filing a claim under this Agreement; 2) If the odometer or ECM has been tampered with or disabled and You have failed to repair the odometer or ECM; 3) If You do not pay the Agreement price. If We cancel this Agreement for any reason other than non-payment, We will mail You written notice at least thirty (30) days prior to cancellation. A pro-rata refund reflecting the greater days in force or miles driven based on the term of the plan selected and the date coverage begins will be made to You. All refunds will be paid to the Lienholder, if any, otherwise to You. If this Agreement is financed and Your Vehicle is a total loss or is repossessed, You authorize Your Lienholder to cancel this Agreement and receive the refund.

**Transfer of Agreement:**
In the event that You sell the covered Vehicle, this Agreement shall terminate. You may apply for a transfer to the new owner. Where applicable, the manufacturer's warranty including extended powertrain warranty must transfer to the new owner to obtain coverage under the Transfer provisions of this Agreement. Within thirty (30) days from the date of sale to a private party and not a dealer or entity in the business of selling, trading or leasing vehicles, submit the following: 1) A check for a $100.00 transfer fee payable to Administrator - AGWS, 2) A copy of the Information Page of this Agreement, 3) A signed affidavit stating the date of sale, the mileage at sale and the new owners name, address and telephone number, and 4) Copies of Your maintenance documents for the covered Vehicle. Proof of continuation of regular maintenance will be necessary in the event of a claim. The Administrator reserves the right to reject a transfer request in the event that the above requirements are not met. This Agreement may not be assigned separately from the covered Vehicle, nor can it be assigned to a new or used car dealership or anyone other than an individual person that purchased Your Vehicle. This Agreement may only be transferred once.

**Payment Plan Agreements:**
If this Agreement is purchased on a payment plan, failure to make timely payments will result in cancellation with no refund due unless state law mandates otherwise. Should a claim arise before this Agreement is paid in full, the balance owed will be deducted from the claim payment unless state law mandates otherwise.

**NOTICE TO CONSUMERS:**
- The benefits provided may duplicate express manufacturer or seller's warranties that come automatically with every sale. You may be required by the Seller of this coverage to pursue those warranties, which are available to You without this Agreement.
- The purchase of this Agreement is not required to purchase or obtain financing for the Vehicle.
- The terms of this written Agreement control the Agreement between us. No change or modification to the written terms is valid.
- This Agreement is based on information You provided on the Information Page. Misrepresentation on the Information Page will result in rejection of this Agreement.
- This is a service contract not an insurance policy.

## STATE REQUIREMENTS

If this Agreement was purchased in any of the following states, the Agreement is amended as indicated after each state. The Administrator of this Agreement makes diligent effort to include all state notices as they become effective, but in cases where a state's notice is not present on this printing of the Agreement, state law will take precedence over the terms and conditions of this Agreement.

**California:** American Guardian Warranty Services, Inc.'s California License number is 0C73808. Performance to You under this contract is guaranteed by a California approved insurance company. You may file a claim with this insurance company if any promise made in the contract has been denied or has not been honored within sixty (60) days after Your request. The name and address of the insurance company is Virginia Surety Company, Inc., 175 West Jackson Blvd., Chicago, IL 60604 (800) 209-6206. If You are not satisfied with the insurance company's response, You may contact the California Department of Insurance at 1-800-927-4357. Cancellation of this Agreement shall comply with California law. If You provide notice of cancellation to Us during the first sixty (60) days from the effective date for a new or thirty (30) days for a used Vehicle, You will be refunded 100% of the premium paid, if no claims have been filed. If a claim has been filed within the first sixty (60) days for a new or thirty (30) days for a used Vehicle, the refund will be pro-rated based on either elapsed time or mileage remaining. After the first sixty (60) days for a new or thirty (30) days for a used Vehicle, You will be refunded 100% of the unearned premium paid, less a fee of ten percent (10%) of the refund amount or $25.00, whichever is less. The unearned premium will be prorated according to the pro-rata method reflecting the greater days in force or the miles remaining. In the event of a claim arising in California, the proper venue for litigation shall be in California. Administrator reserves the right to void the Agreement or deny claims at any time due to fraud, misrepresentation or nonpayment. The name of the Obligor is amended to American Guardian Warranty Services Inc. dba A.G.W.S. Insurance Services.

**Connecticut:** All disputes must be resolved in accordance with the Regulations of Connecticut State Agencies §42-260. In the event of a dispute with the Administrator, You may contact the State of Connecticut Insurance Department, PO Box 816, Hartford, CT 06142-0816. Attn: Consumer Affairs. The written complaint must contain a description of the dispute, the purchase price or lease price of the product, the cost of the repair or replacement and a copy of the extended warranty contract. If the term of this Agreement is less than one (1) year, the Agreement term shall be automatically extended while any repairs covered under the Agreement are being done and the Vehicle is in the custody of the Authorized Repair Facility. If You return the Vehicle or the Vehicle is sold, lost, stolen, or destroyed, You may cancel this Agreement, subject to the cancellation provisions of this Agreement.

**Georgia:** Any claim or dispute will be adjudicated in Your county of residence. Pre-existing conditions known to You at the time of Your purchase of the Agreement is excluded from coverage. Also, repairs when the covered Vehicle's odometer has been altered or tampered with while owned by You are excluded from coverage. Modifications to the Vehicle made by You results in rejection of coverage under this Agreement. Damage due to sludge may not be excluded from coverage. A cancellation will comply with Georgia Code Chapter 33-24-44. If You cancel this Agreement after thirty days, the cancellation/administrative fee will be $50 or 10% of the pro-rata refund amount, whichever is less. The Obligor/Administrator may only cancel the Agreement for fraud, material misrepresentation or nonpayment. There is a thirty (30) day written notice of cancellation for reasons other than non-payment regardless of when the Agreement was cancelled. We will return the unearned premium to You within ten (10) working days after cancellation. A ten (10) day written notice of cancellation will be given if canceled for non-payment. The finance company/Lienholder must hold a power of attorney in order to cancel the service for nonpayment.

**Hawaii:** Cancellation: A ten percent (10%) penalty per month shall be added to a refund that is not paid or credited within forty-five (45) days after the receipt of the service contract to the provider.

**Idaho:** Coverage afforded under this Contract is not guaranteed by the Idaho Insurance Guarantee Association.

**Illinois:** If You provide a written notice of cancellation to the Selling Dealer after the first thirty (30) days after the Agreement purchase date, or if We or the Lienholder cancel this Agreement at any time, You will be entitled to a pro-rated refund of the Agreement price based on the greater of the number of days the Agreement was in force or the miles driven compared to the total time or mileage specified in the Agreement, less a cancellation fee equal to the lesser of $50.00 or ten percent (10%) of the amount of the pro-rated refund, and the amount of claims paid under this Agreement. Wear and Tear: a gradual reduction in operating performance due to normal wear and use IS included in this Agreement.

**Indiana:** THIS SERVICE CONTRACT IS NOT INSURANCE AND IS NOT SUBJECT TO INDIANA INSURANCE LAW.

**Iowa:** If You have problems or questions about this Agreement, You may contact the Commissioner of Insurance of the State of Iowa or the Iowa Securities Bureau at (515) 281-4441, Two Ruan Center, 601 Locust Street, 4th Floor, Des Moines, Iowa 50309-3738. Cancellation: A ten percent (10%) penalty will be added each month to the cancellation refund not paid to You within thirty (30) days of the return of the Agreement to Us.

**Louisiana:** The Obligor/Provider is American Guardian Warranty Services of Florida, Inc., PO Box 768, Warrenville, IL 60555, (800) 579-2233. Cancellation: If this Agreement is cancelled within thirty (30) days of the sale date, We will refund the full amount of the cost of the Agreement. If the Agreement is cancelled after the first thirty (30) days the refund will be made on an amount of the Agreement charge according to the pro-rata method reflecting the days in force based on the term of the plan selected and the date coverage begins, less a $50.00 dollar administrative fee.

**Maine:** A monthly penalty equal to ten percent (10%) of the returned amount will be added to any refund that is not paid or credited to You within forty-five (45) days after Our receipt of a cancellation request from You. In the event of a cancellation by Us, We will provide You with notice mailed fifteen (15) days prior to cancellation that identifies both the basis for cancellation and the cancellation effective date.

**Maryland:** The repair of a malfunction or defect covered under this Agreement shall include the Cost of the tear down and diagnosing the malfunction or defect. A ten percent penalty (10%) per month shall be added to a refund that is not paid within forty five (45) days after the receipt of the service contract to Us.

**Mississippi:** Cancellation of a contract by Us shall become effective sixty (60) days after a cancellation notice is mailed to You unless a cancellation is for non-payment of a contract whereby the contract will be cancelled fifteen (15) days after the notice of cancellation is mailed to You.

**Nebraska:** The aggregate actual cash value is the purchase price of the Vehicle.

**New York:** A ten percent (10%) penalty per month shall be added to a refund not made within thirty (30) days of the receipt of the cancellation request.

**North Carolina:** The seller of this Coverage is required to inform You of any warranties available to You without this Agreement. No Agreements may be cancelled by the Seller or Administrator prior to the expiration of the term as stated in the Agreement without Your consent, except in the case of nonpayment of the Agreement price, a material misrepresentation related to this Agreement made by You or any other act by You constituting a breach of duty under this Agreement. You may cancel at any time and receive a pro rata refund less any claims paid on the Agreement and a reasonable administrative fee not to exceed ten percent (10%) of the pro-rata refund. The term of this Agreement for cancellation purposes will be based on the date You purchased Your Vehicle and the Vehicle mileage on the date purchased.

**Utah:** This service contract or warranty is subject to limited regulation by the Utah Insurance Department. To file a complaint, contact the Utah Insurance Department. Coverage afforded under this Agreement is not guaranteed by the Property and Casualty Guarantee Association. Arbitration in Utah is binding and shall be in compliance with the "Utah Uniform Arbitration Act" (78B-11-101). In Utah, arbitration does not have to take place within sixty (60) days of the filed loss. ANY MATTER IN DISPUTE BETWEEN YOU AND THE COMPANY MAY BE SUBJECT TO ARBITRATION AS AN ALTERNATIVE TO COURT ACTION PURSUANT TO THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION, A COPY OF WHICH IS AVAILABLE ON REQUEST FROM THE COMPANY. ANY DECISION REACHED BY ARBITRATION SHALL BE BINDING UPON BOTH YOU AND THE COMPANY. THE ARBITRATION AWARD MAY INCLUDE ATTORNEY'S FEES IF ALLOWED BY STATE LAW AND MAY BE ENTERED AS JUDGMENT IN ANY COURT OF PROPER JURISDICTION. Agreement Coverage: Failure to give any notice or file any proof of loss required by the policy within the time specified in the policy does not invalidate a claim made by the insured, if the insured shows that it was not reasonably possible to give the notice or file proof of loss within the prescribed time. The Cancellation provision is amended to abide by the Utah Code 31A-21-303. Cancellation of this Agreement at any time is

effective no sooner than thirty (30) days from the delivery or first-class mailing of a written notice to You. This Agreement cannot be voided for any reason and may only be cancelled with proper notice. You may purchase this Agreement through payment up front or through installment payments.

**Washington:** You may contact Virginia Surety Company at any time. The following provisions of Your Agreement are hereby amended with the following pursuant to the revised Code of Washington 48.110.075: Cancellation: You may cancel and return this Agreement and receive a refund of the full purchase price by returning it to the Administrator within nine (9) days or less, if no claim has been made. If after nine (9) days and no claim has been made, You may cancel and return this Agreement for full purchase price, less a cancellation charge of $25.00. If after thirty (30) days, and a claim has not been made, the refund will be determined on a pro-rata basis, which is the greater of usage reflecting the days in force or the miles driven from the start of the Agreement term to the expiration terms, less a cancellation charge of up to twenty five dollars ($25.00). If You cancel and return this Agreement, the Agreement is void from the beginning and the parties are in the same position as if no Agreement had been issued. Any claim paid or incurred may be deducted from the amount of the cancellation refund. A ten percent (10%) penalty shall be added to any refund that is not paid within thirty (30) days of return of the Agreement to the provider. Cancellation by Us: We will not deny a claim based upon Your failure to properly maintain the Vehicle, UNLESS the failure to maintain the Vehicle involved the failed part or parts. Arbitration: Any decision reached by Arbitration shall be binding upon both You and AGWS. If this Agreement is found to be subject to Arbitration the proceeding will take place in the state of Washington near Your residence. If this Agreement is found to be not subject to arbitration, any legal proceeding with respect to any dispute will be tried in the State of Washington. Both Parties hereby waive the right to a jury trial in any such proceeding. The implied warranty of merchantability on the motor Vehicle is not waived if the Agreement has been purchased within ninety (90) days of the purchase date of the motor Vehicle from a provider who also sold the motor Vehicle covered by this Agreement.  (You must Initial here). By Initialing, You acknowledge the review and understanding of the above disclosures and the contract including, coverage, maintenance requirements, duty to protect against further damage, claim procedures, covered parts and labor, time/mileage limitations, exclusions, and cancellation provisions. Service of Suit: The commissioner is the attorney to receive service of legal process in action, suit or proceeding in court.

**Wisconsin:** THIS CONTRACT IS SUBJECT TO LIMITED REGULATION BY THE OFFICE OF THE COMMISSIONER OF INSURANCE. The Agreement Administrator and Obligor is American Guardian Warranty Services of Wisconsin, Inc., P.O. Box 768, Warrenville, Illinois 60555; (800) 579-2233. Cancellation: If We do not pay or credit a refund within 45 days after the return of a service contract to the provider, We shall pay a ten percent (10%) per month penalty of the refund amount outstanding which will be added to the amount of the refund. If We cancel this Agreement, notice, inclusive of an effective date outlining the specific nature or reason for cancellation will be mailed to You at the last known address for You at least five (5) days prior to the cancellation date. We may charge an administrative fee for cancellation equal to ten (10%) percent of the provider fee. Our rights of ownership to salvaged parts shall become effective only after You have been fully compensated for damages or repairs under this Agreement. Our rights to subrogation under this Agreement are not valid until You have been made whole and fully compensated for damages. Note: In Wisconsin, the arbitration provision is amended to provide for non-binding arbitration upon the agreement of both parties.

Exhibit 16

AGWS Service Agreement – Truck #003

**Vehicle Service Agreement**
**Information Page**

**compass**
**HEAVY DUTY TRUCK & BUS**
**PROTECTION**

Agreement No.

HDTRA80460462

## I. Customer Information

| | |
|---|---|
| Trade Winds Transport LLC | Eric Grace |
| Last Name/Company Name | First Name |
| 505 El Redundo Ave #A | |
| Address | |
| Redondo Beach | CA | 90277 |
| City | State | Zip |
| (310) 809-4661 | egrace5577@gmail.com | |
| Phone | E-mail | |

## II. Dealer Information

Rush Truck Center - Jacksonville
Name
5175 West Beaver Street
Address
Jacksonville,  FL  32254
City  State  Zip
(888) 783-6170   mulhollandr@rushenterprises.com
Phone  E-mail

## III. Lienholder Information

Name

Address

City  State  Zip

## IV. Vehicle and Coverage Information

| 2012 | INTERNATIONAL | PROSTAR LF627 PREMIUM | 3HSDJSJR7CN624243 | | 347,475 |
|---|---|---|---|---|---|
| Year | Make | Model | Vehicle Identification Number (VIN) | Current ECM Reading | Current Odometer Reading |
| | $22,813.00 | | 01/25/2017 | | $7,137.00 |
| Vehicle Purchase Date | Vehicle Purchase Price | | Agreement Purchase Date | | Agreement Purchase Price |
| 8 | | | | | ☑ Diesel ☐ Gas |
| Vehicle Class (2-8) | Engine Size in Liters | | Engine Type | | |

**Refrigeration Unit:**

| | | |
|---|---|---|
| Model No. | Model Year | Serial No. |

**Navigator Coverage:**

☐ Engine Coverage
☑ Engine/Transmission Coverage
☐ Engine/Transmission/Drive Axle Coverage

**Optional Coverage:** (must be selected at the time of purchase to apply)

☐ Option A - EGR/DPF
☑ Option B - (Aftertreatment Assemblies)
  ☐ Proxor MX Equipped  ☑ Maxxforce Equipped

☐ Refrigeration Unit Coverage
  (Current Unit Hours: _____ )
☐ XLT Package

**Agreement Term:**

Months 36      Miles 500,000

☐ Service Drive Sale/Non-Point of Sale Delivery
  (Inspection and waiting period of 30 days and 1,500 miles required)

Coverage Start Date:
01/25/2017

Coverage Starting Mileage:
347,475

Agreement Administrator/
Provider/Obligor: American
Guardian Warranty Services, Inc.
PO Box 768
Warrenville, Illinois 60555
800.579.2233

Lockdown Obligor/Administrator:
American Guardian Warranty Services of Florida, Inc.
PO Box 760, Warrenville, IL 60555
800.579.2233

Wisconsin Administrator & Obligor:
American Guardian Warranty
Services of Wisconsin, Inc.
PO Box 768
Warrenville, Illinois 60555
800.579.2233

## V. Customer Acknowledgment

The Agreement that You are purchasing is between You and the Agreement Obligor. You will be notified by the Selling Dealer and/or the Administrator if the Agreement is ineligible for coverage. You (the undersigned) have reviewed the terms of this Agreement and understand the coverage, exclusions and maintenance requirements. This Agreement is based on information You provided on this Information Page. AUTHORIZATION IS REQUIRED FROM THE ADMINISTRATOR PRIOR TO THE REPAIR OF COVERED COMPONENTS.

_signature_          01/25/2017

Purchaser [Name]          Purchaser Date          Selling Dealer Representative Signature

If no coverage level is selected, then only engine coverage will apply. If no term months and mileage have been indicated in Agreement term, then coverage will be in effect for 12 months/25,000 miles, whichever occurs first. A Deductible of $100 per repair visit will apply. Any modification, alteration or change to the printed terms, conditions or coverages of this Agreement renders the Agreement invalid.

**AUTHORIZATION IS REQUIRED FROM THE ADMINISTRATOR PRIOR TO THE REPAIR OF COVERED COMPONENTS**

**CLAIMS: 800.579.2233 | ROADSIDE ASSISTANCE: 888.491.3370**
**TO START A CLAIM ONLINE GO TO WWW.AGWSINC.COM**

AG HDT (06.16) VSC XLT RT EMAT          Page 1 of 6          CUSTOMER MUST RECEIVE



PLAINTIFF'S
EXHIBIT
16

## TERMS AND CONDITIONS

In the event of a **Breakdown** of a covered part listed below, **We** agree to pay for the **Cost** of necessary parts and labor to repair or replace a covered part listed below for each component (including replacement of all lost fluids), less applicable **Deductible**, subject to the terms, conditions and limitations herein. A covered part has failed when it can no longer perform the function for which it was designed and not because of the action, inaction or failure of any non-covered parts.

**ENGINE ONLY COVERAGE** (Includes those items listed in Components 1-2)

**1. ENGINE:** The following stated components are covered. The internal lubricated parts within the engine including pistons, piston rings, wrist pins, crankshaft, rod and main bearings, camshaft and cam bearings, cam followers. Timing chain and timing gears, timing chain tensioners. Intake and exhaust valves, valve guides, valve springs and valve retainers. Rocker arms, pushrods, lifters. Turbocharger rotor/turbine and housing. Water pump. Fuel Injectors. Progressive Damage: the Engine Block, Cylinder Head(s) and Cylinder Liners are covered if damaged in conjunction with a covered mechanical failure.

**2. TAXES AND FLUIDS:** Associated state and local taxes where applicable and required fluids to complete covered repairs.

**ENGINE AND TRANSMISSION COVERAGE** (Includes those items listed in Components 1-3)

**3. TRANSMISSION:** The following stated components are covered. All internal lubricated parts of the manual or automatic transmissions, including: torque converter, oil pump, valve body, governor, bands, drums, planetaries, sun gear, sprag(s), shaft(s), bearings and related bushings, shift rail, forks and synchronizers. Progressive Damage: the transmission case is covered if damaged in conjunction with a covered mechanical failure.

**ENGINE, TRANSMISSION AND DRIVE AXLE COVERAGE** (Includes those items listed in Components 1-4)

**4. DRIVE AXLE:** The following stated components are covered. All internal lubricated parts including: output shaft, bearings, bushings, gear sets, axle and bearings, carrier, ring and pinion gears, bearings, bushings, axle shaft. Progressive Damage: the drive axle housing is covered if damaged in conjunction with a covered mechanical failure.

**OPTIONAL COVERAGE** The following surcharged coverage is available when identified on the **Information Page** and a surcharge has been paid.

**OPTION A – DPF/EGR:** Failure of the diesel particulate filter (DPF) or the EGR Valve Coverage is limited to the first 24 months or 240,000 miles, or term months/mileage selected, whichever is less. No progressive damage outside of DPF/EGR coverage. **Coverage under this option is limited to one failure per DPF and two failures of the EGR Valve.**

**OPTION B—Aftertreatment Assemblies (includes the following named components):** DPF (filter only), EGR Valve(s) (valve component only), EGR Cooler, DOC Doser Injector, SCR, DPF Doser Injector, DPF Dosing Module, DEF Dosing Injection Nozzle, DEF Tank, Diesel Oxidation Catalyst (DOC), Lambda Sensor (O2 Sensor), NOx Sensor, Aftertreatment Control Module (Aftertreatment ECM), DEF Dosing Module. No progressive damage from Aftertreatment to any other component except within Aftertreatment Assemblies. Coverage is limited to one failure per listed component. Coverage is limited to the first 24 months or 240,000 miles, or term months/mileage selected, whichever is less. Proof of maintenance service being done as per OEM schedule must be documented.

**XLT PACKAGE—**The following stated components are covered. Fan clutch, charged air cooler, air compressor, alternator, starter and solenoid, fuel tank(s), engine oil pan, engine vibration damper, radio (AM/FM/CD) main cabin primary HVAC (excluding sleeper): a/c compressor and clutch, blower motor, temperature control head, heater core.

**REFRIGERATION UNIT COVERAGE—** Thermo King and Carrier units only: Engine Components: Internally lubricated hard parts limited to pistons, piston rings, piston oil cooling jets, wrist pins, connecting rods, connecting rod bearings, crankshaft, main bearings, thrust washers, camshaft and cam bearings, cam followers, rocker arm shafts, rocker arms, push rods, hydraulic lifters, intake and exhaust valves and guides, valve springs, constant velocity valve, oil pump housing, oil pump gears, oil pump pick up screen, oil pump pick up tube, oil pump pressure relief springs and valves, valve retainers, valve keepers (locks), timing chain and gears, timing chain tensioners, timing gear cover, valve cover, oil pan, injectors and water pump. Compressor: Limited to reciprocal compressor internal components and scroll compressor internal components. Any damage resulting from a seal leak or a blown head gasket is not covered.

### Additional Benefits

**ROADSIDE ASSISTANCE:** You are entitled to one (1) Roadside Assistance service per 72-hour period. To receive these benefits You must call 888-491-3370 and provide Your **Agreement** number. The following benefits are available: (1) **Battery Service:** if a battery failure occurs, a jump start will be applied to start the covered Vehicle; (2) **Vehicle Fluid Delivery:** an emergency supply of coolant, oil or fuel will be delivered for Your covered Vehicle if you have an immediate need. You must pay the Cost of the actual fluid or fuel when delivered. (3) **Lock-Out Assistance:** if Your keys are locked inside the Vehicle, assistance will be provided to gain entry to the Vehicle. Roadside Assistance is available ONLY during the Agreement term and services obtained through any source other than the toll-free number will not be covered. **The limit of liability for any single benefit is one hundred dollars ($100.00).**

**TRIP INTERRUPTION OR RENTAL ASSISTANCE:** When a covered Breakdown disables Your Vehicle and the repairs are completed more than one hundred (100) miles from Your residence, We will reimburse You for lodging and meal expenses or substitute rental vehicle expenses incurred by You between the date of the Breakdown and the date on which covered repairs are completed. You will be reimbursed for actual lodging expenses or substitute rental vehicle expenses up to one hundred twenty five dollars ($125.00) per day for up to two (2) days, not to exceed two hundred fifty dollars ($250.00) per occurrence. Legible and verifiable receipts are required for reimbursement.

**TOWING ASSISTANCE:** If towing assistance becomes necessary due to the Breakdown of a covered component, towing costs not payable by insurance will be covered for up to three hundred seventy five dollars ($375.00) per occurrence. A paid in full, signed towing bill is required for reimbursement.

### WHAT TO DO IF REPAIRS ARE NEEDED

If Your Vehicle is unsafe and needs to be towed, contact a tow company to arrange towing service. Otherwise, deliver Your Vehicle to a repair facility and authorize them to diagnose the failure. Provide the repairer with Your Agreement number and direct them to call the Administrator for Repair Authorization at 1-800-579-2233. **Emergency Repair—**if a covered component has a Breakdown at any time outside of the Claims Department regular business hours, You may take one of the following steps: (1) Wait until regular business hours and then follow the normal claims procedure outlined above; or (2) Authorize and pay for any teardown or diagnostic time needed to determine whether Your Vehicle has a covered Breakdown. If You reasonably determine that You have a covered Breakdown and You choose to have Your Vehicle repaired, You are responsible for paying the repair. You must then call the Administrator during the next available regular business day so that the Administrator may determine whether there was a covered Breakdown. If the Administrator determines that there was a covered Breakdown and You meet the requirements outlined herein, then We will pay You in accordance with the terms and conditions of this Agreement.

*You must obtain a Repair Authorization Number from Our Claims Department to assure coverage under this Agreement.*

*Call Toll Free at 1-800-579-2233 for Instructions and Repair Authorization.*

### No Payment for a Claim will be made without Authorization.

This Agreement is subject to the following terms and conditions. **No alterations, changes or waivers of provisions may be made to this Agreement.** The benefits payable under this Agreement are strictly provided to You for repairs to the Covered Vehicle.

**Definitions:** When used, key terms will appear in bold print and have special meaning as follows:

**Actual Cash Value (ACV)** – means the actual cash value of Your Vehicle at the time of repair according to the most recently published NADA Guide for Trade-in-Value.

**Administrator, Obligor, Our, Us and We** – means American Guardian Warranty Services, Inc. ("AGWS"), except in the state of Louisiana where it means American Guardian Warranty Services of Florida, Inc. and in the state of Wisconsin where it means American Guardian Warranty Services of Wisconsin, Inc. Our mailing address is P.O. Box 768, Warrenville, IL 60555; and Our toll-free telephone number is 1-800-579-2233.

**Agreement** – means the service Agreement that is a contract between You and Us.

AG HDT (06.16) VSC XLT RT EMAT                 Page 2 of 6                 CUSTOMER MUST RECEIVE PAGES 1 - 6

Breakdown or Mechanical Failure – means the failure of an original or replacement part, covered by this Agreement, to perform its function as it was originally designed to work in normal service with required maintenance due to material failure, wear and tear or defects in workmanship and outside the manufacturer's tolerance.

Cost(s) – means the usual and fair charges for parts and labor necessary to repair covered parts. **Replacement of any covered part may be made with new, remanufactured, rebuilt or like kind and quality at the time of Breakdown at the discretion of the Administrator. Parts will be reimbursed up to the manufacturer's suggested list price. Labor time will be reimbursed using nationally recognized labor time standards. Labor rate will be determined based on repairing facility's geographic region.**

Deductible – means the amount that You must pay for covered repairs per occurrence as identified on the Information Page.

Information Page – means Page 1 of this Agreement.

Lienholder/Lender – means a financial institution identified on the Information Page and providing financing for the purchase of this Agreement.

Selling Dealer – means the retail seller of this Agreement to You for the Vehicle described on the Information Page.

Vehicle or Covered Vehicle – means the Vehicle described on the Information Page.

You and Your – means the purchaser identified on the Information Page.

### Insurance Statement:

Our obligations are guaranteed by an insurance policy issued by Virginia Surety Company, Inc. In the event that We cease to operate, are bankrupt, or fail to pay an authorized claim within sixty (60) days after proof of loss is filed, You may file a claim directly with Virginia Surety Company, Inc., 175 West Jackson Blvd., Chicago, IL 60604 (800) 209-6206.

### Your Responsibilities:

1. You must follow the manufacturer's recommended maintenance schedule for any and all required services, including keeping receipts for services performed. The required receipts include date, mileage, service performed and service provider. These records may be requested by the Administrator for the investigation of a claim or transfer. IT IS RECOMMENDED THAT YOU KEEP MAINTENANCE RECORDS WITH THE VEHICLE. In the event that You perform Your own maintenance, You must provide copies of receipts for materials purchased and a service log showing date, mileage and services.
2. Use all reasonable means to protect Your Vehicle from further damage when a Breakdown occurs.
3. You must authorize necessary labor time for the repairer to diagnose a Breakdown.
4. Direct the repair facility to call Administrator at 1-800-579-2233 to report a claim. You must obtain Repair Authorization from the Administrator prior to repairing any covered component.
5. In the event You need to receive reimbursement for Your authorized claim, You must submit the following within ninety (90) days of approval: A) the original Repair Order signed by You; B) proof of payment with a cash register receipt/credit card receipt/personal check copy; C) where applicable, copies of original towing or rental bill with proof of payment.

### Our Responsibilities:

Subject to the Coverage Level and Deductible selected on the Information Page of this Agreement, the Limits of Liability and items found under ExcLusioNs–WHAT is NoT CoVERED, the Administrator will pay for the Cost of necessary repairs. The Administrator reserves the right to inspect Your Vehicle to evaluate covered repairs.

### Exclusions–What is Not Covered:

Where permitted by state requirements the following are not covered (See State Requirements):

1. **PRE-EXISTING CONDITIONS.**
2. Failures that occur during the waiting period identified on the Information Page.
3. Cooler lines and related componentry.
4. Damage to a covered component caused by the failure of a component not listed as covered under this Agreement.
5. Repairs that are covered under the original manufacturer's warranty regardless of whether or not that warranty was transferred to You or the manufacturer refuses to honor its obligations. Any cost, repair, replacement or benefit for which the manufacturer has announced its responsibility through any means including recalls, service bulletins or campaign(s) by manufacturer.
6. Repairs beyond those required to correct a Breakdown.
7. ANY COVERED REPAIR NOT AUTHORIZED IN ADVANCE BY THE ADMINISTRATOR.
8. Damage caused by continued operation of an impaired Vehicle.
9. Seals, gaskets, and fasteners unless required in conjunction with a covered mechanical Breakdown. Any component part of the engine block assembly not specifically listed as covered under item 1. ENGINE. Stuck or failed variable vanes (VGT) turbocharger mechanism. Any component parts of the transmission assembly not listed as covered under item 3. TRANSMISSION, including electronic controls, levers, linkage, rubber mounts, transmission cooler, external hoses, pipes, tubes and hard lines. Any component parts of the drive axle assembly not listed as covered under item 4. DRIVE AXLE: including wheel bearings.
10. Damage caused by towing the Vehicle in a manner not consistent with the manufacturer's recommendations.
11. Damage caused by overloading the Vehicle beyond the manufacturer's recommended capacity.
12. A Breakdown caused by or involving modifications, alterations or additions to the Vehicle unless those modifications, alterations or additions were performed by or recommended by the original Vehicle Manufacturer.
13. Towing another vehicle unless Your Vehicle was equipped by the manufacturer for that purpose.
14. Repairs required because of technician negligence, overheating, detonation, sludge or carbon deposits, contamination, rust, corrosion, cavitation, electrolysis, operation without the proper lubrication levels or fluid type, and the failure to perform the manufacturer's recommended maintenance. All gasket or seal failures, cracked heads or block, overheating or other engine failure due to lack of fluids or improper maintenance.
15. Repairs made outside of the United States and Canada.
16. Repairs required because of fraud, collision, abuse, negligence, neglect, misuse, abuse, road hazard, racing, off-road use, vandalism, riot, theft, flood, fire, war, acts of God, or loss that is normally covered by Casualty insurance.
17. The cost of teardown, disassembly or assembly when a Breakdown is not covered by this Agreement.
18. Repairs that are covered under a repairer's guarantee, service agreement or other warranty.
19. Incidental or consequential damage, loss of profits, property damage, personal injury, inconvenience, loss of Vehicle use, commercial loss, punitive or exemplary damages, attorney fees, loss of earnings, personal damage or per diem expenses.

This Agreement provides no benefit or coverage and We have no obligation if:

1. The Vehicle odometer fails to register, record actual mileage or true mileage cannot be determined for any reason, including ECM failure, while owned by You.
2. You rent Your Vehicle to someone else.
3. Your Vehicle is used for postal service, taxi, livery, police or other emergency services, snow plowing, competition or speed events.

4.  Your Vehicle is modified from the Vehicle manufacturer's original specifications regardless of who made the modifications or when the modifications were made.

5.  Your Vehicle is identified as a Gray Market Vehicle, Total Loss, Flood Damaged, Salvaged, Rebuilt or a Glider Reconstruction.

nit of Liability:  In no event shall the Aggregate Limit of liability exceed the amount identified by Vehicle Class below or the Actual Cash Value (ACV) of the vehicle at the time of repair, whichever is less.

| | Vehicle Class 3-4 | Vehicle Class 5-6-7 | Vehicle Class 8 |
|---|---|---|---|
| Engine/Water Pump: | $9,500 | $15,000 | $20,000 |
| Transmission: | $4,000 | $6,000 | $7,500 |
| Drive Axle: | $4,000 | $6,000 | $7,500 |
| Option  B (if selected): | $7,500 | $7,500 | $7,500 |
| XLT Package: | $1,000 per component | $1,000 per component | $1,000 per component |
| AGGREGATE LIMIT: | $13,000/ACV | $20,000/ACV | $30,000/ACV |

**Subrogation:**
If You receive benefits under this Agreement, We will be entitled to Your rights to recover against any manufacturer, insurance company or service Agreement provider who may be responsible to You for Costs covered under this Agreement or any payments made by Us.  In all states except California, if We ask, You agree to cooperate with Us in any matter concerning this Agreement or, to enforce Our rights.

**Agreement Period:**
The time and mileage limit of the Term Selected starts on the Agreement Purchase Date and Current Odometer Reading shown on the Information Page.  If the Service Drive Sale/Non- Point of Sale Delivery box is checked, coverage begins 30 days and 1,500 miles from the Agreement Purchase Date and Current Odometer Reading shown on the Information Page.  The additional 30 days and 1,500 miles will be added on to the end of the contract term and odometer mileage.

**Arbitration:**  You agree that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE, BUT THEY CHOOSE TO HAVE ANY DISPUTES DECIDED THROUGH ARBITRATION.  Rules and forms of the American Arbitration Association may be obtained and all claims shall be filed at any office of the American Arbitration Association or at Corporate Headquarters, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043. Telephone: (877) 495-4185; Website:  www.adr.org.  This Arbitration provision is deleted in its entirety in California, Georgia, Mississippi, Nebraska, and Oregon.

**Cancellation:**
In the event the covered Vehicle is repossessed, declared a total loss, or, You give notice of cancellation, the Agreement shall terminate.  You may cancel this Agreement.  request a cancellation, submit written notification immediately to the Selling Dealer or Administrator including the following: 1) the Agreement Number; 2) Vehicle ntification Number; 3) a signed notarized statement certifying the current Vehicle odometer reading. If this Agreement is cancelled within thirty (30) days of the Agreement purchase date and no claim has been made, We will refund the full Agreement purchase price.  If the Agreement is cancelled after the first thirty (30) days or a claim has been filed, the refund will be made on an amount of the Agreement purchase price calculated according to the pro-rata method reflecting the greater days in force or the miles driven based on the term of the plan selected and the date coverage begins, less a fifty dollar ($50.00) administrative fee; $25.00 or 10% of the refund, whichever is less, in California; $50.00 or 10% of the refund, whichever is less, in Georgia; $50.00 or 10% of the refund, whichever is less, in Illinois; $50.00 or 10% of the pro rata refund, whichever is less, in North Carolina; $25.00 in Washington; and $50 or 10% of the provider fee, whichever is less, in Wisconsin).  In the event of a cancellation, the Lienholder, if any, will be named on the refund check. In the event of a cancellation upon repossession, the Lienholder will be the sole payee.  Where permitted, any claim incurred or paid will be deducted from the amount of the cancellation refund.  State guidelines and regulations where the Agreement was sold take precedent over these terms.  (Georgia does not allow for a claim incurred or paid to be deducted from the amount to be returned.)

**Cancellation By Us:**  We may cancel this Agreement: 1) If there has been a material misrepresentation or fraud at the time of sale of this Agreement or when filing a claim under this Agreement; 2) If the odometer or ECM has been tampered with or disabled and You have failed to repair the odometer or ECM; 3) If You do not pay the Agreement price.  If We cancel this Agreement for any reason other than non-payment, We will mail You written notice at least thirty (30) days prior to cancellation. A pro-rata refund reflecting the greater days in force or miles driven based on the term of the plan selected and the date coverage begins will be made to You.  All refunds will be paid to the Lienholder, if any, otherwise to You.  If this Agreement is financed and Your Vehicle is a total loss or is repossessed, You authorize Your Lienholder to cancel this Agreement and receive the refund.

**Transfer of Agreement:**
In the event that You sell the covered Vehicle, this Agreement shall terminate.  You may apply for a transfer to the new owner.  Where applicable, the manufacturer's warranty including extended powertrain warranty must transfer to the new owner to obtain coverage under the Transfer provisions of this Agreement.  Within thirty (30) days from the date of sale to a private party and not a dealer or entity in the business of selling, trading or leasing vehicles, submit the following:  1) A check for a $100.00 transfer fee payable to Administrator - AGWS, 2) A copy of the Information Page of this Agreement, 3) A signed affidavit stating the date of sale, the mileage at sale and the new owners name, address and telephone number, and 4) Copies of Your maintenance documents for the covered Vehicle.  Proof of continuation of regular maintenance will be necessary in the event of a claim.  The Administrator reserves the right to reject a transfer request in the event that the above requirements are not met.  This Agreement may not be assigned separately from the covered Vehicle, nor can it be assigned to a new or used car dealership or anyone other than an individual person that purchased Your Vehicle.  This Agreement may only be transferred once.

**Payment Plan Agreements:**
If this Agreement is purchased on a payment plan, failure to make timely payments will result in cancellation with no refund due unless state law mandates otherwise.  Should a claim arise before this Agreement is paid in full, the balance owed will be deducted from the claim payment unless state law mandates otherwise.

**NOTICE TO CONSUMERS:**

*   The benefits provided may duplicate express manufacturer or seller's warranties that come automatically with every sale.  You may be required by the Seller of this coverage to pursue those warranties, which are available to You without this Agreement.
    The purchase of this Agreement is not required to purchase or obtain financing for the Vehicle.
*   The terms of this written Agreement control the Agreement between us.  No change or modification to the written terms is valid.
*   This Agreement is based on information You provided on the Information Page.  Misrepresentation on the Information Page will result in rejection of this Agreement.
*   This is a service contract not an insurance policy.

**STATE REQUIREMENTS**

If this Agreement was purchased in any of the following states, the Agreement is amended as indicated after each state. The Administrator of this Agreement makes diligent effort to include all state notices as they become effective, but in cases where a state's notice is not present on this printing of the Agreement, state law will take precedence over the terms and conditions of this Agreement.

**California:** American Guardian Warranty Services, Inc.'s California License number is 0C73808. Performance to You under this contract is guaranteed by a California approved insurance company. You may file a claim with this insurance company if any promise made in the contract has been denied or has not been honored within sixty (60) days after Your request. The name and address of the insurance company is Virginia Surety Company, Inc., 175 West Jackson Blvd., Chicago, IL 60604 (800) 209-6206. If You are not satisfied with the insurance company's response, You may contact the California Department of Insurance at 1-800-927-4357. Cancellation of this Agreement shall comply with California law. If You provide notice of cancellation to Us during the first sixty (60) days from the effective date for a new or thirty (30) days for a used Vehicle, You will be refunded 100% of the premium paid, if no claims have been filed. If a claim has been filed within the first sixty (60) days for a new or thirty (30) days for a used Vehicle, the refund will be pro-rated based on either elapsed time or mileage remaining. After the first sixty (60) days for a new or thirty (30) days for a used Vehicle, You will be refunded 100% of the unearned premium paid, less a fee of ten percent (10%) of the refund amount or $25.00, whichever is less. The unearned premium will be prorated according to the pro-rata method reflecting the greater days in force or the miles remaining. In the event of a claim arising in California, the proper venue for litigation shall be in California. Administrator reserves the right to void the Agreement or deny claims at any time due to fraud, misrepresentation or nonpayment. The name of the Obligor is amended to American Guardian Warranty Services Inc. dba A.G.W.S. Insurance Services.

**Connecticut:** All disputes must be resolved in accordance with the Regulations of Connecticut State Agencies §42-260. In the event of a dispute with the Administrator, You may contact the State of Connecticut Insurance Department, PO Box 816, Hartford, CT 06142-0816. Attn: Consumer Affairs. The written complaint must contain a description of the dispute, the purchase price or lease price of the product, the cost of the repair or replacement and a copy of the extended warranty contract. If the term of this Agreement is less than one (1) year, the Agreement term shall be automatically extended while any repairs covered under the Agreement are being done and the Vehicle is in the custody of the Authorized Repair Facility. If You return the Vehicle or the Vehicle is sold, lost, stolen, or destroyed, You may cancel this Agreement, subject to the cancellation provisions of this Agreement.

**Georgia:** Any claim or dispute will be adjudicated in Your county of residence. Pre-existing conditions known to You at the time of Your purchase of the Agreement is excluded from coverage. Also, repairs when the covered Vehicle's odometer has been altered or tampered with while owned by You are excluded from coverage. Modifications to the Vehicle made by You results in rejection of coverage under this Agreement. Damage due to sludge may not be excluded from coverage. A cancellation will comply with Georgia Code Chapter 33-24-44. If You cancel this Agreement after thirty days, the cancellation/administrative fee will be $50 or 10% of the pro-rata refund amount, whichever is less. The Obligor/Administrator may only cancel the Agreement for fraud, material misrepresentation or nonpayment. There is a thirty (30) day written notice of cancellation for reasons other than non-payment regardless of when the Agreement was cancelled. We will return the unearned premium to You within ten (10) working days after cancellation. A ten (10) day written notice of cancellation will be given if canceled for non-payment. The finance company/Lienholder must hold a power of attorney in order to cancel the service for nonpayment.

**Hawaii:** Cancellation: A ten percent (10%) penalty per month shall be added to a refund that is not paid or credited within forty-five (45) days after the receipt of the service contract to the provider.

**Idaho:** Coverage afforded under this Contract is not guaranteed by the Idaho Insurance Guarantee Association.

**Illinois:** If You provide a written notice of cancellation to the Selling Dealer after the first thirty (30) days after the Agreement purchase date, or if We or the Lienholder cancel this Agreement at any time, You will be entitled to a pro-rated refund of the Agreement price based on the greater of the number of days the Agreement was in force or the miles driven compared to the total time or mileage specified in the Agreement, less a cancellation fee equal to the lesser of $50.00 or ten percent (10%) of the amount of the pro-rated refund, and the amount of claims paid under this Agreement. Wear and Tear: a gradual reduction in operating performance due to normal wear and use IS included in this Agreement.

**Indiana:** THIS SERVICE CONTRACT IS NOT INSURANCE AND IS NOT SUBJECT TO INDIANA INSURANCE LAW.

**Iowa:** If You have problems or questions about this Agreement, You may contact the Commissioner of Insurance of the State of Iowa or the Iowa Securities Bureau at (515) 281-4441, Two Ruan Center, 601 Locust Street, 4th Floor, Des Moines, Iowa 50309-3738. Cancellation: A ten percent (10%) penalty will be added each month to the cancellation refund not paid to You within thirty (30) days of the return of the Agreement to Us.

**Louisiana:** The Obligor/Provider is American Guardian Warranty Services of Florida, Inc., PO Box 768, Warrenville, IL 60555, (800) 579-2233. Cancellation: If this Agreement is canceled within thirty (30) days of the sale date, We will refund the full amount of the cost of the Agreement. If the Agreement is canceled after the first thirty (30) days the refund will be made on an amount of the Agreement charge according to the pro-rata method reflecting the days in force based on the term of the plan selected and the date coverage begins, less a $50.00 dollar administrative fee.

**Maine:** A monthly penalty equal to ten percent (10%) of the returned amount will be added to any refund that is not paid or credited to You within forty-five (45) days after Our receipt of a cancellation request from You. In the event of a cancellation by Us, We will provide You with notice mailed fifteen (15) days prior to cancellation that identifies both the basis for cancellation and the cancellation effective date.

**Maryland:** The repair of a malfunction or defect covered under this Agreement shall include the Cost of the tear down and diagnosing the malfunction or defect. A ten percent penalty (10%) per month shall be added to a refund that is not paid within forty five (45) days after the receipt of the service contract to Us.

**Mississippi:** Cancellation of a contract by Us shall become effective sixty (60) days after a cancellation notice is mailed to You unless a cancellation is for non-payment of a contract whereby the contract will be cancelled fifteen (15) days after the notice of cancellation is mailed to You.

**Nebraska:** The aggregate actual cash value is the purchase price of the Vehicle.

**New York:** A ten percent (10%) penalty per month shall be added to a refund not made within thirty (30) days of the receipt of the cancellation request.

**North Carolina:** The seller of this Coverage is required to inform You of any warranties available to You without this Agreement. No Agreements may be canceled by the Seller or Administrator prior to the expiration of the term as stated in the Agreement without Your consent, except in the case of nonpayment of the Agreement price, a material misrepresentation related to this Agreement made by You or any other act by You constituting a breach of duty under this Agreement. You may cancel at any time and receive a pro rata refund less any claims paid on the Agreement and a reasonable administrative fee not to exceed ten percent (10%) of the pro-rata refund. The term of this Agreement for cancellation purposes will be based on the date You purchased Your Vehicle and the Vehicle mileage on the date purchased.

**Utah:** This service contract or warranty is subject to limited regulation by the Utah Insurance Department. To file a complaint, contact the Utah Insurance Department. Coverage afforded under this Agreement is not guaranteed by the Property and Casualty Guarantee Association. Arbitration in Utah is binding and shall be in compliance ...in the "Utah Uniform Arbitration Act" (78B-11-101). In Utah, arbitration does not have to take place within sixty (60) days of the filed loss. ANY MATTER IN DISPUTE BETWEEN YOU AND THE COMPANY MAY BE SUBJECT TO ARBITRATION AS AN ALTERNATIVE TO COURT ACTION PURSUANT TO THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION, A COPY OF WHICH IS AVAILABLE ON REQUEST FROM THE COMPANY. ANY DECISION REACHED BY ARBITRATION SHALL BE BINDING UPON BOTH YOU AND THE COMPANY. THE ARBITRATION AWARD MAY INCLUDE ATTORNEY'S FEES IF ALLOWED BY STATE LAW AND MAY BE ENTERED AS JUDGMENT IN ANY COURT OF PROPER JURISDICTION. Agreement Coverage: Failure to give any notice or file any proof of loss required by the policy within the time specified in the policy does not invalidate a claim made by the insured, if the insured shows that it was not reasonably possible to give the notice or file proof of loss within the prescribed time. The Cancellation provision is amended to abide by the Utah Code 31A-21-303. Cancellation of this Agreement at any time is

effective no sooner than thirty (30) days from the delivery or first-class mailing of a written notice to You. This Agreement cannot be voided for any reason and may only be cancelled with proper notice. You may purchase this Agreement through payment up front or through installment payments.

**Washington:**   You may contact Virginia Surety Company at any time. The following provisions of Your Agreement are hereby amended with the following pursuant to the revised Code of Washington 48.110.075:  Cancellation:  You may cancel and return this Agreement and receive a refund of the full purchase price by returning it to the administrator within nine (9) days or less, if no claim has been made.  If after nine (9) days and no claim has been made, You may cancel and return this Agreement for full purchase price, less a cancellation charge of $25.00.  If after thirty (30) days, and a claim has not been made, the refund will be determined on a pro-rata basis, which is the greater of usage reflecting the days in force or the miles driven from the start of the Agreement term to the expiration terms, less a cancellation charge of up to twenty five dollars ($25.00).  If You cancel and return this Agreement, the Agreement is void from the beginning and the parties are in the same position as if no Agreement had been issued. Any claim paid or incurred may be deducted from the amount of the cancellation refund.  A ten percent (10%) penalty shall be added to any refund that is not paid within thirty (30) days of return of the Agreement to the provider.  Cancellation by Us:  We will not deny a claim based upon Your failure to properly maintain the Vehicle, UNLESS the failure to maintain the Vehicle involved the failed part or parts. Arbitration:  Any decision reached by Arbitration shall be binding upon both You and AGWS.  If this Agreement is found to be subject to Arbitration the proceeding will take place in the state of Washington near Your residence.  If this Agreement is found to be not subject to arbitration, any legal proceeding with respect to any dispute will be tried in the State of Washington. Both Parties hereby waive the right to a jury trial in any such proceeding.  The implied warranty of merchantability on the motor Vehicle is not waived if the Agreement has been purchased within ninety (90) days of the purchase date of the motor Vehicle from a provider who also sold the motor Vehicle covered by this Agreement _MC_ (You must initial here).  By initialing, You acknowledge the review and understanding of the above disclosures and the contract including, coverage, maintenance requirements, duty to protect against further damage, claim procedures, covered parts and labor, time/mileage limitations, exclusions, and cancellation provisions.  Service of Suit:  The commissioner is the attorney to receive service of legal process in action, suit or proceeding in court.

**Wisconsin:** THIS CONTRACT IS SUBJECT TO LIMITED REGULATION BY THE OFFICE OF THE COMMISSIONER OF INSURANCE.  The Agreement Administrator and Obligor is American Guardian Warranty Services of Wisconsin, Inc., P.O. Box 768, Warrenville, Illinois 60555; (800) 579-2233. Cancellation: If We do not pay or credit a refund within 45 days after the return of a service contract to the provider, We shall pay a ten percent (10%) per month penalty of the refund amount outstanding which will be added to the amount of the refund.  If We cancel this Agreement, notice, inclusive of an effective date outlining the specific nature or reason for cancellation will be mailed to You at the last known address for You at least five (5) days prior to the cancellation date.   We may charge an administrative fee for cancellation equal to ten (10%) percent of the provider fee. Our rights of ownership to salvaged parts shall become effective only after You have been fully compensated for damages or repairs under this Agreement. Our rights to subrogation under this Agreement are not valid until You have been made whole and fully compensated for damages.  Note: In Wisconsin, the arbitration provision is amended to provide for non-binding arbitration upon the agreement of both parties.

Exhibit 17

AGWS Service Agreement – Truck #004

**Vehicle Service Agreement**
**Information Page**

**compass**
HEAVY DUTY TRUCK & BUS
**PROTECTION**

Agreement No.

HDTRA80460478

## I. Customer Information

| | | |
|---|---|---|
| Trade Winds Transport LLC | Eric Grace | |
| Last Name/Company Name | First Name | M |
| 505 El Redundo Ave. #A | | |
| Address | | |
| Redondo Beach | CA | 90277 |
| City | State | Zip |
| (310) 809-4661 | egrace5577@gmail.com | |
| Phone | E-mail | |

## II. Dealer Information

## III. Lienholder Information

| | | | | | |
|---|---|---|---|---|---|
| Rush Truck Center - Jacksonville | | Name | | | |
| Name | | | | | |
| 5175 West Beaver Street | | Address | | | |
| Address | | | | | |
| Jacksonville, | FL | 32254 | City | State | Zip |
| City | State | Zip | | | |
| (888) 783-6170 | mulhollandr@rushenterprises.com | | | | |
| Phone | E-mail | | | | |

## IV. Vehicle and Coverage Information

| | | | | | |
|---|---|---|---|---|---|
| 2012 | INTERNATIONAL | PROSTAR LF627 PREMIUM | 3HSDJSJR5CN624256 | | 340,975 |
| Year | Make | Model | Vehicle Identification Number (VIN) | Current ECM Reading | Miles/Hours Current Odometer Reading |
| | | $22,813.00 | 01/25/2017 | | $7,137.00 |
| Vehicle Purchase Date | Vehicle Purchase Price | | Agreement Purchase Date | | Agreement Purchase Price |
| 8 | | | | | |
| Vehicle Class (3-8) | Engine Size in Liters | | Engine Type | | ☑ Diesel   ☐ Gas |

### Refrigeration Unit:

| | | |
|---|---|---|
| Model No. | Model Year | Serial No. |

**Navigator Coverage:**

☐ Engine Coverage

☑ Engine/Transmission Coverage

☐ Engine/Transmission/Drive Axle Coverage

**Optional Coverage:** (must be selected at the time of purchase to apply)

☐ Option A - EGR/DPF

☑ Option B - (Aftertreatment Assemblies)
☐ Paccar MX Equipped  ☑ Maxxforce Equipped

☐ **Refrigeration Unit Coverage**
(Current Unit Hours: _____)

☐ XLT Package

**Agreement Term:**

Months 36    Miles 500,000

☐ Service Drive Sale/Non-Point of Sale Delivery
(inspection and waiting period of 30 days and 1,500 miles required)

Coverage Start Date:
01/25/2017

Coverage Starting Mileage:
340,975

**Agreement Administrator/ Provider/Obligor:** American Guardian Warranty Services, Inc.
PO Box 760
Warrenville, Illinois 60555
800.579.2233

**Warranty Administrator & Obligor:** American Guardian Warranty Services of Wisconsin, Inc.
PO Box 760
Warrenville, Illinois 60555
800.579.2233

**Lockhaven Obligor/Administrator:** American Guardian Warranty Services of Florida, Inc.
PO Box 760, Warrenville, IL 60555
800.579.2233

## V. Customer Acknowledgment

The Agreement that You are purchasing is between You and the Agreement Obligor. You will be notified by the Selling Dealer and/or the Administrator if the Agreement is ineligible for coverage. You (the undersigned) have reviewed the terms of this Agreement and understand the coverage, exclusions and maintenance requirements. This Agreement is based on information You provided on this Information Page. AUTHORIZATION IS REQUIRED FROM THE ADMINISTRATOR PRIOR TO THE REPAIR OF COVERED COMPONENTS.

01/25/2017

Customer Signature (Year)          Purchase Date          Selling Dealer Representative Signature

If no coverage level is selected, then only engine coverage will apply. If no term months and mileage have been indicated in Agreement term, then coverage will be in effect for 12 months/25,000 miles, whichever occurs first. A Deductible of $100 per repair visit will apply. Any modification, alteration or change to the printed terms, conditions or coverages of this Agreement renders the Agreement invalid.

**AUTHORIZATION IS REQUIRED FROM THE ADMINISTRATOR PRIOR TO THE REPAIR OF COVERED COMPONENTS**

**CLAIMS: 800.579.2233  |  ROADSIDE ASSISTANCE: 888.491.3370**
**TO START A CLAIM ONLINE GO TO WWW.AGWSINC.COM**

AG HDT (06.16) VSC XLT RT EMAT          Page 1 of 6          CUSTOMER MUST RECEIVE



PLAINTIFF'S EXHIBIT
17

## TERMS AND CONDITIONS

In the event of a **Breakdown** of a covered part listed below, **We** agree to pay for the **Cost** of necessary parts and labor to repair or replace a covered part listed below for each component (including replacement of all lost fluids), less applicable **Deductible**, subject to the terms, conditions and limitations herein. A covered part has failed when it can no longer perform the function for which it was designed and not because of the action, inaction or failure of any non-covered parts.

**ENGINE ONLY COVERAGE** (Includes those items listed in Components 1-2)

**1. ENGINE:** The following stated components are covered. The internal lubricated parts within the engine including pistons, piston rings, wrist pins, crankshaft, rod and main bearings, camshaft and cam bearings, cam followers. Timing chain and timing gears, timing chain tensioners. Intake and exhaust valves, valve guides, valve springs and valve retainers. Rocker arms, pushrods, lifters. Turbocharger rotor/turbine and housing. Water pump. Fuel Injectors. Progressive Damage: the Engine Block, Cylinder Head(s) and Cylinder Liners are covered if damaged in conjunction with a covered mechanical failure.

**2. TAXES AND FLUIDS:** Associated state and local taxes where applicable and required fluids to complete covered repairs.

**ENGINE AND TRANSMISSION COVERAGE** (Includes those items listed in Components 1-3)

**3. TRANSMISSION:** The following stated components are covered. All internal lubricated parts of the manual or automatic transmissions, including: torque converter, oil pump, valve body, governor, bands, drums, planetaries, sun gear, sprag(s), shaft(s), bearings and related bushings, shift rail, forks and synchronizers. Progressive Damage: the transmission case is covered if damaged in conjunction with a covered mechanical failure.

**ENGINE, TRANSMISSION AND DRIVE AXLE COVERAGE** (Includes those items listed in Components 1-4)

**4. DRIVE AXLE:** The following stated components are covered.  All internal lubricated parts including: output shaft, bearings, bushings, gear sets, axle and bearings, carrier, ring and pinion gears, bearings, bushings, axle shaft. Progressive Damage: the drive axle housing is covered if damaged in conjunction with a covered mechanical failure.

**OPTIONAL COVERAGE** The following surcharged coverage is available when identified on the **Information Page** and a surcharge has been paid.

**OPTION A – DPF/EGR:** Failure of the diesel particulate filter (DPF) or the EGR Valve Coverage is limited to the first 24 months or 240,000 miles, or term months/mileage selected, whichever is less. No progressive damage outside of DPF/EGR coverage. **Coverage under this option is limited to one failure per DPF and two failures of the EGR Valve.**

**OPTION B—Aftertreatment Assemblies (includes the following named components):** DPF (filter only), EGR Valve(s) (valve component only), EGR Cooler, DOC Doser Injector, SCR, DPF Doser Injector, DPF Dosing Module, DEF Dosing Injection Nozzle, DEF Tank, Diesel Oxidation Catalyst (DOC), Lambda Sensor (O2 Sensor), NOx Sensor, Aftertreatment Control Module (Aftertreatment ECM), DEF Dosing Module. No progressive damage from Aftertreatment to any other component except within Aftertreatment Assemblies. Coverage is limited to one failure per listed component. Coverage is limited to the first 24 months or 240,000 miles, or term months/mileage selected, whichever is less. Proof of maintenance service being done as per OEM schedule must be documented.

**XLT PACKAGE—**The following stated components are covered: Radiator, fan clutch, charged air cooler, air compressor, alternator, starter and solenoid, fuel tank(s), engine oil pan, engine vibration damper, radio (AM/FM/CD) main cabin primary HVAC (excluding sleeper): a/c compressor and clutch, blower motor, temperature control head, heater core.

**REFRIGERATION UNIT COVERAGE—** Thermo King and Carrier units only: Engine Components: Internally lubricated hard parts limited to pistons, piston rings, piston oil cooling jets, wrist pins, connecting rods, connecting rod bearings, crankshaft, main bearings, thrust washers, camshaft and cam bearings, cam followers, rocker arm shafts, rocker arms, push rods, hydraulic lifters, intake and exhaust valves and guides, valve springs, constant velocity valve, oil pump housing, oil pump gears, oil pump pick up screen, oil pump pick up tube, oil pump pressure relief springs and valves, valve retainers, valve keepers (locks), timing chain and gears, timing chain tensioners, timing gear cover, valve cover, oil pan, injectors and water pump. Compressor: Limited to reciprocal compressor internal components and scroll compressor internal components. Any ...nage resulting from a seal leak or a blown head gasket is not covered.

## Additional Benefits

**ROADSIDE ASSISTANCE:** You are entitled to one (1) Roadside Assistance service per 72-hour period.  To receive these benefits You must call 888-491-3370 and provide Your Agreement number. The following benefits are available: (1) **Battery Service:** If a battery failure occurs, a jump start will be applied to start the covered Vehicle; (2) **Vehicle Fluid Delivery:** an emergency supply of coolant, oil or fuel will be delivered for Your covered **Vehicle** if You have an immediate need. You must pay the Cost of the actual fluid or fuel when delivered. (3) **Lock-Out Assistance:** If Your keys are locked inside the Vehicle, assistance will be provided to gain entry to the Vehicle.  Roadside Assistance is available ONLY during the Agreement term and services obtained through any source other than the toll-free number will not be covered.  **The limit of liability for any single benefit is one hundred dollars ($100.00).**

**TRIP INTERRUPTION OR RENTAL ASSISTANCE:** When a covered **Breakdown** disables Your **Vehicle** and the repairs are completed more than one hundred (100) miles from Your residence, **We** will reimburse You for lodging and meal expenses or substitute rental vehicle expenses incurred by You between the date of the **Breakdown** and the date on which covered repairs are completed. You will be reimbursed for actual lodging expenses or substitute rental vehicle expenses up to one hundred twenty five dollars ($125.00) per day for up to two (2) days, not to exceed two hundred fifty dollars ($250.00) per occurrence. Legible and verifiable receipts are required for reimbursement.

**TOWING ASSISTANCE:** If towing assistance becomes necessary due to the **Breakdown** of a covered component, towing costs not payable by insurance will be covered for up to three hundred seventy five dollars ($375.00) per occurrence. A paid in full, signed towing bill is required for reimbursement.

## WHAT TO DO IF REPAIRS ARE NEEDED

If Your Vehicle is unsafe and needs to be towed, contact a tow company to arrange towing service.  Otherwise, deliver Your Vehicle to a repair facility and authorize them to diagnose the failure. Provide the repairer with Your Agreement number and direct them to call the Administrator for Repair Authorization at 1-800-579-2233. **Emergency Repair—**If a covered component has a **Breakdown** at any time outside of the Claims Department regular business hours, You may take one of the following steps:  (1) Wait until regular business hours and then follow the normal claims procedure outlined above; or (2) Authorize and pay for any teardown or diagnostic time needed to determine whether Your **Vehicle** has a covered **Breakdown**.  If You reasonably determine that You have a covered **Breakdown** and You choose to have Your **Vehicle** repaired, You are responsible for paying the repair.  You must then call the **Administrator** during the next available regular business day so that the **Administrator** may determine whether there was a covered **Breakdown**.  If the **Administrator** determines that there was a covered **Breakdown** and You meet the requirements outlined herein, then **We** will pay You in accordance with the terms and conditions of this **Agreement**.

*You must obtain a Repair Authorization Number from Our Claims Department to assure coverage under this Agreement.*

Call Toll Free at 1-800-579-2233 for Instructions and Repair Authorization.

No Payment for a Claim will be made without Authorization.

This Agreement is subject to the following terms and conditions.  **No alterations, changes or waivers of provisions may be made to this Agreement.**  The benefits available under this Agreement are strictly provided to You for repairs to the Covered Vehicle.

**Definitions:** When used, key terms will appear in bold print and have special meaning as follows:

**Actual Cash Value (ACV)** – means the actual cash value of Your Vehicle at the time of repair according to the most recently published NADA Guide for Trade-in-Value.
**Administrator, Obligor, Our, Us and We** – means American Guardian Warranty Services, Inc. ("AGWS"), except in the state of Louisiana where it means **American Guardian Warranty Services of Florida, Inc.** and in the state of Wisconsin where it means **American Guardian Warranty Services of Wisconsin, Inc.**  Our mailing address is P.O. Box 768, Warrenville, IL 60555; and Our toll-free telephone number is 1-800-579-2233.
**Agreement** – means the service Agreement that is a contract between You and Us.

**Breakdown or Mechanical Failure** – means the failure of an original or replacement part, covered by this Agreement, to perform its function as it was originally designed to work in normal service with required maintenance due to material failure, wear and tear or defects in workmanship and outside the manufacturer's tolerance.

**Cost(s)** – means the usual and fair charges for parts and labor necessary to repair covered parts. Replacement of any covered part may be made with new, remanufactured, rebuilt or like kind and quality at the time of Breakdown at the discretion of the Administrator. Parts will be reimbursed up to the manufacturer's suggested list price. Labor time will be reimbursed using nationally recognized labor time standards. Labor rate will be determined based on repairing facility's geographic region.

**Deductible** – means the amount that You must pay for covered repairs per occurrence as identified on the Information Page.

**Information Page** – means Page 1 of this Agreement.

**Lienholder/Lender** – means a financial institution identified on the Information Page and providing financing for the purchase of this Agreement.

**Selling Dealer** – means the retail seller of this Agreement to You for the Vehicle described on the Information Page.

**Vehicle or Covered Vehicle** – means the Vehicle described on the Information Page.

**You and Your** – means the purchaser identified on the Information Page.

**Insurance Statement:**

Our obligations are guaranteed by an insurance policy issued by Virginia Surety Company, Inc. In the event that We cease to operate, are bankrupt, or fail to pay an authorized claim within sixty (60) days after proof of loss is filed, You may file a claim directly with Virginia Surety Company, Inc., 175 West Jackson Blvd., Chicago, IL 60604 (800) 209-6206.

**Your Responsibilities:**

1. You must follow the manufacturer's recommended maintenance schedule for any and all required services, including keeping receipts for services performed. The required receipts include date, mileage, service performed and service provider. These records may be requested by the Administrator for the investigation of a claim or transfer. IT IS RECOMMENDED THAT YOU KEEP MAINTENANCE RECORDS WITH THE VEHICLE. In the event that You perform Your own maintenance, You must provide copies of receipts for materials purchased and a service log showing date, mileage and services.
2. Use all reasonable means to protect Your Vehicle from further damage when a Breakdown occurs.
3. You must authorize necessary labor time for the repairer to diagnose a Breakdown.
4. Direct the repair facility to call Administrator at 1-800-579-2233 to report a claim. You must obtain Repair Authorization from the Administrator prior to repairing any covered component.
5. In the event You need to receive reimbursement for Your authorized claim, You must submit the following within ninety (90) days of approval: A) the original Repair Order signed by You; B) proof of payment with a cash register receipt/credit card receipt/personal check copy; C) where applicable, copies of original towing or rental bill with proof of payment.

**Our Responsibilities:**

Subject to the Coverage Level and Deductible selected on the Information Page of this Agreement, the Limits of Liability and items found under EXCLUSIONS-WHAT IS NOT COVERED, the Administrator will pay for the Cost of necessary repairs. The Administrator reserves the right to inspect Your Vehicle to evaluate covered repairs.

**Exclusions-What is Not Covered:**

Where permitted by state requirements the following are not covered (See State Requirements):

**PRE-EXISTING CONDITIONS.**

2. Failures that occur during the waiting period identified on the Information Page.
3. Cooler lines and related componentry.
4. Damage to a covered component caused by the failure of a component not listed as covered under this Agreement.
5. Repairs that are covered under the original manufacturer's warranty regardless of whether or not that warranty was transferred to You or the manufacturer refuses to honor its obligations. Any cost, repair, replacement or benefit for which the manufacturer has announced its responsibility through any means including recalls, service bulletins or campaign(s) by manufacturer.
6. Repairs beyond those required to correct a Breakdown.
7. ANY COVERED REPAIR NOT AUTHORIZED IN ADVANCE BY THE ADMINISTRATOR.
8. Damage caused by continued operation of an impaired Vehicle.
9. Seals, gaskets, and fasteners unless required in conjunction with a covered mechanical Breakdown. Any component part of the engine block assembly not specifically listed as covered under Item 1. ENGINE. Stuck or failed variable vanes (VGT) turbocharger mechanism. Any component parts of the transmission assembly not listed as covered under Item 3. TRANSMISSION, including electronic controls, levers, linkage, rubber mounts, transmission cooler, external hoses, pipes, tubes and hard lines. Any component parts of the drive axle assembly not listed as covered under Item 4. DRIVE AXLE: including wheel bearings.
10. Damage caused by towing the Vehicle in a manner not consistent with the manufacturer's recommendations.
11. Damage caused by overloading the Vehicle beyond the manufacturer's recommended capacity.
12. A Breakdown caused by or involving modifications, alterations or additions to the Vehicle unless those modifications, alterations or additions were performed by or recommended by the original Vehicle Manufacturer.
13. Towing another vehicle unless Your Vehicle was equipped by the manufacturer for that purpose.
14. Repairs required because of technician negligence, overheating, detonation, sludge or carbon deposits, contamination, rust, corrosion, cavitation, electrolysis, operation without the proper lubrication levels or fluid type, and the failure to perform the manufacturer's recommended maintenance. All gasket or seal failures, cracked heads or block, overheating or other engine failure due to lack of fluids or improper maintenance.
15. Repairs made outside of the United States and Canada.
16. Repairs required because of fraud, collision, abuse, negligence, neglect, misuse, abuse, road hazard, racing, off-road use, vandalism, riot, theft, flood, fire, war, acts of God, or loss that is normally covered by Casualty Insurance.
17. The cost of teardown, disassembly or assembly when a Breakdown is not covered by this Agreement.
18. Repairs that are covered under a repairer's guarantee, service agreement or other warranty.
19. Incidental or consequential damage, loss of profits, property damage, personal injury, inconvenience, loss of Vehicle use, commercial loss, punitive or examplary damages, attorney fees, loss of earnings, personal damage or per diem expenses.

This Agreement provides no benefit or coverage and We have no obligation if:

1. The Vehicle odometer fails to register, record actual mileage or true mileage cannot be determined for any reason, including ECM failure, while owned by You.
2. You rent Your Vehicle to someone else.
3. Your Vehicle is used for postal service, taxi, livery, police or other emergency services, snow plowing, competition or speed events.

4.   Your Vehicle is modified from the Vehicle manufacturer's original specifications regardless of who made the modifications or when the modifications were made.

5.   Your Vehicle is identified as a Gray Market Vehicle, Total Loss, Flood Damaged, Salvaged, Rebuilt or a Glider Reconstruction.

nit of Liability:   In no event shall the Aggregate Limit of liability exceed the amount identified by Vehicle Class below or the Actual Cash Value (ACV) of the vehicle at the time of repair, whichever is less.

|  | Vehicle Class 3-4 | Vehicle Class 5-6-7 | Vehicle Class 8 |
|---|---|---|---|
| Engine/Water Pump: | $9,500 | $15,000 | $20,000 |
| Transmission: | $4,000 | $6,000 | $7,500 |
| Drive Axle: | $4,000 | $6,000 | $7,500 |
| Option  B (if selected): | $7,500 | $7,500 | $7,500 |
| XLT Package: | $1,000 per component | $1,000 per component | $1,000 per component |
| AGGREGATE LIMIT: | $13,000/ACV | $20,000/ACV | $30,000/ACV |

### Subrogation:
If You receive benefits under this Agreement, We will be entitled to Your rights to recover against any manufacturer, insurance company or service Agreement provider who may be responsible to You for Costs covered under this Agreement or any payments made by Us.  In all states except California, if We ask, You agree to cooperate with Us in any matter concerning this Agreement or, to enforce Our rights.

### Agreement Period:
The time and mileage limit of the Term Selected starts on the Agreement Purchase Date and Current Odometer Reading shown on the Information Page.  If the Service Drive Sale/Non- Point of Sale Delivery box is checked, coverage begins 30 days and 1,500 miles from the Agreement Purchase Date and Current Odometer Reading shown on the Information Page.  The additional 30 days and 1,500 miles will be added on to the end of the contract term and odometer mileage.

### Arbitration:
You agree that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE, BUT THEY CHOOSE TO HAVE ANY DISPUTES DECIDED THROUGH ARBITRATION.  Rules and forms of the American Arbitration Association may be obtained and all claims shall be filed at any office of the American Arbitration Association or at Corporate Headquarters, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043.  Telephone: (877) 495-4185; Website:  www.adr.org.  This Arbitration provision is deleted in its entirety in California, Georgia, Mississippi, Nebraska, and Oregon.

### Cancellation:
In the event the covered Vehicle is repossessed, declared a total loss, or, You give notice of cancellation, the Agreement shall terminate.  You may cancel this Agreement.  To request a cancellation, submit written notification immediately to the Selling Dealer or Administrator including the following: 1) the Agreement Number; 2) Vehicle ntification Number; 3)  a signed notarized statement certifying the current Vehicle odometer reading.  If this Agreement is cancelled within thirty (30) days of the . greement purchase date and no claim has been made, We will refund the full Agreement purchase price.  If the Agreement is cancelled after the first thirty (30) days or a claim has been filed, the refund will be made on an amount of the Agreement purchase price calculated according to the pro-rata method reflecting the greater days in force or the miles driven based on the term of the plan selected and the date coverage begins, less a fifty dollar ($50.00) administrative fee; $25.00 or 10% of the refund, whichever is less, in California; $50.00 or 10% of the refund, whichever is less, in Georgia; $50.00 or 10% of the refund, whichever is less, in Illinois; $50.00 or 10% of the pro rata refund, whichever is less, in North Carolina; $25.00 in Washington; and $50 or 10% of the provider fee, whichever is less, in Wisconsin).  In the event of a cancellation, the Lienholder, if any, will be named on the refund check.  In the event of a cancellation upon repossession, the Lienholder will be the sole payee.  Where permitted, any claim incurred or paid will be deducted from the amount of the cancellation refund.  State guidelines and regulations where the Agreement was sold take precedent over these terms.  (Georgia does not allow for a claim incurred or paid to be deducted from the amount to be returned.)

### Cancellation By Us:
We may cancel this Agreement: 1) If there has been a material misrepresentation or fraud at the time of sale of this Agreement or when filing a claim under this Agreement; 2) If the odometer or ECM has been tampered with or disabled and You have failed to repair the odometer or ECM; 3) If You do not pay the Agreement price.  If We cancel this Agreement for any reason other than non-payment, We will mail You written notice at least thirty (30) days prior to cancellation.  A pro-rata refund reflecting the greater days in force or miles driven based on the term of the plan selected and the date coverage begins will be made to You.  All refunds will be paid to the Lienholder, if any, otherwise to You.  If this Agreement is financed and Your Vehicle is a total loss or is repossessed, You authorize Your Lienholder to cancel this Agreement and receive the refund.

### Transfer of Agreement:
In the event that You sell the covered Vehicle, this Agreement shall terminate.  You may apply for a transfer to the new owner.  Where applicable, the manufacturer's warranty including extended powertrain warranty must transfer to the new owner to obtain coverage under the Transfer provisions of this Agreement.  Within thirty (30) days from the date of sale to a private party and not a dealer or entity in the business of selling, trading or leasing vehicles, submit the following:  1) A check for a $100.00 transfer fee payable to Administrator - AGWS, 2) A copy of the Information Page of this Agreement, 3) A signed affidavit stating the date of sale, the mileage at sale and the new owners name, address and telephone number, and 4) Copies of Your maintenance documents for the covered Vehicle.  Proof of continuation of regular maintenance will be necessary in the event of a claim.  The Administrator reserves the right to reject a transfer request in the event that the above requirements are not met.  This Agreement may not be assigned separately from the covered Vehicle, nor can it be assigned to a new or used car dealership or anyone other than an individual person that purchased Your Vehicle.  This Agreement may only be transferred once.

### Payment Plan Agreements:
If this Agreement is purchased on a payment plan, failure to make timely payments will result in cancellation with no refund due unless state law mandates otherwise.  Should a claim arise before this Agreement is paid in full, the balance owed will be deducted from the claim payment unless state law mandates otherwise.

### NOTICE TO CONSUMERS:
- The benefits provided may duplicate express manufacturer or seller's warranties that come automatically with every sale.  You may be required by the Seller of this coverage to pursue those warranties, which are available to You without this Agreement.
  The purchase of this Agreement is not required to purchase or obtain financing for the Vehicle.
- The terms of this written Agreement control the Agreement between us.  No change or modification to the written terms is valid.
- This Agreement is based on information You provided on the Information Page.  Misrepresentation on the Information Page will result in rejection of this Agreement.
- This is a service contract not an insurance policy.

## STATE REQUIREMENTS

If this Agreement was purchased in any of the following states, the Agreement is amended as indicated after each state. The Administrator of this Agreement makes diligent effort to include all state notices as they become effective, but in cases where a state's notice is not present on this printing of the Agreement, state law will take precedence over the terms and conditions of this Agreement.

**California:** American Guardian Warranty Services, Inc.'s California License number is 0C73806. Performance to You under this contract is guaranteed by a California approved insurance company. You may file a claim with this insurance company if any promise made in the contract has been denied or has not been honored within sixty (60) days after Your request. The name and address of the insurance company is Virginia Surety Company, Inc., 175 West Jackson Blvd., Chicago, IL 60604 (800) 209-6206. If You are not satisfied with the insurance company's response, You may contact the California Department of Insurance at 1-800-927-4357. Cancellation of this Agreement shall comply with California law. If You provide notice of cancellation to Us during the first sixty (60) days from the effective date for a new or thirty (30) days for a used Vehicle, You will be refunded 100% of the premium paid, if no claims have been filed. If a claim has been filed within the first sixty (60) days for a new or thirty (30) days for a used Vehicle, the refund will be pro-rated based on either elapsed time or mileage remaining. After the first sixty (60) days for a new or thirty (30) days for a used Vehicle, You will be refunded 100% of the unearned premium paid, less a fee of ten percent (10%) of the refund amount or $25.00, whichever is less. The unearned premium will be prorated according to the pro-rata method reflecting the greater days in force or the miles remaining. In the event of a claim arising in California, the proper venue for litigation shall be in California. Administrator reserves the right to void the Agreement or deny claims at any time due to fraud, misrepresentation or nonpayment. The name of the Obligor is amended to American Guardian Warranty Services Inc. dba A.G.W.S. Insurance Services.

**Connecticut:** All disputes must be resolved in accordance with the Regulations of Connecticut State Agencies §42-260. In the event of a dispute with the Administrator, You may contact the State of Connecticut Insurance Department, PO Box 816, Hartford, CT 06142-0816. Attn: Consumer Affairs. The written complaint must contain a description of the dispute, the purchase price or lease price of the product, the cost of the repair or replacement and a copy of the extended warranty contract. If the term of this Agreement is less than one (1) year, the Agreement term shall be automatically extended while any repairs covered under the Agreement are being done and the Vehicle is in the custody of the Authorized Repair Facility. If You return the Vehicle or the Vehicle is sold, lost, stolen, or destroyed, You may cancel this Agreement, subject to the cancellation provisions of this Agreement.

**Georgia:** Any claim or dispute will be adjudicated in Your county of residence. Pre-existing conditions known to You at the time of Your purchase of the Agreement is excluded from coverage. Also, repairs when the covered Vehicle's odometer has been altered or tampered with while owned by You are excluded from coverage. Modifications to the Vehicle made by You results in rejection of coverage under this Agreement. Damage due to sludge may not be excluded from coverage. A cancellation will comply with Georgia Code Chapter 33-24-44. If You cancel this Agreement after thirty days, the cancellation/administrative fee will be $50 or 10% of the pro-rata refund amount, whichever is less. The Obligor/Administrator may only cancel the Agreement for fraud, material misrepresentation or nonpayment. There is a thirty (30) day written notice of cancellation for reasons other than non-payment regardless of when the Agreement was cancelled. We will return the unearned premium to You within ten (10) working days after cancellation. A ten (10) day written notice of cancellation will be given if canceled for non-payment. The finance company/Lienholder must hold a power of attorney in order to cancel the service for nonpayment.

**Hawaii:** Cancellation: A ten percent (10%) penalty per month shall be added to a refund that is not paid or credited within forty-five (45) days after the receipt of the service contract to the provider.

**Idaho:** Coverage afforded under this Contract is not guaranteed by the Idaho Insurance Guarantee Association.

**Illinois:** If You provide a written notice of cancellation to the Selling Dealer after the first thirty (30) days after the Agreement purchase date, or if We or the Lienholder cancel this Agreement at any time, You will be entitled to a pro-rated refund of the Agreement price based on the greater of the number of days the Agreement was in force or the miles driven compared to the total time or mileage specified in the Agreement, less a cancellation fee equal to the lesser of $50.00 or ten percent (10%) of the amount of the pro-rated refund, and the amount of claims paid under this Agreement. Wear and Tear: a gradual reduction in operating performance due to normal wear and use IS included in this Agreement.

**Indiana:** THIS SERVICE CONTRACT IS NOT INSURANCE AND IS NOT SUBJECT TO INDIANA INSURANCE LAW.

**Iowa:** If You have problems or questions about this Agreement, You may contact the Commissioner of Insurance of the State of Iowa or the Iowa Securities Bureau at (515) 281-4441, Two Ruan Center, 601 Locust Street, 4th Floor, Des Moines, Iowa 50309-3738. Cancellation: A ten percent (10%) penalty will be added each month to the cancellation refund not paid to You within thirty (30) days of the return of the Agreement to Us.

**Louisiana:** The Obligor/Provider is American Guardian Warranty Services of Florida, Inc., PO Box 768, Warrenville, IL 60555, (800) 579-2233. Cancellation: If this Agreement is cancelled within thirty (30) days of the sale date, We will refund the full amount of the cost of the Agreement. If the Agreement is cancelled after the first thirty (30) days the refund will be made on an amount of the Agreement charge according to the pro-rata method reflecting the days in force based on the term of the plan selected and the date coverage begins, less a $50.00 dollar administrative fee.

**Maine:** A monthly penalty equal to ten percent (10%) of the returned amount will be added to any refund that is not paid or credited to You within forty-five (45) days after Our receipt of a cancellation request from You. In the event of a cancellation by Us, We will provide You with notice mailed fifteen (15) days prior to cancellation that identifies both the basis for cancellation and the cancellation effective date.

**Maryland:** The repair of a malfunction or defect covered under this Agreement shall include the Cost of the tear down and diagnosing the malfunction or defect. A ten percent penalty (10%) per month shall be added to a refund that is not paid within forty five (45) days after the receipt of the service contract to Us.

**Mississippi:** Cancellation of a contract by Us shall become effective sixty (60) days after a cancellation notice is mailed to You unless a cancellation is for non-payment of a contract whereby the contract will be cancelled fifteen (15) days after the notice of cancellation is mailed to You.

**Nebraska:** The aggregate actual cash value is the purchase price of the Vehicle.

**New York:** A ten percent (10%) penalty per month shall be added to a refund not made within thirty (30) days of the receipt of the cancellation request.

**North Carolina:** The Seller of this Coverage is required to inform You of any warranties available to You without this Agreement. No Agreements may be cancelled by the Seller or Administrator prior to the expiration of the term as stated in the Agreement without Your consent, except in the case of nonpayment of the Agreement price, a material misrepresentation related to this Agreement made by You or any other act by You constituting a breach of duty under this Agreement. You may cancel at any time and receive a pro rata refund less any claims paid on the Agreement and a reasonable administrative fee not to exceed ten percent (10%) of the pro-rata refund. The term of this Agreement for cancellation purposes will be based on the date You purchased Your Vehicle and the Vehicle mileage on the date purchased.

**Utah:** This service contract or warranty is subject to limited regulation by the Utah Insurance Department. To file a complaint, contact the Utah Insurance Department. Coverage afforded under this Agreement is not guaranteed by the Property and Casualty Guarantee Association. Arbitration in Utah is binding and shall be in compliance with the "Utah Uniform Arbitration Act" (78B-11-101). In Utah, arbitration does not have to take place within sixty (60) days of the filed loss. ANY MATTER IN DISPUTE BETWEEN YOU AND THE COMPANY MAY BE SUBJECT TO ARBITRATION AS AN ALTERNATIVE TO COURT ACTION PURSUANT TO THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION, A COPY OF WHICH IS AVAILABLE ON REQUEST FROM THE COMPANY. ANY DECISION REACHED BY ARBITRATION SHALL BE BINDING UPON BOTH YOU AND THE COMPANY. THE ARBITRATION AWARD MAY INCLUDE ATTORNEY'S FEES IF ALLOWED BY STATE LAW AND MAY BE ENTERED AS JUDGMENT IN ANY COURT OF PROPER JURISDICTION. Agreement Coverage: Failure to give any notice or file any proof of loss required by the policy within the time specified in the policy does not invalidate a claim made by the insured, if the insured shows that it was not reasonably possible to give the notice or file proof of loss within the prescribed time. The Cancellation provision is amended to abide by the Utah Code 31A-21-303. Cancellation of this Agreement at any time is

AG HDT (06.16) VSC XLT RT EMAT                          Page 5 of 6                          CUSTOMER MUST RECEIVE PAGES 1 - 6

effective no sooner than thirty (30) days from the delivery or first-class mailing of a written notice to You. This Agreement cannot be voided for any reason and may only be cancelled with proper notice. You may purchase this Agreement through payment up front or through installment payments.

**Washington:**  You may contact Virginia Surety Company at any time. The following provisions of Your Agreement are hereby amended with the following pursuant to the Revised Code of Washington 48.110.075:  Cancellation:  You may cancel and return this Agreement and receive a refund of the full purchase price by returning it to the Administrator within nine (9) days or less, if no claim has been made. If after nine (9) days and no claim has been made, You may cancel and return this Agreement for full purchase price, less a cancellation charge of $25.00. If after thirty (30) days, and a claim has not been made, the refund will be determined on a pro-rata basis, which is the greater of usage reflecting the days in force or the miles driven from the start of the Agreement term to the expiration terms, less a cancellation charge of up to twenty five dollars ($25.00). If You cancel and return this Agreement, the Agreement is void from the beginning and the parties are in the same position as if no Agreement had been issued. Any claim paid or incurred may be deducted from the amount of the cancellation refund. A ten percent (10%) penalty shall be added to any refund that is not paid within thirty (30) days of return of the Agreement to the provider. Cancellation by Us: We will not deny a claim based upon Your failure to properly maintain the Vehicle, UNLESS the failure to maintain the Vehicle involved the failed part or parts. Arbitration: Any decision reached by Arbitration shall be binding upon both You and AGWS. If this Agreement is found to be subject to Arbitration the proceeding will take place in the state of Washington near Your residence. If this Agreement is found to be not subject to arbitration, any legal proceeding with respect to any dispute will be tried in the State of Washington. Both Parties hereby waive the right to a jury trial in any such proceeding. The implied warranty of merchantability on the motor Vehicle is not waived if the Agreement has been purchased within ninety (90) days of the purchase date of the motor Vehicle from a provider who also sold the motor Vehicle covered by this Agreement. _____(You must initial here). By initialing, You acknowledge the review and understanding of the above disclosures and the contract including, coverage, maintenance requirements, duty to protect against further damage, claim procedures, covered parts and labor, time/mileage limitations, exclusions, and cancellation provisions. Service of Suit: The commissioner is the attorney to receive service of legal process in action, suit or proceeding in court.

**Wisconsin:** THIS CONTRACT IS SUBJECT TO LIMITED REGULATION BY THE OFFICE OF THE COMMISSIONER OF INSURANCE. The Agreement Administrator and Obligor is American Guardian Warranty Services of Wisconsin, Inc., P.O. Box 788, Warrenville, Illinois 60555; (800) 579-2233. Cancellation: If We do not pay or credit a refund within 45 days after the return of a service contract to the provider, We shall pay a ten percent (10%) per month penalty of the refund amount outstanding which will be added to the amount of the refund. If We cancel this Agreement, notice, inclusive of an effective date outlining the specific nature or reason for cancellation will be mailed to You at the last known address for You at least five (5) days prior to the cancellation date.  We may charge an administrative fee for cancellation equal to ten (10%) percent of the provider fee. Our rights of ownership to salvaged parts shall become effective only after You have been fully compensated for damages or repairs under this Agreement. Our rights to subrogation under this Agreement are not valid until You have been made whole and fully compensated for damages. Note: In Wisconsin, the arbitration provision is amended to provide for non-binding arbitration upon the agreement of both parties.

Exhibit 18

Truck/Bus Owner Responsibilities Used Truck Service Contracts – #Truck 001



Agreement # __HDTRA80460471__
(Found on your AGWS Contract)

## TRUCK/BUS OWNER RESPONSIBILITIES
## USED TRUCK SERVICE CONTRACT

If you have purchased an AGWS Service Contract (Compass Heavy Duty Truck Protection)
on your used truck, please be aware of your responsibilities.
**Keep Copies of your Service Contract in your Truck**

Call AGWS Claims Department to get repair approved or your Service Contract may not cover the repair cost.
Phone #: 800-579-2233 (Press 2 for Claims Department)
You must give them your Agreement Number provided above.

There is a deductible that you are responsible to pay on any repair.
Your deductible is $100.00 per repair visit.

You are required to do your best to mitigate damage to a failed component.
Shut off the truck at the first sign of a problem.

You must document your oil changes and service your transmission and rear axles in accordance to
engine, transmission and rear differentials manufacturer's recommended service schedule specific to the
components on your truck.
In the event of a claim, **you will be required to show** proof that your truck has been serviced as recommended by
the manufacturer of the failed component. **This applies to all Class 3-7 and Class 8 vehicles.**
If you have your truck serviced at a dealer or other facility, keep receipts with the date, VIN of truck and mileage to be
presented at time of any claim
**Keep copies of documentation in the truck.**

If you do your own oil changes and/or other routine PM service on your truck, use a service log to record the
dates and mileage of these activities. Be sure to keep receipts (or copies) for all oil and other fluids
purchased with this log for presentation to AGWS Claims Department at time of claim submission.
**You, the Owner, are responsible to find and follow the service guidelines specific to your vehicle's covered
components.**
**Your Service Contract will be voided if your truck is not maintained as described above.**

If you need Roadside Assistance, call 888-491-3370. You must give them your AGWS Agreement # listed above.

Trip Interruption Assistance - to be reimbursed for expenses related to a covered claim, send copies of your food and
lodging receipts with a copy of your repair order to: AGWS, P.O. Box 768, Warrenville, IL 60555

Keep towing receipts and send copies to AGWS for reimbursement on approved claims only.
There is a limit of $375.00 on towing reimbursement. You are responsible for any difference.
See contract for reimbursement details. AGWS address: AGWS, P.O. Box 768, Warrenville, IL 60555

You are aware that you chose the Navigator or Navigator NT coverage and as such acknowlege there are limits
of liability within the agreements.

Remember . . .
**Keep copies of all of your Service Contract documents in your truck.**
Get repair approved prior to any work being done.
Coverage is very specific. - Read your Service Contract and know what is covered!

**This document is a general guideline and not part of any Service Contract.
Following it is no guarantee of compliance with coverage or contract terms.
See AGWS Service Contract for Complete Details.**

I have read and initialed this document and I understand my responsibilities.

_____         1/25/17
Truck Owner(Purchaser)              Date                    Dealer                        Date

Copy to Truck Owner - Copy to Dealer Truck File

**PLAINTIFF'S
EXHIBIT**
_18_

HDT 1/11/16

Exhibit 19

Truck/Bus Owner Responsibilities Used Truck Service Contracts – #Truck 002



Agreement # HDTRA80480469
(Found on your AGWS Contract)

## TRUCK/BUS OWNER RESPONSIBILITIES
## USED TRUCK SERVICE CONTRACT

**If you have purchased an AGWS Service Contract (Compass Heavy Duty Truck Protection)**
**on your used truck, please be aware of your responsibilities.**
**Keep Copies of your Service Contract in your Truck**



Call AGWS Claims Department to get repair approved or your Service Contract may not cover the repair cost.
Phone #: 800-579-2233 (Press 2 for Claims Department)
You must give them your Agreement Number provided above.



There is a deductible that you are responsible to pay on any repair.
Your deductible is $100.00 per repair visit.

You are required to do your best to mitigate damage to a failed component.
Shut off the truck at the first sign of a problem.



You must document your oil changes and service your transmission and rear axles in accordance to
engine, transmission and rear differentials manufacturer's recommended service schedule specific to the
components on your truck.
In the event of a claim, you **will be required** to **show proof** that your truck has been serviced as recommended by
the manufacturer of the failed component. This applies to all Class 3-7 and Class 8 vehicles.
If you have your truck serviced at a dealer or other facility, keep receipts with the date, VIN of truck and mileage to be
presented at time of any claim
**Keep copies of documentation in the truck.**

If you do your own oil changes and/or other routine PM service on your truck, use a service log to record the
dates and mileage of these activities. Be sure to keep receipts (or copies) for all oil and other fluids
purchased with this log for presentation to AGWS Claims Department at time of claim submission.
**You, the Owner, are responsible to find and follow the service guidelines specific to your vehicle's covered**
**components.**
**Your Service Contract will be voided if your truck is not maintained as described above.**



If you need Roadside Assistance, call 888-491-3370. You must give them your AGWS Agreement # listed above.



Trip Interruption Assistance - to be reimbursed for expenses related to a covered claim, send copies of your food and
lodging receipts with a copy of your repair order to: AGWS, P.O. Box 768, Warrenville, IL 60555



Keep towing receipts and send copies to AGWS for reimbursement on <u>approved claims only</u>.
There is a limit of <u>$375.00</u> on towing reimbursement. You are responsible for any difference.
See contract for reimbursement details.  AGWS address:  AGWS, P.O. Box 768, Warrenville, IL 60555

You are aware that you chose the Navigator or Navigator NT coverage and as such acknowlege there are limits
of liability within the agreements.

Remember . . .
**Keep copies of all of your Service Contract documents in your truck.**
Get repair approved prior to any work being done.
Coverage is very specific. - Read your Service Contract and know what is covered!

**This document is a general guideline and not part of any Service Contract.**
**Following it is no guarantee of compliance with coverage or contract terms.**
**See AGWS Service Contract for Complete Details.**

**I have read and initialed this document and I understand my responsibilities.**

_____     1/25/17
Truck Owner(Purchaser)              Date

_____     _____
Dealer                                       Date

Copy to Truck Owner - Copy to Dealer Truck File



PLAINTIFF'S
EXHIBIT
19

HDT 1/11/16

Exhibit 20

Truck/Bus Owner Responsibilities Used Truck Service Contracts – #Truck 003



Agreement # <u>HDTRA80480462</u>
(Found on your AGWS Contract)

## TRUCK/BUS OWNER RESPONSIBILITIES
## USED TRUCK SERVICE CONTRACT

If you have purchased an AGWS Service Contract (Compass Heavy Duty Truck Protection)
on your used truck, please be aware of your responsibilities.
**Keep Copies of your Service Contract in your Truck**

Call AGWS Claims Department to get repair approved or your Service Contract may not cover the repair cost.
   Phone #: 800-579-2233 (Press 2 for Claims Department)
   You must give them your Agreement Number provided above.

There is a deductible that you are responsible to pay on any repair.
Your deductible is $100.00 per repair visit.

You are required to do your best to mitigate damage to a failed component.
Shut off the truck at the first sign of a problem.

You must document your oil changes and service your transmission and rear axles in accordance to
   engine, transmission and rear differentials manufacturer's recommended service schedule specific to the
   components on your truck.
In the event of a claim, you **will be required to show proof** that your truck has been serviced as recommended by
the manufacturer of the failed component. **This applies to all Class 3-7 and Class 8 vehicles.**
If you have your truck serviced at a dealer or other facility, keep receipts with the date, VIN of truck and mileage to be
presented at time of any claim
**Keep copies of documentation in the truck.**

If you do your own oil changes and/or other routine PM service on your truck, use a service log to record the
   dates and mileage of these activities. Be sure to keep receipts (or copies) for all oil and other fluids
   purchased with this log for presentation to AGWS Claims Department at time of claim submission.
**You, the Owner, are responsible to find and follow the service guidelines specific to your vehicle's covered
components.**
**Your Service Contract will be voided if your truck is not maintained as described above.**

If you need Roadside Assistance, call 888-491-3370. You must give them your AGWS Agreement # listed above.

Trip Interruption Assistance - to be reimbursed for expenses related to a covered claim, send copies of your food and
lodging receipts with a copy of your repair order to: AGWS, P.O. Box 768, Warrenville, IL 60555

Keep towing receipts and send copies to AGWS for reimbursement on <u>approved claims only</u>.
There is a limit of <u>$375.00</u> on towing reimbursement. You are responsible for any difference.
See contract for reimbursement details. AGWS address: AGWS, P.O. Box 768, Warrenville, IL 60555

You are aware that you chose the Navigator or Navigator NT coverage and as such acknowlege there are limits
of liability within the agreements.

Remember . . .
   **Keep copies of all of your Service Contract documents in your truck.**
   Get repair approved prior to any work being done.
   Coverage is very specific. - Read your Service Contract and know what is covered!

     **This document is a general guideline and not part of any Service Contract.
     Following it is no guarantee of compliance with coverage or contract terms.
     See AGWS Service Contract for Complete Details.**

**I have read and initialed this document and I understand my responsibilities.**

_____        _____        _____
Truck Owner(Purchaser)                    Date                       Dealer                            Date

     Copy to Truck Owner – Copy to Dealer Truck File

PLAINTIFF'S
EXHIBIT
20

HDT 1/11/16

Exhibit 21

Truck/Bus Owner Responsibilities Used Truck Service Contracts – #Truck 004

Agreement # HDTRA80460478
(Found on your AGWS Contract)



## TRUCK/BUS OWNER RESPONSIBILITIES
### USED TRUCK SERVICE CONTRACT

If you have purchased an AGWS Service Contract (Compass Heavy Duty Truck Protection)
on your used truck, please be aware of your responsibilities.
**Keep Copies of your Service Contract in your Truck**

Call AGWS Claims Department to get repair approved or your Service Contract may not cover the repair cost.
Phone #: 800-579-2233 (Press 2 for Claims Department)
You must give them your Agreement Number provided above.

There is a deductible that you are responsible to pay on any repair.
Your deductible is $100.00 per repair visit.

You are required to do your best to mitigate damage to a failed component.
Shut off the truck at the first sign of a problem.

You must document your oil changes and service your transmission and rear axles in accordance to
engine, transmission and rear differentials manufacturer's recommended service schedule specific to the
components on your truck.
In the event of a claim, **you will be required to show proof** that your truck has been serviced as recommended by
the manufacturer of the failed component. **This applies to all Class 3-7 and Class 8 vehicles.**
If you have your truck serviced at a dealer or other facility, keep receipts with the date, VIN of truck and mileage to be
presented at time of any claim
**Keep copies of documentation in the truck.**

If you do your own oil changes and/or other routine PM service on your truck, use a service log to record the
dates and mileage of these activities. Be sure to keep receipts (or copies) for all oil and other fluids
purchased with this log for presentation to AGWS Claims Department at time of claim submission.
**You, the Owner, are responsible to find and follow the service guidelines specific to your vehicle's covered
components.**
**Your Service Contract will be voided if your truck is not maintained as described above.**

If you need Roadside Assistance, call 888-491-3370. You must give them your AGWS Agreement # listed above.

Trip Interruption Assistance - to be reimbursed for expenses related to a covered claim, send copies of your food and
lodging receipts with a copy of your repair order to: AGWS, P.O. Box 768, Warrenville, IL 60555

Keep towing receipts and send copies to AGWS for reimbursement on approved claims only.
There is a limit of $375.00 on towing reimbursement. You are responsible for any difference.
See contract for reimbursement details. AGWS address: AGWS, P.O. Box 768, Warrenville, IL 60555

You are aware that you chose the Navigator or Navigator NT coverage and as such acknowlege there are limits
of liability within the agreements.

Remember . . .
**Keep copies of all of your Service Contract documents in your truck.**
Get repair approved prior to any work being done.
Coverage is very specific. - Read your Service Contract and know what is covered!

This document is a general guideline and not part of any Service Contract.
Following it is no guarantee of compliance with coverage or contract terms.
See AGWS Service Contract for Complete Details.

I have read and initialed this document and I understand my responsibilities.

_____        1/25/17        _____        _____
Truck Owner(Purchaser)           Date           Dealer                          Date

Copy to Truck Owner - Copy to Dealer Truck File



PLAINTIFF'S
EXHIBIT
2

HDT 1/11/16

Exhibit 22

Acknowledgement of "As Is" Purchase and 3rd Party Service Contract – Truck #001

## ACKNOWLEDGEMENT OF "AS IS" PURCHASE

### AND

### 3RD PARTY SERVICE CONTRACT

Dealer: **Rush Truck Center, Atlanta** ("Dealer")

The customer identified below ("Customer") is purchasing the following used vehicle(s) from Dealer:

VIN(S): **3HSDJSJR8CN624235** ("Vehicle(s)")

By signing below, Customer acknowledges that the Vehicle(s) are sold by Rush on an "AS IS, WHERE IS" basis, without any warranties by Rush, provided that Vehicle(s) sold by Dealer as "Certified Pre-Owned" are subject to the express written terms and conditions of the Dealer's certified pre-owned program. EXCEPT FOR ANY MANUFACTURERS' WARRANTIES THAT MAY STILL BE IN EFFECT, ALL OTHER WARANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY DISCLAIMED. Rush makes no other representations regarding the Vehicle(s).

Because the Vehicle(s) are sold on an "AS IS, WHERE IS" basis with no warranties from Dealer, Dealer has offered the Customer the opportunity to purchase from a third party a service contract at an extra charge.

INITIAL ONE:

_____ Customer has elected to purchase a third party service contract for the Vehicle(s) for an extra charge or a third party service contract is included with. Customer acknowledges that Rush is not a party to the service contract and makes no representations regarding the service contract.

_____ Customer hereby DECLINES to purchase a third party service contract for the Vehicle(s). Customer understands that the Vehicle(s) does not include a warranty or extended service contract and that Customer is responsible for all costs for any repairs, subject to any manufacturer warranty that may be in effect.

**Trade Winds Transport LLC**
_____
Customer Name

_____      1/25/17
Signature                                        Date

ERiL  Grow
_____
Name
owner
_____
Title

PLAINTIFF'S EXHIBIT
22

Ver_092716

Exhibit 23

Acknowledgement of "As Is" Purchase and 3rd Party Service Contract – Truck #002

## ACKNOWLEDGEMENT OF "AS IS" PURCHASE

### AND

### 3RD PARTY SERVICE CONTRACT

Dealer: **Rush Truck Center, Atlanta** _____ ("Dealer")

The customer identified below ("Customer") is purchasing the following used vehicle(s) from Dealer:

VIN(S): **3HSDJSJR6CN624251** _____ ("Vehicle(s)")

By signing below, Customer acknowledges that the Vehicle(s) are sold by Rush on an "AS IS, WHERE IS" basis, without any warranties by Rush, provided that Vehicle(s) sold by Dealer as "Certified Pre-Owned" are subject to the express written terms and conditions of the Dealer's certified pre-owned program. EXCEPT FOR ANY MANUFACTURERS' WARRANTIES THAT MAY STILL BE IN EFFECT, ALL OTHER WARANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY DISCLAIMED. Rush makes no other representations regarding the Vehicle(s).

Because the Vehicle(s) are sold on an "AS IS, WHERE IS" basis with no warranties from Dealer, Dealer has offered the Customer the opportunity to purchase from a third party a service contract at an extra charge.

INITIAL ONE:

_____ Customer has elected to purchase a third party service contract for the Vehicle(s) for an extra charge or a third party service contract is included with. Customer acknowledges that Rush is not a party to the service contract and makes no representations regarding the service contract.

_____ Customer hereby DECLINES to purchase a third party service contract for the Vehicle(s). Customer understands that the Vehicle(s) does not include a warranty or extended service contract and that Customer is responsible for all costs for any repairs, subject to any manufacturer warranty that may be in effect.

**Trade Winds Transport LLC** _____
Customer Name

_____ 1/25/17
Signature                Date

Eric Grove
Name

Owner
Title

Ver_092716

PLAINTIFF'S EXHIBIT
23

Exhibit 24

Acknowledgement of "As Is" Purchase and 3rd Party Service Contract – Truck #003

## ACKNOWLEDGEMENT OF "AS IS" PURCHASE

### AND

### 3RD PARTY SERVICE CONTRACT

Dealer: **Rush Truck Center, Atlanta** _____ ("Dealer")

The customer identified below ("Customer") is purchasing the following used vehicle(s) from Dealer:

VIN(S): **3HSDJSJR7CN624243** _____ ("Vehicle(s)")

By signing below, Customer acknowledges that the Vehicle(s) are sold by Rush on an "AS IS, WHERE IS" basis, without any warranties by Rush, provided that Vehicle(s) sold by Dealer as "Certified Pre-Owned" are subject to the express written terms and conditions of the Dealer's certified pre-owned program. EXCEPT FOR ANY MANUFACTURERS' WARRANTIES THAT MAY STILL BE IN EFFECT, ALL OTHER WARANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY DISCLAIMED. Rush makes no other representations regarding the Vehicle(s).

Because the Vehicle(s) are sold on an "AS IS, WHERE IS" basis with no warranties from Dealer, Dealer has offered the Customer the opportunity to purchase from a third party a service contract at an extra charge.

INITIAL ONE:

_Jmr_

Customer has elected to purchase a third party service contract for the Vehicle(s) for an extra charge or a third party service contract is included with. Customer acknowledges that Rush is not a party to the service contract and makes no representations regarding the service contract.

_____

Customer hereby DECLINES to purchase a third party service contract for the Vehicle(s). Customer understands that the Vehicle(s) does not include a warranty or extended service contract and that Customer is responsible for all costs for any repairs, subject to any manufacturer warranty that may be in effect.

**Trade Winds Transport LLC** _____
Customer Name

_signature_                    1/25/17
Signature                      Date

_Eric Grow_
Name
_Owner_
Title

PLAINTIFF'S
EXHIBIT
24

Ver_092716

Exhibit 25

Acknowledgement of "As Is" Purchase and 3rd Party Service Contract – Truck #004

# ACKNOWLEDGEMENT OF "AS IS" PURCHASE

## AND

## 3RD PARTY SERVICE CONTRACT

Dealer: **Rush Truck Center, Atlanta** _____ ("Dealer")

The customer identified below ("Customer") is purchasing the following used vehicle(s) from Dealer:

VIN(S): **3HSDJSJR5CN624256** _____ ("Vehicle(s)")

By signing below, Customer acknowledges that the Vehicle(s) are sold by Rush on an "AS IS, WHERE IS" basis, without any warranties by Rush, provided that Vehicle(s) sold by Dealer as "Certified Pre-Owned" are subject to the express written terms and conditions of the Dealer's certified pre-owned program. EXCEPT FOR ANY MANUFACTURERS' WARRANTIES THAT MAY STILL BE IN EFFECT, ALL OTHER WARANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY DISCLAIMED. Rush makes no other representations regarding the Vehicle(s).

Because the Vehicle(s) are sold on an "AS IS, WHERE IS" basis with no warranties from Dealer, Dealer has offered the Customer the opportunity to purchase from a third party a service contract at an extra charge.

INITIAL ONE:

_BMG_ ~~Customer has elected to purchase a third party service contract for the Vehicle(s) at an extra charge, or a third party service contract is included with the purchase. Customer acknowledges that Rush is not a party to the service contract and makes no representations regarding the service contract.~~

_____ Customer hereby DECLINES to purchase a third party service contract for the Vehicle(s). Customer understands that the Vehicle(s) does not include a warranty or extended service contract and that Customer is responsible for all costs for any repairs, subject to any manufacturer warranty that may be in effect.

**Trade Winds Transport LLC** _____
Customer Name

_signature_ _____   4/25/17
Signature        Date

ERIC GRACE _____
Name

Owner _____
Title

PLAINTIFF'S EXHIBIT
25

092716

Exhibit 26

Proposed Release

## SETTLEMENT AGREEMENT AND FULL RELEASE OF ALL CLAIMS

This is a Settlement Agreement and Full Release of All Claims (the "Agreement") between RUSH TRUCK CENTERS OF GEORGIA, INC., dba RUSH TRUCK CENTER, ATLANTA (hereinafter referred to as "Rush"), and TRADE WINDS TRANSPORT LLC (hereinafter referred to as the "Releasing Party"). RUSH and RELEASING PARTY may be collectively referred to as "the Parties."

## RECITALS

A.      Contractual Relationship. RUSH and RELEASING PARTY entered into four Retail Sales Orders dated January 25, 2017 (hereinafter collectively called the "Contract"), wherein RUSH sold to RELEASING PARTY four 2012 International ProStars, VIN: 3HSDJSJR5CN624256, VIN: 3HSDJSJR8CN624235, VIN: 3HSDJSJR7CN824243 and VIN: 3HSDJSJR6CN624251 (the "Trucks"), in the total amount of $129,879.76.

B.      Disputed Claims. There are disagreements, disputes and controversies between the Parties regarding the Contract, the Truck, and the rights and obligations arising therefrom, including the RELEASING PARTY'S claims that the Trucks have needed repairs since they were purchased, has incurred unexpected repairs and expenses arising from those repairs, claims the Trucks at the time of sale were overvalued and did not the meet the quality or conditions as advertised and represented, that they did not receive the benefit of their bargain, have sustained unexpected and unnecessary out of pocket expense, experienced down time and lost revenue, and one of the trucks currently needs tank repairs (collectively referred to as the "Claims").

C.      Denial of Claims. RELEASING PARTY and RUSH have denied, and continue to deny the claims of the other Party.

D.      No Admission of Liability.   This Agreement, and the execution hereof, does not, and is not intended to be, construed to be, or is an admission of any fault or wrongdoing by or on behalf of RUSH or RELEASING PARTY and all such claims having been expressly denied heretofore, and the parties continue to deny the same.

E.      Desire to Settle Claims. The Parties wish to settle the disagreements, disputes and controversies that exist between them.

G.      Contractual Provisions. All provisions of this Agreement are contractual in nature, and not mere recitals only.

H.      Purpose of Agreement.   The purpose of this Agreement is to set forth and embody a negotiated compromise and release, as set forth herein, and the Parties intend to release one another from their obligations under the Contract, and to hold one another harmless from any claims or causes of actions arising from the Contract or the Claims, and for RELEASING PARTY to indemnify RUSH for claims from third parties arising from RELEASING PARTIES' use and/or possession of the Trucks prior to the Effective Date of this Agreement.

## SETTLEMENT AND FULL RELEASE OF ALL CLAIMS

NOW THEREFORE, in exchange for the following, which RELEASING PARTY accepts as good and adequate consideration, RELEASING PARTY agrees to release and hold RUSH harmless from the Claims:

RUSH agrees to absorb the cost of one final repair, the repair of the fuel tanks ("Tank Repair"), for VIN: 3HSDJSJR8CN624235 at no cost to RELEASING PARTY (the "Consideration").

1.      Full and Final Release. RELEASING PARTY, hereby fully and finally RELEASES, ACQUITS, AND FOREVER DISCHARGES RUSH (and its parent company Rush Enterprises, Inc., along with all of its corporate affiliates and subsidiaries and any of their employees, directors, officers, attorneys and representatives, and any other parties who might be liable for the Claims), from any liability arising from the Claims or Contract.

*****
Page 1 of 3.

PLAINTIFF'S
EXHIBIT
2.6

SETTLEMENT AGREEMENT AND FULL RELEASE OF ALL CLAIMS
*****

2.  Covenant Not to Assert Further Claim. RELEASING PARTY covenants not to assert any actual or potential claims held by RELEASING PARTY, against RUSH, or its corporate parent or its subsidiaries and affiliates, employees, directors, officers, attorneys and representatives, for the Claims and/or any suits, demands, causes of action, charges or grievances of any kind or character whatsoever, heretofore or hereafter accruing for or because of any matter done, omitted or suffered to be done by any Party prior to and including the date hereof, or in any manner (whether directly or indirectly) arising from or related to the Claims.

3.  Binding Upon Representatives. RELEASING PARTY understands and agrees that by execution of this Agreement, the terms become binding upon RELEASING PARTY and upon all representatives, successors and assigns of RELEASING PARTY.

4.  Limitation as to Interpretation of Payment. RELEASING PARTY agrees that neither the Consideration, nor this Agreement, shall be intended to be, nor shall be construed to be, an admission of liability on the part of RUSH, and any and all such liability is expressly denied.

5.  Full Satisfaction. The aforementioned Consideration is accepted by RELEASING PARTY, in full satisfaction of the Claims, and any other claims that might be owned by RELEASING PARTY, against RUSH, including but not limited to all claims for direct special damages and consequential damages, claims of lost income, costs for repairs, or rental costs, whether such claims and/or damages are known or unknown, present or future.

6.  No Other Claims. RELEASING PARTY warrants and represents that RELEASING PARTY has no awareness of the existence of any actual or potential claim, demand, suit, cause of action, charge or grievance possessed by RELEASING PARTY, which is not subject to and fully released by this Agreement.

7.  Ownership of Claims. RELEASING PARTY warrants and represents that they are the full owners of all of any actual or potential claims, demands, suits, causes of action, charges, or grievances of any kind or character against RUSH which relate to the Claims above, and none have been assigned to any other person or entity.

8.  Hold Harmless Obligations. RELEASING PARTY agrees to hold harmless RUSH, and its parent company Rush Enterprises, Inc., along with all of its corporate affiliates and subsidiaries and any of their employees, directors, officers, attorneys and representatives, from the Claims and any and all other possible claims, damages, liability or causes of action which may be asserted by any person, firm or corporation in connection with the subject matter of this Agreement.

9.  Construction. This Agreement represents the mutual agreement of the Parties and shall not be construed more strongly against or in favor of any individual party.

10. Jurisdiction and Venue; Performance.  Except to the extent that the laws of the United States may apply or otherwise control this Agreement, the rights and obligations of the Parties shall be governed by, construed and interpreted in accordance with the laws of the State of Georgia, and Fulton County, Georgia shall be the proper place of venue to enforce the performance of this Agreement.

11. Entire Agreement.  This Agreement constitutes the entire agreement and understanding of RELEASING PARTY and RUSH with respect to the transactions contemplated hereby, and supersedes all prior agreements, arrangements, and understandings related to the subject matter hereof, including but not limited to, the Claims.

12. Binding Agreement. All the terms, provisions, conditions, covenants, warranties, recitals, and statements of intention in this Agreement shall be binding upon, inure to the benefit of, and be enforceable by RELEASING PARTY and RUSH.

*****

SETTLEMENT AGREEMENT AND FULL RELEASE OF ALL CLAIMS
*****

13. The Parties expressly agree that the terms and conditions of this Agreement, and all matters relating to the Claims shall be kept strictly confidential and shall not be revealed or divulged to any third persons or entities except as necessary for tax purposes and/or necessary and legitimate purposes, or pursuant to a court order. The Parties further agree and acknowledge that this Agreement not be disseminated to any third party without the prior written consent of the Parties.

14. Warranties Regarding Execution of Agreement. EACH RELEASING PERSON, ENTITY, OR PARTY WARRANTS THAT SUCH PARTY HAS READ THIS FULL AND FINAL AGREEMENT, AND FULLY UNDERSTANDS IT. EACH PARTY WARRANTS THAT SUCH PARTY IS OF LEGAL COMPETENCE OR LEGAL CAPACITY, AND IS FREE, WITHOUT DURESS, TO EXECUTE THIS AGREEMENT, AND THAT SUCH PARTY HAS DONE SO OF FREE WILL AND ACCORD, WITHOUT RELIANCE ON ANY REPRESENTATION OF ANY KIND OR CHARACTER NOT EXPRESSLY SET FORTH HEREIN.

15. Effective Date of Agreement. This Agreement is to be effective upon the execution hereof by RELEASING PARTY and the "Effective Date" of this Agreement shall be the date set forth below the signature of RELEASING PARTY. The Agreement may be executed in counter parts and electronic signatures are sufficient.

AGREED and EXECUTED as of the Effective Date as set forth below.

RELEASING PARTY:

TRADE WINDS TRANSPORT LLC

By: _____

_____
(print name)                    (title)

_____
(date)

RUSH TRUCK CENTERS OF GEORGIA, INC.

By: _____

_____
(print name)                    (title)

_____
(date)

# EXHIBIT C-8

Fulton County Superior Court
***EFILED***TAW
Date: 10/5/2018 5:04 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

**TRADE WINDS TRANSPORT LLC, and
ERIC GRACE, individually, and doing
business as WEST COAST LOGISTICS
LLC,**

        **Plaintiff,**

        **v.**

**RUSH ENTERPRISES, INC., RUSH
TRUCK CENTERS OD GEORGIA,
INC., RUSH TRUCK CENTERS OF
FLORIDA, INC., INTERSTATE
CREATIONS LLC, NAVISTAR, INC.,
TROY CLARKE, individually, DENNIS
KING, individually, WILL NEWMAN,
individually, WILLIAM MAURICE
"RUSTY" RUSH, individually,
DOUGLAS SHIELDS, individually,
CHRISTOPHER VENTI, individually,
JOSHUA VENTI, individually, JOHN
DOE, individually, and ABC ENTITY
      Defendants.**

**CIVIL ACTION FILE NO.
2018CV311198**

**HON. ERIC K. DUNAWAY**

---

## NOTICE OF HEARING

    Please be advised that the above-captioned matter will come before The Honorable Eric

K. Dunaway for a hearing on Plaintiff's Motion for EX PARTE Temporary Restraining Order

and Order Requiring Compliance with Plaintiff's Notice to Produce on **Wednesday, October**

**10, 2018 at 3:00 p.m.** in Courtroom 4F, Fulton County Superior Court, 185 Central Avenue SW,

Atlanta, GA 30303.  No continuances of this hearing will be granted unless good cause is shown.

Failure to appear could result in a dismissal of the case, default judgment, or other sanctions.

Any legal conflicts are to be reported to Lisa Rast, Staff Attorney to Judge Dunaway, at least

**seven** (7) days prior to the hearing in a conflict letter compliant with Uniform Superior Court

Rule 17.1.  Any questions regarding this notice should also be directed to Lisa Rast, who may be

contacted at (404) 612-6044 or lisa.rast@fultoncountyga.gov. If the parties would like the

hearing reported, such inquiries should be directed to Jolanda Price, Court Reporter, at (404)

612-6049 or jolanda.price@fultoncountyga.gov.

This the 5th day of October, 2018.

*Eric Dunaway*
_____
**ERIC K. DUNAWAY**, JUDGE
Fulton County Superior Court
Atlanta Judicial Circuit

# EXHIBIT C-9

Fulton County Superior Court
***EFILED***MH
Date: 10/9/2018 11:16 PM
Cathelene Robinson, Clerk

## NOTICE OF LEAVE OF ABSENCE

TO:        All Judges, Clerks of Court and Counsel of Record

FROM:    Robert Arkin                                                    2018CV311198

RE:        **Notice of Leave of Absence**

DATE:    October 9, 2018

COMES NOW, Robert Arkin, and respectfully notifies all judges before whom he has cases pending, all affected clerks of court, and all opposing counsel and pro se parties as shown on Exhibit A attached hereto, that he will be on leave pursuant to Georgia Uniform Court Rule 16.

1.        The period of leave during which time Applicant will be away from the practice of law are:  October 18-23, 2018.  The reasons for the leave are to attend my father-in-law's funeral and personal leave.

2.        All affected judges and opposing counsel shall have ten (10) days from the date of this Notice to object to it. If no objections are filed, the leave will be granted.

_____

Robert Arkin
Georgia Bar No.: 021575

ROBERT ARKIN LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Ste. 1428
Atlanta, GA 30303
Phone: (404) 220-8500
Fax:    (855) 804-9334
Email: robert@arkin.law

1

**Exhibit A**

| NAME OF CASE<br>CASE NUMBER | COURT/COUNTY<br>NAME OF JUDGE | OPPOSING COUNSEL |
|---|---|---|
| Trade Winds Transport LLC, et al. v. Rush Enterprises, Inc., et al., Civil Action File No. 2018CV311198 | Fulton Superior Court Hon. Eric K. Dunaway | Fredrick W. Helveston Corporate Counsel Rush Enterprises, Inc. (830) 830-302-5256 GefenJ@rushenterprises.com |
| In Re: Estate of Catherine Bussey Austin Estate No. PC-2016-671 | Fulton Probate Court Hon. Pinkie Turner Toomer | Thomas Gould Caldwell, Propst & DeLoach, LLP (404) 843-4107 Tgould@cpdlawyers.com |
| Orion Vision Group, Inc. v. Rose, et al. Civil Action File No. 17-1-7964 | Cobb Superior Court Hon. Ann B. Harris | Matthew M. Wilkins Collin D. Hatcher King, Yaklin & Wilkins, LLP 770-615-7216 mwilkins@kingyaklin.com chatcher@kingyaklin.com |
| Paul Diederich v. Element Condominium Association, et al. | Fulton Superior Court | Lanier Coulter Coulter & Sierra LLC 404.554.2071 glc@coultersierra.com |
| YP, LLC and YP Advertising and Publishing, LLC VS My-Hien Pham d/b/a Goldfinger's Aesthetics Civil Action File No. 17CV8853 | DeKalb Superior Court Hon. Courtney L. Johnson | Lunsford Dunn, Leslie Ann ldunnattorney@gmail.com |
| YP LLC d/b/a YP Advertising and Publishing LLC v. JC Plumbing, Inc., Civil Action File No. 18CV1534 | DeKalb Superior Court Hon. Gail C. Flake | Benjamin D. Schwartz Schwartz & Stafford, P.A. (704) 708-5652 bschwartz@pss-law.com |
| ABC Supply Co., Inc. v. Future Remodeling, LLC 2018CV301515 | Fulton Superior Court Hon. Shawn Ellen LaGrua | Beau Hays Hays Potter & Martin, LLP 770-934-8858 Cell: 404/433- Beau@HPMLawATL.com |
| Cooley v. Luellen, et al., Civil Action File No. 18CV306822 | Fulton Superior Court Hon. Doris Downs | |

| | | |
|---|---|---|
| Jackson v. Nabie, Case No. 2018CV00710 | Clayton Superior Court Hon. Geronda V. Carter | Martha Nabie, Pro Se 893 Carter Road Jonesboro, GA 30238 404-661-3381 marthaanabie@yahoo.com mnabie@yahoo.com |
| Dawson v. Hall, et al. Civil Action File No. 2018CV309398 | Fulton Superior Court Hon. Kelly Lee Ellerbe | |

# EXHIBIT C-10

Fulton County Superior Court
***EFILED***MH
Date: 10/9/2018 11:16 PM
Cathelene Robinson, Clerk

## THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **TRADE WINDS TRANSPORT LLC, and** | ) | |
| **ERIC GRACE, individually,** | ) | |
|    **and doing business as** | ) | |
| **WEST COAST LOGISTICS LLC,** | ) | |
| | ) | |
|      **Plaintiffs,** | ) | **Civil Action No.: 2018CV311198** |
| | ) | |
| **RUSH ENTERPRISES, INC.,** | ) | |
| **RUSH TRUCK CENTERS OF GEORGIA, INC.,** | ) | |
| **RUSH TRUCK CENTERS OF FLORIDA, INC.,** | ) | |
| **INTERSTATE CREATIONS LLC,** | ) | |
| **NAVISTAR, INC.,** | ) | **JURY TRIAL DEMANDED** |
| **TROY CLARKE, individually,** | ) | |
| **DENNIS KING, individually,** | ) | |
| **WILL NEWMAN, individually,** | ) | |
| **WILLIAM MAURICE "RUSTY" RUSH,** | ) | |
|    **individually,** | ) | |
| **DOUGLAS SHIELDS, individually,** | ) | |
| **CHRISTOPHER VENTI, individually,** | ) | |
| **JOSHUA VENTI, individually,** | ) | |
| **JOHN DOE, individually, and** | ) | |
| **ABC ENTITY,** | ) | |
| | ) | |
|      **Defendants.** | ) | |

## BRIEF IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR EXPEDITED DISCOVERY

COMES NOW, Trade Winds Transport LLC ("Trade Winds") and Eric Grace ("Grace"),

Plaintiffs in the above-styled manner, and file this Brief in Support of their Emergency Motion for

Expedited Discovery, and respectfully show the Court as follows:

### PRELIMINARY STATEMENT

Trade Winds and Grace are victims of Defendants' illicit scheme and conspiracy to pass

off, as "Certified Pre-Owned," "Diamond," "remanufactured," or "pre-certified to manufacturer's

1

specs," four used, un-reconditioned, defective 2012 Navistar International Prostar™ Plus LF 627 Premium 13.0-liter engine diesel rear wheel drive Class 8 commercial tractor trucks manufactured and ostensibly reconditioned by Defendant Navistar, Inc. and sold through dealerships owned by Rush Enterprises, Inc. in Atlanta, Georgia (i.e., Rush Truck Centers of Georgia, Inc.) and Jacksonville, Florida (i.e., Rush Truck Centers of Florida, Inc.). (Verified Complaint, ¶¶ 140-152.) Based upon Defendants' representations that the vehicles were reconditioned and "certified Pre-Owned" and warranted under the Rush Truck Centers Certified Pre-Owned Program ("Rush Certified Pre-Owned Program") and exclusive RushCare™ Protection Plan described on the websites of Rush Enterprises, Inc. ("Rush Enterprises"), Rush Truck Centers of Georgia, Inc. ("Rush-Atlanta") and Rush Truck Centers of Florida, Inc. ("Rush-Jacksonville") (Rush Enterprises, Rush-Atlanta and Rush-Jacksonville being hereinafter referred to collectively, the "Rush Entities"), Trade Winds and Grace purchased four used, un-reconditioned, defective 2012 Navistar International Prostar™ Plus LF 627 Premium 13.0-liter engine diesel rear wheel drive Class 8 commercial tractor trucks (the "Trucks") for approximately $130,000. (Verified Complaint, ¶¶ 66-74.)

Immediately after the purchase, the Trucks began evincing significant mechanical issues. All four Trucks have since broken down repeatedly and the Trucks are no longer operational. Indeed, no Truck remained in operation longer than eight months after purchase. (Verified Complaint ¶¶ 84-125.)

Assuming that the "exclusive RushCare™ Protection Plan" included under the Rush Certified Pre-Owned Program would cover the repairs on the Trucks, Trade Winds and Grace approached the Rush Entities' and their affiliates, only to find that the Rush Certified Pre-Owned Program was either a hoax, existing in name only or, if it did exist, did not cover the Trucks.

(Verified Complaint ¶¶ 78, 80.)  Based upon the Trucks' mechanical condition, the Trucks could not have passed the Rush Certified Pre-Owned Program's 143-point inspection and pre-certification road test and have been reconditioned to manufacturers specifications. (Verified Complaint, ¶¶ 91, 104, 120, 124.)  In fact, notwithstanding Trade Winds' repeated requests, the Rush Entities have never delivered to Grace copies of the completed 143-point inspections and pre-certification road tests for each of the four Trucks (Verified Complaint, ¶¶ 84-125.)  In addition, the Trucks' Navistar MaxxForce engines had serious defects and are the subject of several lawsuits. (Verified Complaint, ¶¶ 126-139.)

As a result of Defendants' conspiracy to pawn off the Trucks as reconditioned, precertified and warrantied under the Rush Certified Pre-Owned Program and exclusive RushCare™ Protection Plan, Trade Winds and Grace have suffered the following damages and injury:

(i)     Complete loss of Grace's investment in Trade Winds;

(ii)    Loss of Trade Winds' earnings and revenue;

(iii)   Trade Winds' insolvency and business failure;

(iv)    Loss of income to Grace;

(v)     Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)    Severe emotional distress, which resulted in Grace's almost fatal heart attack, medical complications and heart and kidney transplants.

(Verified Complaint, ¶¶ 163, 182, 194, 204, 215, 223, 233, 243, 250, 257, 267, 277, 284, 294, 354, 362, 392, 399, 450, 481.)

## BRIEF STATEMENT OF FACTS

In September 2016, Trade Wind's Managing Member, Grace, responded to a listing on

BizBuySell.com, an online "Business for Sale Marketplace," advertising the sale of trucking company in Hawaii grossing over $1.5 million annually. (Complaint ¶ 33.)  On information and belief, the listing advertising the Hawaiian trucking company was a "bait and switch" orchestrated by Defendants Christopher Venti ("Chris Venti") and Joshua Venti to solicit potential customers on false pretenses (Complaint ¶ 37.)

In November 2016, Chris Venti, who with Josh Venti, controls Defendant Interstate Creations LLC ("Interstate"), responded to Grace's inquiry, advising Grace that the Hawaiian company was not "for sale any more [sic]." (Complaint ¶ 37.)  Instead, Chris Venti proposed that Grace retain Interstate as a consultant to help Grace start his own trucking company, providing a materially misleading seven-page Offering Circular entitled "Dream of Owning Your Own Business and Making a Minimum of $5,000 a week or $260,000 for Under $55,000." (Verified Complaint ¶¶ 36, 38.)  Grace signed the Consulting Agreement with Interstate on November 29, 2016. (Verified Complaint ¶¶ 45, 51, 55.)

Soon after the execution of the Consulting Agreement, Interstate and the Ventis began touting a "new sales platform" called the "Rush Certified Pre-Owned Program." (Verified Complaint ¶ 45.)  The Rush Entities' websites described their certified Pre-Owned vehicles as "among the highest quality, best value, pre-owned trucks available today. . .. Each vehicle must pass an exhaustive 143-point inspection and pre-certification road test . . . [a]nd includes . . . the exclusive RushCare™ Protection Plan." (Verified Complaint ¶ 47.)

The Ventis referred Grace to Dennis King ("King"), the New and Used Truck Sales Manager at Rush-Jacksonville. In a December 22, 2016 email, followed by a telephone conversation on December 23, 2016, King advised Grace that:

(i)     Rush Enterprises ran the Rush Certified Pre-Owned Program exclusively out of the

Rush-Atlanta dealership. (Verified Complaint ¶ 61.)

 (ii) The Rush Certified Pre-Owned Program was very exclusive in that it only included warrantied trucks identified on a Special Inventory List prepared for Rush Enterprises by Dennis Shields, the National Director, Used Truck Operations - Rush Enterprises, Inc. (Verified Complaint ¶¶ 61, 62, 66, Exhibit 5.)

 (iii) The Rush Certified Pre-Owned Program included only tractor trucks that passed the 143-point inspection and pre-certification road test and were reconditioned to manufacturers specifications. (Verified Complaint ¶ 61.)

 (iv) The Rush Certified Pre-Owned Program included, without additional charge, the exclusive RushCare™ Protection Plan, and represented "their signature RushCare Warranty" and "the best used truck warranty we have ever offered." (Verified Complaint ¶¶ 56, 61.)

King also assured Grace that, with the exclusive RushCare™ Protection Plan, Trade Winds would avoid costly maintenance and repairs. (Verified Complaint ¶ 82.)

Based upon Defendants' representations that the Trucks were reconditioned and "certified Pre-Owned" and warrantied under the Rush Certified Pre-Owned Program and exclusive RushCare™ Protection Plan, Trade Winds and Grace purchased the Trucks for approximately $130,000 on January 25, 2017. (Verified Complaint, ¶¶ 66, 68.) On behalf of Trade Winds, Grace signed, among other documents, a three-page Retail Sales TRO with Rush-Atlanta and a six-page American Guardian Warranty Services, Inc. ("AGWS") Vehicle Service Agreement with Rush-Jacksonville for each of the Trucks. (Verified Complaint ¶ 69.)

Over the next three weeks, Trade Winds dispatched drivers to Rush-Atlanta where they took possession of the Trucks. (Verified Complaint ¶¶ 84, 98, 115, 122.) Immediately, the Trucks

began evincing significant mechanical issues. One of the Trucks broke down 70 miles after the driver picked it up from Rush-Atlanta. (Verified Complaint ¶ 99.)  All four Trucks broke down within a matter of weeks or months no Truck remained in operation longer than eight months after purchase. (Verified Complaint ¶¶ 84-125.)  In addition, the Trucks' Navistar MaxxForce engines has serious defects and are the subject of several lawsuits. (Verified Complaint ¶¶ 126-139.)

On information and belief, the Rush Certified Pre-Owned Program and exclusive RushCare™ Protection Plan, which Defendants represented as "the best in the industry," (Verified Complaint ¶ 48) is a hoax, existing in name only, which Defendants fabricated as part of their conspiracy to unload otherwise unsaleable vehicles and increase profit margins at the expense of trusting customers. (Verified Complaint, ¶¶ 73, 78-79.)  However, even if the Rush Certified Pre-Owned Program is not a hoax, the Trucks (i) did not pass, or even undergo, the "exhaustive 143-point inspection and pre-certification road test" that Defendants represented as central to the Rush Certified Pre-Owned Program (Verified Complaint, ¶ 74), and (ii) were not covered under the exclusive RushCare™ Protection Plan. (Verified Complaint ¶ 80.)  Despite repeated request, neither King nor any other agent or affiliate of the Rush Entities have provided Trade Winds or Grace with copies of the completed 143-point inspection on each Truck. (Verified Complaint ¶ 72.)

On information and belief, King intentionally confused the so-called RushCare™ Protection Plan with the Vehicle Service Agreements described above, misleading Trade Winds and Grace into believing the Vehicle Service Agreements and the "exclusive RushCare™ Protection Plan" were one and the same, when they were not. (Verified Complaint ¶ 79.)  In fact, the Vehicle Service Agreements are not exclusive to Rush-Atlanta but offered by a separate company, AGWS through AGWS's extensive U.S. dealer network in which Rush-Jacksonville

participates. (Verified Complaint ¶¶ 81, 180.) In addition, the AGWS Vehicle Service Agreements, which cost Trade Winds $28,548, were optional extended warranties (Verified Complaint ¶ 179), rather than the ostensible RushCare™ Protection Plan advertised by the Rush Entities as included, without additional charge, as part of the Rush Certified Pre-Owned Program.

Despite the $28,548 added cost, the Vehicle Service Agreements proved worthless to Trade Winds and Grace because they only included "covered Breakdowns." To determine the existence of a covered Breakdown, Trade Winds was required upfront to "pay for any teardown or diagnostic time need to determine whether [the vehicle had] a covered Breakdown," which proved extremely expensive. In addition, it took weeks, once the repairer diagnosed a covered Breakdown, for a Repair Authorization to be issued. Furthermore, the total downtime between delivery of the disabled Trucks to the repair facility, the teardown and diagnosis and the repair itself was so lengthy as to be untenable.[1] Finally, covered Breakdowns did not include many of the significant mechanical problems afflicting the Trucks, such as (i) cracked or corroded fuel tanks;[2] (ii) the engine computer; (iii) brakes; (iv) air conditioning; (v) the electrical system; (vi) the alternator/generator/regulator; (vii) electronic stability control; (viii) trailer hitches; (ix) visibility; (x) defroster/defogger system, windshield and blower; and (xi) the drive axle.

## ARGUMENT AND CITATION OF AUTHORITY

### A. Uniform Superior Court Rule 6.7.

Trade Winds and Grace seek expedited discovery under Uniform Superior Court Rule 6.7. Rule 6.7 provides in relevant part:

---

[1] When operational each Truck generated revenues for Trade Winds of approximately $900 per day. When out of service, the incremental fixed cost for each Truck to Trade Winds was $50 per hour.

[2] In an unsuccessful effort to limit its liability, Rush Truck Centers of Georgia, Inc. offered to repair the fuel tank on one truck in exchange for a full and final release of all claims relating to the sale and purchase of all the Trucks. (Verified Complaint ¶¶ 92-95.)

> Upon written notice and good cause shown, the assigned judge may shorten or waive the time requirement applicable to emergency motions . . . or grant an immediate hearing on any matter requiring such expedited procedure. The motion shall set forth in detail the necessity for such expedited procedure.

Trade Winds and Grace have good cause for seeking their Emergency Motion for Expedited Discovery (the "Emergency Motion"). The Emergency Motion requests the Court to order each Defendant to respond to ten Interrogatories from Trade Winds and Grace and submit to one deposition to enable Trade Winds and Grace to conduct the factual investigation necessary to support their Motion for an Interlocutory Injunction before the 30-day term of a Temporary Restraining Order expires of its own accord.

The Motion is necessitated because of the allegations set forth in the Verified Complaint, which support 19 causes of action against one or more of the Defendants, including breach of contract, fraud in the inducement, deceit, constructive fraud, conspiracy, and violations of the federal RICO statute and the Georgia RICO statute. These allegations demonstrate that Defendants have conspired and engaged in a demonstrable patter of deceptive activities, which reflects their propensity for the spoliation of evidence. For example, the Rush Entities never provided Trade Winds and Grace with fully executed copies of the Retail Service Orders and the Vehicle Service Agreements for the four Trucks. (Verified Complaint, ¶ 69 and Exhibits 10, 11, 12, 13, 14, 15, 16, 17.) If these contracts were *never* countersigned by Rush-Atlanta and Rush-Florida, the exculpatory language upon which Defendants would certainly rely to support their defense would be inadmissible. Without early access to these and other documents in the possession of the Rush Entities, Trade Winds and Grace risk the spoliation of evidence Therefore, it is imperative that Trade Winds and Grace have the opportunity to conduct limited discovery during the time interval between issuance of a Temporary Restraining Order and a hearing on Plaintiffs' Motion for Interlocutory Injunction.

**B. Good Cause**

When the moving party shows "necessity" or "good cause" in support of its motion, expedited discovery is appropriate. *See* Tefel v. Reno, 972 F.Supp. 608, 621 (S.D. Fla. 1997), granting plaintiffs motion for expedited discovery to obtain essential testimony and documents; see also Commodity Futures Trading Commission v. Advent Capital Partners, Ltd., 2002 WL 31357169 (N.D. Ga. 2002), granting motion for expedited discovery. In Semitool v. Tokyo Electron America, Inc., 208 F.R.D. 273, 276 (N.D. Cal. 2002), the U.S. District Court opined that "[g]ood cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party."

In the instant matter, Plaintiffs have demonstrated good cause. Plaintiffs merit expedited discovery because Plaintiffs' need for expedited discovery outweighs the prejudice to the responding part. Evidence essential to Plaintiffs' case is in Defendants sole possession. If that evidence is destroyed, Plaintiffs' ability to discover this evidence by other means is nonexistent.

**C. Notaro Factors**

In Notaro v. Koch, 95 F.R.D. 403 (S.D.N.Y. 1982), the U.S. District Court set forth four factors the moving party must satisfy for the court to grant a motion for expedited discovery, to wit: (i) irreparable injury, (ii) some probability of success on the merits, (iii) some connection between the expedited discovery and the avoidance of the irreparable injury, and (iv) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." Notaro, 95 F.R.D. at 405. When a

discovery request has substantive elements similar to a request for equitable relief, the court has applied the *Notaro* analysis. In the instant case, Plaintiffs satisfy each of the four factors.

**D. Reasonableness Inquiry**

Some courts have applied a reasonableness standard in considering a motion for expedited discovery. In Entm't Tech. Corp. v. Walt Disney Imagineering, 2003 U.S. Dist. LEXIS 19832 (E.D. Pa. 2003), the U.S. District Court identified several factors, to wit:

(i)     Is the non-movant an "unsophisticated" party that requires additional time so that it may retain counsel?

(ii)    Are the discovery requests overbroad?

(iii)   Will the moving party suffer irreparable harm if discovery is not expedited?

(iv)    Some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.

In Entm't Tech. Corp., the U.S. District Court concluded that, if request is narrowly tailored to fit the needs of the hearing, leave to conduct expedited should be granted.

Each of the *Entertainment Technology* factors weighs in favor of the court granting Trade Wind's motion for expedited discovery. First, with the possible exception of the Venti Defendants and Trade Winds, the other Defendants are sophisticated parties with the ability and means to secure outside legal counsel to help it respond to the contemplated expedited discovery. Second, Plaintiffs' requests are not overbroad in that they are narrowly tailored to specific information pertaining to discussions had and representations made between Plaintiffs and Defendants. Third, Plaintiffs will suffer irreparable harm if Defendants do, in fact, destroy information pertaining to discussions and representations they made since Plaintiffs have no alternative means of

discovering this information. Fourth and finally, the injury that will result to Plaintiffs without expedited discovery far outweighs any injury that Defendants will suffer if the expedited relief is granted.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests that their Motion be GRANTED and that an Order issue requiring Defendants to provide discovery information on an expedited basis.

Respectfully submitted this 9th day of October 2018.

_____
Robert Arkin
Georgia Bar No.: 021575
Attorney for Plaintiffs

ROBERT ARKIN LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Ste. 1428
Atlanta, GA 30303
Phone: (404) 220-8500
Fax:    (855) 804-9334
Email: robert@arkin.law

# EXHIBIT C-11

Fulton County Superior Court
***EFILED***MH
Date: 10/9/2018 11:16 PM
Cathelene Robinson, Clerk

## THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **TRADE WINDS TRANSPORT LLC**, and | ) | |
| **ERIC GRACE**, individually, | ) | |
| and doing business as | ) | |
| **WEST COAST LOGISTICS LLC**, | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No.: 2018CV311198** |
| | ) | |
| **RUSH ENTERPRISES, INC.,** | ) | |
| **RUSH TRUCK CENTERS OF GEORGIA, INC.,** | ) | |
| **RUSH TRUCK CENTERS OF FLORIDA, INC.,** | ) | |
| **INTERSTATE CREATIONS LLC,** | ) | |
| **NAVISTAR, INC.,** | ) | **JURY TRIAL DEMANDED** |
| **TROY CLARKE**, individually, | ) | |
| **DENNIS KING**, individually, | ) | |
| **WILL NEWMAN**, individually, | ) | |
| **WILLIAM MAURICE "RUSTY" RUSH,** | ) | |
| individually, | ) | |
| **DOUGLAS SHIELDS**, individually, | ) | |
| **CHRISTOPHER VENTI**, individually, | ) | |
| **JOSHUA VENTI**, individually, | ) | |
| **JOHN DOE**, individually, and | ) | |
| **ABC ENTITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFFS' NOTICE TO PRODUCE

COME NOW Plaintiffs Trade Winds Transport LLC and Eric Grace (hereinafter "Plaintiffs") and, by and through their counsel, file this Motion for Temporary Restraining Order pursuant to O.C.G.A. § 9-11-65(d) and Order Requiring Compliance with Plaintiffs' Notice to Produce pursuant to O.C.G.A. § 24-10-26 for the reasons set forth in the following pleadings:

1

(i)     Plaintiffs' Brief in Support of their Motion for Temporary Restraining Order pursuant to O.C.G.A. § 9-11-65(d) and Order Requiring Compliance with Plaintiffs' Notice to Produce pursuant to O.C.G.A. § 24-10-26, which requests the Court to enjoin Defendants from the spoliation of evidence pertinent to this case during the 30-day term of the TRO or the Court's hearing on Plaintiffs' Motion for Interlocutory Injunction, whichever is earlier;

(ii)     Plaintiffs' Motion for *Ex Parte* Temporary Restraining Order pursuant to O.C.G.A. § 9-11-65(b) and Order Requiring Compliance with Plaintiffs' Notice to Produce pursuant to O.C.G.A. § 24-10-26;

(iii)     Plaintiff's Brief in Support of their Motion for *Ex Parte* Temporary Restraining Order and Order Requiring Compliance with Plaintiffs' Notice to Produce;

(iv)     Plaintiff's Certification of Counsel pursuant to O.C.G.A. § 9-11-65(b);

(v)     Plaintiffs' Notice to Defendants to Preserve Electronic Data pursuant to O.C.G.A. § 9-11-34;

(vi)     Plaintiff's Notice to Produce pursuant to Plaintiff's Certification of Counsel pursuant to O.C.G.A. § 9-11-65(b).

(vii)     Plaintiffs' Emergency Motion for Expedited Discovery and Brief in Support thereof that requests the Court to order each Defendant to respond to ten Interrogatories from Trade Winds and Grace and submit to one deposition to enable Trade Winds and Grace to obtain enough information to determine whether to file the Motion for an Interlocutory Injunction before the 30-day term of the TRO expires of its own accord; and

(viii)     Plaintiffs' Verified Complaint and exhibits thereto.

A proposed Temporary Restraining Order and Order Requiring Compliance with Plaintiffs' Notice

to Produce is attached hereto as Exhibit A.


Respectfully submitted this 9th day of October 2018.


_____
Robert Arkin
Georgia Bar No.: 021575
Attorney for Plaintiffs

ROBERT ARKIN LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Ste. 1428
Atlanta, GA 30303
Phone: (404) 220-8500
Fax:    (855) 804-9334
Email: robert@arkin.law

**Exhibit A**

THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

TRADE WINDS TRANSPORT LLC, and )
ERIC GRACE, individually, )
   and doing business as )
WEST COAST LOGISTICS LLC, )
    )
      Plaintiffs, )     Civil Action No.: 2018CV311198
    )
RUSH ENTERPRISES, INC., )
RUSH TRUCK CENTERS OF GEORGIA, INC., )
RUSH TRUCK CENTERS OF FLORIDA, INC., )
INTERSTATE CREATIONS LLC, )
NAVISTAR, INC., )     JURY TRIAL DEMANDED
TROY CLARKE, individually, )
DENNIS KING, individually, )
WILL NEWMAN, individually, )
WILLIAM MAURICE "RUSTY" RUSH, )
   individually, )
DOUGLAS SHIELDS, individually, )
CHRISTOPHER VENTI, individually, )
JOSHUA VENTI, individually, )
JOHN DOE, individually, and )
ABC ENTITY, )
    )
      Defendants. )

## [PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING

## COMPLIANCE WITH PLAINTIFFS' NOTICE TO PRODUCE

THIS MATTER is before the Court on the application of the Plaintiffs for a Temporary

Restraining Order under O.C.G.A § 9-11-65(d) and Order Requiring Compliance with Plaintiffs'

Notice to Produce under O.C.G.A. § 24-10-26. After oral argument and submission of briefs by

the parties, the Court finds that immediate and irreparable injury, loss, and/or damage will result if Plaintiffs' motion is not granted.

Accordingly, it is **HEREBY ORDERED** that Defendants are enjoined from:

(1)     Deleting any files or other electronic data from Defendants' personal and workplace computers, tablets, cellular telephones, portable digital media storage devices, or from any and all cloud-based services such as Gmail, iCloud, Dropbox, Google Drive, Google Docs, or One Drive (Office 365); and

(2)     Destroying any and all documents or other physical evidence relating to the facts contained in the Verified Complaint for Equitable Relief and Damages; and

Defendants are further **HEREBY ORDERED** to comply with Plaintiffs' Notice to Produce and cooperate with Plaintiffs and their attorney and agents, as follows:

(1)   Within three (3) business days from the date of this Order, providing any and all login, passwords, passcodes, and/or swipe patterns to unlock mobile or electronic devices, internet-based, cloud computing services or networks, including, but not limited to, Gmail, iCloud, Google Drive, Google Docs, or One Drive (Office 365) for the purpose of forensic mirror imaging of the same by Kroll Discovery to collect and preserve data for subsequent extraction of admissible evidence;

(2)   Within three (3) business days from the date of this Order, felivering physically into the custody of the Court any and all personal and workplace computers, tablets, cellular telephones, portable digital media storage devices, including, but not limited to, flash drives, Compact Discs ("CDs"), and Digital Video Discs ("DVDs"), used by the Defendants since January 1, 2016, for the purpose of forensic mirror imaging of the

same by Kroll Discovery to collect and preserve data for subsequent extraction of admissible evidence; and

(3) Bringing any and all physical documents with regard to the Trucks pertaining to the 143-point inspections and pre-certification road tests, the Retail Service Orders and the Vehicle Service Agreements.

This Order shall expire 30 days following the date of issuance of this Temporary Restraining Order or immediately following the Court's hearing on Plaintiffs' Motion for Interlocutory Injunction, whichever occurs earlier.

ORDERED this _____ day of October 2018.


_____
JUDGE, Superior Court of Fulton County

Presented by:


_____
Robert Arkin
Georgia Bar No.: 021575
Attorney for Plaintiffs

ROBERT ARKIN LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Ste. 1428
Atlanta, GA 30303
Phone: (404) 220-8500
Fax:    (855) 804-9334
Email: robert@arkin.law


Submitted:  October 9, 2018

Fulton County Superior Court
***EFILED***MH
Date: 10/9/2018 11:16 PM
Cathelene Robinson, Clerk

THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

TRADE WINDS TRANSPORT LLC, and )
ERIC GRACE, individually, )
  and doing business as )
WEST COAST LOGISTICS LLC, )
                             )
      Plaintiffs, )      Civil Action No.: 2018CV311198
                             )
RUSH ENTERPRISES, INC., )
RUSH TRUCK CENTERS OF GEORGIA, INC )
RUSH TRUCK CENTERS OF FLORIDA, INC. )
INTERSTATE CREATIONS LLC, )
NAVISTAR, INC., )      JURY TRIAL DEMANDED
TROY CLARKE, individually, )
DENNIS KING, individually, )
WILL NEWMAN, individually, )
WILLIAM MAURICE "RUSTY" RUSH, )
  individually, )
DOUGLAS SHIELDS, individually, )
CHRISTOPHER VENTI, individually, )
JOSHUA VENTI, individually, )
JOHN DOE, individually, and )
ABC ENTITY, )
                             )
      Defendants. )

      The Motion for Temporary Restraining Order and Order Requiring Compliance with Plaintiffs' Notice to Produce of Plaintiffs Trade Winds Transport LLC and Eric Grace (hereinafter "Plaintiffs") having been filed with this Court on October 9, 2018, it is

      **HEREBY ORDERED** that Defendants appear before the Honorable _____, on the ____ day of October, 2018, at _____ a.m./p.m. in Courtroom _____ at the Superior Court of Fulton County, to show cause, if any, why the Plaintiffs' Motion should not be granted.

1

This _____ day of October 2018.


_____
JUDGE,
SUPERIOR COURT OF FULTON COUNTY

Presented by:


_____
Robert Arkin
Georgia Bar No. 021575
Attorney for Plaintiffs

Robert Arkin LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Suite 1428
Atlanta, GA 30303-2946
Phone: (404) 220-8500
Fax:    (855) 804-9334
Email: robert@arkin.law

Submitted:  October 9, 2018

2

# EXHIBIT C-12

Fulton County Superior Court
***EFILED***MH
Date: 10/9/2018 11:16 PM
Cathelene Robinson, Clerk

## THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **TRADE WINDS TRANSPORT LLC,** and | ) | |
| **ERIC GRACE, individually,** | ) | |
| and doing business as | ) | |
| **WEST COAST LOGISTICS LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No.: 2018CV311198** |
| | ) | |
| **RUSH ENTERPRISES, INC.,** | ) | |
| **RUSH TRUCK CENTERS OF GEORGIA, INC.,)** | | |
| **RUSH TRUCK CENTERS OF FLORIDA, INC.,)** | | |
| **INTERSTATE CREATIONS LLC,** | ) | |
| **NAVISTAR, INC.,** | ) | **JURY TRIAL DEMANDED** |
| **TROY CLARKE, individually,** | ) | |
| **DENNIS KING, individually,** | ) | |
| **WILL NEWMAN, individually,** | ) | |
| **WILLIAM MAURICE "RUSTY" RUSH,** | ) | |
| individually, | ) | |
| **DOUGLAS SHIELDS, individually,** | ) | |
| **CHRISTOPHER VENTI, individually,** | ) | |
| **JOSHUA VENTI, individually,** | ) | |
| **JOHN DOE, individually,** and | ) | |
| **ABC ENTITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFFS' NOTICE TO PRODUCE

COMES NOW, Trade Winds Transport LLC ("Trade Winds") and Eric Grace ("Grace"),

Plaintiffs in the above-styled manner, and file this Brief in Support of their Motion for Temporary

Restraining Order and Order Requiring Compliance with Plaintiffs' Notice to Produce (the

"TRO"), and respectfully show the Court as follows:

## PRELIMINARY STATEMENT

Trade Winds and Grace are victims of Defendants' illicit scheme and conspiracy to pass

1

off, as "Certified Pre-Owned," "Diamond," "remanufactured," or "pre-certified to manufacturer's specs," four used, un-reconditioned, defective 2012 Navistar International Prostar™ Plus LF 627 Premium 13.0-liter engine diesel rear wheel drive Class 8 commercial tractor trucks manufactured and ostensibly reconditioned by Defendant Navistar, Inc. and sold through dealerships owned by Rush Enterprises, Inc. in Atlanta, Georgia (i.e., Rush Truck Centers of Georgia, Inc.) and Jacksonville, Florida (i.e., Rush Truck Centers of Florida, Inc.). (Verified Complaint, ¶¶ 140-152.) Based upon Defendants' representations that the vehicles were reconditioned and "certified Pre-Owned" and warrantied under the Rush Truck Centers Certified Pre-Owned Program ("Rush Certified Pre-Owned Program") and exclusive RushCare™ Protection Plan described on the websites of Rush Enterprises, Inc. ("Rush Enterprises"), Rush Truck Centers of Georgia, Inc. ("Rush-Atlanta") and Rush Truck Centers of Florida, Inc. ("Rush-Jacksonville") (Rush Enterprises, Rush-Atlanta and Rush-Jacksonville being hereinafter referred to collectively, the "Rush Entities"), Trade Winds and Grace purchased four used, un-reconditioned, defective 2012 Navistar International Prostar™ Plus LF 627 Premium 13.0-liter engine diesel rear wheel drive Class 8 commercial tractor trucks (the "Trucks") for approximately $130,000. (Verified Complaint, ¶¶ 66-74.)

Immediately after the purchase, the Trucks began evincing significant mechanical issues. All four Trucks have since broken down repeatedly and the Trucks are no longer operational. Indeed, no Truck remained in operation longer than eight months after purchase. (Verified Complaint ¶¶ 84-125.)

Assuming that the "exclusive RushCare™ Protection Plan" included under the Rush Certified Pre-Owned Program would cover the repairs on the Trucks, Trade Winds and Grace approached the Rush Entities' and their affiliates, only to find that the Rush Certified Pre-Owned

2

Program was either a hoax, existing in name only or, if it did exist, did not cover the Trucks. (Verified Complaint ¶¶ 78, 80.)  Based upon the Trucks' mechanical condition, the Trucks could not have passed the Rush Certified Pre-Owned Program's 143-point inspection and pre-certification road test and have been reconditioned to manufacturers specifications. (Verified Complaint, ¶¶ 91, 104, 120, 124.)  In fact, notwithstanding Trade Winds' repeated requests, the Rush Entities have never delivered to Grace copies of the completed 143-point inspections and pre-certification road tests for each of the four Trucks (Verified Complaint, ¶¶ 84-125.)  In addition, the Trucks' Navistar MaxxForce engines had serious defects and are the subject of several lawsuits. (Verified Complaint, ¶¶ 126-139.)

As a result of Defendants' conspiracy to pawn off the Trucks as reconditioned, precertified and warrantied under the Rush Certified Pre-Owned Program and exclusive RushCare™ Protection Plan, Trade Winds and Grace have suffered the following damages and injury:

(i)     Complete loss of Grace's investment in Trade Winds;

(ii)    Loss of Trade Winds' earnings and revenue;

(iii)   Trade Winds' insolvency and business failure;

(iv)    Loss of income to Grace;

(v)     Damage to Grace's reputation and credibility as a business person, entrepreneur and manager; and

(vi)    Severe emotional distress, which resulted in Grace's almost fatal heart attack, medical complications and heart and kidney transplants.

(Verified Complaint, ¶¶ 163, 182, 194, 204, 215, 223, 233, 243, 250, 257, 267, 277, 284, 294, 354, 362, 392, 399, 450, 481.)

3

## BASIS FOR EXTRAORDINARY RELIEF

Trade Winds and Grace seek immediate equitable relief and, in addition to this Brief, have filed the following in support of such efforts:

(i)    Plaintiffs' Motion for Temporary Restraining Order pursuant to O.C.G.A. § 9-11-65(d) and Order Requiring Compliance with Plaintiffs' Notice to Produce pursuant to O.C.G.A. § 24-10-26, which requests the Court to enjoin Defendants from the spoliation of evidence pertinent to this case during the 30-day term of the TRO or the Court's hearing on Plaintiffs' Motion for Interlocutory Injunction, whichever is earlier;

(ii)   Plaintiffs' Motion for *Ex Parte* Temporary Restraining Order pursuant to O.C.G.A. § 9-11-65(b) and Order Requiring Compliance with Plaintiffs' Notice to Produce pursuant to O.C.G.A. § 24-10-26;

(iii)  Plaintiff's Brief in Support of Motion for *Ex Parte* Temporary Restraining Order and Order Requiring Compliance with Plaintiffs' Notice to Produce;

(iv)   Plaintiff's Certification of Counsel pursuant to O.C.G.A. § 9-11-65(b);

(v)    Plaintiffs' Notice to Defendants to Preserve Electronic Data pursuant to O.C.G.A. § 9-11-34;

(vi)   Plaintiff's Notice to Produce pursuant to Plaintiff's Certification of Counsel pursuant to O.C.G.A. § 9-11-65(b).

(vii)  Plaintiffs' Emergency Motion for Expedited Discovery and Brief in Support thereof that requests the Court to order each Defendant to respond to ten Interrogatories from Trade Winds and Grace and submit to one deposition to enable Trade Winds and Grace to obtain enough information to determine whether to file the Motion for an Interlocutory Injunction before the 30-day term of the TRO expires of its own accord;

4

and

(viii)   Plaintiffs' Verified Complaint and exhibits thereto.

The allegations set forth in the Verified Complaint support 19 causes of action against one or more of the Defendants, including breach of contract, fraud in the inducement, deceit, constructive fraud, conspiracy, and violations of the federal RICO statute and the Georgia RICO statute. These allegations demonstrate that Defendants have conspired and engaged in a demonstrable patter of deceptive activities, which reflects their propensity for the spoliation of evidence. The evidence Trade Winds and Grace seek to preserve from spoliation, in addition to supporting their claims in the instant matter, exposes Defendants to the risk of investigation and prosecution by government agencies.

For example, the Rush Entities never provided Trade Winds and Grace with fully executed copies of the Retail Service Orders and the Vehicle Service Agreements for the four Trucks. (Verified Complaint, ¶ 69 and Exhibits 10, 11, 12, 13, 14, 15, 16, 17.) If these contracts were *never* countersigned by Rush-Atlanta and Rush-Florida, the exculpatory language contained in these contracts is inoperative, in which case the TRO is required to protect Trade Winds and Grace from the possibility of Defendants executing the Retail Service Orders and the Vehicle Service Agreements ex-post-facto as soon as Defendants gain notice of the lawsuit.

For these reasons, Defendants have an extraordinary interest in making sure that certain data is altered, deleted and/or expunged from their personal and workplace computers, tablets, cellular phones, portable digital media storage devices (including but not limited to flash drives, CDs, and DVDs) and internet based "cloud" computing systems, including, but not limited to, Gmail, Yahoo, AOL, Dropbox, Google Drive, One Drive, Office 365 and other data storage systems of Defendants (collectively, the "Computer Systems"). Information solely available to

5

Defendants and in Defendants' possession is necessary to substantiate the claims of Trade Winds and Grace as to Defendants' wrongdoing.

Because the restraint sought in the proposed TRO is limited in scope and of very short duration, the relief Trade Winds and Grace seek is not unreasonable. Accordingly, Trade Winds and Grace seek the proposed TRO to preserve the status quo and prevent the immediate and irreparable harm that will result from Defendants' potential spoliation of evidence during the intervening period between the date the Court issues the requested TRO and a hearing on Plaintiffs' Motion for Interlocutory Injunction. Plaintiffs' Motion for the proposed TRO is filed concurrently herewith.

## BRIEF STATEMENT OF FACTS

In September 2016, Trade Wind's Managing Member, Grace, responded to a listing on BizBuySell.com, an online "Business for Sale Marketplace," advertising the sale of trucking company in Hawaii grossing over $1.5 million annually. (Complaint ¶ 33.) On information and belief, the listing advertising the Hawaiian trucking company was a "bait and switch" orchestrated by Defendants Christopher Venti ("Chris Venti") and Joshua Venti to solicit potential customers on false pretenses (Complaint ¶ 37.)

In November 2016, Chris Venti, who with Josh Venti, controls Defendant Interstate Creations LLC ("Interstate"), responded to Grace's inquiry, advising Grace that the Hawaiian company was not "for sale any more [sic]." (Complaint ¶ 37.) Instead, Chris Venti proposed that Grace retain Interstate as a consultant to help Grace start his own trucking company, providing a materially misleading seven-page Offering Circular entitled "Dream of Owning Your Own Business and Making a Minimum of $5,000 a week or $260,000 for Under $55,000." (Verified Complaint ¶¶ 36, 38.) Grace signed the Consulting Agreement with Interstate on November 29,

6

2016. (Verified Complaint ¶¶ 45, 51, 55.)

Soon after the execution of the Consulting Agreement, Interstate and the Ventis began touting a "new sales platform" called the "Rush Certified Pre-Owned Program." (Verified Complaint ¶ 45.) The Rush Entities' websites described their certified Pre-Owned vehicles as "among the highest quality, best value, pre-owned trucks available today. . .. Each vehicle must pass an exhaustive 143-point inspection and pre-certification road test . . . [a]nd includes . . . the exclusive RushCare™ Protection Plan." (Verified Complaint ¶ 47.)

The Ventis referred Grace to Dennis King ("King"), the New and Used Truck Sales Manager at Rush-Jacksonville. In a December 22, 2016 email, followed by a telephone conversation on December 23, 2016, King advised Grace that:

(i)     Rush Enterprises ran the Rush Certified Pre-Owned Program exclusively out of the Rush-Atlanta dealership. (Verified Complaint ¶ 61.)

(ii)    The Rush Certified Pre-Owned Program was very exclusive in that it only included warrantied trucks identified on a Special Inventory List prepared for Rush Enterprises by Dennis Shields, the National Director, Used Truck Operations - Rush Enterprises, Inc. (Verified Complaint ¶¶ 61, 62, 66, Exhibit 5.)

(iii)   The Rush Certified Pre-Owned Program included only tractor trucks that passed the 143-point inspection and pre-certification road test and were reconditioned to manufacturers specifications. (Verified Complaint ¶ 61.)

(iv)    The Rush Certified Pre-Owned Program included, without additional charge, the exclusive RushCare™ Protection Plan, and represented "their signature RushCare Warranty" and "the best used truck warranty we have ever offered." (Verified Complaint ¶¶ 56, 61.)

King also assured Grace that, with the exclusive RushCare™ Protection Plan, Trade Winds would avoid costly maintenance and repairs. (Verified Complaint ¶ 82.)

Based upon Defendants' representations that the Trucks were reconditioned and "certified Pre-Owned" and warrantied under the Rush Certified Pre-Owned Program and exclusive RushCare™ Protection Plan, Trade Winds and Grace purchased the Trucks for approximately $130,000 on January 25, 2017. (Verified Complaint, ¶¶ 66, 68.)  On behalf of Trade Winds, Grace signed, among other documents, a three-page Retail Sales TRO with Rush-Atlanta and a six-page American Guardian Warranty Services, Inc. ("AGWS") Vehicle Service Agreement with Rush-Jacksonville for each of the Trucks. (Verified Complaint ¶ 69.)

Over the next three weeks, Trade Winds dispatched drivers to Rush-Atlanta where they took possession of the Trucks. (Verified Complaint ¶¶ 84, 98, 115, 122.)  Immediately, the Trucks began evincing significant mechanical issues. One of the Trucks broke down 70 miles after the driver picked it up from Rush-Atlanta. (Verified Complaint ¶ 99.)  All four Trucks broke down within a matter of weeks or months no Truck remained in operation longer than eight months after purchase. (Verified Complaint ¶¶ 84-125.)  In addition, the Trucks' Navistar MaxxForce engines has serious defects and are the subject of several lawsuits. (Verified Complaint ¶¶ 126-139.)

On information and belief, the Rush Certified Pre-Owned Program and exclusive RushCare™ Protection Plan, which Defendants represented as "the best in the industry," (Verified Complaint ¶ 48) is a hoax, existing in name only, which Defendants fabricated as part of their conspiracy to unload otherwise unsaleable vehicles and increase profit margins at the expense of trusting customers. (Verified Complaint, ¶¶ 73, 78-79.)  However, even if the Rush Certified Pre-Owned Program is not a hoax, the Trucks (i) did not pass, or even undergo, the "exhaustive 143-point inspection and pre-certification road test" that Defendants represented as central to the Rush

Certified Pre-Owned Program (Verified Complaint, ¶ 74), and (ii) were not covered under the exclusive RushCare™ Protection Plan. (Verified Complaint ¶ 80.)  Despite repeated request, neither King nor any other agent or affiliate of the Rush Entities have provided Trade Winds or Grace with copies of the completed 143-point inspection on each Truck. (Verified Complaint ¶ 72.)

On information and belief, King intentionally confused the so-called RushCare™ Protection Plan with the Vehicle Service Agreements described above, misleading Trade Winds and Grace into believing the Vehicle Service Agreements and the "exclusive RushCare™ Protection Plan" were one and the same, when they were not. (Verified Complaint ¶ 79.)  In fact, the Vehicle Service Agreements are not exclusive to Rush-Atlanta but offered by a separate company, AGWS through AGWS's extensive U.S. dealer network in which Rush-Jacksonville participates. (Verified Complaint ¶¶ 81, 180.)  In addition, the AGWS Vehicle Service Agreements, which cost Trade Winds $28,548, were optional extended warranties (Verified Complaint ¶ 179), rather than the ostensible RushCare™ Protection Plan advertised by the Rush Entities as included, without additional charge, as part of the Rush Certified Pre-Owned Program.

Despite the $28,548 added cost, the Vehicle Service Agreements proved worthless to Trade Winds and Grace because they only included "covered Breakdowns." To determine the existence of a covered Breakdown, Trade Winds was required upfront to "pay for any teardown or diagnostic time need to determine whether [the vehicle had] a covered Breakdown," which proved extremely expensive. In addition, it took weeks, once the repairer diagnosed a covered Breakdown, for a Repair Authorization to be issued. Furthermore, the total downtime between delivery of the disabled Trucks to the repair facility, the teardown and diagnosis and the repair itself was so

9

lengthy as to be untenable.[1] Finally, covered Breakdowns did not include many of the significant mechanical problems afflicting the Trucks, such as (i) cracked or corroded fuel tanks;[2] (ii) the engine computer; (iii) brakes; (iv) air conditioning; (v) the electrical system; (vi) the alternator/generator/regulator; (vii) electronic stability control; (viii) trailer hitches; (ix) visibility; (x) defroster/defogger system, windshield and blower; and (xi) the drive axle.

## ARGUMENT AND CITATION OF AUTHORITY

Temporary Restraining Orders are authorized under O.C.G.A. §9-11-65(d). Georgia law has long recognized that the Superior Courts have the authority to issue Temporary Restraining Orders until a hearing can be had on an interlocutory injunction. Jones v. Peach Trader Inc., 302 Ga. 504, 512, 807 S.E.2d 840, 846 (Ga. 2017), *citing* Kaufman v. M. Ferst & Co., 55 Ga. 350, 352 (Ga. 1875) and Mayor of Savannah v. Grayson, 104 Ga. 105, 105, 30 SE 693 (Ga. 1898). A TRO is properly granted in order to maintain the status quo or to prevent irreparable injury pending a hearing on an interlocutory injunction. Corley v. Crompton-Highland Mills, 201 Ga. 333, 39 S.E.2d 861 (1946)

As stated in Sumbry v. Land, 127 Ga. App. 786, 794-955, 195 S.E.2d 228, 234 (Ga. App. 1974), There is a place in our jurisprudence for issuance . . . of temporary restraining orders . . .."

The statutory requirements for the granting of a temporary restraining order are set forth at O.C.G.A. § 9-11-65(b), to wit:

> A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if:

---

[1] When operational each Truck generated revenues for Trade Winds of approximately $900 per day. When out of service, the incremental fixed cost for each Truck to Trade Winds was $50 per hour.

[2] In an unsuccessful effort to limit its liability, Rush Truck Centers of Georgia, Inc. offered to repair the fuel tank on one truck in exchange for a full and final release of all claims relating to the sale and purchase of all the Trucks. (Verified Complaint ¶¶ 92-95.)

(1)  It clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition; and

(2)  The applicant's attorney certifies to the court, in writing, the efforts, if any, which have been made to give the notice and the reasons supporting the party's claim that notice should not be required.

As explained below, both requirements have been clearly satisfied in the instant case.

## A. Trade Winds and Grace Will Continue to Suffer Serious Irreparable Harm that Can Only be Remedied Through the Grant of the TRO.

The allegations set forth in the Verified Complaint support 19 causes of action against one or more of the Defendants, including breach of contract, fraud in the inducement, deceit, constructive fraud, conspiracy, and violations of the federal RICO statute and the Georgia RICO statute. These allegations demonstrate that Defendants have conspired and engaged in a demonstrable patter of deceptive activities, which reflects their propensity for the spoliation of evidence.

The Rush Entities have never provided Trade Winds and Grace with the ostensibly completed 143-point inspection and pre-certification road tests, fully executed copies of the Retail Service Orders and fully executed copies of the Vehicle Service Agreements. As stated in Delphi Communs. v. Advanced Computing Techs, 336 Ga. App. 435, 436, 784 S.E.2d 805 (Ga. App. 2016), "[t]he term 'spoliation' is used to refer to the destruction or failure to preserve evidence that is relevant to contemplated or pending litigation. Such conduct may give rise to the rebuttable presumption that the evidence would have been harmful to the spoliator." Phillips v. Harmon, 297 Ga. 386, 393-94, 774 S.E.2d 596 (Ga. 2015).; see Baxley v. Hakiel Industries, Inc., 282 Ga. 312, 313, 647 S.E.2d 29) (Ga. 2007); O.C.G.A. § 24-14-22. Without the TRO, Trade Winds and Grace fear that Defendants might avail themselves of the opportunity to sanitize their wrongful conduct

through a spoliation of the evidence. These concerns are justified, as Defendants have demonstrated the great lengths they have taken to misrepresent information for their own benefit.

With so much at stake, Trade Winds and Grace face the immediate threat, absent the TRO, that Defendants will succumb to the temptation to alter evidence not currently in the possession of Trade Winds and Grace. Since the potential for such wrongdoing is so grave, it is imperative that the TRO be granted.

## B. Plaintiff Must Proceed Without Notice in TRO to Receive a Fair Adjudication on the Merits.

The potential for Defendants to spoliate evidence upon receiving the Summons and Complaint and Motion for TRO is too great. Trade Winds and Grace have narrowly tailored the proposed TRO only to prohibit Defendants, until the earlier of thirty (30) days from the granting thereof or until the Court can hear Plaintiffs' Motion for Interlocutory Injunction, from (i) deleting anything from their computer devices or from any cloud-based service, and (ii) destroying any documents or other physical evidence relating to the facts contained in the Verified Complaint. These requests are simply to preserve the status quo as to all devices that might contain information pertinent to this lawsuit.

Further, O.C.G.A. § 9-11-65(b) states that a temporary restraining order may only extend for a period not exceeding thirty (30) days and will expire on its own without any further action necessary by the Court. Because of this limitation in time, Defendants will not be unduly burdened or prejudiced in the interim.

## REQUEST FOR ORDER REQUIRING COMPLIANCE WITH PLAINTIFFS' NOTICE TO PRODUCE

WHEREFORE, Trade Winds and Grace pray that the Court order Defendants to comply with Plaintiffs' Notice to Produce by requiring Defendants to cooperate with Plaintiffs and their attorney and agents by providing and delivering at the hearing on Plaintiffs' Motion for TRO the following:

(1) Any and all login, passwords, passcodes, and/or swipe patterns to unlock mobile or electronic devices, internet-based, cloud computing services or networks, including, but not limited to, Gmail, iCloud, Google Drive, Google Docs, or One Drive (Office 365) for the purpose of forensic mirror imaging of the same by Kroll Discovery to collect and preserve data for subsequent extraction of admissible evidence;

(2) Any and all personal and workplace computers, tablets, cellular telephones, portable digital media storage devices, including, but not limited to, flash drives, Compact Discs ("CDs"), and Digital Video Discs ("DVDs"), used by the Defendants since January 1, 2016, into the custody of the Court for the purpose of forensic mirror imaging of the same by Kroll Discovery to collect and preserve data for subsequent extraction of admissible evidence; and

(3) Any and all physical documents with regard to the Trucks pertaining to the 143-point inspections and pre-certification road tests, the Retail Service Orders and the Vehicle Service Agreements.

## REQUEST FOR TRO

WHEREFORE, Trade Winds and Grace pray that the Court enjoin Defendants from taking the following actions until such time as the Court can hear Plaintiffs' Motion for TRO:

(1) Deleting any files or other electronic data from Defendants' personal and workplace computers, tablets, cellular telephones, portable digital media storage devices, or from any and all cloud-based services such as Gmail, iCloud, Dropbox, Google Drive, Google Docs, or One Drive (Office 365); and

(2) Destroying any and all documents or other physical evidence relating to the facts contained in the Verified Complaint for Equitable Relief and Damages.

Respectfully submitted this 9th day of October 2018.

_____
Robert Arkin
Georgia Bar No.: 021575
Attorney for Plaintiffs

ROBERT ARKIN LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Ste. 1428
Atlanta, GA 30303
Phone: (404) 220-8500
Fax:    (855) 804-9334
Email: robert@arkin.law

# EXHIBIT C-13

## THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| TRADE WINDS TRANSPORT LLC, and | ) | |
| ERIC GRACE, individually, | ) | |
| and doing business as | ) | |
| WEST COAST LOGISTICS LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.: 2018CV311198 |
| | ) | |
| RUSH ENTERPRISES, INC., | ) | |
| RUSH TRUCK CENTERS OF GEORGIA, INC., | ) | |
| RUSH TRUCK CENTERS OF FLORIDA, INC., | ) | |
| INTERSTATE CREATIONS LLC, | ) | |
| NAVISTAR, INC., | ) | JURY TRIAL DEMANDED |
| TROY CLARKE, individually, | ) | |
| DENNIS KING, individually, | ) | |
| WILL NEWMAN, individually, | ) | |
| WILLIAM MAURICE "RUSTY" RUSH, | ) | |
| individually, | ) | |
| DOUGLAS SHIELDS, individually, | ) | |
| CHRISTOPHER VENTI, individually, | ) | |
| JOSHUA VENTI, individually, | ) | |
| JOHN DOE, individually, and | ) | |
| ABC ENTITY, | ) | |
| | ) | |
| Defendants. | ) | |

## [PROPOSED] ORDER PERMITTING EXPEDITED DISCOVERY

Upon consideration of Plaintiffs' Emergency Motion for Expedited Discovery, the arguments and materials submitted by the parties and for good cause shown, Plaintiffs' Motion is hereby GRANTED and IT IS HEREBY ORDERED as follows:

1. The Notice of Rule 30(b)(6) Deposition and First Request for Production of Documents attached to Plaintiffs' Motion as Exhibits A and B respectively are deemed properly served as of the date of service of the Motion. The Rule 30(b)(6) Deposition shall take

11

place on _____, 2018 as set forth in the Notice, or such earlier

convenient time as may be mutually agreed upon by counsel and the parties.

2. Response to Plaintiffs' First Request for Production shall be served, and the documents

   to be produced pursuant thereto shall be made available for inspection and copying, on

   or before _____, 2018.

IT IS SO ORDERED THIS _____ day of October 2018


_____
JUDGE,
SUPERIOR COURT OF FULTON COUNTY

Submitted by:


_____
Robert Arkin
Georgia Bar No. 021575

Robert Arkin LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Suite 1428
Atlanta, GA 30303
Phone: (404) 220-8500
Fax:     (855) 804-9334
Email: robert@arkin.law
Attorney for Plaintiffs

# EXHIBIT C-14

Fulton County Superior Court
***EFILED***MH
Date: 10/9/2018 11:16 PM
Cathelene Robinson, Clerk

## THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **TRADE WINDS TRANSPORT LLC**, and | ) | |
| **ERIC GRACE, individually,** | ) | |
| and doing business as | ) | |
| **WEST COAST LOGISTICS LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No.: 2018CV311198** |
| | ) | |
| **RUSH ENTERPRISES, INC.,** | ) | |
| **RUSH TRUCK CENTERS OF GEORGIA, INC.,** | ) | |
| **RUSH TRUCK CENTERS OF FLORIDA, INC.,** | ) | |
| **INTERSTATE CREATIONS LLC,** | ) | |
| **NAVISTAR, INC.,** | ) | **JURY TRIAL DEMANDED** |
| **TROY CLARKE, individually,** | ) | |
| **DENNIS KING, individually,** | ) | |
| **WILL NEWMAN, individually,** | ) | |
| **WILLIAM MAURICE "RUSTY" RUSH,** | ) | |
| individually, | ) | |
| **DOUGLAS SHIELDS, individually,** | ) | |
| **CHRISTOPHER VENTI, individually,** | ) | |
| **JOSHUA VENTI, individually,** | ) | |
| **JOHN DOE, individually, and** | ) | |
| **ABC ENTITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY

COME NOW Plaintiffs Trade Winds Transport LLC and Eric Grace (hereinafter "Plaintiffs") and, by and through their counsel, file this Emergency Motion for Expedited Discovery pursuant to O.C.G.A. § 9-11-30(a), for the reasons set forth in the following pleadings: (i) Plaintiff's Brief in Support of their Emergency Motion for Expedited Discovery; (ii) Plaintiff's Motion for Temporary Restraining Order pursuant to O.C.G.A. § 9-11-65(d) and Order Requiring Compliance with Plaintiffs' Notice to Produce pursuant to O.C.G.A. § 24-10-26 ("TRO"), which

requests the Court to enjoin Defendants from the spoliation of evidence pertinent to this case during the 30-day term of the TRO or the Court's hearing on Plaintiffs' Motion for Interlocutory Injunction, whichever is earlier; (iii) Plaintiffs' Brief in Support of their Motion for TRO; (iv) Plaintiffs' Motion for Ex Parte Temporary Restraining Order pursuant to O.C.G.A. § 9-11-65(b) and Order Requiring Compliance with Plaintiffs' Notice to Produce pursuant to O.C.G.A. § 24-10-26; (v) Plaintiff's Brief in Support of their Motion for Ex Parte Temporary Restraining Order and Order Requiring Compliance with Plaintiffs' Notice to Produce; (vi) Plaintiff's Certification of Counsel pursuant to O.C.G.A. § 9-11-65(b); (vii) Plaintiffs' Notice to Defendants to Preserve Electronic Data pursuant to O.C.G.A. § 9-11-34; (viii) Plaintiff's Notice to Produce pursuant to Plaintiff's Certification of Counsel pursuant to O.C.G.A. § 9-11-65(b); and (ix) Plaintiffs' Verified Complaint and exhibits thereto.

Specifically, Plaintiffs request that the Court permit the following discovery:

(1)    Allow Plaintiffs to notice the deposition of each named Defendant including a 30(b)(6) deposition of each corporate defendant on three (3) business days' notice and require each deponent noticed for deposition to appear for a deposition and testify on a date that is no later than (10) days before the date set for a hearing on Plaintiffs' Motion for Interlocutory Injunction;

(2)    Allow Plaintiffs to serve up to ten (10) document requests on each named Defendant with responses due within five (5) business days; and

(3)    Allow Plaintiffs toy perform a search of any and all of Defendants' personal and workplace computers, tablets, cellular telephones, portable digital media storage devices, including, but not limited to, flash drives, Compact Discs ("CDs"), and Digital Video Discs ("DVDs"), used by the Defendants since January 1, 2016 for

the search terms included in Exhibit A.

Given the limited scope of the discovery provided for in this Motion, any discovery taken pursuant to an Order issued by this Court for Expedited Discovery shall not preclude later discovery from the same individuals in the same manner or methods during the regular course of discovery in this matter.

**WHEREFORE**, Plaintiffs move the Court to enter its Order granting the Plaintiffs leave to take the above-specified discovery on an expedited basis. A Proposed Order granting the Plaintiffs' leave to take the above specified discovery on an expedited basis in attached hereto as Exhibit B.

Respectfully submitted this 9th day of October 2018.

_____

Robert Arkin
Georgia Bar No. 021575
Attorney for Plaintiffs

Robert Arkin LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Suite 1428
Atlanta, GA 30303
Phone: (404) 220-8500
Fax:    (855) 804-9334
Email: robert@arkin.law

## Exhibit A

## Search Terms

(844) 265-1514
(855) 765-7874
844-265-1514
8442651514
$13,000
$13,000.00
$130,000
$130,000.00
$13000
$130000
$200,000
$200,000 in lost profit
$200,000 lost profit
$200,000.00
$200000
$22,813
$22813
$260,000 for Under $55,000
$3,500
$3,500.00
$3500
100,000 miles
100,000 miles of remaining factory warranty
100000 miles
143-point
143-point inspection
23 items
23 items you need
3HSDJSJR5CN624256
3HSDJSJR6CN624251
3HSDJSJR7CN624243
3HSDJSJR8CN624235
97543463
97543465
9754364
9754386
Agreement

AGWS
AGWS dealer
American Guardian Warranty Services
American Guardian Warranty Services dealer
American Guardian Warranty Services Inc.
American Guardian Warranty Services Inc. dealer
American Guardian Warranty Services, Inc.
American Guardian Warranty Services, Inc. dealer
Average return
Average return on investment
Bad faith
Barry
Barry St. Pierre
Best in the market
Best on the market
Biz Buy
BizBuy
BizBuySell
BizBuySell.com
Brand new
Breakage
Brokers
Business for Sale
Business for Sale Marketplace
Center
Certified Pre-Owned Program
Certified-Pre-Owned
Certified-Pre-Owned designation
Chris
Chris Venti
Claim
Class 8 trucks
Company is DOT compliant
Connections
Consulting
Consulting Agreement
Contractor
Contractor Agreement
Covered by warranty
Daryl

Dealer
Dennis
Dennis King
Department of Transportation
Department of Transportation compliant
Department of Transportation violation
DOT
DOT compliant
DOT violation
Doug Shields
Dream of Owning Your Own Business
Egrace
Egrace5577
Egrace5577@gmail.com
Eric
Eric Grace
Exclusive
Exclusive RushCare™ Protection Plan
Expert Consultants
Extended warranty
Factory warranty
Fraud
Fewer than 600,000 miles
Five model years
Five model years or newer
Fuel tanks corroded
Get your business off the ground
Gil Oyola
Grace
Independent Consulting Agreement
Independent Contractor Agreement
Ineffective
Inspection
Insurance companies
Intended use
International
Interstate Creations
Investment
Josh
Josh Venti

King

Long haul trucking

Lost profit

Maintenance

Making a Minimum of $5,000 a week or $260,000 for Under $55,000

Making a Minimum of $5,000 a week

Marketing

Matthew Smith – Service Manager

Mercer

Minimum of 100,000 miles

Minimum of 100,000 miles of remaining factory warranty

National Used Truck Sales Manager

Navistar Pro Star

Navistar Pro Star+

New platform

Odometer

Odometer reading

Offer to purchase

Offer to purchase for $3,500

Oklahoma

Optional extended warranty

Our connections

Our relationships

Our relationships with insurance companies, shippers, brokers, and other trucking businesses

OyolaG@rushenterprises.com

Pablo

Pico Rivers inventory

Platform

Power train

Pre-certification

Pre-certification inspection

Pre-certification road test

Pre-Owned

Pre-owned inspection

Preowned

Presale inspection

Prevent

Preventative

Preventative maintenance

Preventive

Pro Star
Pro Star+
Profit
Program Platform
Proof
Proof of breakage
ProStar
Protection Plan
Purchase
Purchase for $3,500
Purchase price
Quality used trucks
Relationships
Relationships with insurance companies, shippers, brokers, and other trucking businesses
Repair
Repair center
Repair cost under the warranty
Repair costs
Results of inspection
Return on investment
Road test
Rush Enterprises Pico Rivers
Rush Truck Centers
Rush Truck Centers Certified Pre-Owned Program
Rush Truck Centers Inc.
Rush Truck Centers of Atlanta
Rush Truck Centers of Atlanta Inc.
Rush Truck Centers of Atlanta, Inc.
Rush Truck Centers of Florida
Rush Truck Centers of Florida Inc.
Rush Truck Centers of Florida, Inc.
Rush Truck Centers, Inc.
RushCare
RushCare™
RushCare™ Protection Plan
Sales
Sales platform
Secure all trucks and trailers
Shippers
Should have been caught

Special Program
Specialized
Specialized trucking consultants
Specs
Spreadsheet
Spreadsheets
Start collecting profit
Start your business
Tanks corroded
Total of $130,000
Trade Winds
Trade Winds Transport
Trade Winds Transport LLC
Trade Winds Transport, LLC
Truck sales
Trucking business
Trucking businesses
Trucking consultants
TWT
TWT LLC
TWT, LLC
U-joints
Universal joints
Used Truck sales
Used trucks
Venti
Ventis
Warranty
Warranty center
Warranty claim
Warranty offer
Will
Will Newman

**Exhibit B**

**Proposed Order**

# EXHIBIT C-15

Fulton County Superior Court
***EFILED***QW
Date: 10/12/2018 3:25 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **TRADE WINDS TRANSPORT LLC**, and<br>**ERIC GRACE, individually,**<br>  and doing business as<br>**WEST COAST LOGISTICS LLC,**<br><br>  **Plaintiffs,**<br><br>**RUSH ENTERPRISES, INC.,**<br>**RUSH TRUCK CENTERS OF GEORGIA, INC.,**<br>**RUSH TRUCK CENTERS OF FLORIDA, INC.,**<br>**INTERSTATE CREATIONS LLC,**<br>**NAVISTAR, INC.,**<br>**TROY CLARKE, individually,**<br>**DENNIS KING, individually,**<br>**WILL NEWMAN, individually,**<br>**WILLIAM MAURICE "RUSTY" RUSH,**<br>  **individually,**<br>**DOUGLAS SHIELDS, individually,**<br>**CHRISTOPHER VENTI, individually,**<br>**JOSHUA VENTI, individually,**<br>**JOHN DOE, individually, and**<br>**ABC ENTITY,**<br><br>  **Defendants.** | **CIVIL ACTION NO.**<br>**2018CV311198** |

## EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFFS' NOTICE TO PRODUCE

THIS MATTER is before the Court on the *Ex Parte* Motion of Plaintiffs for an *Ex Parte*

Temporary Restraining Order under O.C.G.A § 9-11-65(b) and Order Requiring Compliance

with Plaintiffs' Notice to Produce under O.C.G.A. § 24-13-27. Upon consideration of Plaintiffs'

submissions, namely the Verified Complaint for Equitable Relief and Damages, including its

supporting exhibits, Plaintiffs' Motion for *Ex Parte* Temporary Restraining Order and Order

Requiring Compliance with Plaintiffs' Notice to Produce, Plaintiffs' Brief in Support thereof, the

Notice to Produce, and Plaintiffs' Certification of Counsel under O.C.G.A. § 9-11-65(b)(2), it (1)

1

clearly appears from specific facts shown that immediate and irreparable injury, loss, or damage will result to Plaintiffs before Defendants or their attorneys can be heard in opposition; and (2) Plaintiffs' attorney has certified to the Court, in writing, the reasons supporting Plaintiffs' claim that notice should not be required.

Accordingly, the Court hereby grants Plaintiffs' Motion for *Ex Parte* Temporary Restraining Order and Order Requiring Compliance with Plaintiffs' Notice to Produce and **HEREBY ORDERS** as follows:

1. That Defendants are enjoined from:

    a. Deleting, altering or creating any files or other electronic data which relate to this lawsuit from and on any and all of Defendants' personal and workplace computers, tablets, cellular telephones, portable digital media storage devices, or from any and all private networks and/or cloud storage services (e.g., iCloud, Dropbox, Google Drive, Google Docs, One Drive (Office 365)), email service providers (e.g., AOL, Gmail, Yahoo), and/or any cellular service providers (i.e., Verizon Wireless, MetroPCS, T-Mobile), including, by way of example, and not in limitation, the following: (i) BizQuest #1277728 listing; (ii) Interstate Consulting Agreement; (iii) Rush Truck Centers Certified Pre-Owned Program; (iv) 143-point inspections and precertification road tests; (v) Special Inventory Lists; (vi) RushCare™ Protection Plan; (vi) Truck #001: Stock Number 499864, Vehicle Identification Number ("VIN") #3HSDJSJR8CN624235; (vii) Truck #002: Stock Number 320851, VIN #3HSDJSJR6CN624251; (viii) Truck #003: Stock Number 499891, VIN #3HSDJSJR7CN624243; (ix) Truck #004: Stock Number 333227, VIN

#3HSDJSJR5CN624256; (x) Retail Sales Orders; (xi) Vehicle Service Agreements; (xii) Truck/Bus Owner Responsibilities Used Truck Service Contracts; (xiii) Acknowledgments of "As IS" Purchases and 3rd Party Service Contracts; (xiv) Customer Proposal Letters; (xv) any and all correspondence, including text messages and emails, by and among Defendants, relating to the foregoing; (xvi) any and all correspondence by and among Defendants with Plaintiffs, including text messages and emails, relating to the foregoing; (xvii) Any and all memoranda or notes by and among Defendants, relating to the foregoing; and (xviii) any and all telephone, cellphone and fax records by Defendants, relating to the foregoing.

b.  Destroying, altering or creating any and all documents or other physical evidence relating to the facts contained in the Verified Complaint for Equitable Relief and Damages.

2.  That Defendants comply with Plaintiffs' Amended Notice to Produce by producing the following physical documents or other physical evidence relating to the facts contained in the Verified Complaint for Equitable Relief and Damages, that is currently in Defendants' possession, at the hearing on the Motion for Temporary Restraining Order:

(i) BizQuest #1277728 listing; (ii) Interstate Consulting Agreement; (iii) Rush Truck Centers Certified Pre-Owned Program; (iv) 143-point inspections and precertification road tests; (v) Special Inventory Lists; (vi) RushCare™ Protection Plan; (vi) Retail Sales Orders; (vii) Vehicle Service Agreements; (viii) Truck/Bus Owner Responsibilities Used Truck Service Contracts; (ix)

Acknowledgments of "As IS" Purchases and 3rd Party Service Contracts; (x)

Customer Proposal Letters.

This Order shall expire on the ___15th___ day of ___Nov___, 2018, at which time the

Court will hear from all parties on the Plaintiffs' Motion for Temporary Restraining Order.

**ORDERED** this ___12___ day October 2018.

ERIC K. DUNAWAY, JUDGE,
Fulton County Superior Court
Atlanta Judicial District

Proposed Order presented by:

Robert Arkin
Georgia Bar No.: 021575
Attorney for Plaintiffs

ROBERT ARKIN LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Ste. 1428
Atlanta, GA 30303
Phone: (404) 220-8500
Fax:     (855) 804-9334
Email: robert@arkin.law

Submitted:  October 11, 2018

4

# EXHIBIT C-16

Fulton County Superior Court
***EFILED***DG
Date: 10/12/2018 3:22 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| TRADE WINDS TRANSPORT LLC, and | ) | |
| ERIC GRACE, individually, | ) | |
| and doing business as | ) | |
| WEST COAST LOGISTICS LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | **CIVIL ACTION NO.** |
| | ) | **2018CV311198** |
| RUSH ENTERPRISES, INC., | ) | |
| RUSH TRUCK CENTERS OF GEORGIA, INC., | ) | |
| RUSH TRUCK CENTERS OF FLORIDA, INC., | ) | |
| INTERSTATE CREATIONS LLC, | ) | |
| NAVISTAR, INC., | ) | |
| TROY CLARKE, individually, | ) | |
| DENNIS KING, individually, | ) | |
| WILL NEWMAN, individually, | ) | |
| WILLIAM MAURICE "RUSTY" RUSH, | ) | |
| individually, | ) | |
| DOUGLAS SHIELDS, individually, | ) | |
| CHRISTOPHER VENTI, individually, | ) | |
| JOSHUA VENTI, individually, | ) | |
| JOHN DOE, individually, and | ) | |
| ABC ENTITY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF HEARING

All parties are HEREBY ORDERED to appear for a hearing on Plaintiffs' Motion for

Temporary Restraining Order in this matter on **Tuesday, the 13th of November, 2018 at 10 am.**,

Courtroom 4-F, Fulton County Superior Court, 185 Central Avenue, SW, Atlanta, Georgia

30303. Failure to appear may result in dismissal of the action or counterclaim for want of

prosecution.  Cases settled or resolved prior to the hearing will not be removed from the calendar

unless a signed settlement agreement, voluntary dismissal, final order or written confirmation has

been filed with the Court.

IT IS SO ORDERED this, the 12th day of October, 2018.

Judge Eric Dunaway
Superior Court of Fulton County
Atlanta Judicial Circuit

# EXHIBIT C-17

Fulton County Superior Court
***EFILED***MH
Date: 10/24/2018 4:50 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **TRADE WINDS TRANSPORT LLC**, and | ) | |
| **ERIC GRACE, individually,** | ) | |
| and doing business as | ) | |
| **WEST COAST LOGISTICS LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No.: 2018CV311198** |
| | ) | |
| **RUSH ENTERPRISES, INC.,** | ) | |
| **RUSH TRUCK CENTERS OF GEORGIA, INC** | ) | |
| **RUSH TRUCK CENTERS OF FLORIDA, INC** | ) | |
| **INTERSTATE CREATIONS LLC,** | ) | |
| **NAVISTAR, INC.,** | ) | |
| **TROY CLARKE, individually,** | ) | |
| **DENNIS KING, individually,** | ) | |
| **WILL NEWMAN, individually,** | ) | |
| **WILLIAM MAURICE "RUSTY" RUSH,** | ) | |
| individually, | ) | |
| **DOUGLAS SHIELDS, individually,** | ) | |
| **CHRISTOPHER VENTI, individually,** | ) | |
| **JOSHUA VENTI, individually,** | ) | |
| **JOHN DOE, individually, and** | ) | |
| **ABC ENTITY,** | ) | |
| | ) | |
| **Defendants.** | | |

## PROPOSED RULE NISI ON PLAINTIFFS' EMERGENCY MOTION FOR EXPEDITED DISCOVERY

A proposed Rule Nisi seeking a hearing on Plaintiffs' Emergency Motion for Expedited

Discovery before Judge Dunaway on November 13, 2018 at 10:00 a.m. in Courtroom 4F, Fulton

County Superior Court, 185 Central Avenue, SW, Atlanta, Georgia 30303 is attached hereto and

incorporated herein by reference.

Respectfully submitted this 24th day of October 2018.

_____

Robert Arkin
Georgia Bar No.: 021575
Attorney for Plaintiffs

ROBERT ARKIN LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Ste. 1428
Atlanta, GA 30303
Phone: (404) 220-8500
Fax:    (855) 804-9334
Email: robert@arkin.law

Submitted:  October 24, 2018

**Attachment**

**Proposed Rule Nisi**

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| **TRADE WINDS TRANSPORT LLC**, and | ) | |
| **ERIC GRACE**, individually, | ) | |
| and doing business as | ) | |
| **WEST COAST LOGISTICS LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No.: 2018CV311198** |
| | ) | |
| **RUSH ENTERPRISES, INC.,** | ) | |
| **RUSH TRUCK CENTERS OF GEORGIA, INC** | ) | |
| **RUSH TRUCK CENTERS OF FLORIDA, INC** | ) | |
| **INTERSTATE CREATIONS LLC,** | ) | |
| **NAVISTAR, INC.,** | ) | **JURY TRIAL DEMANDED** |
| **TROY CLARKE**, individually, | ) | |
| **DENNIS KING**, individually, | ) | |
| **WILL NEWMAN**, individually, | ) | |
| **WILLIAM MAURICE "RUSTY" RUSH,** | ) | |
| individually, | ) | |
| **DOUGLAS SHIELDS**, individually, | ) | |
| **CHRISTOPHER VENTI**, individually, | ) | |
| **JOSHUA VENTI**, individually, | ) | |
| **JOHN DOE**, individually, and | ) | |
| **ABC ENTITY,** | ) | |
| | ) | |
| **Defendants.** | | |

[Proposed]
**RULE NISI**

The Emergency Motion for Expedited Discovery of Plaintiffs Trade Winds Transport

LLC and Eric Grace (hereinafter "Plaintiffs") having been filed with this Court on October 9,

2018, it is

**HEREBY ORDERED** that all parties appear for a hearing on Plaintiffs' Emergency

Motion for Expedited Discovery in this matter on the same date and time as Plaintiffs' scheduled

hearing on Plaintiffs' Motion for Temporary Restraining Order, which date and time is Tuesday,

the 13th of November 2018 at 10 a.m., Courtroom 4F, Fulton County Superior Court, 185 Central

Avenue, SW, Atlanta, Georgia 30303.


      **ORDERED** this _____ day October 2018.


                                      _____

                                        **ERIC K. DUNAWAY**, JUDGE,
                                        Fulton County Superior Court
                                        Atlanta Judicial District


Proposed Order presented by:


_____

Robert Arkin
Georgia Bar No.: 021575
Attorney for Plaintiffs

ROBERT ARKIN LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Ste. 1428
Atlanta, GA 30303
Phone: (404) 220-8500
Fax:    (855) 804-9334
Email: robert@arkin.law


Submitted:  October 24, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a true and correct copy of the foregoing

REQUEST FOR HEARING ON PLAINTIFFS' EMERGENCY MOTION FOR EXPEDITED

DISCOVERY and attached Rule Nisi via USPS First-Class Mail with adequate postage affixed

thereon to the following:

Rush Enterprises, Inc.
c/o Corporation Service Company d/b/a CSC-Lawyer Incorporating Service
211 E. 7th Street, Suite 620
Austin, TX 78701

Rush Truck Centers of Georgia, Inc.
c/o Corporation Service Company
40 Technology Parkway South #300, Norcross, GA 30092

Rush Truck Centers of Florida, Inc.
c/o Corporation Service Company
40 Technology Parkway South #300, Norcross, GA 30092

Interstate Creations LLC
c/o Joshua Venti
4444 SW 115th St
Ocala, FL 34476

Navistar, Inc
C T Corporation Systems
208 South Lasalle St, Suite 814
Chicago, IL 60604

Troy Clarke
2701 Navistar Dr
Lisle, IL 60532

Dennis King
Rush Truck Centers
5175 W. Beaver St
Jacksonville, FL 32254

Will Newman
Rush Truck Centers
2560 Moreland Ave.
Atlanta, GA 30315

William Maurice "Rusty" Rush
Rush Enterprises, Inc.
555 IH-35 South, Suite 500
New Braunfels, TX 78130

Douglas Shields
Rush Enterprises, Inc.
555 IH-35 South, Suite 500
New Braunfels, TX 78130

Christopher Venti
4444 SW 115th Street
Ocala, FL 34476

Joshua Venti
4444 SW 115th Street
Ocala, FL 34476

Dated: October 24, 2018

                                               _____
Robert Arkin
Georgia Bar No. 021575
Attorney for Plaintiffs

ROBERT ARKIN LLC d/b/a Arkin.Law
50 Hurt Plaza SE, Ste. 1428
Atlanta, GA 30303
Phone: (404) 220-8500
Fax: (855) 804-9334
Email: robert@arkin.law

# EXHIBIT C-18

Fulton County Superior Court
***EFILED***LW
Date: 10/24/2018 3:45 PM
Cathelene Robinson, Clerk

## CAUSE NO. 2018CV311198

| | | |
|---|---|---|
| TRADE WINDS TRANSPORT LLC, and ERIC GRACE, individually, and doing business as WEST COAST LOGISTICS LLC | § § § | IN THE SUPERIOR COURT |
| Plaintiff, | § | |
| VS. | § | OF FULTON COUNTY |
| | § | |
| RUSH ENTERPRISES, INC., RUSH TRUCK CENTERS OF GEORGIA, INC., | § § | |
| Defendant. | § | STATE OF GEORGIA |

### AFFIDAVIT OF SERVICE

On this day personally appeared Myranda Marin who, being by me duly sworn, deposed and said:

"The following came to hand on Oct 23, 2018, 3:45 pm,

BRIEF IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR EXPEDITED DISCOVERY , BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFFS' NOTICE TO PRODUCE , BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFFS' NOTICE TO PRODUCE , CASE INITIATION FORM , EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFF'S NOTICE TO PRODUCE , MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFFS' NOTICE TO PRODUCE , MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFF'S NOTICE TO PRODUCE , NOTICE OF HEARING , NOTICE TO PRODUCE , O.C.G.A. 9-11-34 NOTICE TO PRESERVE ELECTRONIC DATA , O.C.G.A. 9-11-65(B) CERTIFICATION OF COUNSEL , PLAINTIFF'S EMERGENCY MOTION FOR EXPEDITED DISCOVERY , PROPOSED RULE NISI , SUMMONS ,

and was executed at 555 INTERSTATE 35 #500, NEW BRAUNFELS, TX 78130 within the county of COMAL at 12:30 PM on Wed, Oct 24 2018, by delivering a true copy to the within named

### DOUGLAS SHIELDS

in person, having first endorsed the date of delivery on same.

I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Texas. I am familiar with the Texas Rules of Civil Procedure as they apply to service of Process. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I have personal knowledge of the facts stated herein and they are true and correct."

Myranda Marin
PSC#12685

**BEFORE ME**, a Notary Public, on this day personally appeared **Myranda Marin**, known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statements therein contained are within his or her personal knowledge and are true and correct.

SUBSCRIBED AND SWORN TO ME ON ___10/24/18___

Notary Public, State of Texas

TEENA MARIE GARCIA
Notary Public, State of Texas
Comm. Expires 01-24-2021
Notary ID 130976201

# EXHIBIT C-19

Fulton County Superior Court
***EFILED***LW
Date: 10/24/2018 3:44 PM
Cathelene Robinson, Clerk

## CAUSE NO. 2018CV311198

| | | |
|---|---|---|
| TRADE WINDS TRANSPORT LLC, and ERIC GRACE, individually, and doing business as WEST COAST LOGISTICS LLC | § § § | IN THE SUPERIOR COURT |
| Plaintiff, | § | |
| VS. | § | OF FULTON COUNTY |
| | § | |
| RUSH ENTERPRISES, INC., RUSH TRUCK CENTERS OF GEORGIA, INC., | § | |
| Defendant. | § | STATE OF GEORGIA |

## AFFIDAVIT OF SERVICE

On this day personally appeared **Myranda Marin** who, being by me duly sworn, deposed and said:

"The following came to hand on **Oct 23, 2018, 3:45 pm**,

BRIEF IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR EXPEDITED DISCOVERY , BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFFS' NOTICE TO PRODUCE , BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFFS' NOTICE TO PRODUCE , CASE INITIATION FORM , EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFF'S NOTICE TO PRODUCE , MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFFS' NOTICE TO PRODUCE , MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER REQUIRING COMPLIANCE WITH PLAINTIFF'S NOTICE TO PRODUCE , NOTICE OF HEARING , NOTICE TO PRODUCE , O.C.G.A. 9-11-34 NOTICE TO PRESERVE ELECTRONIC DATA , O.C.G.A. 9-11-65(B) CERTIFICATION OF COUNSEL , PLAINTIFF'S EMERGENCY MOTION FOR EXPEDITED DISCOVERY , PROPOSED RULE NISI , SUMMONS ,

and was executed at 555 INTERSTATE 35 S #500, NEW BRAUNFELS, TX 78130 within the county of COMAL at 12:41 PM on Wed, Oct 24 2018, by delivering a true copy to the within named

MICHAEL GOLDSTONE, RUSH ENTERPRISES INC. V.P. ACCEPTED ON BEHALF OF WILLIAM MAURICE "RUSTY" RUSH

in person, having first endorsed the date of delivery on same.

I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Texas. I am familiar with the Texas Rules of Civil Procedure as they apply to service of Process. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I have personal knowledge of the facts stated herein and they are true and correct."

Myranda Marin
PSC#12685

**BEFORE ME**, a Notary Public, on this day personally appeared **Myranda Marin**, known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statements therein contained are within his or her personal knowledge and are true and correct.

SUBSCRIBED AND SWORN TO ME ON  10/24/18

Notary Public, State of Texas

TEENA MARIE GARCIA
Notary Public, State of Texas
Comm. Expires 01-24-2021
Notary ID 130976201